**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| HISCOX INSURANCE COMPANY, INC.,     ) <br>     ) <br>     Plaintiff,     ) <br>     ) <br> v.     ) <br>     ) <br> COX RADIO, INC., COX ENTERPRISES, INC.,     ) <br> MICHAEL CALTA, MATTHEW CHRISTIAN     ) <br> LOYD and TERRY GENE BOLLEA,     ) <br>     ) <br>     Defendants.     ) <br> _____) | CASE NO. 20-cv-221 |

**COMPLAINT FOR DECLARATORY JUDGMENT**

HISCOX INSURANCE COMPANY, INC. ("Hiscox") pursuant to FED. R. CIV. P. 57 and

28 U.S.C. § 2201, respectfully submits this Complaint for Declaratory Judgment against

Defendants, COX RADIO, INC. ("Cox Radio"), COX ENTERPRISES, INC. ("Cox Enterprises"),

MATTHEW CHRISTIAN LOYD ("Loyd"), MICHAEL CALTA ("Calta") and TERRY GENE

BOLLEA ("Bollea"), and states as follows:

**Parties, Jurisdiction, and Venue**

1. Hiscox is a foreign corporation incorporated in the State of Illinois with its principal

place of business in Chicago, Illinois and is authorized to do business in the State of Florida.

2. Bollea is an individual and plaintiff in the underlying action, resides in Pinellas

County, Florida, and is a citizen of the State of Florida.

3. Cox Enterprises is a foreign corporation incorporated in the State of Delaware with

its principal place of business in Atlanta, Georgia, authorized to do business in the State of Florida.

4. Cox Radio, is a foreign corporation incorporated in the State of Delaware with its

principal place of business in Atlanta, Georgia, authorized to do business in the State of Florida.

1

5.      Loyd is an individual and a named defendant in the underlying action and is a citizen of the State of Florida domiciled in Hillsborough County, Florida.

6.      Calta is an individual and a named defendant in the underlying action and is a citizen of the State of Florida domiciled in Pasco County, Florida.

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because of the complete diversity of citizenship and residency between Plaintiff and Defendant, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

8.      Venue is proper before this Court pursuant to 28 U.S.C. § 1391.

## Factual Background

### A.      THE UNDERLYING LAWSUIT

9.      On May 2, 2016, Bollea filed the underlying lawsuit captioned *Terry Gene Bollea professionally known as Hulk Hogan vs. Don Buchwald & Associates, Inc., et al*., in the Circuit Court of the Sixth Circuit in and for Pinellas County, Florida and assigned the Case Number 16-002861-CI.  (the "Underlying Lawsuit").

10.      On January 4, 2019, Bollea filed the Second Amended Complaint in the Underlying Lawsuit (the "Underlying Complaint"). A copy of the Underlying Complaint is attached hereto as Exhibit "A".

11.      The Underlying Complaint alleges that Bollea was the victim of an ongoing scheme orchestrated by defendants Calta and Loyd who allegedly victimized Bollea by obtaining, using, disclosing, selling, disseminating, and exploiting surreptitiously-recorded and illegally-obtained footage of Bollea naked, engaged in sexual activity, and having private conversation in a private bedroom (the "Bollea Footage").

12.     Specifically, the Underlying Complaint alleges that in 2012 and again in 2015, Defendants Loyd and Calta, leaked and sold excerpts of the Bollea Footage to tabloid news sites TMZ, TheDirty.com, and Gawker.com.

13.     The Underlying Complaint further alleges that Defendants Loyd and Calta ultimately tried to extort money from Bollea in exchange for the Bollea Footage—which included a recording in which Bollea was making racially insensitive comments.

14.     The Underlying Complaint alleges that the Bollea Footage allegedly led to the destruction of Bollea's career as it is alleged that Defendants Loyd and Calta conspired to leak, sell and anonymously send footage to websites, including TMZ.com, TheDirty.com, and Gawker.com.

**15.**     Bollea alleges in the Underlying Complaint:

77. Following the Gawker.com Posting, Cox Radio knew Bubba suspected Loyd was involved in leaking Footage of Bollea to the media. In fact, Cox Radio is believed to have initiated an investigation into the leaks of Footage during this time period.

\*\*\*

81. In mid-August 2013, Cox Radio supervisory personnel met with Loyd about Bubba's claim that Loyd was responsible for selling Footage and Loyd's concerns about Bubba trying to get Loyd fired. On August 20, 2013, Calta sent Burton an e-mail indicating Cox was contemplating letting Bubba go.

82. On August 26, 2013, Cox fired Loyd. Shortly after his departure, Loyd tweeted, "Revenge is the best revenge. ... right Bubba? Just checking. . ."

83. After Loyd's termination, the hostility between Calta and Bubba got worse. In late 2013-early 2014, Cox Radio executives and Burton frequently were called on to intervene in on-air and social media attacks between Calta and Bubba.

\*\*\*

105. As Calta, Loyd, Burton, and Cox Radio were conspiring in the ongoing war against Bubba, more illegal Footage of Bollea surfaced. This time, in July 2015, when the animosity between Calta, Loyd, Cox Radio, and Bubba was at its peak and TPD's criminal investigation over Footage was coming to an end, the most damaging, racially insensitive portions of the illegally recorded Footage were leaked to The Enquirer.

***

132. Once screen shots from the Footage surfaced on TheDirty.com and Loyd quit Bubba's show and was promoted by Cox Radio, the illegally recorded Footage and its source was a topic of discussion with Cox Radio; and Cox Radio's agents, employees, and supervisory personnel knew about, openly discussed and/or viewed Bollea Footage that had been stolen from Bubba's studio and circulated at Cox Radio's facilities.

133. However, Calta, Loyd, Burton, Cox Radio, and DBA failed to take any steps to notify or warn Bollea or Houston about the Footage or to prevent the Footage from being disseminated, used and/or exploited.

134. Cox, Calta, Loyd, Burton, Cox Radio, and DBA also failed to take any steps to prevent any further disclosure, dissemination or use of the Footage despite their ability to do so.

***

175. On October 4, 2012, Gawker posted the 1:41 Video to the Internet, along with a graphic narrative description of portions of the 30 Minute Video not contained in the 1:41 Video (the "Gawker.com Posting"). At least 7 million people watched the 1:41 Video on the Internet.

176. That same day, Burton and Calta had nine phone calls and talked for nearly 30 minutes. Calta also called Peirce and Brennan. Oliviero called Loyd and Calta. Loyd called Epps and, using the alias "Jim Jannero," direct messaged Daulerio. All of these communications were about the conspiracy and Footage. Burton also forwarded Calta a story published on heavydot.com about the release of the Hulk Hogan sex tape, in response to which Calta replied "That's GREAT!"

***

183. TMZ paid Loyd (between $8,500-$10,000) for the information he provided about, and as a licensing fee for access to and a transcript of Footage. In order to cover his tracks, Loyd directed TMZ to send that payment to Burbridge, who cashed the check, took a fee, and then gave the rest to Loyd and Carrega.

***

187. Davidson represented and acted on behalf of and in concert with Loyd, Carrega, Burbridge, and the conspiracy. He spoke to Houston and told him that his client possessed surreptitious recordings of Bollea, one of which contained insensitive racial remarks which could have the effect of causing great economic harm to Bollea if released publicly. Initially, Davidson requested $1 million for the DVDs. Davidson also said that the 30 Minute Video was sent to Gawker as a "shot across the bow."

***

218. The FBI interviewed Burbridge, who confirmed that Loyd leaked stills from surreptitious Footage to TheDirty.com and was paid by TMZ for leaking information about the Footage.

4

219. Burbridge also explained to the FBI how she, Carrega, and Loyd watched the Footage on Veterans Day 2012 at Loyd's house on Loyd's computer, and later had a conference call and meeting with Davidson in Pinellas County, Florida to plan out their exchange with Bollea.

***

276. On July 24, 2015, two days after Loyd and Calta's 35-minute call and Calta's calls to Brennan and Burton, The National Enquirer and its sister publication RadarOnline.com (collectively, the "Enquirer"), gave notice to Bollea's counsel that the Enquirer intended to publish excerpts from what they claimed was a confidential "sealed" transcript of Footage from the Gawker Litigation.

277. On July 24, 2015, the Enquirer published its story quoting excerpts from the surreptitious Footage of Bollea, which they described as coming from a court-protected, confidential transcript. That same day, the Enquirer's Lachlan Cartwright tweeted that Gawker was not its source for its story, and that the Enquirer was provided with a "transcript" of Footage. However, the Enquirer since confirmed it had no transcript or copies of any recordings of Bollea Footage.

*See* Underlying Complaint.

**16.**     Notably, the Underlying Complaint concedes that the Defendants' actions were

neither negligent nor news-gathering activities, stating at Paragraph 283 that:

Defendants, in doing the things alleged herein, acted with actual malice and reckless disregard of Bollea's rights. Moreover, although **none of the Defendants were acting in the capacity of a member of the "press" while engaging in the conduct forming the basis of this action, the actions of each of the Defendants, alleged herein, still served no legitimate public interest** . . .

*See* Underlying Complaint at ¶ 283 (Emphasis added).

17.     Bollea asserts ten causes of action in the Underlying Complaint: (1) Invasion of

Privacy and/or Aiding and Abetting Invasion of Privacy; (2) Public Disclosure of Private Facts

and/or Aiding and Abetting Public Disclosure of Private Facts; (3) Invasion of Privacy by Intrusion

Upon Seclusion and/or Aiding and Abetting Invasion of Privacy by Intrusion Upon Seclusion; (4)

Intentional Infliction of Emotional Distress; (5) Intentional Interference with Contractual Relations

and Advantageous Business Relationships; (6) Violation of Section 934.10 Florida Statutes and/or

5

Aiding and Abetting of Violation of Section 934.10, Florida Statutes; (7) Civil Conspiracy; (8)

Negligent Retention – Cox & Buchwald; (9) Negligence – Cox; and (10) Negligence – Buchwald.

## B.    THE INSURANCE POLICY

18.    Hiscox issued an insurance policy to Cox Enterprises, bearing effective dates of

December 1, 2011 through December 1, 2012 providing Multimedia Coverage, designated policy

no. US UUA 2619952.11 (the "Policy").  A true and correct copy of the Policy is attached hereto

as Exhibit "B".

19.    The Policy provides Multimedia Coverage up to the $15,000,000 Single Aggregate

Limit and is subject to a $500,000 Retention.

20.     The Policy states in relevant part:

We will indemnify you for defense costs and damages incurred as a result of a claim
that falls within WHAT HAS TO GO WRONG (Section II) under this policy,
WHAT WE WILL PAY (Section IV) under this policy, and HOW MUCH WE
WILL PAY (Section V) under this policy.

***

**II. WHAT HAS TO GO WRONG**

Media, personal injury and negligent media content liability

The performance of media activities by you or anyone on your behalf during the
policy period results in a claim against you that arises from covered media or
advertising, regardless of when such claim is made or where such claim is brought,
and including but not limited to any claim for any actual or alleged:

***

d. defamation, including but not limited to libel, slander, trade libel, product
disparagement, and injurious falsehood;

e. infliction of emotional distress or outrage;

f. breach of duty of confidentiality, invasion of privacy or violation of any other
legal protections for personal information, including but not limited to false light,

intrusion upon a person's seclusion, public disclosure of a person's private information, misappropriation of a person's picture, name, voice, or identity for commercial gain, or unauthorized interception or recording of sound or data in violation of a civil anti-wiretap statute;

\*\*\*

i. unfair competition, deceptive business practices, or false designation or origin, but only when asserted in conjunction with and based on the same factual allegations as a claim under (a), (b), (c), (d), or (e) above;

\*\*\*

l. negligent supervision of an employee, but only when asserted in conjunction with and based on the same factual allegations as a claim under (a), (b), (c), (d) or (e) above; and/or

m. any form of negligence (including any negligent act, negligent error, negligent omission, negligent misrepresentation, negligent misstatement, including negligent transmission of a computer virus) but only where arising from your media content disseminated in covered media or advertising.

**\*\*\***

**IV. What we will pay**

| | |
|---|---|
| Payments toward defense costs | We will pay covered defense costs as incurred by you. |
| Payment toward claim resolution | We will pay covered damages as incurred by you |

21.     The Policy also contains the following definitions:

Definition of "Covered Media." Where the phrase "covered media" appears within this policy (whether in the singular or plural), it shall solely mean the following: All publications, programming and other communications (but not including ordinary business communications not directly related to the preparation, dissemination or promotion of your multimedia products) produced or disseminated by you; including but not limited to content of personal appearances by you and all content disseminated via web sites owned or operated by you.

\*\*\*

"Advertising" means advertising, publicity, or promotion in or of covered media.
\*\*\*

7

"Media activities" means:

1. the gathering, acquisition, investigation, collection, researching, creation and compilation of media content;

2. any broadcast, transmission, dissemination, telecast, cablecast, syndication, serialization, podcast, streaming, or production of media content;

3. any publication, republication, or dissemination of media content including any special editions or supplements to such media content;

4. any digital, online, or electronic dissemination of media content,… regardless of the mode or method of communication of such media content.

"Media content" means the substance of any communication of any kind whatsoever within covered media or advertising, regardless of the nature or form of such "media content" or the medium by which such "media content" is communicated, including but not limited to language, data, facts, fiction, music, photographs, images, advertisements, artistic expression, or visual or graphical


22.      The Policy is modified by Endorsement 1, which states:


In consideration of the premium charged and on the understanding that this endorsement leaves all other terms, conditions and exclusions unchanged, it is agreed that:

1. Under What Has To Go Wrong (Section II), Media, personal injury and negligent content liability, paragraph l. is deleted in its entirety and replaced with the following:

l. negligent supervision of an employee, but only when asserted in conjunction with and based on the same factual allegations as a claim under (a) - (m); and/or

2. Also under What Has To Go Wrong (Section II), Media, personal injury and negligent content liability, paragraph k. is deleted and replaced with the following:

k. disclosure of a trade secret, but only where the disclosure alleged was to the public within covered media;

*** 

5. Under Definitions (Section VIII), "Advertising" is deleted and replaced with the following:

"Advertising" means advertising, marketing, publicity, or promotion of the insured's, existing subsidiary's, or acquired entity's own goods and services and of the goods and services of their clients.

6. Under General Matters (Section IX), Alternate dispute resolution is deleted in its entirety and replaced with the following:

We and you agree that any dispute arising out of or relating to this policy, including but not limited to its construction, application and validity, or any breach thereof, shall be submitted to non-binding mediation prior to the commencement of litigation by either party. We and you shall mutually agree on the choice of a mediator, as well as a location for mediation. Each party shall bear its own fees and costs in connection with any mediation but the fees and expenses of the mediator shall be shared equally by the parties.

23.     To the extent that the Underlying Lawsuit alleges facts, the facts alleged do not implicate the Policy because the allegations fail to fall within the aforementioned definitions of "media activity," "media content," or "covered media," and thus the Policy does not provide coverage.

24.     Pursuant to the terms of the Policy, Hiscox attended mediation with Cox Radio and Cox Enterprises on January 23, 2020, to address and attempt to resolve the coverage issues between them, which mediation was unsuccessful.

### COUNT I - DECLARATORY JUDGMENT

25.     Hiscox realleges and incorporates the allegations contained in Paragraphs 1-24 above as if fully set forth herein.

26.     Hiscox seeks an Order from the Court determining the obligations of Hiscox to the Parties relative to the Underlying Lawsuit, including a determination that Hiscox is not obligated to defend and/or indemnify Cox Enterprises, Cox Radio, Loyd or Calta relative to the Underlying Lawsuit.

9

27.     An actual, justiciable controversy exists between the Parties regarding Hiscox's obligations under the Policy in regards to the Underlying Lawsuit within the meaning of 28 U.S.C. § 2201 as demonstrated by the facts alleged herein.

28.     Accordingly, Hiscox is uncertain as to its rights, duties and obligations under the Policy.

29.     A bona fide, actual, present practical need for a declaration exists.

30.     The declaration requested concerns a present, ascertained or ascertainable state of facts or present controversy as to a state of facts.

31.     A privilege or right of the Plaintiff is dependent upon the facts or the law applicable to the facts.

32.     The Parties have an actual, present, adverse and antagonistic interest in the subject matter, either in law or in fact.

33.     The relief sought by Hiscox is not merely the giving of legal advice or the answer to questions propounded for curiosity.

34.     Further, Hiscox seeks an Order awarding Hiscox such other relief as the Court deems proper.

WHEREFORE the Plaintiff, HISCOX INSURANCE COMPANY, INC., respectfully requests that this Court resolve this controversy pursuant to FED. R. CIV. P. 57 and 28 U.S.C. § 2201 and determine the rights and obligations of the Parties under the Policy relative to the Lawsuit, enter a declaration that Hiscox is not required to defend and/or indemnify Defendants COX RADIO, INC., COX ENTERPRISES, INC., MICHAEL CALTA and/or MATTHEW CHRISTIAN LOYD in relation to the claims raised by TERRY BOLLEA in the Underlying Lawsuit, and any other relief this Court deems just.

Respectfully submitted this 28 day of January, 2020,

LYDECKER |DIAZ
*Attorneys for Plaintiff,*
*HISCOX INSURANCE COMPANY, INC.*
1221 Brickell Avenue, 19th Floor
Miami, Florida 33131
(305) 416-3180 – Phone
(305) 416-3190 – Fax

By:      /s/ Stephen Hunter Johnson
STEPHEN HUNTER JOHNSON
Florida Bar No. 12362
shj@lydeckerdiaz.com
SHAWN L.M. HAIRSTON
Florida Bar No. 110046
shairston@lydeckerdiaz.com