IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, FLORIDA

TERRY GENE BOLLEA professionally known
as HULK HOGAN,

      Plaintiff,

vs.

DON BUCHWALD & ASSOCIATES, INC.;
TONY BURTON; MICHAEL CALTA a/k/a
"Cowhead"; MATTHEW CHRISTIAN LOYD
a/k/a "Matt Loyd" aka "Spice Boy"; KEITH M.
DAVIDSON; KEITH M. DAVIDSON &
ASSOCIATES, P.L.C.; COX RADIO, INC.,
TASHA NICOLE CARREGA; and LORI
BURBRIDGE,

      Defendants.

_____/

Case No.:  16-002861-CI

### SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Terry Gene Bollea, professionally known as "Hulk Hogan" ("Plaintiff" or "Bollea"), sues Defendants, Don Buchwald & Associates, Inc. ("DBA"), Tony Burton ("Burton"), Michael Calta (a/k/a "Cowhead") ("Calta"), Matthew Christian Loyd (a/k/a "Matt Loyd" aka "Spice Boy") ("Loyd"), Cox Radio, Inc. ("Cox Radio"), Keith M. Davidson ("Davidson"), Keith M. Davidson & Associates, P.L.C. ("KMDA"), Tasha Nicole Carrega ("Carrega"), and Lori Burbridge ("Burbridge"), (together collectively, "Defendants"), and alleges as follows:

### NATURE OF THIS ACTION

1.    Bollea is a 65-year-old former professional wrestler who through his talent and decades of personal sacrifice and hard work achieved mainstream popularity as the character "Hulk Hogan."

**EXHIBIT
A**

{BC00183782:1}

2.      Bollea played a central role in making professional wrestling the world-wide phenomenon it is today.  He earned his iconic status in the entertainment industry by wrestling and entertaining fans around the globe for decades.

3.      In the later part of his career, Bollea was fortunate enough to have been enshrined in the World Wrestling Entertainment ("WWE") Hall of Fame, secured a lucrative contract working with the WWE, and had several profitable projects as a professional spokesperson, television personality, and product endorser.

4.      No longer able to wrestle, Bollea depended upon his WWE contract and endorsement deals to make a living.

5.      Bollea's livelihood depended upon his public image.

6.      In 2012, everything Bollea worked so hard to achieve slowly started being ripped away from him when, because of his celebrity status and then-friendship with Bubba "The Love Sponge" Clem ("Bubba"), the Defendants engaged in an ongoing scheme to injure and harm Bollea and use him as a pawn—an unwitting, innocent bystander—in a personal and professional vendetta between and amongst the Defendants and Bubba, which culminated in the July 2015 destruction of Bollea's career.

7.      In hopes of exacting revenge against Bubba, furthering their own careers, and profiting off of Bollea's iconic status and legacy, the Defendants repeatedly victimized Bollea by obtaining, using, disclosing, disseminating, and exploiting surreptitiously recorded and illegally obtained video footage of Bollea naked, engaged in sexual activity, and having private conversations in a private bedroom (the "Footage").

8.      Defendants knew Bubba secretly recorded this Footage of Bollea without Bollea's knowledge or consent; yet, they each played a role in the conspiracy to use, publicly disseminate, disclose, and exploit the contents of this illegal Footage.

9.      Defendants' actions violated Bollea's privacy rights and Florida's Security of Communications Act and ultimately destroyed Bollea's career, legacy, lifelong work and income streams.

10.      Defendants, most of whom are veterans to and/or insiders in the entertainment industry, worked in concert with, aided, abetted, and/or conspired with one another to obtain and leak the secretly recorded Footage of Bollea to various tabloids.

11.      In March-April 2012, Defendants, Loyd, Calta, Cox Radio, Burton, Carrega, and Burbridge worked in concert and conspired to leak and sell information about and excerpts from the Footage to *TMZ* and *TheDirty.com*.

12.      In September-October 2012, these same Defendants worked in concert and conspired to "anonymously" send a DVD containing some of the Footage to A.J. Daulerio, then-editor of *Gawker.com*—a website notorious for posting salacious images of celebrities online in order to destroy their careers—while intending and knowing that Daulerio would post the Footage online.

13.      Indeed, *Gawker* posted a "highlight reel" of some of the Footage—which enabled over seven million people to watch Bollea naked and having sex (the "*Gawker.com* Posting").

14.      Defendants used the *Gawker.com* Posting as a spring-board to try to extort Bollea with more of the illegally recorded Footage.   Acting on behalf of the conspiracy, Davidson demanded money from Bollea in exchange for three DVDs, one of which Defendants knew and

stated contained recordings in which Bollea could be heard making racially insensitive comments.

15.     Refusing to allow himself to be victimized, Bollea filed lawsuits over the *Gawker.com* Posting and enlisted the help of the FBI to try to stop the extortion.  The FBI opened an investigation that culminated in a sting operation in December 2012, at which three DVDs containing Footage were seized.

16.     Finally, in July 2015, while Bollea was in the midst of the litigation over the *Gawker.com* Posting, Calta and Cox Radio were embroiled in a vicious ratings war with Bubba, and Loyd was being criminally investigated for his role in obtaining and using video recordings (including the Footage of Bollea) stolen from Bubba, the Defendants' conspiracy caused racially insensitive comments from the illegal Footage of Bollea to be leaked to *The Enquirer* and *Radar Online*.   The aftermath was immediate and devastating:   all of Bollea's contracts were terminated, he was erased from the WWE Hall of Fame and website, he was branded as a racist in the media, and all of his work opportunities dried up.

17.     In March 2016, Bollea partially was vindicated when a Pinellas County Jury rendered a $140.1 million verdict against Gawker Media, LLC, Nick Denton and A.J. Daulerio for the *Gawker.com* Posting.  Following bankruptcy proceedings, Bollea agreed to resolve his judgment against Gawker, Denton and Daulerio for $31 million.

18.     Bollea filed this lawsuit to hold the remaining offenders liable for their roles in the use, public disclosure and dissemination, and exploitation of the illegally recorded Footage, and to recover the balance of the damages Defendants caused, such as the economic damages Bollea suffered to his career, reputation, legacy and earning ability.

19.     Bollea seeks redress for the damages and injuries caused by the Defendants' use, disclosure, exploitation, and public dissemination of the contents of the illegally recorded Footage, including the willful and malicious conspiracy to extort Bollea, invade his privacy, profit from his name and likeness and the contents of the illegally recorded Footage, and to destroy Bollea economically and emotionally.

20.     The Defendants' nefarious roles in the attacks against Bollea are undeniable—and in most cases already confirmed through law enforcement investigations, prior discovery, and phone records.

21.     Unfortunately, the United States Government and the State of Florida declined to prosecute anyone involved in the improper use and disclosure of the contents of the illegal Footage of Bollea.

22.     Consequently, Bollea brought this action to ensure that those who used, exploited, disclosed and disseminated the contents of the Footage are brought to justice.

## **JURISDICTION**

23.     This Court has subject matter jurisdiction because Plaintiff seeks relief in an amount greater than $15,000, exclusive of interest, attorneys' fees and costs.

24.     As more specifically set forth below, this Court has personal jurisdiction over Defendants under § 48.193, Florida Statutes, because they each personally, in concert with one another and/or through an agent or co-conspirator, engaged in one or more of the following acts:

a.      committing tortious acts within the State of Florida;

b.      committing intentional torts expressly aimed at Bollea, the effects of which were suffered in Pinellas County, Florida;

c.      operating, conducting, engaging in, or carrying on a business or business venture within the State of Florida, or having an office in this State;

d.      engaging in substantial and not isolated activity within the State of Florida; and/or

e.      engaging in a conspiracy to commit tortious acts against Bollea within the State of Florida and/or engaging in overt acts in furtherance of that conspiracy within the State of Florida.

25.      As more specifically set forth below, sufficient minimum contacts exist between each Defendant and the State of Florida to satisfy the Due Process under the U.S. Constitution because Defendants have engaged in substantial and not isolated activity within and/or directed at the State of Florida, reside or maintain offices in the State of Florida, and/or committed or conspired to commit intentional torts expressly aimed at Bollea, the effects and harms of which were calculated to and did cause injury to Bollea, within the State of Florida; such that Defendants should have reasonably anticipated being sued by Bollea in the State of Florida.

26.      Venue is proper in this Court pursuant to section 47.011, Florida Statutes because, among other things, the claims at issue accrued within Pinellas County, Florida.

## PARTIES

27.      Bollea is a resident and citizen of the State of Florida, and resident of Pinellas County.

28.      At all relevant times, Defendant, DBA, was and is a corporation organized and operating under the laws of the State of New York, with its principal place of business in the City of New York, County of New York, State of New York.  DBA is a talent agency that represents clients in, among other areas, the radio broadcasting industry; including clients within the State of Florida.

29.      At all relevant times, Defendant, Burton, was and is a citizen, resident and domiciliary of the State of New York, and was and is a talent agent acting within the course and

scope of his employment by DBA.  Burton's clients have included, and currently include, among others, Tampa radio personality, Defendant, Calta.

30.     At all relevant times, Defendant, Calta, was and is a citizen, resident and domiciliary of Pasco County, Florida.  Calta was and is a radio personality in the Tampa Bay area who hosts a radio show on "The Bone" 102.5 FM.  At all relevant times, Calta was acting within the course and scope of his employment by Defendant, Cox Radio, Inc.

31.     At all relevant times, Defendant, Loyd, was and is a citizen, resident and domiciliary of Hillsborough County, Florida.  At certain times relevant hereto, Loyd was a radio personality in the Tampa Bay area and was acting within the course and scope of his employment by Defendant, Cox Radio.

32.     At all relevant times, Defendant, Cox Radio, was and is a corporation organized and operating under the laws of the State of Delaware, registered to do business in the State of Florida, with its principal place of business in the City of Atlanta, State of Georgia.  At all material times, Cox Radio owned and operated several terrestrial radio stations broadcasting in the Tampa Bay area, including "The Bone" 102.5 FM, which operates in and from offices located in Pinellas County, Florida.

33.     At all relevant times, Defendant, Davidson, was and is a citizen, resident and domiciliary of the State of California, and a resident of Los Angeles County, California.  Davidson is an attorney at law, licensed to practice in the State of California, with a record of discipline by the State Bar of California.  Davidson was retained to assist and facilitate in the extortion of Bollea using the illegally obtained surreptitious video Footage within Pinellas County, Florida.

34.     At all relevant times, Defendant, KMDA, was and is a professional corporation organized and existing under the laws of the State of California, with its principal place of business in the State of California, County of Los Angeles.  At all relevant times, Davidson was acting within the course and scope of his employment by KMDA.

35.     At all relevant times, Defendant, Carrega, was the wife of Defendant, Loyd, and a citizen, resident and domiciliary of Hillsborough County, Florida.

36.     At all relevant times, Defendant, Burbridge, was a close friend of Carrega and a citizen, resident and domiciliary of Pasco County, Florida.

37.     At all relevant times, the Defendants were the agents, licensees, employees, partners, joint-venturers, co-conspirators, masters, and/or employers of one another, and each of them are, and at all material times herein mentioned were, acting within the course and scope of that agency, license, partnership, employment, conspiracy, ownership, or joint venture.  At all relevant times, the acts, failures to act, and misconduct herein alleged of each Defendant were known to, authorized, approved, and/or ratified by the other said Defendants, and each of them, and/or such acts, omissions, and misconduct were engaged in by the Defendants in concert or active participation with one another or in order to aid or abet one another.

38.     The actions, failures to act, and misconduct herein alleged of each Defendant produced and/or contributed substantially to producing the damages, injuries and harms Bollea seeks to recover through this action.

## OPERATIVE FACTS
### Tampa's Shock Jock Culture

39.     The sordid history between and amongst Bubba, Calta, Loyd, Cox Radio, and Burton includes a significant amount of personal and professional animosity, misconduct, and unlawful activity that provides the backdrop for the victimization of Bollea.

40.     Loyd, Calta, and Bubba have a troubled and well-known past as "shock jocks" in the radio broadcasting industry, dating back to the late 1990s.  At various times, Calta and Loyd worked on Bubba's radio shows; and at various times, Bubba had falling outs with each of them, which led to deep-seeded resentment, hostility, and the desire for revenge.

41.     Calta and Loyd began working for Clear Channel Communications ("Clear Channel") on Bubba's radio show in Tampa in 1996-97.  By 2000, Calta and Loyd were working on Bubba's morning show on Tampa radio station WXTB-FM "98 Rock."

42.     However, Bubba had a falling out with and fired Calta when Calta was expecting his first child.  Calta has since publicly expressed his antipathy toward of Bubba over this betrayal.

43.     In 2001, Bubba gained notoriety after he was arrested and charged with animal cruelty following a live segment during which a wild hog was slaughtered as sound effects were played to give the impression the hog was being harassed or abused.

44.     In early 2004, Clear Channel fired Bubba after the FCC levied a well-publicized $755,000 fine against Clear Channel for Bubba's radio segments that included graphic discussions about sex and drugs that were "designed to pander to, titillate and shock listeners." Bubba then began hosting his show on satellite radio.

45.     Eventually, Clear Channel hired Calta as Bubba's replacement.  Calta hosted "The Cowhead Show" on the 98 Rock morning drive (with co-host, Loyd).  This was Calta's first big break in the radio industry.

46.     However, just a few months after being hired, Calta and Loyd were fired over indecent comments made on their show.  Calta blamed their firing on a "competitor" who edited

Calta's bits to contain expletives and sent them to the station's advertisers.  Calta's suspicions that Bubba was responsible are well-known.

47.     In July 2006, Cox Radio hired Calta to host the morning drive on 102.5 FM "The Bone."

48.     In October 2006, Bubba faced more trouble when he was sued by a pornographic actress who alleged that while appearing on a radio program together with another actress she was penetrated with an oversized sex toy against her will at Bubba's demand.

49.     In January 2008, despite actual knowledge of Bubba's checkered past in the radio industry and the animosity between Bubba and Calta, Cox Radio hired Bubba to take over the morning drive on 102.5 FN.  Bubba brought Loyd (as "Spiceboy") back into the fold on his show, while Calta was relegated to the afternoon time slot on 102.5 FM.

50.     

51.     Radio morning drive time slots are coveted because they are when the number of listeners is at its peak and when commercial radio can get paid the most for advertising.  Radio hosts and their agents, such as Burton, covet these morning slots because they can lead to syndication, which greatly increases the money the radio host, his agent, and his station can make.

52.     Burton started representing Calta while he was working for Cox Radio.  Burton and DBA are well-known for representing nationally recognized shock-jock Howard Stern, who at one time had a working relationship with Bubba on satellite radio.

53.     ████████████████████████████████████████

████████████████████████████████   ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████

54.     When Cox Radio hired Bubba, Loyd and Calta, they all were well known in the radio industry and Tampa Bay community for their "shock-jock" roles and propensities for misconduct.  Cox Radio knew about the various controversies each of the men were involved in over their careers, and their tendencies to test and cross-over the boundaries of decency, obscenity, and legality.

55.     In fact, this is the reason broadcasters such as Cox Radio hire shock jocks such as Bubba, Calta, and Loyd.  Cox Radio's motivation to boost ratings and revenues trumped the obvious risks of employing Bubba, Calta, and Loyd.  Cox Radio even encouraged, participated in, and approved of their outrageous behavior in order to win ratings wars.

56.     From 2008 through 2015, Cox Radio and Burton knew about the significant and escalating hostility between Bubba, Calta, and Loyd, and knew Bubba, Calta, and Loyd had a propensity for harming other people.

57.     ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████   █████████████████

████████████████████████████████████████████

████████████████████████████████    ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

58.     Although in 2011 Bubba, Calta and Loyd were all working together for Cox Radio at 102.5 The Bone, the personal and professional animosity amongst them was boiling over.  Bubba is notorious for treating the people worked on his show poorly (*i.e.,* Calta's 2000 firing) and for being vindictive against former associates (*i.e.,* Calta and Loyd's 2006 firing after replacing Bubba), and Calta was bitter over being demoted upon Bubba's arrival at 102.5.  Calta and Loyd also aspired to further their own careers and to get out from under Bubba's shadow, a goal which Bubba did not share with them.  Stated simply, Calta and Loyd shared a bitter enemy in Bubba.

59.     Burton maintained continuous and systematic contacts with Florida over the course of several years, was substantially involved in managing Calta's Florida career, and communicated with Calta with extreme frequency in Florida.  Between 2011 and 2015, Burton had thousands of phone calls with Calta in Florida, including calls about Calta's career and Florida radio show, Calta's professional decisions, and the content of Calta's show broadcasted in Florida.  Burton also had frequent calls with Cox Radio executives in Florida about Calta, his career, his show, and his professional obligations.  Burton also negotiated the terms of Calta's contracts with Cox Radio for payments and Calta's services to be provided in Florida, through which Burton benefitted financially.

60.     Burton also was directly involved in the infighting that persisted between Calta and Bubba from 2011-2015.   Burton had numerous phone calls with Calta, Cox Radio executives, and others in Florida about that infighting.

61.     In 2011, as the infighting between Bubba and Calta got worse, Cox Radio intervened and exercised its control over both Calta and Bubba. ███████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ █████████████████████████████████ Burton was personally involved in and had numerous calls with Calta and Cox Radio executives in Florida about this situation.

62.     ████████████████████████████████████████ ████████████████████████████████   ███████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████   ████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████   ██████████████████████ ██████████████████████████████████████   ████████ ████████████████████████

63.     In late 2011, Bubba and his then-wife, Heather Clem (a/k/a "Heather Cole") ("Cole") were going through a nasty divorce.   During this time, their relationship was

contentious and the existence of several homemade DVDs depicting consensual sexual activity between Cole and other people (the "Cole DVDs") was of primary concern to Bubba because of the impact it could have on his career and reputation.  As a result, Bubba moved the Cole DVDs from his home to his studio office.  Upon information and belief, Loyd, Calta, and other Cox Radio employees and agents were aware of this situation and Bubba's concerns.

64.     In or about December 2011 through January 2012, Bubba and his staff (including Loyd) moved Bubba's equipment and property to a new radio studio.  Bubba moved the Cole DVDs to an upstairs office/storage area designated for his own personal items.  At that time, Loyd was still working for Bubba's show on 102.5 The Bone and had access to the Cole DVDs.

65.     It was during this time that, according to a law enforcement investigation, Loyd stole the Cole DVDs from Bubba's office/storage area; after which copies of DVDs containing Footage of Bollea began circulating amongst Cox Radio employees and agents.  Cox Radio's employees, agents, and supervisors were aware of the existence of these DVDs and their circulation and knew materials such as these inevitably would be publicly disclosed by its shock jock agents and employees with a propensity for harming others and grudges against Bubba. However, Cox Radio failed to take any reasonable steps to stop that from happening.

66.     █████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████

67.     █████████████████████████████████████████████████

█████████████████████████████████████████████████████████



68.     On the heels of Bubba's 2012 agreement with Cox Radio, Calta still coveted Bubba's morning drive slot on 102.5 The Bone and ███████████████████████████ ████████████████████ At the same time, Loyd was lobbying Cox Radio executives to host his own show on The Bone and started to implement the plan to use and exploit the Footage stolen from Bubba.

69.     In March 2012, Loyd, Calta, and Burton, as well as other non-parties such as Richard Peirce ("Peirce") and Broderick Epps ("Epps"), began discussing the Footage and its dissemination to the media.

70.     Between March 1, 2012 and April 29, 2012 (as more specifically alleged below), the conspiracy between Calta, Loyd, Carrega, Burbridge, Burton, DBA and Cox Radio took root and its principals carried out overt acts in furtherance of the conspiracy in Florida, including leaking Footage to *TMZ* and *thedirty.com*.  During that time, there were numerous phone calls and conversations between and amongst Calta, Loyd, Cox Radio executives, agents, and employees, Burton, Peirce, Epps, *TMZ*, Mike Walters, Anthony Kotzev, *thedirty.com*, Steve

Hirsch, Burbridge, Carrega, Gina Rodriguez, and others emanating from or directed into Florida for purposes of carrying out the conspiracy.

71.     On April 19, 2012 (the day *thedirty.com* first published still images from the Footage), Loyd quit Bubba's show and was given his own radio program on 102.5.

72.     

73.     As animosity toward Bubba grew, Calta, Loyd, Burton, and other Cox Radio executives, agents and employees knew Bubba's friendship with Bollea was a soft-spot, the secretly recorded Footage of Bollea could be exploited to exert pressure on and instill fear in Bubba, and exposing the secretly recorded Footage could destroy Bubba and Bollea's friendship, get Bubba fired and/or possibly result in criminal charges against Bubba.

74.     By the fall of 2012, Calta was expecting his second child and facing yet another significant controversy of his own after Calta's show posted on its website a photo of a developmentally disabled child holding a doctored sign changed to read "RETARDED NEWS." That stunt eventually led to a multi-million dollar lawsuit against Cox and significant public backlash.  Burton was involved in managing Calta through that situation.

75.     As Calta's and Cox Radio's 2012 "RETARTED NEWS" scandal was unfolding, surreptitious Footage of Bollea again surfaced.  This time, in September 2012, Calta and Burton,

who had been and still was acting in his capacity as Calta's agent and an employee of DBA, worked in concert with each other and others to deliver a 30 minute "Hogan Sex Tape" to A.J. Daulerio and *Gawker.com*.

76.     Shortly after that Footage was leaked to Gawker, Bubba started receiving anonymous messages about other DVDs featuring Cole, including photos of DVDs and threats about releasing them.

77.     Following the *Gawker.com* Posting, Cox Radio knew Bubba suspected Loyd was involved in leaking Footage of Bollea to the media.   In fact, Cox Radio is believed to have initiated an investigation into the leaks of Footage during this time period.   However, Cox Radio did not take any steps to warn Bollea, stop Footage from being disseminated, or implement any measures to prevent future leaks despite its ability to do so.

78.     In late 2012, as the animosity and hostility between Calta, Loyd, and Bubba continued to grow, the conspiracy to exploit Footage of Bollea moved to its next phase – the attempted extortion of Bollea.

79.     After the FBI foiled the extortion plot in December 2012, the infighting between Calta, Loyd, and Bubba continued to escalate, and Bubba started pressuring Cox Radio to fire Loyd.

80.     ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████

81.     In mid-August 2013, Cox Radio supervisory personnel met with Loyd about Bubba's claim Loyd was responsible for selling Footage and Loyd's concerns about Bubba

trying to get Loyd fired.  On August 20, 2013, Calta sent Burton an e-mail indicating Cox was contemplating letting Bubba go.

82.    On August 26, 2013, Cox fired Loyd.  Shortly after his departure, Loyd tweeted, "Revenge is the best revenge… right Bubba?  Just checking…"

83.    After Loyd's termination, the hostility between Calta and Bubba got worse.  In late 2013-early 2014, Cox Radio executives and Burton frequently were called on to intervene in on-air and social media attacks between Calta and Bubba.

84.    ████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████

85.    ████████████████████████████████████████████
██████████████████████████████████   ████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████   ████████████████
████████████████████████████

86.    ████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
██████████████████████   ████████████████████████████
███████████████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████

87.     In August 2014, Cox Radio declined to renew Bubba's 2012 agreement, which opened the door for Calta to host the 102.5 The Bone morning drive.

88.     Bubba's contract with Cox Radio ended December 31, 2014.

89.     As Bubba geared up to return to the Tampa airwaves to compete with Calta and Cox Radio in early 2015, Cox Radio executives started planning to deal with Bubba upon his return.

90.     In January 2015, Bubba returned to the morning drive on Tampa radio on Beasley radio station 98.7 FM.  The station ran a non-stop loop of Bubba's show 24/7 while it developed its permanent format.

91.     In February 2015, 98.7 FM launched its full format as the Bubba Radio Network and announced plans to change the station's call letters to WBRN.

92.     By March 2015, Bubba's new radio network was up and running at full speed and Bubba was in the midst of a vicious all-out assault against Cox Radio, Calta, and several Cox Radio executives.

93.     Bubba vowed to "Bury the Bone" and attacked Calta, Loyd, Lawless, and other Cox Radio executives on and off air in derogatory and humiliating ways.  Bubba even went so far as to attack Calta's family on social media and circled Cox Radio's building with his followers in cars, honking horns, and making obscene gestures.

94.     In April 2015, Bubba began overtaking Calta in the ratings war.

95.   ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

96.   During April-June 2015, Bubba surpassed Calta in the ratings.

97.   According to Bubba, "Cox's management team in the Tampa Market was extremely disappointed that [102.5] could not maintain the ratings success it had when [Bubba] was host of its morning drive show.  In an effort to reclaim [102.5's] No. 1 status in the Tampa Market, Cox, acting through its agents, sought ways to eliminate [Bubba] as a competition in the Tampa Market."

98.   As the "warfare" between Cox Radio/Calta and Bubba was playing out and Bubba's vicious attacks against Calta and Cox Radio executives continued, Calta and Burton were in frequent and constant communication about the events that were unfolding.

99.   During that same time, TPD's criminal investigation of Loyd was coming to a head, including interviews of Cole, Carrega and Patrick Fowler.  In late April 2015, TPD tried to interview Calta, which he refused to do.

100.   In May-June 2015, phone calls between Calta and Loyd, Calta and Cox Radio executives, and Calta and Burton in Florida about the situation with Bubba, ways to get revenge, Footage, and TPD's related criminal investigation increased in frequency and duration.

101.   ████████████████████████████████████████████████

████████████████████████████████████████████████████  ██████████████

████████████████████████████████████████████

102.     On June 26, 2015, Loyd called Nielsen and Arbitron several times, and continued those calls over the ensuing days.  Loyd also had calls with Beasley Media, which operated the station where Bubba was broadcasting at the time.

103.     ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

104.     Bubba eventually was fired from 98.7 FM after Cox Radio's allegations of tampering with ratings.   Nielsen sued Bubba in Tampa Federal Court.   Bubba filed a Counterclaim against Nielsen in that lawsuit, which included allegations of a mid-2015 conspiracy involving Cox Radio and Calta, the goal of which was to eliminate Bubba as competition.

105.     As Calta, Loyd, Burton, and Cox Radio were conspiring in the ongoing war against Bubba, more illegal Footage of Bollea surfaced.  This time, in July 2015, when the animosity between Calta, Loyd, Cox Radio, and Bubba was at its peak and TPD's criminal investigation over Footage was coming to an end, the most damaging, racially insensitive portions of the illegally recorded Footage were leaked to *The Enquirer*.

## The Victimization of Bollea

106.     In the summer of 2007, Bollea was at a particularly low point in his life, dealing with several personal tragedies, and feeling the physical effects of decades of work inside the ring.  His wrestling career was nearing its end, and his first wife, Linda, left him and was moving to California after 24 years of marriage.

107.     Bollea had a very hard time dealing with the failure of his marriage and allowed himself to be manipulated by his then-best friend, Bubba, who convinced Bollea (after years of

pressure) to have sex with Cole.  Bubba and Cole had an open marriage and had been pressuring Bollea to have sex with Cole for years.

108.    Unbeknownst to Bollea, Bubba installed a hidden camera in his bedroom was disguised as a motion detector and hidden above some cabinets.  Bubba secretly recorded Bollea naked and engaged in sexual activity with Cole, as well as Bollea's private conversations with Bubba and Cole before and after these encounters (the "Footage").

109.    Bollea understood, believed and expected that his activities and conversations were private and would not be viewed, heard by other persons or recorded.  Had Bollea known that his private activities and conversations were being recorded, he never would have engaged in any such activities or conversations.

110.    Nearly *five years later*, on March 7, 2012, the tabloid website *TMZ.com* first reported on the possibility of a "Hulk Hogan Sex Tape."  At that time, Bollea and his attorney, David Houston ("Houston"), gave an interview to *TMZ* and publicly stated that Bollea never consented to being taped having sex and would prosecute anyone who distributed such a tape. All Defendants were aware of Bollea's statements.

A.    The *TMZ* Leak

111.    As set forth above, in March 2012, Bubba, Calta, and Loyd all worked for Cox Radio at 102.5 The Bone.  Cox Radio knew about ongoing infighting between them and exercised direction and control over Bubba, Calta, and Loyd's on-air and off-air conduct.  Loyd was pushing Cox Radio executives for his own show.  Calta wanted his morning drive time slot back from Bubba, and he and Burton ███████████████████████████████████ ██████████████████████████████.

112.    In the days leading up to the March 7, 2012, *TMZ* leak, Calta spoke on the phone in Florida with Burton several times and called and texted Richard Peirce ("Peirce"), who worked for Bubba until 2010, was identified by Loyd as possibly possessing Footage, and would later send Calta a detailed summary of Bollea Footage.  During the same time, Loyd had several calls with Broderick Epps ("Epps"), who was working on Bubba's show and identified by Loyd as possibly possessing Footage.  Loyd also had calls with Steve Hirsch ("Hirsch"), founder of Vivid Entertainment, an adult film and entertainment company that expressed interest in Bollea Footage once its existence was revealed.  Loyd also spoke with his friend, lawyer Morgan Barfield ("Barfield").  All of these calls related to the conspiracy and Footage.

113.    The day of the *TMZ* leak, Loyd spoke with *TMZ*'s Mike Walters ("Walters") four times and Barfield twice.  That same day, Loyd also spoke to Epps, and Calta had more calls in Florida with Burton and Peirce.  All of these calls related to the conspiracy and Footage.

114.    The next day, March 8, 2012, *TMZ* reported on a letter from Hirsch to Bollea expressing an interest in the Bollea sex tape and revealing Hirsch was shown "teaser images."  That same day, Loyd spoke with Hirsch, and Calta had calls in Florida with Burton and texts with Peirce, all of which related to the conspiracy and Footage.

115.    Loyd provided *TMZ* access to still shots of Footage and a short video clip.  As *TMZ*'s reporting was unfolding, Loyd and Calta were communicating with Cox Radio Director of Programming Mike Oliviero ("Oliviero") and Cox Radio Program Director Mike Sharkey ("Shark") about the *TMZ* leaks.  Loyd also had extended calls with Barfield about the same.

116.    FBI and TPD investigations later confirmed that Loyd admitted to leaking information about the "Hogan Sex Tape" to *TMZ* in early March 2012.

117.   Calta continued texting Peirce over the ensuing days, and on March 12, 2012, Peirce e-mailed Calta a "DVD Details" summary of Footage of Bollea.  Calta immediately called Burton, and later that day Calta and Burton spoke several times about the conspiracy and Footage.  That day, Calta also spoke on the phone with Peirce several times, and Loyd spoke again with Hirsch.

118.   On March 13, 2012, Calta forwarded Burton the March 12, 2012 e-mail from Peirce with the attached "DVD Details" summary.  The "DVD Details" attachment to this e-mail included an overview of two DVDs containing illegally recorded Footage of Bollea.  According to Burton, Calta was considering talking about the DVDs on air.  Burton and Calta spoke three times on March 13, 2012 about Footage, and Calta also called Lawless and texted and called Peirce.   Loyd had two calls with Barfield, two calls with Oliviero, and a call with Walters.  All of these calls were related to the conspiracy and Footage.

119.   At that time, Calta, Burton, Loyd and Cox Radio knew Bollea was secretly recorded and the Footage described in the "DVD Details" summary could be devastating to Bollea's career if publicly disclosed.

120.   However, none of them took any steps to notify Bollea or Houston about the Footage.

**B.**     ***Thedirty.com Leak***

121.   Between March 13, 2012 and April 19, 2012, numerous phone calls and texts about the conspiracy and Footage continued between Burton and Calta, Calta and Peirce, Loyd and Epps, Loyd and Hirsch, Loyd and Barfield, and Cox Radio and Loyd and Calta.

122.   Then, on March 23, 2012, Loyd spoke with Gina Rodriguez ("Rodriguez"), a former adult film star turned talent agent who managed Stormy Daniels (for whom Defendant

Davidson negotiated an agreement with President Trump) about Footage. At the time, Rodriguez was dating Anthony Kotzev ("Kotzev"), who worked at *thedirty.com*.

123. Rodriguez is known to work with tabloids and sell stories to *TMZ* and the *Enquirer* and *Radar Online*, and to be a referral source to Davidson. *See* "'A LITTLE EXTORTION-Y'… This Guy Figured Out What Stormy Daniels' Old Lawyer ACTUALLY DOES – And It's Not Pretty!" *Huffington Post*, May 11, 2018 (https://www.huffingtonpost.com/entry/keith-davidson-stormy-daniels-hollywood_us_5ad7bbdae4b03c426daaf5ed).

124. On March 31, 2012 and April 7, 2012, Loyd and Burbridge spoke on the phone about the Footage and Burbridge's role in the conspiracy.

125. On April 11, 2012, Burton and Calta spoke three times, and Loyd called Carl Harris, a person Loyd identified as possibly possessing Footage. The following day, Loyd again spoke with Barfield, Hirsch twice, and Bruce Hammil, who produced "Bubba Raw" videos, was the owner of *voyeurdorm.com* and other adult content websites, and was identified by Calta and Loyd as someone who may have possessed Footage.

126. Over the ensuing days, Loyd had several more calls with Rodriguez, Kotzev, Epps, Lawless, Oliviero, Jason Meder (a Cox Radio GM in Orlando), and Patrick Fowler. During that same time, Calta had several calls with Peirce, Brennan and Burton, all of which related to the conspiracy and Footage. On April 15, Loyd also had a 23-minute call with Russ Bruno, who ran businesses that provided adult content over the Internet, presumably to assist in granting access to Footage online.

127. On April 17, 2012, Loyd had three calls with Rodriguez and three calls with Fowler. The Bone also called Loyd during Calta's afternoon drive time.

128. The following day, Calta again texted Peirce and had a call with Burton, and Loyd had a call with Fowler and three calls with Oliviero.

129.    On April 19, 2012, the website *TheDirty.com* published screen shots from the "Hulk Hogan Sex Tape."  FBI and TPD investigations later confirmed that Loyd admitted to leaking these screen shots to *TheDirty.com*.

130.    *That same day*, Cox Radio promoted Loyd and announced that Loyd now would be hosting his own show on 102.5 The Bone.

131.    Also on April 19, 2012, Calta and Burton spoke twice for 35 minutes, Calta exchanged texts with Peirce, and Loyd had another call with Rodriguez, all of which related to the conspiracy and Footage.

132.    Once screen shots from the Footage surfaced on *TheDirty.com* and Loyd quit Bubba's show and was promoted by Cox Radio, the illegally recorded Footage and its source was a topic of discussion with Cox Radio; and Cox Radio's agents, employees, and supervisory personnel knew about, openly discussed and/or viewed Bollea Footage that had been stolen from Bubba's studio and circulated at Cox Radio's facilities.

133.    However, Calta, Loyd, Burton, Cox Radio, and DBA failed to take any steps to notify or warn Bollea or Houston about the Footage or to prevent the Footage from being disseminated, used and/or exploited.

134.    Cox, Calta, Loyd, Burton, Cox Radio, and DBA also failed to take any steps to prevent any further disclosure, dissemination or use of the Footage despite their ability to do so.

135.    In the days immediately after *thedirty.com* leak, Loyd and Calta's calls with Cox Radio executives and employees about the conspiracy and Footage continued.

136.    On April 22, 2012, Calta called Loyd and they spoke for approximately 20 minutes about the conspiracy and Footage.

137.    The following day, Loyd called Rodriguez and Epps, and Calta had calls with Burton, Peirce, and Fowler about the conspiracy and Footage.

138.    Calta and Burton also spoke on April 24, 2012 and April 25, 2012 for nearly an hour about the conspiracy and Footage.

139.    Then, on April 26, 2012, *thedirty.com* posted a second story about the Footage that referenced Bollea making statements about "black people."   That same day, Burton and Calta had four calls, and Loyd had calls with Kotzev, Hirsch, and Fowler about the conspiracy and Footage.  Also that same day, Calta e-mailed Burton a copy of *thedirty.com*'s April 26, 2012 story under the subject "The audio is out!!"  In response, Burton reminded Calta about what they talked about on the phone – "It's all about hulk and defend/deflect anything bubba."

140.    Over the Summer 2012, the calls about the conspiracy and Footage between and amongst Loyd, Calta, Burton, Cox Radio executives, employees, and agents, and other key players continued.

C.    **The Gawker Leak**

141.    In September 2012, Burton and Calta had numerous additional calls about Footage.  Throughout this time, Calta also spoke with Meder, Brennan, Oliviero and Peirce many times about Footage.  During the same time, Loyd also spoke to Oliviero, Epps, and Rodriguez about Footage.

142.    Between September 11, 2012 and October 8, 2012, Calta and Burton had at least 36 calls totaling over 276:30 minutes, during which they discussed Footage, the conspiracy, and leaking Footage to Gawker.

143.    On September 21, 2012, Loyd and Calta had another call at 1:07 a.m. and, later that day, Calta had three calls with Burton, a call with Cox Radio, and a call with Oliviero, all about the conspiracy and Footage.

144.    The following day, Calta and Loyd texted, Burton and Calta had another call, and Loyd had calls with Oliviero and Barfield about the conspiracy and Footage.

145.    On September 24, 2012, Calta had more of the same calls with Cox Radio, Brennan and The Bone.

146.    On September 25, 2012, Calta had a 20-minute call with Burton, two calls with Peirce, and a call with Meder, and Loyd had two lengthy calls with Epps and a call with Oliviero, about the conspiracy and Footage.

147.    On September 26, 2012, Calta had two calls with Oliviero at 1:24 and 1:38 a.m., a call with his lawyer, Dominic Fariello, another 33-minute call with Burton, and a call with Brennan about the conspiracy and Footage.  Loyd also received a call from The Bone during Calta's afternoon drive time.

148.    On September 27, 2012, Burton, acting at the behest of and in concert with Calta, and in his capacity as Calta's agent, an employee of DBA and member of the conspiracy, reached out to A.J. Daulerio ("Daulerio"), then-Editor-in-Chief of New York-based website, *Gawker.com* about the Footage.  Daulerio had made a name for himself by publishing salacious images of celebrities, and *Gawker.com* was infamous for attacking people in the entertainment and sports industries and trying to ruin their careers.

149.    As a New York based talent agent, Burton was well aware of Daulerio's and Gawker's reputations when he decided to contact Daulerio to arrange the "anonymous" delivery

of some of the Bollea Footage. Burton also was aware of the animosity between Calta and Bubba and shared Calta's goal of getting Bubba out of the way of Calta's career.

150. Burton e-mailed Daulerio that he had "a client that has a very significant DVD they want to send you." Burton's "client" was Calta.

151. Burton asked Daulerio for an address to send the DVD by mail for "anonymity" purposes. They subsequently spoke on the phone about the Footage of Bollea. Then, at 4:55 p.m., Burton e-mailed Daulerio's mailing address to Calta.

152. Later that day, Calta and Burton spoke on the phone, Calta had an extended call with Peirce, and Loyd had extended calls with Barfield and Greg Galvin, a co-host of Calta's radio show, all about the conspiracy and Footage.

153. The following day, Loyd also had an extended call with Epps and two calls with Oliviero, about the conspiracy and Footage.

154. Soon after Burton provided Calta Daulerio's mailing address, a DVD was sent to Daulerio which contained a little more than 30 minutes of the surreptitious Footage of Bollea, including video images of him fully naked and engaged in consensual sexual activity with Cole, and also including audio recordings of conversations between Bollea, Cole and Bubba (the "30 Minute Video").

155. As Calta's agent, Burton exercised control over Calta, particularly with respect to choices that could impact Calta's career. In that capacity, Burton already knew about the "Hogan Sex Tape" from Calta's March 13, 2012 e-mail and all of his above-referenced calls with Calta. Burton certainly would have discussed and did in his capacity as Calta's talent agent discuss what it was that Calta wanted to send to Daulerio and why Calta wanted to send it, before Burton agreed to help facilitate the "anonymous" delivery of a "significant DVD" to

*Gawker.com* for Calta.   In fact, Calta and Burton spoke on the phone numerous times for extended periods about what they were doing and why they were doing it in the days leading up to the Gawker leak.

156.   Burton had actual or constructive control over Calta such that he could have and should have stopped Calta from sending or procuring someone else to send the Footage to Daulerio or, at a minimum, could have and should have warned Bollea about the existence of the Footage, the "significant DVD," and/or the imminent delivery of the Footage to *Gawker.com*.

157.   Instead, Burton chose to actively participate in the conspiracy and its dissemination and disclosure of the Footage, including through his numerous calls with Calta in Florida, thus placing his self-interests and those of his client, Calta, above Bollea's fundamental right to privacy, his emotional well-being, and his legacy and career.

158.   ██████████████████████████████████████████████████████
████████████████████████████████████████████████

159.   The 30 Minute Video sent to Gawker was one of the two DVDs summarized in the "DVD Details" attachment to Calta's March 2012 e-mail to Burton.

160.   On October 2, 2012, Burton followed up with Daulerio to make sure that he received the 30 Minute Video.  That same day, Burton and Calta had two calls and spoke for over 32 minutes, and Loyd called Epps, all of which related to the conspiracy and Footage.

161.   Far from being a mere conduit for an address that Calta easily could have obtained himself on the Internet, Burton actively participated with Calta to send the 30 Minute Video to Daulerio because Burton admittedly had a relationship with Daulerio and—being based in New York—knew what Daulerio and Gawker were going to do with the Footage.  Burton was an integral piece of the conspiracy because of his role in trying to cover-up leaking the Footage

to Daulerio by ensuring its sender and the conspiracy would be kept "anonymous."  Moreover, Burton failed to prevent the Footage from being sent to Daulerio.

162.    Going even further, on October 3, 2012, after confirming for Calta that the "significant DVD" was received, Burton e-mailed Daulerio and stated "I hear there's a second DVD of the same but has more racist comments by Hogan."

163.    Burton's reference to audio portions of the Footage coincides with references in the summary of the second DVD in the "DVD Details" summary from Peirce, which Calta forwarded to Burton on March 13, 2012, and the audio portions of Footage referenced in *thedirty.com*'s April 26, 2012 story.

164.    Daulerio responded to Burton, "[s]o… we're gonna slice this up into a highlight reel then do some commentary on the stills.  I just say this 'came across our desk' right?"

165.    At that time, Burton did not say or do anything to stop Daulerio from publicly disclosing the contents of the 30 Minute Video.

166.    Instead, Burton replied, "[h]owever you say you want to got it [*sic.*].  All I know is it was sent to you anonymously.  Work for you?"

167.    After Burton and Daulerio's e-mail exchange on October 3, 2012, Calta and Burton spoke on the phone again for nearly 30 minutes about what was happening.

168.    Burton knew the implications of what he was doing, and knew that what he and his client were doing was wrong and would harm and injure Bollea.

169.    In fact, this is why Burton actively participated in and helped cover-up his and Calta's nefarious activities.

170.    Burton admittedly knew before the Footage was published by *Gawker.com* that the significant DVD was the "Hulk Hogan Sex Tape."  Burton also knew and understood that

Calta had animosity against Bubba and Bollea, that they had a "radio war," and that Bubba needed to be fired to further Calta's career.

171.    As an experienced agent, Burton also knew that the Footage he was actively involved in sending Daulerio would have a devastating impact on Bollea's life and career.

172.    Burton later revealed that Calta pointed the finger at Loyd as being the person who gave the "Hulk Hogan Sex Tape" to Gawker, which confirms the conspiracy.

173.    Certainly, Calta, Loyd, and Burton all played key roles in publicly disclosing, disseminating, and exploiting the illegal Footage of Bollea.

174.    Daulerio edited the surreptitious Footage within the 30 Minute Video into a one-minute and forty-second "highlight reel" video (the "1:41 Video"), which showed Bollea fully naked, receiving oral sex, and engaged in sexual intercourse.  The 1:41 Video also included Bollea's private conversations with Cole, as well as subtitles to ensure that viewers understood every word spoken.

175.    On October 4, 2012, Gawker posted the 1:41 Video to the Internet, along with a graphic narrative description of portions of the 30 Minute Video not contained in the 1:41 Video (the "*Gawker.com* Posting").  At least 7 million people watched the 1:41 Video on the Internet.

176.    That same day, Burton and Calta had nine phone calls and talked for nearly 30 minutes.  Calta also called Peirce and Brennan.  Oliviero called Loyd and Calta.  Loyd called Epps and, using the alias "Jim Jannero," direct messaged Daulerio.  All of these communications were about the conspiracy and Footage.  Burton also forwarded Calta a story published on heavydotcom about the release of the Hulk Hogan sex tape, in response to which Calta replied "That's GREAT!!"

177.    The next day, October 5, 2012, Burton and Calta had five more calls and talked for over 41 minutes about Gawker, the conspiracy, and the Footage.  Calta and Peirce had three more calls, Calta also called Lawless, and Loyd called Epps, Rodriguez and Luther McLendon about the conspiracy and Footage.

178.    Over the ensuing days, Loyd had several more calls with The Bone during the time of Calta's afternoon show, as well as calls with Epps, Hammil, and Walters/*TMZ*; and Calta had numerous lengthy calls with Peirce and Burton about the conspiracy and Footage.

**D.    The Extortion Plot**

179.    On October 9, 2012, *TMZ* revealed to Bollea and Houston that Bubba could be heard at the end of an excerpt of the Footage talking about using the tapes for "retirement." These statements were not on the 30 Minute Video sent to Gawker.

180.    That same day, Loyd had numerous calls with Walters/*TMZ*.  Calta and Loyd also spoke twice; and after each call with Loyd, Calta called Burton.  All of those calls were about the conspiracy and Footage.

181.    Also on October 9, 2012, Loyd had calls with Epps, Hirsch, and Hammil, and Calta had several more calls with Peirce.  All of those calls were about the conspiracy and Footage.

182.    The TPD investigation of Loyd later confirmed that, between March 7, 2012 and October 16, 2012, Loyd had 38 phone calls with *TMZ* and during one of those calls *TMZ* referred Loyd to Davidson as someone who may be able to help sell the Footage.

183.    TMZ paid Loyd (between $8,500-$10,000) for the information he provided about, and as a licensing fee for access to and a transcript of Footage.  In order to cover his tracks, Loyd

directed *TMZ* to send that payment to Burbridge, who cashed the check, took a fee, and then gave the rest to Loyd and Carrega.

184.    On October 10, 2012, the conspiracy's plot to use the Footage to extort Bollea started to unfold:

- Daulerio direct messaged Loyd to "call me ASAP;"

- Peirce and Calta had numerous calls from 12:43-1:08 a.m.;

- Burton called Calta at 1:47 a.m.;

- Loyd called Calta at 2:13 a.m.;

- Loyd called Epps at 2:40 a.m.;

- At 2:14 p.m., Davidson e-mailed Houston regarding "Hulk Hogan Tape;"

- Shortly thereafter, Burton and Calta and Loyd and Calta again spoke on the phone;

- Loyd then had a call with  Hirsch, 2 calls with Daulerio, 3 calls with Walters, a call with Barfield, and a call with Davidson; and

- At the end of the night, Lawless called Loyd.

185.    On October 11, 2012, Daulerio direct messaged Loyd again for a call.  That same day, Burton and Calta had two calls lasting over an hour, and Loyd has several calls with Epps, Davidson, Bruno, and Barfield; all about the conspiracy and Footage.

186.    On October 12, 2012, Davidson e-mailed Houston that he reviewed all of the materials and was prepared to talk.  Later that day, Burton and Calta had 2 calls and Loyd had calls with Barfield and Davidson about the conspiracy and Footage.

187.    Davidson represented and acted on behalf of and in concert with Loyd, Carrega, Burbridge, and the conspiracy.  He spoke to Houston and told him that his client possessed surreptitious recordings of Bollea, one of which contained insensitive racial remarks which could

have the effect of causing great economic harm to Bollea if released publicly. Initially, Davidson requested $1 million for the DVDs. Davidson also said that the 30 Minute Video was sent to Gawker as a "shot across the bow."

188.    Even though they all knew Bollea was secretly recorded, none of the  Defendants turned over the illegally recorded Footage to Bollea.

189.    Instead, over the ensuing weeks, Davidson exchanged numerous e-mails and calls with Houston to negotiate a "settlement agreement" requiring Bollea to buy the Footage from Davidson's then-undisclosed clients. Meanwhile, Houston had already reported the threat to the Tampa, Florida office of the FBI.

190.    On October 15, 2012, Bollea sued Gawker over the *Gawker.com* Posting and held a press conference announcing the suit. Burton and Calta had five calls that day, one of which lasted over 30 minutes.

191.    That same day, Daulerio e-mailed Burton to have another call, Calta had 2 more calls with Peirce, and Loyd had calls with Rodriguez and Epps about the conspiracy and Footage. Calta and Burton also exchanged e-mails about discussing the Footage and Bubba on air and coordinating the content of those discussions with Shark and Lawless.

192.    On October 16, 2012, Bollea reported Davdison's contacts regarding the sex tape to the FBI.

193.    That same day, Calta and Burton had seven calls and spoke for over 40 minutes, Calta and Peirce spoke three times for over 30 minutes, Loyd had several calls with Walters/*TMZ*, as well as more calls with Epps, Rodriguez and Davidson. All of these calls were about the conspiracy and Footage.

194.    Over the ensuing days, Burton and Calta have numerous additional calls about the conspiracy and Footage.  During the same time, Loyd had several more calls with Epps, Walters/*TMZ*, and Barfield, as well as a call with Al Borda, an adult film producer, about the conspiracy and Footage.

195.    On October 19, 2012, shortly after Loyd's calls with Walters, *TMZ* posted a story about there being multiple tapes of Cole with other men.  That same day, Calta and Burton had 3 calls and Calta made 2 calls to Brennan about the conspiracy and Footage.

196.    On October 22, 2012, Houston and Davidson spoke about the Footage.  That same day, an anonymous Twitter post with an image of a DVD was directed to Bubba and stated, "you want me to tell you (*sic*) public audience you have more tapes or shall I? @TMZ."

197.    That same day, Loyd had a lengthy call with Galvin and a call with Oliviero, Brennan called Calta, and Burton and Calta had 3 more calls about the conspiracy and Footage.

198.    Over the ensuing days, Calta had several more calls with Burton, Brennan, Peirce, The Bone, Meder, and Oliviero, and Loyd had several more calls with Davidson about the conspiracy and Footage.

199.    On November 2, 2012, Daulerio posted an article on *Gawker.com* titled "List of People Bubba's Ex-Wife Had Sex With on Camera," which was based on information he obtained from Loyd.

200.    Over the ensuing week, Loyd had numerous calls with Davidson, Walters/*TMZ*, Epps, Fowler, and Barfield, and Calta has several more lengthy calls with Burton and Fowler about the conspiracy and Footage.

201.    On November 6, 2012, Davidson e-mailed Houston a draft of the settlement agreement regarding the Footage.

202.     On November 9, 2012, Burton and Calta had another 30+ minute call about the conspiracy and Footage.

203.     Over Veterans Day weekend, Loyd, Carrega, and Burbridge met to watch Footage on Loyd's laptop computer so Burbridge could be familiar with its content when she participated in the sale of Footage Davidson was negotiating.  That weekend, Loyd again talked to Barfield.

204.     On November 13, 2012, Calta had another 30-minute call with Burton, this time at 12:02 a.m.  After that call, Calta called Galvin.  Later that day, Calta and Loyd texted each other before Loyd made a 15-minute call to Calta at 4:35 p.m.  After that call, Calta called Burton and they talked for nearly 20 minutes, immediately after which Calta called Meder and Brennan.  Later that night, Loyd called Epps.  All of these call were about the conspiracy and Footage.

205.     On November 14, 2012, The Bone called Loyd during the time of Calta's show, shortly after which Calta had a 21-minute call with Burton.  That day, Calta had several more calls with Burton and made calls to Lawless, Oliviero, and Brennan.  Lawless and Calta also talked for nearly 17 minutes that night, immediately after which Calta called Burton for a 10-minute call.  All of these calls were about the conspiracy and Footage.

206.     As Davidson negotiated with Houston and they began exchanging versions of the settlement agreement to buy the Footage over the next several weeks, the numerous calls between and amongst Calta, Loyd, Burton, Epps, Davidson, Burbridge, Walters/*TMZ*, Brennan, Meder, Lawless, Oliviero, Fowler, The Bone, Barfield and Cox Radio about Footage and the conspiracy continued.

207.     On December 4, 2012, Houston e-mailed the revised agreement to Davidson. That same day, Brennan and Calta had 3 calls, Calta had calls with The Bone, Lawless, Burton,

and Oliviero, and Loyd had calls with Oliviero, Bruno, and Epps.  All of these calls were about the conspiracy and Footage.

208.    On December 5, 2012, Houston e-mailed Davidson about final edits to the agreement and meeting in Tampa for the DVD exchange.

209.    The following day, Burton and Calta had 3 more calls, Loyd had calls with Davidson, Oliviero, Epps, and Barfield, and Brennan called Calta; all about the conspiracy and Footage.

210.    On December 7, 2012, Calta and Loyd texted each other again, Burton and Calta had two more calls, Calta had calls with Peirce, Brennan, and Fariello, and Loyd called Galvin again; all about the conspiracy and Footage.

211.    The following day, Calta and Burton had 2 more calls about the conspiracy and Footage lasting about 35 minutes.

212.    On December 10, 2012, Davidson e-mailed the final version of the agreement to Houston and later initiated 3-way calls with Loyd and Burbridge to go over the deal and upcoming meeting to exchange the DVDs.  Loyd and Barfield also spoke again.

213.    On December 11, 2012, Calta and Burton spoke for nearly 25 minutes shortly after midnight.  Later that day, Davidson e-mailed an executed version of the settlement agreement for the Footage to Houston, and initiated another 3-way call with Loyd and Burbridge.  Burton and Calta also had another call at 10:36 p.m.  All of these calls were about the conspiracy and Footage.

214.    On December 12, 2012, Houston e-mailed the fully executed agreement to Davidson.  That same day, Calta had lengthy calls with Peirce and Burton, and Loyd had an

extended call with Rodriguez and calls with Davidson and Shark.  All of these calls were about the conspiracy and Footage.

215.    On December 13, 2012, the day before the planned exchange of the Footage as part of the extortion, Calta had more calls with Burton, Brennan, Oliviero, The Bone, and Lawless, and Loyd had several calls with Davidson.  All of these calls were about the conspiracy and Footage.  That night, Davidson, Loyd, Carrega, and Burbridge met for dinner and discussed the DVD exchange the following day.

216.    On December 14, 2012, the FBI set up the sting operation at the Sand Pearl Hotel in Clearwater Beach.  Davidson and Burbridge, acting at the behest of and in concert with Loyd, Carrega, and the rest of their co-conspirators, met Houston and Bollea and turned over what they represented were all copies of the surreptitious Footage of Bollea in exchange for a check in the amount of $150,000 and a commitment to make subsequent payments of an additional $150,000, for a total extortion payment of $300,000.  The parties exchanged a "Settlement Agreement," attached to which is a "transcript" summarizing three DVDs.

217.    The FBI recorded the activities of the participants (Bollea, Houston, Davidson, Burbridge and a polygraph examiner who was working undercover for the FBI) in a room at the hotel.  When Houston handed the check to Davidson and Burbridge, several FBI agents entered the room with guns drawn, took Davidson and Burbridge into custody, and immediately removed Bollea and Houston from the room.  The FBI seized three DVDs.

218.    The FBI interviewed Burbridge, who confirmed that Loyd leaked stills from surreptitious Footage to *TheDirty.com* and was paid by TMZ for leaking information about the Footage.

219.    Burbridge also explained to the FBI how she, Carrega, and Loyd watched the Footage on Veterans Day 2012 at Loyd's house on Loyd's computer, and later had a conference call and meeting with Davidson in Pinellas County, Florida to plan out their exchange with Bollea.

220.    Burbridge also claimed that they (her, Loyd, and Carrega) were not the ones who sent the 30 Minute Video to Gawker; but insisted that Davidson instructed her that she needed to lie to Bollea and say that they did leak the Footage to Gawker in order for the deal with Bollea to go through.

221.    In the days after the FBI sting, Calta and Burton had seven calls lasting nearly 1-1/2 hours, Calta had more calls with Brennan, Peirce and Fowler, and Loyd had calls with Oliviero and Epps, all about the conspiracy and Footage.

**E.    The *Enquirer* Leak**

222.    Over the next several years, Bollea's lawsuit against Gawker, Denton, and Daulerio over the *Gawker.com* Posting progressed (the "Gawker Litigation").

223.    Meanwhile, unbeknownst to Bollea, Bubba filed a complaint with TPD in May 2014, after a photo of another of the Cole DVDs with "Denzel"[1] written on it was tweeted to Bubba from an alias twitter account.  TPD opened an investigation and traced the tweet to Loyd.

224.    On August 20, 2014, TPD interviewed Loyd and confirmed that Loyd was the one who sent the tweet, which Loyd claimed to have sent to "make Bubba squirm."

225.    TPD continued its investigation into Loyd over the next 15 months, including subpoenaing phone records and interviewing critical witnesses. In early 2015, TPD and the

---

[1]   TPD later confirmed that "Denzel" was Denzil Lewis, a friend of Bubba who also was recorded having sex with Cole.

Hillsborough County State Attorneys' Office ("HCSAO") interviewed Burbridge, Bubba, and Epps.

226.    Epps claimed to TPD that Loyd was always looking for "dirt" on Bubba and that Epps had never seen any sex videos with Cole and did not remember Bubba ever saying he had them prior to them being exposed in the tabloids.

227.    On April 1, 2015, TPD and the HCSAO interviewed Cole.  That same day, Calta and Burton spoke for over 17 minutes.  Late that night, Calta and Loyd started texting, and then Calta called Loyd.  All these communications were about the conspiracy and Footage.  In April 2015, Loyd no longer worked for Cox Radio.

228.    On April 2, 2015, Loyd and Calta had another call at 12:29 a.m., and then exchanged texts shortly thereafter.  Calta called Loyd at 1:41 a.m. and they spoke for over 35 minutes.  Later that night, Calta and Burton spoke for over 12 minutes.  All of these calls and texts were about the conspiracy and Footage.

229.    On April 3, 2015, Calta had calls with Lawless, Oliviero, and Brennan about the conspiracy and Footage.

230.    On April 6, 2015, Oliviero called both Calta and Loyd.  Soon thereafter, Loyd participated on a call originated from a VOIP that included several other callers and lasted nearly an hour.  Soon after Loyd's conference call ended, Burton called Calta and that call originated from the same VOIP as Loyd's conference call.

231.    On April 8, 2015, Loyd participated on another call with  multiple callers that lasted over 73 minutes and originated from ██████████  That same day, Calta made a call originating from that same number.

232.     On April 9, 2015, Calta and Loyd exchanged text messages throughout the evening about the conspiracy and Footage.

233.     On April 10, 2015, Burbridge had a 15-minute call with Loyd at 1:34 a.m.  At 1:56 a.m., Calta called Loyd and they spoke for nearly 30 minutes.  Later that day, Calta had another 12-minute call with Burton.  All of these calls and texts were about the conspiracy and Footage.

234.     Over the next few days, Calta and Burton had two more calls lasting 45 minutes, and Calta had another 10-minute call with Brennan.  All of these calls and texts were about the conspiracy and Footage.

235.     On April 16, 2015, TPD called Calta and left a message asking him an interview in the Loyd criminal investigation.

236.     On April 17, 2015, Calta had two calls with Fariello, and calls with Lawless and Brennan about the TPD investigation.

237.     Calta and Lawless spoke again on April 19, 2015.  That same day, Loyd and Barfield had another call.

238.     On April 20, 2015, Calta had two more calls with Fariello, and Loyd had several calls with his criminal attorney, Jeff Brown ("Brown").  Loyd also had another conference-line call that lasted nearly 15 minutes.  All of these calls were about the TPD, investigation, conspiracy and Footage.

239.     On April 21, 2015, Fariello called TPD to make arrangements for Calta to be interviewed the following morning, but called back later that day to tell TPD Calta would not agree to meet.  That night, Calta called Burton and had a call with Lawless about the TPD investigation, conspiracy and Footage.

240.     On April 22, 2015, Calta had multiple calls with Burton and Lawless, and a nearly 15-minute call with Peirce at 11:43 p.m. about the TPD investigation, conspiracy and Footage.

241.     On April 23, 2015, Calta had another 30-minute call with Burton and nearly 10-minute call with Brennan about the TPD investigation, conspiracy and Footage.

242.     On April 27, 2015, Calta called Loyd at 12:20 a.m. and Burton at 4:08 a.m.  Later that day, Burton and Calta had 3 additional calls and talked for over 30 minutes.  All of these calls were about the TPD, investigation, conspiracy and Footage.

243.     On April 28, 2015, Loyd participated in another conference-line call at 5:33 p.m. and, shortly thereafter, Calta and Burton had another call.  That night, Loyd had an over 12-minute call with Oliviero.  All of these calls were about the TPD, investigation, conspiracy and Footage.

244.     On April 29, 2015, Calta and Lawless had another 10-minute call at 5:04 p.m. Shortly thereafter, Calta had calls with Burton and Fariello before participating in an over 30-minute call on the Cox Media conference line.  Following the Cox Media conference call, Burton and Calta had a 30-minute call, after which Calta had calls with Fariello and Oliviero.  All of these calls were about the TPD, investigation, conspiracy and Footage.

245.     On April 30, 2015, Calta had two more lengthy calls with Burton, two calls with Fariello, and calls with Brennan, SiriusXM, and Lawless.

246.     Over the ensuing days, Loyd participated in several more conference-line calls and Calta had several more calls with Lawless, Fariello, Brennan, and Peirce.

247.     On May 12, 2015, TPD interviewed Carrega in the Loyd criminal investigation. That same day, Burton and Calta had three calls lasting 27 minutes about the conspiracy and Footage.

248.   The next day, Calta called Loyd at 2:38 a.m. and they talked for nearly 22 minutes.  Shortly thereafter, Brenan and Calta had a 21-minute call, following which Lawless called Calta.  All of these calls were about the conspiracy and Footage.

249.   Later that day, Calta and Burton spoke twice more for over 32 minutes, and Loyd and Calta had three more calls.  All of these calls were about the conspiracy and Footage.

250.   On May 14, 2015, Calta again called Loyd.  Soon thereafter, Calta and Burton had multiple calls lasting over 30 minutes.  Later that night, Loyd called Calta again.  All of these calls were about the conspiracy and Footage.

251.   On May 15, 2015, Calta had calls with Burton and Brennan, after which he participated in another conference-line call.

252.   On May 18, 2015, Loyd had another call with Brown and another call with Calta. All of these calls were about the conspiracy and Footage.

253.   On May 19, 2015, Loyd had a call with Beasley Media (Bubba's station) that lasted nearly 10 minutes.  That same day, Calta had a 17-minute call with Lawless and a 26-minute call with Burton.  All of these calls were about the conspiracy and Footage.

254.   On May 20, 2015, Calta and Loyd had another call.  That same day, Calta had calls with Brennan, Galvin, and The Bone, and Loyd had extended calls with Barfield and Brown.  All of these calls were about the conspiracy and Footage.

255.   The following day, Loyd had another call with Barfield, as well as two more lengthy conference-line calls at 7:13 p.m. and 8:06 p.m.

256.   Over the ensuing weeks, Calta had several more calls with Burton, Brennan, Fariello, and Oliviero; and Loyd had several more calls with Burbridge, Brown, and Barfield about the conspiracy and Footage.

257.    On June 10, 2015, Loyd and Calta had another call lasting almost 18 minutes, following which Calta called Lawless and Burton.  That night, Calta and Lawless talked for almost 14 minutes.  All of these calls were about the conspiracy and Footage.

258.    On June 16, 2015, Loyd and Barfield had another call and Calta and Loyd had another lengthy call at 10:18 p.m.  Burton called Calta at 12:31 a.m. the following morning.  All of these calls were about the conspiracy and Footage.

259.    ████████████████████████████████████████████
████████████████████████

260.    On June 25, 2015, Calta had a 25-minute call with Burton and several calls with Brennan and Fariello.  Loyd had lengthy calls with Barfield and Brown, and a 16-minute conference-line call at 8:10 p.m.

261.    On June 26, 2015, Calta had a 12-minute call with Brennan at 1:48 a.m., followed by a 12-minute call with Burton at 2:00 a.m.  Later that day, Loyd made several calls to Nielsen and Arbitron.

262.    Over the ensuing week, Loyd made more calls to Arbitron, and Calta had several more lengthy calls with Burton, Brennan, and Peirce.

263.    On July 1, 2015, Loyd participated in another conference-line call lasting nearly 15 minutes at 2:15 p.m.  That same day, Calta had a conference-line call lasting nearly 33 minutes at 3:35 p.m.

264.    The next day, Calta and Burton had another 30-minute call, and Calta had several calls with Brennan about the conspiracy and Footage.

265.     On July 3, 2015, Loyd had a 20-minute call with Beasley Media, followed by a 13-minute call to SiriusXM and another conference-line call that originated from the same VOIP number as the early April 2015 calls.

266.     Over the ensuing weeks, Calta had several more lengthy calls with Burton, Lawless, Fariello, and Brennan about the conspiracy and Footage.

267.     Bollea originally was scheduled for trial against Gawker to commence the first week of July 2015.  In the days leading up to the trial, Bubba's on-air attacks against Loyd, Calta and Cox Radio, including statements about their involvement in publicly releasing the surreptitious Footage of Bollea, escalated.  However, due to an appellate decision by the Second DCA, the Gawker Litigation trial was cancelled on the eve of its commencement.

268.     During this same time period (as explained in detail above), Bubba, Cox and Calta were involved in their own battle.  Bubba was overtaking Calta's show in key ratings and, according to Bubba, Cox was looking for ways to eliminate Bubba as competition.

269.     On July 10, 2015, Calta had extended calls with Lawless and Brennan.

270.     On July 13, 2015, Loyd had calls with iHeart Media and Clear Channel, as well as an over 21-minute call with Barfield.

271.     Over the next few days, Loyd has several more calls with Clear Channel and a nearly 25-minute call with Barfield.

272.     On July 16, 2015, TPD interviewed Fowler.  Fowler told TPD that he recalled seeing Loyd and Calta together in 2012 watching a video of Bollea and Cole having sex, which they were viewing on a desktop computer at Cox Radio's office in St. Petersburg.

273.     The night of Fowler's TPD interview, Burton and Calta had another 20-minute call about the conspiracy and Footage.

274.     On July 22, 2015, Calta called Loyd at 1:47 a.m. and they talked for nearly 35 minutes, after which Burton and Calta had another 10-minute call about the conspiracy and Footage.

275.     The next day, Calta had another call with Brennan and a 16-minute call with Burton about the conspiracy and Footage.

276.     On July 24, 2015, two days after Loyd and Calta's 35-minute call and Calta's calls to Brennan and Burton, *The National Enquirer* and its sister publication *RadarOnline.com* (collectively, the "*Enquirer*"), gave notice to Bollea's counsel that the *Enquirer* intended to publish excerpts from what they claimed was a confidential "sealed" transcript of Footage from the Gawker Litigation.

277.     On July 24, 2015, the *Enquirer* published its story quoting excerpts from the surreptitious Footage of Bollea, which they described as coming from a court-protected, confidential transcript.  That same day, the *Enquirer's* Lachlan Cartwright tweeted that Gawker was not its source for its story, and that the *Enquirer* was provided with a "transcript" of Footage.  However, the *Enquirer* since confirmed it had no transcript or copies of any recordings of Bollea Footage.

278.     Although based on the hostile nature of the Gawker Litigation Bollea initially believed that Gawker may have been behind the *Enquirer* leak, Daulerio, Denton and Gawker's in-house counsel, Heather Dietrick, all declared under penalty of perjury that they had no involvement in the *Enquirer* leak.

279.     On July 24, 2015, Calta and Burton had four more calls and talked for over 33 minutes, Calta had two calls with Brennan and one with Fariello, and Loyd made calls to Barfield and Brown; all about the conspiracy and Footage.

280. Defendants each at various times possessed, had access to and/or control over the material that was leaked to the *Enquirer*, and all of them had motive and opportunity to leak this material – particularly in July 2015, when the animosity between Cox Radio/Calta/Loyd and Bubba was at its peak and the criminal investigation of Loyd was coming to a head.

281. Ultimately, the actions of all of the Defendants set forth herein substantially contributed to the *Enquirer's* publication of content from the illegally recorded Footage of Bollea, which caused Bollea to be immediately terminated by the WWE and erased from WWE's Hall of Fame, network and website. Hundreds of articles and reports were published by news organizations immediately thereafter, accusing Bollea of being a "racist."

282. Bollea promptly issued a public apology for the offensive language that was illegally in 2007 recorded during a momentary lapse in judgment at a very difficult time in his life, while he was having a private conversation in his then-best friend's bedroom. However, the damage was already done and irreversible.

283. Defendants, in doing the things alleged herein, acted with actual malice and reckless disregard of Bollea's rights. Moreover, although none of the Defendants were acting in the capacity of a member of the "press" while engaging in the conduct forming the basis of this action, the actions of each of the Defendants, alleged herein, still served no legitimate public interest.

284. All conditions precedent to the bringing and maintenance of this action and the granting of the relief requested have been performed, have occurred, or have been waived.

285. Bollea has retained the undersigned attorneys to represent him in this action and is obligated to pay them a reasonable fee for their services.

**FIRST CAUSE OF ACTION**

**(Invasion of Privacy and/or Aiding and Abetting Invasion of Privacy)**

286.    Bollea repeats, re-alleges, adopts and incorporates each and every allegation contained in Paragraphs 1 through 285, inclusive, as though fully set forth herein.

287.    Defendants, in engaging in the conduct alleged herein, grossly invaded Bollea's protected rights of privacy as recognized under the United States Constitution, Florida Constitution, and Florida common law.

288.    Among other things, Defendants used, exploited and publicly disclosed intimate details of Bollea's private life by actively participating in, providing substantial assistance to and/or ratifying or approving the public disclosure and dissemination of surreptitious Footage of Bollea to tabloids including TMZ.com, *TheDirty.com*, *Gawker.com* and *Enquirer*, and/or acting in concert with and/or aiding and abetting oen another to accomplish such public disclosure and dissemination, for their own economic gain and self interests, and to harm Bollea.

289.    The unauthorized use, exploitation, disclosure and dissemination of the surreptitious Footage of Bollea was highly offensive and objectionable to Bollea and to any reasonable person of ordinary sensibilities, and was not of legitimate public concern.

290.    Defendants knew or should have known that:   (1) the surreptitious Footage of Bollea contained private and confidential information about Bollea; (2) Bollea had a reasonable expectation of privacy in being fully naked and engaged in consensual sexual activity, and having private conversations, in a private bedroom; (3) the Footage was taken without Bollea's knowledge or consent; (4) disclosure of the surreptitious Footage would reveal private and personal things about Bollea which Defendants had no right or authorization to use, disseminate, disclose or exploit; (5) the publication of these private facts about Bollea would be offensive and

objectionable to a reasonable person of ordinary sensibilities; and, (6) the publication of these private facts constitutes a substantial violation of Bollea's right of privacy.

291.    Defendants had no reasonable or legitimate purpose for their acts of participation in and assistance provided in using, distributing, disseminating, disclosing and/or exploiting the surreptitious Footage of Bollea, and/or for acting in concert with, aiding and abetting other Defendants to accomplish the same.  Bollea had a reasonable expectation of privacy when he was fully naked and engaged in private consensual sexual activity and having private conversations in a private bedroom, and had no knowledge of, and did not consent to, the recording or public disclosure of any such private activities.

292.    The intimate details of Bollea's private life that were illegally recorded, illegally obtained and then used, distributed, disseminated, disclosed and/or exploited by and as a result of the actions of the Defendants were in fact published and would not have been published but for the Defendants' actions of procuring, actively participating in, providing substantial assistance for, and/or ratifying or approving the use, distribution, dissemination, disclosure, and/or exploitation of such private facts, or Defendants acting in concert with, aiding and abetting such misconduct.

293.    Defendants violated Bollea's fundamental privacy rights by the conduct alleged herein, including the intrusion into Bollea's privacy and the outrageous use, distribution, dissemination, disclosure and/or exploitation of the surreptitious recordings of Bollea to tabloid websites and others, and/or acting in concert with, providing substantial assistance for, ratifying, approving, aiding, and/or abetting of the same, in an unprivileged manner calculated to financially capitalize therefrom and/or cause substantial harm to Bollea and others, in conscious disregard of Bollea's rights.

294.    Defendants acted with actual malice and reckless disregard of Bollea's rights.

295.    As a direct and proximate result of the aforementioned acts by each of the Defendants, Bollea has suffered economic and emotional injury, damage, loss and harm, damage to reputation, loss of income, anxiety, embarrassment, humiliation, shame, and severe emotional distress in an amount subject to proof; which damages are continuing in nature and will be suffered in the future.

296.    Bollea also is entitled to preliminary and permanent injunctive relief enjoining the use, distribution, dissemination and disclosure of the surreptitious Footage, and any portions and content thereof; mandating the delivery of all originals, reproductions, copies, and portions of same and all content derived therefrom to Bollea; and transferring to Bollea all right, title and interest in and to all originals, reproductions, copies, and portions of same and all content derived therefrom.

297.    The aforementioned acts of the Defendants were done intentionally or with a conscious and/or reckless disregard of Bollea's rights, and with the intent to vex, injure or annoy, such as to constitute oppression, fraud or malice.

### SECOND CAUSE OF ACTION

**(Public Disclosure of Private Facts and/or Aiding and
Abetting Public Disclosure of Private Facts)**

298.    Bollea repeats, re-alleges, adopts and incorporates each and every allegation contained in Paragraphs 1 through 285, inclusive, as though fully set forth herein.

299.    Defendants actively participated in, provided substantial assistance to and/or ratified, approved, aided and/or abetted the disclosure and dissemination of Footage and the contents of Footage to tabloid websites, and thus to the public, private facts concerning Bollea contained within the contents of the surreptitious Footage which depicted Bollea fully naked,

engaged in private consensual sexual activity in a private bedroom, and engaged in private conversations, and/or Defendants acted in concert with, aided and abetted one another in connection with such public disclosure, for their own economic gain and self interests and to harm Bollea.

300.    Defendants knew or should have known that:  (1) the surreptitious Footage of Bollea contained private and confidential information about Bollea; (2) Bollea had a reasonable expectation of privacy in being fully naked and engaged in consensual sexual activity, and having private conversations in a private bedroom; (3) the recordings were taken without Bollea's knowledge or consent; (4) the disclosure of the surreptitious Footage would reveal private and personal things about Bollea which said Defendants had no right or authorization to use, disseminate, disclose or exploit; (5) the publication of these private facts about Bollea would be offensive and objectionable to a reasonable person of ordinary sensibilities; and, (6) the publication of these private facts constitutes a substantial violation of Bollea's right of privacy.

301.    Defendants had no reasonable or legitimate purpose for their acts of participation in and assistance provided in using, distributing, disseminating, disclosing and/or exploiting the surreptitious recordings of Bollea and/or for acting in concert with, aiding, and abetting other Defendants in committing these acts.  Bollea had a reasonable expectation of privacy when he was fully naked, engaged in private consensual sexual activity, and having private conversations, in a private bedroom, and had no knowledge of, and did not consent to, the recording of any such private activities.

302.    The private facts that were illegally recorded, illegally obtained, and then used, distributed, disseminated, disclosed and/or exploited by and as a result of the actions of the Defendants were in fact published, and would not have been published but for Defendants'

actions of procuring, actively participating in, providing substantial assistance for and/or ratifying or approving the use, distribution, dissemination, disclosure and/or exploitation of such private facts, or Defendants' actions in concert with, or acts of aiding and abetting such misconduct.

303.    The actions of the Defendants as alleged herein are highly offensive and objectionable to Bollea, as well as to any reasonable person of ordinary sensibilities, and are not of legitimate public concern.   Bollea did not consent to nor authorize any use, distribution, dissemination, disclosure or exploitation of the surreptitious Footage of him, or any portions or content thereof, whatsoever, or of the publication of same by anyone.

304.    Defendants violated Bollea's fundamental privacy rights by the conduct alleged herein, including the intrusion into Bollea's privacy and the outrageous use, distribution, dissemination, disclosure and/or exploitation of the private facts contained within surreptitious Footage of Bollea to tabloid websites and the public, and/or acting in concert, providing substantial assistance for, ratifying, approving, aiding and/or abetting of same, in an unprivileged manner calculated to financially capitalize therefrom and/or cause substantial harm to Bollea and others, in conscious disregard of Bollea's rights.

305.    Defendants acted with actual malice and reckless disregard for Bollea's rights.

306.    As a direct and proximate result of the aforementioned acts by each of the Defendants, Bollea has suffered economic and emotional injury, damage, loss and harm, damage to reputation, loss of income, anxiety, embarrassment, humiliation, shame and severe emotional distress in an amount subject to proof; which damages are continuing in nature and will be suffered in the future.

307.    Bollea also is entitled to preliminary and permanent injunctive relief enjoining the use, distribution, dissemination and disclosure of the surreptitious Footage of Bollea, and any portions and content thereof; mandating the delivery of all originals, reproductions, copies, and portions of same and all content derived therefrom to Bollea; and transferring to Bollea all right, title and interest in and to all originals, reproductions, copies, and portions of same and all content derived therefrom.

308.    The aforementioned acts of Defendants were done intentionally or with a conscious and/or reckless disregard of Bollea's rights, and with the intent to vex, injure or annoy, such as to constitute oppression, fraud or malice.

## THIRD CAUSE OF ACTION

### (Invasion of Privacy by Intrusion Upon Seclusion and/or Aiding and Abetting Invasion of Privacy by Intrusion Upon Seclusion)

309.    Bollea repeats, re-alleges, adopts and incorporates each and every allegation contained in Paragraphs 1 through 285, inclusive, as though fully set forth herein.

310.    Defendants, without Bollea's consent and against Bollea's will, grossly invaded Bollea's protected rights of privacy as recognized under the United States Constitution, Florida Constitution, and applicable common law, by actively participating in, providing substantial assistance for and/or ratifying or approving, obtaining, using, watching, distributing, disseminating, disclosing and/or exploiting the surreptitious Footage of Plaintiff which depicted him fully naked, engaged in private intimate consensual sexual activity, and included his private conversations, in a private bedroom, and/or acting in concert with, aiding, and abetting one another to accomplish such misconduct.

311.    Defendants, through electronic means, enabled the general public to intrude into a place in which Bollea had a reasonable expectation of privacy and watch Bollea when he was

fully naked, engaged in private sexual activity, and engaged in private conversations, in a private bedroom, without Bollea's knowledge, authorization or consent.

312.   The activities of the Defendants were not carried out for reasonable or legitimate purposes, but rather to reap financial rewards at the expense of Bollea and others and/or to cause substantial harm to Bollea and others.

313.   Bollea had a reasonable expectation of privacy in the location in which the surreptitious Footage was secretly recorded, and a reasonable expectation he was not being recorded while engaging in the private activities in which he was engaged; appearing fully naked, engaged in private consensual sexual activity, and having private conversations, in a private bedroom.   Bollea had no knowledge of, and did not consent to, the recording or disclosure and dissemination of such private activities.

314.   The actions by the Defendants are offensive and objectionable to Bollea, and would outrage or cause mental suffering, shame, humiliation or hurt feelings to a person of ordinary sensibilities.

315.   Defendants knew or should have known that:  (1) the surreptitious Footage of Bollea contained private and confidential information about Bollea; (2) Bollea had a reasonable expectation of privacy in being fully naked and engaged in consensual sexual activity, and having private conversations, in a private bedroom; (3) the recordings were taken without Bollea's knowledge or consent; (4) the disclosure of the surreptitious Footage would reveal private and personal things about Bollea which Defendants had no right or authorization to use, disseminate, disclose or exploit; (5) the publication of these private facts about Bollea would be offensive and objectionable to a reasonable person of ordinary sensibilities; and, (6) the publication of these private facts constitutes a substantial violation of Bollea's right of privacy.

316.     Defendants violated Bollea's fundamental privacy rights by the conduct alleged herein in an unprivileged manner, calculated to financially gain therefrom, at the expense of Bollea and others, and/or to cause Bollea to suffer substantial harm therefrom, in conscious disregard of Bollea's right of privacy.

317.     Defendants acted with actual malice and reckless disregard of Bollea's rights.

318.     As a direct and proximate result of the aforementioned acts by each of the Defendants, Bollea has suffered economic and emotional injury, damage, loss and harm, damage to reputation, loss of income, anxiety, embarrassment, humiliation, shame, and severe emotional distress in an amount subject to proof; which damages are continuing in nature and will be suffered in the future.

319.     Bollea also is entitled to preliminary and permanent injunctive relief enjoining the use, distribution, dissemination and disclosure of the surreptitious Footage of Bollea, and any portions and content thereof; mandating the delivery of all originals, reproductions, copies, and portions of same and all content derived therefrom to Bollea; and transferring to Bollea all right, title and interest in and to all originals, reproductions, copies, and portions of same and all content derived therefrom.

320.     The aforementioned acts of the Defendants were done intentionally or with a conscious and/or reckless disregard of Bollea's rights, and with the intent to vex, injure or annoy, such as to constitute oppression, fraud or malice.

### FOURTH CAUSE OF ACTION

### (Intentional Infliction of Emotional Distress)

321.     Bollea repeats, re-alleges, adopts and incorporates each and every allegation contained in paragraphs 1 through 285, inclusive, as if fully set forth herein.

322.    At all times herein, the Defendants acted intentionally, maliciously and without justification, actively participated in, provided substantial assistance to, and/or ratified or approved misconduct that caused the surreptitious Footage of Bollea to be publicly disseminated, disclosed and used to third parties, including tabloid websites, and/or by acting in concert with, aiding and abetting in such activities and a civil extortion scheme, when Defendants knew or should have known that Bollea would suffer severe emotional distress as a result.

323.    The conduct by the Defendants was intentional and malicious and done for the purpose of causing, or was known by Defendants to be likely to cause, Bollea to suffer humiliation, mental anguish and severe emotional distress, and was done with the wanton and reckless disregard of the consequences to Bollea.

324.    In doing the acts alleged hereinabove, the Defendants acted outrageously and beyond all reasonable bounds of decency, and intentionally inflicted severe emotional distress upon Bollea, to his detriment.

325.    Defendants acted with actual malice and reckless disregard of Bollea's rights.

326.    As a direct and proximate result of the aforementioned acts by each of the Defendants, Bollea has suffered emotional injury, damage, loss, harm, anxiety, embarrassment, humiliation, shame, and severe emotional distress in an amount subject to proof; which damages are continuing in nature and will be suffered in the future.

327.    The aforementioned acts of the Defendants were done intentionally or with a conscious and/or reckless disregard of Bollea's rights, and with the intent to vex, injure or annoy, such as to constitute oppression, fraud or malice.

## FIFTH CAUSE OF ACTION

### (Intentional Interference with Contractual Relations
### and Advantageous Business Relationships)

328.    Bollea repeats, re-alleges, adopts and incorporates each and every allegation contained in Paragraphs 1 through 285, inclusive as though fully set forth herein.

329.    At all times herein, the Defendants were aware that Bollea had specific employment, endorsement and other contracts, including without limitation, his WWE contract/relationship, and Defendants acted intentionally, maliciously and without justification in their wrongful acts described herein, when Defendants knew or should have known that their actions would cause or were likely to cause substantial interference with Bollea's existing contracts and his advantageous business relationships.

330.    Defendants' conduct was intentional and malicious and done for the purpose of causing, or was known by them to be likely to cause, the termination of and substantial interference with Bollea's contracts and his advantageous business relationships.

331.    In doing the acts alleged hereinabove, the Defendants acted outrageously and beyond all reasonable bounds of decency.

332.    As a direct and proximate result of the aforementioned wrongful conduct by the Defendants, Bollea has suffered substantial economic injury, loss, damages and harm from the actual interference with Bollea's contracts and advantageous business relationships, in an amount subject to proof; which damages are continuing in nature and will be suffered in the future.

333.    Defendants acted with actual malice and reckless disregard of Bollea's rights.

334.    Defendants acted intentionally or with a conscious and/or reckless disregard of Bollea's rights, and with the intent to vex, injure or annoy, such as to constitute oppression, fraud or malice.

## SIXTH CAUSE OF ACTION

### (Violation of Section 934.10, Florida Statutes and/or
### Aiding and Abetting of Violation of Section 934.10, Florida Statutes)

335. Bollea repeats, re-alleges, adopts and incorporates each and every allegation contained in Paragraphs 1 through 285, inclusive as though fully set forth herein.

336. Bollea had a reasonable expectation of privacy in engaging in private oral communications in a private bedroom, and a reasonable expectation that his oral communications would not be recorded, and did not know about, nor consent to, the recording of such oral communications.

337. Defendants intentionally, either directly or in active participation or concert with one another, or by providing substantial assistance to one another, violated, or aided and abetted in the violation of Plaintiff's rights under Section 934.10, Florida Statutes, by using, disseminating, disclosing and/or distributing to third parties, or procuring another to use, disseminate, disclose or distribute to third parties, the contents of Bollea's private oral communications.

338. Defendants knew or should have known that: (1) the surreptitious Footage of Bollea contained private and confidential information about Bollea; (2) Bollea had a reasonable expectation of privacy while having private conversations, in a private bedroom; (3) the recordings were made without Bollea's knowledge or consent; (4) the disclosure of the surreptitious Footage would reveal private and personal things about Bollea which said Defendants had no or authorization to use, disseminate, disclose or exploit; (5) the use or disclosure of Bollea's oral communications or the contents thereof would be offensive and objectionable to a reasonable person of ordinary sensibilities; and, (6) the use and disclosure of Bollea's oral communications was unlawful.

339.     Defendants' actions have not served any legitimate public interest.

340.     Defendants acted with actual malice and reckless disregard of Bollea's rights, including his right to privacy.

341.     As a direct and proximate result of the aforementioned acts by the Defendants, Bollea has suffered substantial actual damages; which are continuing in nature and will be suffered in the future. in an amount subject to proof.

342.     The aforementioned acts of the Defendants were done intentionally or with a conscious and/or reckless disregard of Bollea's rights, and with the intent to vex, injure or annoy, such as to constitute oppression, fraud or malice.

## SEVENTH CAUSE OF ACTION

### (Civil Conspiracy)

343.     Bollea repeats, re-alleges, adopts and incorporates each and every allegation contained in Paragraphs 1 through 342, inclusive, as if fully set forth herein.

344.     Defendants entered into an agreement or agreements with one another as part of an ongoing scheme to commit an unlawful act or acts and/or perform lawful act(s) by unlawful means.

345.     Defendants, as more specifically set forth above, each performed overt acts in pursuance of their conspiracy.

346.     As a direct and proximate result of Defendants' acts, Bollea suffered substantial economic and emotional injury, damage, loss and harm, anxiety, embarrassment, humiliation, shame, damage to reputation, loss of income, severe emotional distress, in an amount subject to proof; which damages are continuing in nature and will be suffered in the future.

## EIGHTH CAUSE OF ACTION

### (Negligent Retention – Cox & Buchwald)

347.    Bollea repeats, re-alleges, adopts and incorporates each and every allegation contained in paragraphs 1 through 342, inclusive, as if fully set forth herein.

348.    During the course of Cox's employment of Calta and Loyd, and Buchwald's employment of Burton, Cox and Buchwald became aware or should have become aware of conduct and/or misconduct of Calta, Loyd and Burton that demonstrated their unfitness.

349.    Cox and Buchwald knew or should have known that Calta and Loyd and Burton, respectively, were predisposed to committing wrongs, harming others, and/or had a propensity for engaging in the misconduct alleged herein.

350.    Cox and Buchwald failed to take reasonable actions to investigate, prevent and/or avoid the misconduct alleged herein, thereby breaching a duty owed to Bollea.

351.    Cox and Buchwald also had the ability to control Calta, Loyd and Burton, such as to substantially reduce the probability of harm to others, specifically including Bollea.

352.    Bollea was injured by the acts of Calta, Loyd and Burton, which could reasonably have been anticipated by Cox and Buchwald and which, by exercising due diligence and authority over Calta, Loyd and Burton, could have been avoided.

353.    As a direct and proximate result of Cox and Buchwald's actions, Bollea has suffered economic and emotional injury, damage, loss and harm, damage to reputation, loss of income, anxiety, embarrassment, humiliation, shame, and severe emotional distress in an amount subject to proof; which damages are continuing in nature and will be suffered in the future.

## NINTH CAUSE OF ACTION

### (Negligence – Cox)

354.    Bollea repeats, re-alleges, adopts and incorporates each and every allegation contained in paragraphs 1 through 342, inclusive, as if fully set forth herein.

355.    As set forth above, Cox had actual or constructive control of the instrumentality, premises and/or tortfeasors that caused injury to Bollea.

356.    While engaged in the misconduct alleged herein, Calta and Loyd were acting within the course and scope of their employment as "shock jocks" for Cox, engaged in conduct of the kind they were hired to perform, within the time and space limits of their employment, and while motivated at least in part by a purpose to serve Cox.

357.    Alternatively, Cox's hiring, employment, promotion, and approval of misconduct of Calta and Loyd was calculated to, incited and encouraged imminent reckless behavior, such as the torts committed against Bollea.

358.    Cox had actual, constructive and/or implied knowledge of the imminent harm to Bollea, and owed Bollea a duty of care to prevent the misconduct of Cox's agents and employees, as well as misconduct on its premises and/or misconduct accomplished on or using its equipment and facilities.

359.    Cox breached its duty of care by failing to prevent its agents and employees from actively participating in, providing substantial assistance to, conspiring to, and acting in concert with others in procuring, disclosing, using, exploiting and disseminating the Footage, aiding and abetting others in doing the same, and otherwise failing to warn Bollea.

360.    As a direct and proximate result, Bollea has suffered damages, emotional injury, substantial economic injury, loss of income, harm, anxiety, shame, humiliation, emotional

distress, embarrassment, and damage to reputation, in an amount subject to proof; which damages are continuing in nature and will be suffered in the future.

### **TENTH CAUSE OF ACTION**

#### **(Negligence – Buchwald)**

361.    Bollea repeats, re-alleges, adopts and incorporates each and every allegation contained in paragraphs 1 through 342, inclusive, as if fully set forth herein.

362.    As set forth above, Buchwald had actual or constructive control of the instrumentality, premises and/or tortfeasors that caused injury to Bollea.

363.    While engaging in the misconduct alleged herein, Burton was acting within the course and scope of his employment as an agent for Buchwald, engaged in conduct of the kind he was hired to perform, within the time and space limits of his employment, and while motivated at least in part by a purpose to serve Buchwald.

364.    Alternatively, Buchwald's employment and approval of the behavior of Burton was calculated to, incited and encouraged Burton's imminent reckless behavior, such as the torts committed against Bollea.

365.    Buchwald had actual, constructive and/or implied knowledge of the imminent harm to Bollea, and owed Bollea a duty of care to prevent the misconduct of Buchwald's agent and employee, as well as misconduct on its premises and/or misconduct accomplished or or using its equipment and facilities.

366.    Buchwald breached its duty of care by failing to prevent its agent and employee from actively participating in, providing substantial assistance to, conspiring to, and acting in concert with others in procuring, disclosing, using, exploiting and disseminating the Footage, aiding and abetting others in doing the same, and otherwise failing to warn Bollea.

367.     As a direct and proximate result, Bollea has suffered damages, emotional injury, substantial economic injury, loss of income, harm, anxiety, shame, humiliation, embarrassment, emotional distress, and damage to reputation, in an amount subject to proof; which damages are continuing in nature and will be suffered in the future.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, Terry Gene Bollea, prays for judgment against each of the Defendants as follows:

1.     For an award of general and special damages in an amount in excess of the minimum jurisdictional limits of this Court in accordance with proof at trial together with interest thereon at the maximum legal rate;

2.     For costs of suit incurred herein;

3.     For reasonable attorneys' fees;

4.     For a permanent injunction against Defendants, including all persons acting under their discretion or control or in active concert with them, prohibiting any and all activity that would cause the distributing, disseminating, disclosing, publishing, displaying, use, posting for view or access on or through the Internet or any other manner or media outlet, broadcasting, transferring, licensing, selling, offering to sell or license, or otherwise using, exploiting or attempting to exploit, the surreptitious Footage of Bollea, or any portions or content thereof or any copies thereof, in any and all formats and media, including all electronic and physical media;

5.     For an Order and Judgment requiring Defendants to turn over to Bollea all surreptitious Footage of Bollea, or any portions or content thereof or any copies thereof, in any and all formats and media, including all electronic and physical media; and

6.     For such other and further relief as to this Court may deem and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff, Terry Gene Bollea, hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

Dated:  January 4, 2019.

/s/ Shane B. Vogt
Kenneth G. Turkel, Esq.
Florida Bar No. 867233
KTurkel@BajoCuva.com
Shane B. Vogt, Esq.
Florida Bar No. 257620
SVogt@BajoCuva.com
BAJO | CUVA | COHEN | TURKEL
100 N. Tampa Street, Suite 1900
Tampa, Florida  33602
Telephone:  (813) 443-2199
Facsimile:  (813) 443-2193

David R. Houston, Esq.
Nevada Bar No. 2131
(*Pro Hac Vice* application to be filed)
DHouston@houstonatlaw.com
LAW OFFICES OF DAVID R. HOUSTON
432 Court Street
Reno, Nevada  89501
Telephone:  (775) 786-4188
Facsimile:  (775) 786-5091

*Attorneys for Plaintiff Terry Gene Bollea,*
*professionally known as "Hulk Hogan"*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by

e-mail via the e-portal system this 4th day of January, 2019, to the following:

Morgan Barfield
Corless Barfield Trial Group, LLC
6812 West Linebaugh Avenue
Tampa, FL  33625
service@CorlessBarfield.com
MBarfield@CorlessBarfield.com
*Counsel for Matt Loyd and Tasha Carrega*

Erik R. Matheney
Ella Shenhav
Shutts & Bowen LLP
4301 West Boy Scout Boulevard, Suite 300
Tampa, FL 33607
ematheney@shutts.com
lwalter@shutts.com
eshenhav@shutts.com
shatfield@shutts.com
*Co-Counsel for Michael Calta a/k/a "Cowhead"*

Dominic Fariello
Law Offices of Dominic O. Fariello, P.A.
609 W. De Leon Street
Tampa, FL 33606
dominic@askthedom.com
*Co-Counsel for Michael Calta a/k/a "Cowhead"*

Gregory A. Hearing
Thompson, Sizemore, Gonzalez & Hearing, P.A.
One Tampa City Center
201 N. Franklin St., Suite 1600
Tampa, FL  33602
ghearing@tsghlaw.com
*Counsel for Cox Radio*

John A. Schifino, Esquire
William J. Schifino, Jr., Esquire
401 E. Jackson Street, Suite 2500
Tampa, FL  33602
wschifino@gunster.com
jschifino@gunster.com
cwarder@gunster.com
*Co-Counsel for Don Buchwald & Associates and Tony Burton*

Andrew M. Goldsmith, Esq.
Ilene S. Farkas, Esq.
Pryor Cashman LLP
7 Times Square
New York, NY 10036-6569
agoldsmith@pryorcashman.com
*Co - Counsel for Don Buchwald & Associates, Inc.*

Thomas Clyde
Lesli Gaither
Kilpatrick Townsend & Stockton LLP
Suite 2800, 1100 Peachtree Street NE
Atlanta, GA  30309-4528
tclyde@kilpatricktownsend.com
lgaither@kilpatricktownsend.com
*Pro Hac Vice Counsel for Cox Radio*

Keith M. Davidson
Keith M. Davidson & Associates, P.L.C.
8383 Wilshire Blvd., Suite 510
Beverly Hills, CA  90211-2406
keith@kmdlaw.com
*Counsel for Keith M. Davidson and Keith M. Davidson & Associates, P.L.C.*

David R. Houston, Esquire
Law Office of David R. Houston
432 Court Street
Reno, NV 89501

dhouston@houstonatlaw.com
krosser@houstonatlaw.com
*Co-Counsel for Plaintiff*

_/s/ Shane B. Vogt_
Attorney