UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| HISCOX INSURANCE COMPANY, INC., <br><br> Plaintiff, <br><br> v. <br> COX RADIO, INC., COX ENTERPRISES, INC., MICHAEL CALTA, MATTHEW CHRISTIAN LOYD AND TERRY GENE BOLLEA, <br><br> Defendants. | Case No.  8:20-cv-221-T-30SPF |

## DECLARATION OF JOSHUA L. BLOSVEREN IN SUPPORT OF MOTION TO DISMISS OR TRANSFER VENUE

**JOSHUA L. BLOSVEREN**, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury:

1.      I am an attorney admitted to practice law in the State of New York, and am a member of the law firm Hoguet Newman Regal & Kenney, LLP ("HNRK"), attorneys for Defendants Cox Enterprises, Inc. ("CEI") and Cox Radio, Inc (together, "Cox") in this matter.  I have worked on this matter since its inception, and am fully familiar with the prior proceedings in this case and with the facts and circumstances discussed below.  I make this declaration based on my own personal knowledge.

2.      My firm has associated with local counsel in this matter, GrayRobinson, P.A., and I have been admitted to this Court *pro hac vice* in connection with this matter.  (ECF No. 17.)

3.      Attached hereto as Exhibit A is a true and correct copy of the US TNT Multimedia Liability Policy No. US UAA 261.9952.11 (the "Policy") issued by Hiscox Insurance Company ("Hiscox") to CEI for the period of December 1, 2011 to December 1, 2012.

4.      Attached hereto as Exhibit B is a true and correct copy of the Complaint filed by Terry Gene Bollea ("Bollea"), better known as Hulk Hogan, in Florida Circuit Court, in Pinellas County under docket number 16-002861-CI (the "Underlying Litigation").

5.      Attached hereto as Exhibit C is a true and correct copy of an email from CEI to Hiscox dated May 5, 2016.

6.      Attached hereto as Exhibit D is a true and correct copy of a letter from Hiscox to CEI dated June 3, 2016.

7.      On multiple occasions between June 3, 2016 and December 31, 2019, Hiscox acknowledged that Bollea's claims potentially fell within the scope of coverage provided by the Policy.

8.      Attached hereto as Exhibit E is a true and correct copy of a letter from Hiscox's outside counsel to CEI's outside counsel, sent on January 21, 2020, two days before a mediation between Hiscox and CEI had been scheduled to discuss allocation issues raised by Hiscox.

9.      On January 28, 2020, CEI filed a complaint against Hiscox in the United States District Court for the Northern District of Georgia under docket number 20 Civ. 415 (MHC), at Docket Entry No. 5 (the "Georgia Action").

10.     Attached hereto as Exhibit F is a true and correct copy of the First Amended Complaint filed by CEI in the Georgia Action on January 31, 2020.

11.     Melissa Hill, a key witness relating to Cox's bad faith claim, is located in the Middle District of Georgia.

Dated:  February 26, 2020                    Respectfully submitted,

Joshua L. Blosveren (*pro hac vice*)
**Hoguet Newman Regal & Kenney, LLP**
One Grand Central Place
60 East 42nd Street, 48th Floor
New York, NY 10165
Telephone: 212.689.8808

*Attorneys for Defendants Cox Radio, Inc. and Cox Enterprises, Inc.*

# EXHIBIT A



# DECLARATION

**Hiscox Insurance Company Inc**

Hiscox Inc. 357 Main Street Armonk NY 10504   T +1 914 273 7400

## Policy Number:  US UUA 2619952.11

### I.   GENERAL DETAILS

| | |
|---|---|
| **Policy Number** | US UUA 2619952.11 |
| **Insured** | Cox Enterprises, Inc. |
| **Insured's Contact Address** | 6205 Peachtree Dunwoody Road, NE<br>Atlanta, Georgia 30328 |
| **Underwriter** | Hiscox Insurance Company Inc |
| **Insured's Broker** | Marsh Risk & Insurance Services<br>1166 Avenue of the Americas<br>New York, New York 10036-2774 |
| **Insured's Payment** | Payment by Broker's Account |
| **Premium** | $ 701,020.00 |

### II.   COVERAGE DETAILS

| | |
|---|---|
| **Policy Wording** | US TMT Multimedia Liability (Admitted) |
| **Policy Period** | December 1st 2011 to December 1st 2012 at 12:01 am local time at the insured's contact address |

### III.   SPECIFIC COVERAGE DETAILS

**MULTIMEDIA (ADMITTED)**

**Definition of "Covered Media."**   Where the phrase "covered media" appears within this policy (whether in the singular or plural), it shall solely mean the following:

> All publications, programming and other communications (but not including ordinary business communications not directly related to the preparation, dissemination or promotion of your multimedia products) produced or disseminated by you; including but not limited to content of personal appearances by you and all content disseminated via web sites owned or operated by you.

| | |
|---|---|
| **Policy Limit** | $ 15,000,000 Single Aggregate Limit, inclusive of defense costs and damages. |
| **Retention** | $ 500,000 Each and every claim inclusive of defense costs and damages. |
| **Geographical Limits** | Worldwide |



# DECLARATION

**Hiscox Insurance Company Inc**

Hiscox Inc. 357 Main Street Armonk NY 10504   T +1 914 273 7400

**Policy Number:  US UUA 2619952.11**

**Applicable Courts**          Worldwide

# DECLARATION

## Hiscox Insurance Company Inc

Hiscox Inc. 357 Main Street Armonk NY 10504   T +1 914 273 7400

## Policy Number:  US UUA 2619952.11

| ENDORSEMENTS - Applicable to the whole policy | |
| --- | --- |
| Endorsement 1 | E60.1 Cox Amendments Endorsement |
| Endorsement 2 | E62.1 Professional Services Endorsement (Occurrence) |
| Endorsement 3 | E68.1 Cox Claims Reporting Endorsement |
| Endorsement 4 | E69.1 Technology Activities with Breach of Contract Endorsement |
| Endorsement 5 | E70.1 Additional Insured Endorsement |
| Endorsement 6 | E2386.1 Social Media Extension MM |
| Endorsement 7 | E2404.1 Subpoena Defense Costs Coverage Endorsement |
| Endorsement 8 | E2405.1 Broad Form Errors and Omissions (BI/PD) Endorsement MM/MAC |
| Endorsement 9 | E2409.1 Reporter's Shield Enhancement Endorsement |
| Endorsement 10 | E2416.1 Amended Definition of "Acquired Entity" Endorsement |
| Endorsement 11 | E2421.2 Spousal, Civil Union & Domestic Partner Extension End MM/MAC |
| Endorsement 12 | E2430.1 Remove Settlement Clause Endorsement |
| Endorsement 13 | E2444.1 Specific Exclusion Endorsement |
| Endorsement 14 | E2484.1 Premium Payment Warranty |
| Endorsement 15 | E2531.1 First Amendment Enhancement Endorsement MM |
| Endorsement 16 | E2816.2 Georgia Amendatory Endorsement MM/MAC |

IN WITNESS WHEREOF this Declarations has been signed at Armonk, New York

**HISCOX**

| **DECLARATION** |

## Hiscox Insurance Company Inc

Hiscox Inc. 357 Main Street Armonk NY 10504   T +1 914 273 7400

**Policy Number:  US UUA 2619952.11**

| Endorsement 1 | **E60.1 Cox Amendments Endorsement** |

In consideration of the premium charged and on the understanding that this endorsement leaves all other terms, conditions and exclusions unchanged, it is agreed that:

1.  Under What Has To Go Wrong (Section II), Media, personal injury and negligent content liability, paragraph l. is deleted in its entirety and replaced with the following:

l. negligent supervision of an employee, but only when asserted in conjunction with and based on the same factual allegations as a **claim** under (a) - (m); and/or

2.  Also under What Has To Go Wrong (Section II), Media, personal injury and negligent content liability, paragraph k. is deleted and replaced with the following:

k. disclosure of a trade secret, but only where the disclosure alleged was to the public within **covered media**;

3.  With respect to What We Will Not Pay (Section VI), Exclusions, paragraphs c. and n., no conduct of any of **you** will be imputed to any other of **you** to determine the applicability of exclusion c. or n.

4. YOUR OBLIGATIONS TO US (Section VII), Your Representations, of the policy is amended as necessary to include the following:

The unintentional failure by **you** to provide accurate and complete representations as of the inception of the policy will not prejudice the coverages afforded by this policy.

5.  Under Definitions (SectionVIII), "Advertising" is deleted and replaced with the following:

"Advertising" means advertising, marketing, publicity, or promotion of the **insured's**, **existing subsidiary's**, or **acquired entity's** own goods and services and of the goods and services of their clients.

6.  Under General Matters (Section IX), Alternate dispute resolution is deleted in its entirety and replaced with the following:

**We** and **you** agree that any dispute arising out of or relating to this policy, including but not limited to its construction, application and validity, or any breach thereof, shall be submitted to non-binding mediation prior to the commencement of litigation by either party. **We** and **you** shall mutually agree on the choice of a mediator, as well as a location for mediation. Each party shall bear its own fees and costs in connection with any mediation but the fees and expenses of the mediator shall be shared equally by the parties.

7.  Under General Matters (Section IX), the Severability clause is deleted in its entirety.



## DECLARATION

**Hiscox Insurance Company Inc**

Hiscox Inc. 357 Main Street Armonk NY 10504   T +1 914 273 7400

**Policy Number:  US UUA 2619952.11**

8. Under General Matters (Section IX), the following is added:

Choice of Law
This policy, including its construction, application and validity, is governed by the laws of
the State of Georgia without reference to that state's choice of law principles.

The title and any headings in this endorsement are solely for convenience and
form no part of the terms and conditions of coverage.

# HISCOX

| **DECLARATION** |
|---|

**Hiscox Insurance Company Inc**

Hiscox Inc. 357 Main Street Armonk NY 10504   T +1 914 273 7400

**Policy Number:  US UUA 2619952.11**

---

| Endorsement 2 | **E62.1 Professional Services Endorsement (Occurrence)** |
|---|---|

In consideration of the premium charged and on the understanding that this endorsement leaves all other terms, conditions and exclusions unchanged, it is agreed that:

1. WHAT HAS TO GO WRONG (Section II) of the policy is amended to include:

**Professional Services**

The performance during the **policy period** of **professional services** for a **client** by **you** or anyone on **your** behalf, including **your** subcontractors and outsourcers**,** results in a **claim** against **you** that arises from any actual or alleged breach of duty, negligent act, negligent error, or negligent omission, regardless of when such **claim** is made and where such **claim** is brought.

2. For the purposes of the coverage provided by Section 1 of this endorsement only, WHAT WE WILL NOT PAY (Section VI), paragraph (o), of the policy is amended to read:

(o) any breach of any written, oral, express or implied contract or warranty; provided, however, that this exclusion will not apply to any covered liability **assumed under agreement**; to any covered portion(s) of a **claim** under WHAT HAS TO GO WRONG (Section II) Media, Personal Injury & Negligent Media Content Liability (b), (c), (g), (h) or (i) of the policy; or to any legal obligation **you** would otherwise owe in the absence of such contract or warranty;

3. For the purposes of the coverage provided by Section 1 of this endorsement only, WHAT WE WILL NOT PAY (Section VI), Exclusions, of the policy is amended by adding the following:

**We** will not make any payment, including **defense costs** and **damages**, toward any portion(s) of any **claim**:

AA. for, alleging, or arising from:
(i) any breach of an express warranty, guarantee, or contract, including but not limited to any agreements to refund, repurchase, or indemnify any person or entity;

(ii) any breach of any exclusivity, non-competition, non-solicitation, or other similar commercial terms in **your** contract with a **client**;

BB. for, alleging, or arising from any defect in any software, hardware, firmware, or associated network cabling that is solely caused by a third party, including but not limited to any third party software supplier, manufacturer or originator;

## DECLARATION



**Hiscox Insurance Company Inc**

Hiscox Inc. 357 Main Street Armonk NY 10504   T +1 914 273 7400

**Policy Number:  US UUA 2619952.11**

CC. for, alleging, or arising from **your** commercial decision to cease providing a particular product or service but only if **you** are contractually obligated to continue providing such product or service;

DD. for, alleging, or arising from any racketeering or conspiracy law, including but not limited to any actual or alleged violations of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. Section 1961 et seq., any similar state statute, or any amendments thereto or any rules or regulations promulgated under any of them;

EE. for, alleging, or arising from any chargeback, liability or fee incurred by **you** or **your client** as a result of a merchant service provider, including any credit card company or bank, wholly or partially reversing or preventing a payment transaction;

FF. made against **you** by any person or entity falling within the definition of **you**; however, this exclusion will not apply to any **claim** based on a liability to an independent third party directly arising out of the performance of your defined **professional services** but which is brought against **you** via an **existing subsidiary**, parent or sister company;

GG. for, or arising from any armed struggle, civil unrest or conflict or any nationalization, confiscation, requisition, expropriation, appropriation, seizure or destruction of property by or under the order of any government or public or local authority;

HH. for, alleging, or arising from any act or threatened act of terrorism, including but not limited to the use of force or violence, of any person(s) or group(s) of persons whether acting alone or on behalf of or in connection with any organization(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear;

II. directly or indirectly arising out of any activities occurring prior to the applicable **retroactive date** (if any);

JJ. for, alleging, or arising from any electrical or mechanical breakdown, electrical disturbance, wear and tear or gradual deterioration;

KK. for, alleging, or arising from any wrongful taking or intentional disclosure of proprietary information, including but not limited to trade secrets or other confidential business information;

LL. for, alleging, or arising from any violation of the responsibilities, obligations or duties imposed by Employee Retirement Income Security Act of 1974, or amendments thereto or similar provisions of any federal, state or local statutory law or common law;

**DECLARATION**

**HISCOX**

**Hiscox Insurance Company Inc**

Hiscox Inc. 357 Main Street Armonk NY 10504   T +1 914 273 7400

**Policy Number:  US UUA 2619952.11**

MM. for, alleging, or arising from any failure or inability to pay any bond, debt, financial guarantee or failure to pay or collect funds;

NN. for, alleging, or arising from any financial or investment advice given or predictions of financial performance;

OO. for, alleging, or arising from any legal, audit or accountancy advice or services;

PP. for, alleging, or arising from any real estate services or advice;

QQ. for, alleging, or arising from any pharmaceutical or medical advice or treatment; or

RR. for, alleging, or arising from **your** manufacture, sale, supply, installation or maintenance of any product.

4. For the purposes of the coverage provided by Section 1 of this endorsement only, DEFINITIONS (Section VIII) of the policy is amended to include the following terms:

"Client" means any person or entity with whom **you** have contracted to provide **your** services or deliverables that expressly fall within **your professional services**.

"Professional services" means commercial printing for others for a fee; advertising and marketing services for others for a fee; design, creation, hosting and management of web sites or communication devices for others; application development for others

5. For the purposes of the coverage provided by Section 1 of this endorsement only, DEFINITIONS (Section VIII), Damages, of the policy is amended by adding the following:

"Damages" also does not include:

6. the return or restitution of all or any portion of fees, commissions, profits, or charges for goods provided or services rendered by **you**, or anyone performing **professional services** on **your** behalf;

7. the costs of recall, repair or correction of any **professional services**.



| **DECLARATION** |
| --- |

**Hiscox Insurance Company Inc**

Hiscox Inc. 357 Main Street Armonk NY 10504   T +1 914 273 7400

**Policy Number:  US UUA 2619952.11**

6. For the purposes of the coverage provided by Section 1 of this endorsement only, DEFINITIONS (Section VIII), You/Your of the policy is deleted and replaced by the following:

"You and Your" means:

1. the **insured**, any **existing subsidiary** or any **acquired entity**;

2. any person who was, is or becomes a director, officer, trustee, partner in, or employee of the **insured**, any **existing subsidiary** or any **acquired entity** but only in respect to **claims** arising out of the course and scope of their duties as such and in the event of their death, incapacity or bankruptcy, any **claim** against their estates, heirs, legal representatives or assigns shall be considered a **claim** against them;

3. any person or entity that takes legal control of the insured, existing subsidiary or acquired entity upon the insolvency or bankruptcy of the **insured**, **existing subsidiary** or **acquired entity**;

7. For the purposes of the coverage provided by Section 1 of this endorsement only, GENERAL MATTERS (Section IX), Date of Performance of Media Activities, of the policy is deleted in its entirety.

The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

**HISCOX**

## DECLARATION

**Hiscox Insurance Company Inc**

Hiscox Inc. 357 Main Street Armonk NY 10504   T +1 914 273 7400

**Policy Number:  US UUA 2619952.11**

---

**Endorsement 3**

**E68.1 Cox Claims Reporting Endorsement**

In consideration of the premium charged and on the understanding that this endorsement leaves all other terms, conditions and exclusions unchanged, it is agreed that:

1.  WHAT YOU MUST NOTIFY AND WHEN (Section III) of the policy is hereby deleted in its entirety and replaced with the following:

**You** must notify **us** of **claims** against **you** as soon as practicable after such **claim** is first made and the Risk Manager, Chief Financial Officer, General Counsel's office, or Chief Technology Officer first knows or should have known of such **claim**.  Proper notification must be sent in accordance with the instructions set forth below.

Please provide notification of any claim(s), subpoenas **or first amendment restrictions** to:

Hiscox, 520 Madison Ave,  32nd Floor, New York, NY 10022
Email:  tmtclaims@hiscox.com
Fax: 212.922.9652
Telephone: 1.877.544.7269

2.  Notwithstanding the foregoing, it is not necessary to report a **claim** where no lawsuit has been filed or a subpoena or a **first amendment restriction** until the cost of resolving such **claim**, subpoena or **first amendment restriction** inclusive of all **defense costs** has reached $50,000, and then you must notify us of such **claim,** subpoena or **first amendment restriction** as soon as practicable thereafter.

The titles and headings of this endorsement are solely for ease of reference and do not form any part of the terms and conditions of coverage.

Page 10

# HISCOX

## DECLARATION

## Hiscox Insurance Company Inc

Hiscox Inc. 357 Main Street Armonk NY 10504   T +1 914 273 7400

## Policy Number:  US UUA 2619952.11

| Endorsement 4 | **E69.1 Technology Activities with Breach of Contract Endorsement** |

In consideration of the premium charged and on the understanding that this endorsement leaves all other terms, conditions and exclusions unchanged, it is agreed that:

1. WHAT HAS TO GO WRONG (Section II) of the policy is amended to include

**Technology liability protection**

The performance of **technology activities** on or after the **retroactive date** by **you** or anyone on **your** behalf, including **your** subcontractors and outsourcers, results in a **claim** first made against **you** during the **policy period**, regardless of where such **claim** is brought, provided that **you** report the **claim** to **us** during the **policy period** or any applicable extended reporting period, for any actual or alleged:

a. unintentional breach of a written contract brought by a **client**;

b. negligence or breach of any duty to use reasonable care, including but not limited to negligent transmission of a computer virus, worm, logic bomb or Trojan horse or negligence in connection with a denial of service attack, or negligent misrepresentation;

c. intellectual property infringement (but not any patent infringement or trade secret misappropriation), including but not limited to copyright infringement, trademark infringement, trademark dilution, trade dress infringement, publicity rights violations, cybersquatting violations, moral rights violations, any act of passing-off, or any misappropriation of formats, characters, trade names, character names, titles, plots, musical compositions, voices, slogans, graphic material or artwork;

d. unfair competition, deceptive business practices or false designation of origin but only when asserted in conjunction with and based on the same allegations as a **claim** falling under the immediately preceding subparagraph (c) above;

e. breach of any duty of confidentiality, invasion of privacy or violation of any other legal protections for personal information, including but not limited to false light, intrusion upon a person's seclusion, public disclosure of a person's private information, misappropriation of a person's picture, name, voice or identity for commercial gain, unauthorized interception or recording of images or sound in violation of an anti-wiretapping statute; or

f. defamation, including but not limited to libel, slander, trade libel, product disparagement, or injurious falsehood.

2. For the purposes of the coverage provided by Section 1 of this endorsement only, WHAT YOU MUST NOTIFY AND WHEN (Section III) of the policy is hereby deleted in its entirety and replaced with the following:

**A. Claims**

**You** must notify **us** of **claims** against **you** as soon as practicable and in any event within the **policy period**.  Proper notification of **claims** must be sent in accordance with the notification details set forth on the Declarations.



| | **DECLARATION** |
| --- | --- |

**Hiscox Insurance Company Inc**

Hiscox Inc. 357 Main Street Armonk NY 10504   T +1 914 273 7400

**Policy Number:  US UUA 2619952.11**

**B. Potential claims**

**You** may notify **us** of **potential claims** under this policy. If **you** do, such notification must be provided as soon as practicable and within the **policy period** or any applicable extended reporting period, and must to the fullest extent possible identify the particulars of the **potential claim**, including identifying the potential claimant(s), the likely basis for liability, the likely demand for relief, and any additional information about the **potential claim** that we reasonably request. If such a **potential claim** notification is made to **us** then we will treat any **claim** arising from the same particulars as that notification as if it had first been made against **you** on the date **you** properly notified **us** of it as a **potential claim**, even if that **claim** is first made against **you** after the **policy period** has expired. Proper notification of **potential claims** must be sent in accordance with the instructions set forth under the Declarations.

**C. Automatic extended reporting period**

If **we** renew this policy, then **we** agree to accept **your** proper notification of **claims** and **potential claims** under this policy for up to 30 days after the **policy period** has expired, provided **you** first become aware of the **claim** or **potential claim** during the last 30 days of the **policy period**.

If **we** cancel this policy or do not offer renewal terms for this policy, then **we** agree to accept **your** proper notification of **claims** and **potential claims** under this policy up to 30 days after the **policy period** has expired, provided **you** first become aware of the **claim** or **potential claim** during the last 30 days of the **policy period** or during the 30 days immediately following the **policy period**, and such **claim** or **potential claim** directly arises from circumstances or events first occurring after the **retroactive date** but before the end of the **policy period**.

The automatic extended reporting periods described in this section do not apply unless **we** are notified of such **claim** or **potential claim** as soon as practicable but no later than 30 days from the date **you** first learned of the **claim** or **potential claim**, and they do not apply to any policy that **we** have cancelled or refused to renew due to **your** non-payment of premium or failure to comply with the terms of this policy.

It is agreed that the applicable extended reporting period(s) set forth in this section shall be superceded by any conflicting applicable law that requires **we** provide to **you** a longer extended reporting period.

3. For the purposes of the coverage provided by Section 1 of this endorsement only, WHAT WE WILL NOT PAY (Section VI), paragraph (m) of the policy is deleted and replaced with the following:

(m) any damage to, destruction or loss of use of any tangible property; however, this exclusion will not apply to any covered **claim** for trespass or to any damage to electronically stored data, or destruction or loss of use of electronically stored data;



| | **DECLARATION** |
|---|---|

**Hiscox Insurance Company Inc**

Hiscox Inc. 357 Main Street Armonk NY 10504   T +1 914 273 7400

**Policy Number:  US UUA 2619952.11**

4. For the purposes of the coverage provided by Section 1 of this endorsement only WHAT WE WILL NOT PAY (Section VI), paragraph (o) of the policy is deleted and replaced with the following:

(o) any written, oral, express or implied contract or warranty; however, this exclusion will not apply to any:

(i) covered liability **assumed under agreement**;

(ii) covered portion(s) of a **claim** under WHAT HAS TO GO WRONG (Section II), Media, personal injury & negligent media content (b), (c), (g), (h) or (i) of the policy;

(iii) legal obligation **you** would owe in the absence of such contract or warranty; or

(iv) **technology claim**.

5. For the purposes of the coverage provided by Section 1 of this endorsement only, WHAT WE WILL NOT PAY (Section VI), Exclusions, of the policy is amended by adding the following:

**We** will not make any payment, including **defense costs** and **damages**, toward any portion(s):

AA. of any **technology claim** alleging or arising from:

(i) any contractual liability where at the time such contract was entered into **you** were aware or reasonably ought to have been aware that there were not sufficient technical, logistical, or financial resources to perform the contract as promised, including **your** promise to meet a certain performance standard under a service level agreement;

(ii) any breach of a warranty or guarantee; however, this exclusion will not apply to the following:

a. **your** warranty or guarantee that **you** will use reasonable care and skill in the performance of a contract;

b. **your** warranty or guarantee that any software, hardware, firmware, or related services falling within **your technology activities** will not infringe another's intellectual property rights;

c. any implied warranty or similar statutory term requiring any software, hardware, or firmware falling within **your technology activities** to meet a certain standard of quality, safety or fitness, even if **you** have expressly warranted that such software, hardware, or firmware will meet the legally required standard to which **you** are subject;

d. **your** warranty or guarantee that any software, hardware, firmware, or related services falling within **your technology activities** will substantially conform to any material, written specifications and performance standards forming part of the contract between **you** and **your client**; or

(iii) any breach of any exclusivity, non-competition, non-solicitation, or other similar commercial terms in **your** contract with a **client**;

## HISCOX

| DECLARATION |
| --- |

**Hiscox Insurance Company Inc**

Hiscox Inc. 357 Main Street Armonk NY 10504   T +1 914 273 7400

**Policy Number:  US UUA 2619952.11**

BB. of any **technology claim** resulting in an award for consequential, special or indirect damages, or loss of claimant's profits. However, this exclusion will not apply to:

(i) breach of a warranty made by **you** that any software, hardware, firmware, or related services falling within **your technology activities** will not infringe another's intellectual property rights;

(ii) breach of an express contractual provision that is solely triggered by **your** disclosure of **your client's** confidential information;

(iii) a court's award of consequential, special or indirect damages resulting from **your** contractual disclaimer of such damages being deemed unenforceable by the same court issuing the award;

(iv) any contract between **you** and a governmental entity that has insisted, in writing, that it retain the right to recover consequential damages as a precondition to the execution of the contract;

CC. of any **technology claim** for, alleging, or arising from any defect in any software, hardware, firmware, or associated network cabling that is solely caused by a third party, including but not limited to any third party software supplier, manufacturer or originator; provided, however, that this exclusion will not apply to: (1) covered **defense costs** incurred by **you** to defend such portions of a **claim** but only until (if ever) there is a finding in any legal proceeding (including any arbitration) or any admission that the defect at issue is solely caused by a third party, at which time **you** shall reimburse us for all **defense costs** that **we** have paid toward that **claim**, or (2) any amount **you** satisfy **us** that **you** are legally able to recover under a written contract;

DD. of any **technology claim** for, alleging, or arising from any costs or expenses involved in the repair, upgrade, correction, recall or replacement of any software, hardware, firmware, or associated network cabling, or any costs or expenses relating to **your** legal obligation to comply with an injunction; however, this exclusion will not apply to any portion of a judgment requiring **you** to pay direct damages to **your client** for breach of contract;

EE. of any **technology claim** for, alleging, or arising from **your** commercial decision to cease providing a particular product or service but only if **you** are contractually obligated to continue providing such product or service;

FF. of any **technology claim** for, alleging, or arising from any self-replicating, malicious code that was not specifically targeted to **your** system; however, this exclusion will not apply to any covered portion of any **technology claim** for negligent transmission of a computer virus, worm, logic bomb, or Trojan horse;

GG. of any **technology claim** for, alleging, or arising from any commercial dispute with **your** business partner or business associate, including but not limited to any reseller, distributor, original equipment manufacturer, third-party sales agent, systems integrator, or joint venturer, but only to the extent such a **claim** is based upon:

| | DECLARATION |
|---|---|

**Hiscox Insurance Company Inc**

Hiscox Inc. 357 Main Street Armonk NY 10504   T +1 914 273 7400

## Policy Number:  US UUA 2619952.11

(i) a commission or royalty, or any other term upon which such partner or associate is to be compensated in connection with doing business with **you**, or any compensation or remuneration promised or owed by **you** pursuant to those terms; or

(ii) **your** decision to cease doing business with such a partner or associate;

HH. of any **technology claim** for, alleging, or arising from any chargeback, liability or fee incurred as a result of a merchant service provider, including any credit card company or bank, wholly or partially reversing or preventing a payment transaction;

II. of any **technology claim** for, alleging, or arising from any failure of or interruption in service provided by an internet service, telecommunications, or other utility provider; however, this exclusion will not apply to any internet service interruption where **you** are the sole provider of that service as part of **your technology activities**;

JJ. of any **technology claim** made against **you** by any person or entity falling within the definition of **you**; however, this exclusion will not apply to any **claim** based on liability to an independent third party directly arising out of the performance of **your technology activities** but which is brought against **you** via an **existing subsidiary**, parent or sister company;

KK. of any **technology claim** for, alleging, or arising from any armed struggle, civil unrest or conflict or any nationalization, confiscation, requisition, expropriation, appropriation, seizure or destruction of property by or under the order of any government or public or local authority;

LL. of any **technology claim** for, alleging, or arising from any act or threatened act of terrorism, including but not limited to the use of force or violence, of any person(s) or group(s) of persons whether acting alone or on behalf of or in connection with any organization(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear;

MM. of any **technology claim** directly or indirectly arising out of any activities occurring prior to the applicable **retroactive date** (if any);

NN. of any **claim** under WHAT HAS TO GO WRONG (Section II) Media, personal injury & negligent media content liability of the policy, even if such **claim** arises in whole or in part from **your technology activities**; or

OO. of any **technology claim** for, alleging, or arising from telecommunications services and internet service provider services.

6.For the purposes of the coverage provided by Section 1 of this endorsement only, all references to "**media activities**" in YOUR OBLIGATIONS TO US (Section VII) of the policy are hereby deleted and replaced with the phrase "**media activities or technology activities**".

7. For the purposes of the coverage provided by Section 1 of this endorsement only, under YOUR OBLIGATIONS TO US (Section VII), Satisfying Your Retention of the policy, the following sentence is added to the second paragraph:

All **technology claims** that are related will be considered as having been made on the date of **your** first proper notification to **us**.

**DECLARATION**

HISCOX

**Hiscox Insurance Company Inc**

Hiscox Inc. 357 Main Street Armonk NY 10504   T +1 914 273 7400

**Policy Number:  US UUA 2619952.11**

8.For the purposes of the coverage provided by Section 1 of this endorsement only, DEFINITIONS (Section VIII) of the policy is hereby amended to add the following:

"Client" means any person or entity with whom **you** have contracted to provide services or deliverables that expressly fall within **your technology activities**.

"Potential claim" means any matter reasonably likely to lead to a **technology claim**.

"Retroactive date" means 12/1/2010 for analysis, design, programming or integration of information systems; data processing; information technology consulting; licensing of computer software; marketing, selling, distributing, installing, maintaining, support and training in the use of electronic or computer related hardware and software, for others; web-based automobile dealership inventory tracking and valuation solutions, sales management, systems integration, data storage services for others; 7/18/2006 for $3,000,000 Single Aggregate Limit, inclusive of defense costs and damages for web-based automobile dealership inventory tracking and valuation solutions, sales management, systems integration, data storage services for others; 12/1/2011 for consulting, design, configuration, equipment acquisition, installation, training, activation, management and support of telemedicine systems

However, in respect of any **claim** or **potential claim** arising out of activities performed by an **acquired entity**, "retroactive date" means the date **you** first acquired such entity, unless otherwise agreed by **us** in writing

"Technology activities" means analysis, design, programming or integration of information systems; data processing; information technology consulting; licensing of computer software; marketing, selling, distributing, installing, maintaining, support and training in the use of electronic or computer related hardware and software, for others; web-based automobile dealership inventory tracking and valuation solutions, sales management, systems integration, data storage services for others; consulting, design, configuration, equipment acquisition, installation, training, activation, management and support of telemedicine systems

"Technology claim" means a **claim** arising in whole or in part from the performance of **technology activities**.

9.For the purposes of the coverage provided by Section 1 of this endorsement only, DEFINITIONS (Section VIII), Damages, of the policy is amended by adding the following:

"Damages" also does not include:

6. the costs of recall, repair or correction of any **technology activities**.

10. For the purposes of the coverage provided by Section 1 of this endorsement only, DEFINITIONS (Section VIII), You/Your of the policy is deleted and replaced by the following

"You and Your" means

1. The **insured**, any **existing subsidiary** or any **acquired entity**;

## DECLARATION

**HISCOX**

**Hiscox Insurance Company Inc**

Hiscox Inc. 357 Main Street Armonk NY 10504   T +1 914 273 7400

**Policy Number:  US UUA 2619952.11**

2. any person who was, is or becomes a director, officer, trustee, partner in, or employee of the **insured**, any **existing subsidiary** or any **acquired entity** but only in respect to **claims** arising out of the course and scope of their duties as such and in the event of their death, incapacity or bankruptcy, any **claim** against their estates, heirs, legal representatives or assigns shall be considered a **claim** against them;

3. any person or entity that takes legal control of the **insured**, **existing subsidiary** or **acquired entity** upon the insolvency or bankruptcy of the **insured**, **existing subsidiary** or **acquired entity**;

11. For the purposes of the coverage provided by Section 1 of this endorsement only, GENERAL MATTERS (Section IX), Date of Performance of Media Activities, of the policy is deleted in its entirety.

The title of this endorsement is solely for ease of reference and forms no part of the terms and conditions of coverage.

| HISCOX | **DECLARATION** |
|---|---|

**Hiscox Insurance Company Inc**

Hiscox Inc. 357 Main Street Armonk NY 10504   T +1 914 273 7400

**Policy Number:  US UUA 2619952.11**

| Endorsement 5 | **E70.1 Additional Insured Endorsement** |
|---|---|

In consideration of the premium charged and on the understanding that this endorsement leaves all other terms, conditions and exclusions unchanged, it is agreed that the person(s) and/or entity(ies) listed below shall be considered **additional insured (s)** under DEFINITIONS (Section VIII), Additional insured, paragraph 3, of the policy:

DEFINITIONS (Section VIII), Additional insured, paragraph 3, is hereby added as follows:

"Additional insured" also means Wells Fargo Bank, National Association, but only with respect to a **claim** where Wells Fargo Bank, National Association is vicariously liable for a negligent act, error or omission of the **insured, existing subsidiary or acquired entity** in the performance of **technology activities** by the **insured, existing subsidiary or acquired entity**; provided, however, in all events Wells Fargo Bank, National Association shall not mean or be considered an **additional insured** with respect to any actual or alleged liability, award or settlement payment arising out of, in whole or part, its own acts, errors or omissions.

The title of this endorsement is solely for ease of reference and forms no part of the terms and conditions of coverage.

# HISCOX

## DECLARATION

**Hiscox Insurance Company Inc**

Hiscox Inc. 357 Main Street Armonk NY 10504   T +1 914 273 7400

**Policy Number:  US UUA 2619952.11**

---

| Endorsement 6 | **E2386.1 Social Media Extension MM** |
| --- | --- |
| | In consideration of the premium charged and on the understanding that this endorsement leaves all other terms, conditions and exclusions unchanged, it is agreed that with respect to DEFINITIONS (Section VIII), Advertising is deleted in its entirety and replaced with the following: |
| | "Advertising" means advertising, publicity, or promotion in or of **covered media** regardless of the nature or form of such "advertising"  including "advertising"  via any social media  platforms (including but not limited to Facebook, Twitter, LinkedIn or MySpace). |
| | All other terms and conditions remain unchanged. |
| | MED E2386 CW (08/11) |



| | DECLARATION |
|---|---|

**Hiscox Insurance Company Inc**

Hiscox Inc. 357 Main Street Armonk NY 10504   T +1 914 273 7400

**Policy Number:  US UUA 2619952.11**

| **Endorsement 7** | **E2404.1 Subpoena Defense Costs Coverage Endorsement** |
|---|---|

In consideration of the premium charged and on the understanding that this endorsement leaves all other terms, conditions and exclusions unchanged, it is agreed that:

1. WHAT WE WILL PAY (Section IV) of the policy is amended to include the following:

**Payments toward subpoena defense costs**

**We** will pay the reasonable and necessary attorney's fees and legal costs **you** incur in proceedings to quash or challenge the scope of a subpoena ordering **you** to disclose or produce any information or material gathered, acquired, collected, created or compiled by **you**, provided such information or material was gathered, acquired, collected, created or compiled for the purpose of the creation, production or dissemination of **media content** in or for **covered media**, and provided that such subpoena was served on **you** during the **policy period**.

2. For purpose of applying the terms and conditions of WHAT YOU MUST NOTIFY AND WHEN (Section III), HOW MUCH WE WILL PAY (Section V), YOUR OBLIGATIONS TO US (Section VII) and GENERAL MATTERS (Section IX) of the policy to the coverage afforded by this endorsement, wherever the word **claim** appears in such sections, it shall be construed to include a subpoena that falls within the scope of coverage afforded by this endorsement.

3. The coverage afforded by this endorsement is part of and not in addition to the **policy limit.**

4. If a sub-limit is indicated below, the sub-limit is the most **we** will pay under this policy in connection with any one subpoena.  All sub-limits under this endorsement are included within the **policy limit** and are not in addition to the **policy limit**.

Sub-limit: $1,500,000

5. The Retention listed on the Declarations is amended as follows:

**Retention**:
a. $500,000 Each and every **claim** inclusive of **defense costs** and **damages**
b. $100,000      Each and every subpoena

The title of this endorsement is solely for ease of reference and forms no part of the terms and conditions of coverage.

| HISCOX | **DECLARATION** |
|---|---|

**Hiscox Insurance Company Inc**

Hiscox Inc. 357 Main Street Armonk NY 10504   T +1 914 273 7400

**Policy Number:  US UUA 2619952.11**

| Endorsement 8 | **E2405.1 Broad Form Errors and Omissions (BI/PD) Endorsement MM/MAC** |
|---|---|

In consideration of the premium charged and on the understanding that this endorsement leaves all other terms, conditions and exclusions unchanged, it is agreed that:

1. WHAT WE WILL NOT PAY (Section VI), paragraph (l), of the policy is deleted in its entirety and replaced with the following:

any bodily injury, including but not limited to death and emotional injury; however, this exclusion will not apply to any portion of a covered **claim** seeking (i) **damages** for emotional anguish or distress; or (ii) bodily injury arising out of the **media content** of **your covered media or advertising**;

2. WHAT WE WILL NOT PAY (Section VI), paragraph (m), of the policy is deleted in it entirety and replaced with the following:

any damage to, or destruction or loss of use of any tangible property; however, this exclusion will not apply to (i) any covered **claim** for trespass, or (ii) property damage arising out of the **media content** of **your covered media or advertising**.

The title of this endorsement is solely for ease of reference and forms no part of the terms and conditions of coverage.

# HISCOX

## DECLARATION

**Hiscox Insurance Company Inc**

Hiscox Inc. 357 Main Street Armonk NY 10504   T +1 914 273 7400

**Policy Number:  US UUA 2619952.11**

| Endorsement 9 | **E2409.1 Reporter's Shield Enhancement Endorsement** |
|---|---|

In consideration of the premium charged and on the understanding that this endorsement leaves all other terms, conditions and exclusions unchanged, it is agreed that:

1. The following Endorsement Schedule applies to the coverage as provided by this Endorsement:

Item 1.  **Reporters Shield Sublimit**:        $1,000,000 Single Aggregate Limit
Item 2.  **Reporters Shield Coinsurance**:   20%
Item 3.  **Reporters Shield Retention**:       $100,000 each fine or penalty

2.  WHAT WE WILL PAY (Section IV) is amended to include the following:

**Payments towards protecting your source**

Solely where permissible by law, **we** will pay in excess of the **Reporters Shield Retention** and subject to the **Reporters Shield Coinsurance** any court ordered fines and/or court ordered penalties that are imposed against **you** during the **policy period** for **your** in good faith failing to comply with an order to disclose or produce any information or material gathered, acquired, collected, created or compiled by **you**, provided such information or material was gathered, acquired, collected, created or compiled for the purpose of the creation, production or dissemination of **media content**.

The title of this endorsement is solely for ease of reference and forms no part of the terms and conditions of coverage.

MED E2409 CW (02/10)

| | **DECLARATION** |
|---|---|

# HISCOX

**Hiscox Insurance Company Inc**

Hiscox Inc. 357 Main Street Armonk NY 10504   T +1 914 273 7400

**Policy Number:  US UUA 2619952.11**

---

| Endorsement 10 | **E2416.1 Amended Definition of "Acquired Entity" Endorsement** |
|---|---|

In consideration of the premium charged and on the understanding that this endorsement leaves all other terms, conditions and exclusions unchanged, it is agreed that:

1. DEFINITIONS (Section VIII), **Acquired entity**, of the policy, is deleted and replaced with the following:

**Acquired entity**

"Acquired entity" means:

1. any entity that the **insured** or **existing subsidiary** directly or indirectly acquires or creates during the **policy period**, but only to the extent that the entity produces the same type of **covered media** as the **insured** or **existing subsidiary** and only if the annual revenue or the total book value of the consideration provided in return for acquiring control of the entity is less than or equal to 150,000,000 at the time of acquisition or creation; it being agreed and understood that at renewal of this policy, **we** shall be entitled to impose such additional premium in connection with these **acquired entity (ies)** which **we** may require;

2. any entity that the **insured** or **existing subsidiary** directly or indirectly acquires or creates during the **policy period** which has an annual revenue of more than 150,000,000, but only if **you** have provided **us** with written notification of the acquisition or creation within 90 days of such, and only if **we** have provided our written consent to insure that entity under this policy, such consent never to be unreasonably withheld, and **you** have agreed to pay such additional premium as **we** may require.

For purposes of this definition, "acquires" means taking ownership of over 50% of the outstanding voting stock or interest, or assets of any business entity.

The title of this endorsement is solely for ease of reference and forms no part of the terms and conditions of coverage.

## HISCOX

| DECLARATION |
|---|

**Hiscox Insurance Company Inc**

Hiscox Inc. 357 Main Street Armonk NY 10504   T +1 914 273 7400

**Policy Number:  US UUA 2619952.11**

---

**Endorsement 11**

**E2421.2 Spousal, Civil Union & Domestic Partner Extension End MM/MAC**

In consideration of the premium charged and on the understanding that this endorsement leaves all other terms, conditions and exclusions unchanged, it is agreed that:

If **you** fall into the class of persons identified in DEFINITIONS (Section VIII), **You/Your**, paragraph 2, of the policy, and a **claim** insured under this policy against **you** includes a **claim** against **your** lawful spouse, lawful civil union partner or domestic partner solely by reason of (i) such person's status as **your** spouse, civil union partner or domestic partner, or (ii) such spouse's, civil union partner's or domestic partner's ownership interest in property which the claimant seeks as recovery for **claims** against **you** arising out of the **insured's media activities**, any sum such spouse, civil union partner or domestic partner becomes legally obligated to pay as **damages** on account of the **claim** shall be treated under the policy as if the sum were **damages you** are required to pay on account of the **claim** against **you**. All limitations, conditions provisions and other terms of the policy applicable to **damages you** become obligated to pay shall also be applicable to such sums **your** spouse, civil union partner or domestic partner becomes obligated to pay. In no event shall the coverage afforded by this endorsement apply to any **claim** arising out of the **media activities** of **your** spouse, civil union partner or domestic partner.

The title of this endorsement is solely for ease of reference and forms no part of the terms and conditions of coverage.

MED E2421 CW (02/10)

# DECLARATION

**Hiscox Insurance Company Inc**

Hiscox Inc. 357 Main Street Armonk NY 10504   T +1 914 273 7400

## Policy Number:  US UUA 2619952.11

---

| | |
|---|---|
| **Endorsement 12** | **E2430.1 Remove Settlement Clause Endorsement** |

In consideration of the premium charged and on the understanding that this endorsement leaves all other terms, conditions and exclusions unchanged, it is agreed that GENERAL MATTERS (Section IX), Settlement of Claims, of the policy is deleted in its entirety.

The title of this endorsement is solely for ease of reference and forms no part of the terms and conditions of coverage.

# HISCOX

## DECLARATION

**Hiscox Insurance Company Inc**

Hiscox Inc. 357 Main Street Armonk NY 10504   T +1 914 273 7400

## Policy Number:  US UUA 2619952.11

| Endorsement 13 | **E2444.1 Specific Exclusion Endorsement** |
|---|---|

In consideration of the premium charged and on the understanding that this endorsement leaves all other terms, conditions and exclusions unchanged, it is agreed that the following is added to WHAT WE WILL NOT PAY (Section VI) of the policy:

**We** will not make any payment, including **defense costs** and **damages**, toward any portion(s) of any **claim** for, alleging, or arising from:

auction services, however this exclusion does not apply to any covered media or professional services related to auction services.

The title of this endorsement is solely for ease of reference and forms no part of the terms and conditions of coverage.

**HISCOX**

## DECLARATION

**Hiscox Insurance Company Inc**

Hiscox Inc. 357 Main Street Armonk NY 10504   T +1 914 273 7400

**Policy Number:  US UUA 2619952.11**

| | |
|---|---|
| **Endorsement 14** | **E2484.1 Premium Payment Warranty** |
| | Premium payment warranty:  30 days |

# HISCOX

| **DECLARATION** |

**Hiscox Insurance Company Inc**

Hiscox Inc. 357 Main Street Armonk NY 10504   T +1 914 273 7400

## Policy Number:  US UUA 2619952.11

| Endorsement 15 | **E2531.1 First Amendment Enhancement Endorsement MM** |

In consideration of the premium charged and on the understanding that this endorsement leaves all other terms, conditions and exclusions unchanged, it is agreed that:

1. The following Endorsement Schedule applies to this endorsement:

Item 1. **First Amendment Restriction Sublimit**  $1,000,000
Item 2. **First Amendment Restriction co-insurance paid by you**: 20%
Item 3. **Retention**  $500,000
Item 4. **First Amendment Restriction Retention** $100,000

2.  WHAT WE WILL PAY (Section IV) is amended to include the following:

**Payments towards a first amendment restriction**

**We** will pay all reasonable and necessary attorneys' fees and legal costs incurred by **you** to avoid or respond to a **first amendment restriction,** arising out of **your media activities**, that occurs during the **policy period.**

3. For purposes of the coverage afforded by Section 2 of this endorsement only, WHAT WE WILL NOT PAY (Section VI), is amended by deleting exclusions (e) and (m) in their entirety and replacing them with the following:

e. any enforcement of any state or federal regulation, including but not limited to any regulation promulgated by the Federal Trade Commission, Federal Communications Commission, Federal Election Commission or the Securities and Exchange Commission; however, this exclusion shall not apply to coverage afforded by section 2. of the First Amendment Enhancement Endorsement;

m. any damage to, or destruction or loss of use of any tangible property; however, this exclusion will not apply to:

i) any covered **claim** for trespass; or

ii) coverage afforded by section 2. of the First Amendment Enhancement Endorsement.

4.  For purposes of the coverage afforded by Section 2 of this endorsement only, WHAT WE WILL NOT PAY (Section VI) is amended by adding the following:

s.  any proceeding, ruling or order to suspend or revoke a license by the Federal Communications Commission;

t. any actual or alleged violation of the Federal Trade Commission Act or any analagous state law; or

u. any **claim**.

MED E2531 CW (02/10)



| DECLARATION |
|---|

**Hiscox Insurance Company Inc**

Hiscox Inc. 357 Main Street Armonk NY 10504   T +1 914 273 7400

**Policy Number:  US UUA 2619952.11**

5. For purposes of the coverage afforded by Section 2 of this endorsement only, DEFINITIONS (Section VIII) is amended to include the following:

**First Amendment Restriction**

"First amendment restriction" means any infringement or threatened infringement by the government of **your** rights and privileges under (a) the speech and press clauses of the First Amendment to the United States Constitution, (b) any analogous State constitutional provision, or (c) any statute, regulation or rule pertaining to the public's right of access to government-held information, including:

    A.  any governmental action restricting **your** access to proceedings, meetings or information;

    B.  any Federal Communications Commission investigation or enforcement of an alleged obscene, profane or indecent broadcast;

    C.  any prior restraint or other limitation on the dissemination of **media content** caused by governmental action; and

    D.  any search and/or seizure of **your** property resulting from or in respect of **media content** or the gathering or production of such **media content**.

6.  For purposes of the coverage afforded by Section 2 of this endorsement only, DEFINITIONS (Section VIII) of the policy is amended by deleting the definition of **You/Your** and replacing it with the following:

"You" and "Your" means:

1. the **insured, any existing subsidiary** or any **acquired entity**.

2. any person who was, is or becomes a director, officer, trustee, partner in, or employee of the **insured**, any **existing subsidiary** or any **acquired entity** but only in respect to **claims** arising out of the course and scope of their duties as such and in the event of their death, incapacity or bankruptcy, any **claim** against their estates, heirs, legal representatives or assigns shall be considered a **claim** against them; and

3. any person or entity that takes legal control of the **insured**, **existing subsidiary** or **acquired entity** upon the insolvency or bankruptcy of the **insured**, **existing subsidiary** or **acquired entity.**

7. For the purpose of applying the terms and conditions of WHAT YOU MUST NOTIFY AND WHEN (Section III), HOW MUCH WE WILL PAY (Section V), WHAT WE WILL NOT PAY (Section VI),YOUR OBLIGATIONS TO US (Section VII) and GENERAL MATTERS (Section IX) of the policy to the coverage afforded by this endorsement, wherever the word **claim** appears in such sections, it shall be construed to also reference a **first amendment restriction** that falls within the scope of coverage afforded by this endorsement.

8. The coverage afforded by this endorsement is part of and not in addition to the **policy limit.**

MED E2531 CW (02/10)



| | **DECLARATION** |
|---|---|

**Hiscox Insurance Company Inc**

Hiscox Inc. 357 Main Street Armonk NY 10504   T +1 914 273 7400

**Policy Number:  US UUA 2619952.11**

9. If a sub-limit is indicated below, the sub-limit is the most **we** will pay under this policy in connection with a **first amendment restriction**.  The sub-limit is also the maximum **we** will pay in connection with all **first amendment restrictions.** All sub-limits under this endorsement are included within the **policy limit** and are not in addition to the **policy limit**.

Sub-limit: $1,000,000

10. The Retention listed on the Declarations is amended as follows:

**Retention**:
a. $500,000 Each and every **claim** inclusive of **defense costs** and **damages**
b. $100,000      Each and every **first amendment restriction**

11. The coverage afforded by this endorsement is subject to the following co-insurance percentage:

Co-insurance borne by **you**:  20%

The titles and headings of this endorsement are solely for ease of reference and do not form any part of the terms and conditions of coverage.

MED E2531 CW (02/10)

**HISCOX**

| DECLARATION |
|---|

**Hiscox Insurance Company Inc**

Hiscox Inc. 357 Main Street Armonk NY 10504   T +1 914 273 7400

**Policy Number:  US UUA 2619952.11**

| Endorsement 16 | **E2816.2 Georgia Amendatory Endorsement MM/MAC** |
|---|---|

In consideration for the payment of premium and in reliance on the statements made and information provided to **us**:

1.  YOUR OBLIGATIONS TO US (Section VII), Your Representations, of the policy is deleted in its entirety and replaced with the following:

**You** agree that all representations (whether oral or written) including but not limited to any misrepresentation, omission, concealment of fact, or incorrect statement made by **your** board member(s), executive officer(s), in-house counsel, or risk manager(s) in connection with the application for this policy and all materials submitted by them or on **your** behalf in connection with the application for this policy are true, accurate, and not misleading, and were relied upon by **us** and for **our** decision to issue this policy. Such representation or submitted material may prevent recovery under this policy if:

a.  the representation or submitted material is fraudulent or is material either to the acceptance of the risk or to the hazard assumed by **us**; or

b.   if the true facts had been known to **us** pursuant to a requirement under this policy or other requirement, **we**, in good faith, would not have issued this policy, would have not issued it at the same premium rate, would have not issued it in as large an amount, or would not have provided coverage with respect to the hazard resulting in the **claim**.

In reaching this determination, only facts and knowledge possessed by **your** board member(s), executive officer(s), in-house counsel, or risk manager(s) or any other person whose signature appears on the application, shall be imputed to **you**.

2. DEFINITIONS (Section VIII), Damages of the policy and any endorsement attached thereto is modified to the extent necessary to provide the following:

The Definition of Damages shall specifically include (subject to the policy's other terms, conditions and exclusions) punitive and exemplary damages.

3**.**   GENERAL MATTERS (Section IX), Other insurance, of the policy is deleted in its entirety and replaced with the following:

This policy is specifically excess of and will not contribute with:

1.  any valid and collectible Multimedia Liability insurance policy;  Marketing, Advertising and Communications Liability insurance policy; Video, Film and Television Producers Liability insurance policy; or similar insurance; or

2.  any valid and collectible insurance under where there is a duty to defend;

whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is specifically in excess of this policy.

If other valid and collectible insurance, other than the valid and collectible insurance described above, permits contribution by equal shares, **we** will follow this method also.

MED E2816 (09/10)



| | **DECLARATION** |
|---|---|

**Hiscox Insurance Company Inc**

Hiscox Inc. 357 Main Street Armonk NY 10504   T +1 914 273 7400

**Policy Number:  US UUA 2619952.11**

If other valid and collectible insurance, other than the valid and collectible insurance described above, does not permit contribution by equal shares, **we** will contribute by limits.

This policy is specifically excess of and will not contribute with any indemnification that may be available to **you** from any entity other than the **insured.**

4.    GENERAL MATTERS (Section IX), Cancellation, of the policy is deleted in its entirety and replaced with the following:

The **insured** may cancel this policy at any time by mailing to **us** written notice stating when such cancellation shall be effective. Any unearned premium will be calculated in accordance with the customary short rate table and procedure.

**We** will only cancel this policy if the premium is not paid by the due date, or **you** intentionally make a material misrepresentation to **us** in regard to any **claim** or notice given to **us** under this policy.

If this policy has been in effect for less than sixty (60) days, **we** will send written notice of cancellation to the **insured** at the last known address by first class mail at least ten (10) days prior to the effective date of cancellation.

If this policy has been in effect for sixty (60) days or more, **we** will send written notice of cancellation to the **insured** at the last known address by first class mail at least thirty (30) days prior to the effective date of cancellation; except at least ten (10) days for non-payment of premium when due.

Proof of mailing shall be sufficient proof of notice.

In the event of cancellation for misrepresentation, **we** will return a pro-rata amount of premium.

In the event **we** cancel this policy, the unearned premium will be tendered to either the **insured** or the broker of record on or before the effective date of cancellation.  Failure to return the unearned premium may entitle the **insured** to eighteen per cent (18%) annual interest until the refund has been made and a penalty fee equal to twenty-five percent (25%) of the unearned premium amount; combined penalty and interest not to exceed fifty percent (50%) of the amount of refund due.  Failure to return any unearned premium will not invalidate a notice of cancellation.

However, If the premium is financed by a premium finance company and this policy is cancelled, then any unearned premium will be tendered to the premium finance company within ten (10) working days after the effective date of cancellation and such action by **us** shall be deemed to satisfy **our** obligation as to the returned of unearned premium.

5. GENERAL MATTERS (Section IX), Alternative dispute resolution is modified to the extent necessary to provide the following:

There can be no arbitration between **us** and the **insured**.  Per O.C.G.A.  9-9-2, arbitration agreements may only exist between the **Insureds** and any claimants against the **Insureds.**

MED E2816 (09/10)



| DECLARATION |
|---|

**Hiscox Insurance Company Inc**

Hiscox Inc. 357 Main Street Armonk NY 10504   T +1 914 273 7400

**Policy Number:  US UUA 2619952.11**

6.    GENERAL MATTERS (Section IX) of the policy is amended to include the following at the end thereof:

Nonrenewal

**We** are not required to renew this policy upon its expiration.  If **we** choose not to renew this policy, **we** will send written notice to the **insured** by first class mail at least forty-five (45) days prior to the expiration date of this policy.  Proof of mailing will be sufficient proof of notice.

If the notice of nonrenewal is not provided within the time required, the **insured** may elect to extend this policy for thirty (30) days beyond the expiration date of this policy.  The earned premium for this extension will be calculated pro rata based on the expiring policy's rates and must be tendered or paid to **us** on or before the expiration date of this policy.

Conditional Renewal

If **we** issue a renewal policy conditioned on an increase of premium of more than fifteen percent (15%) or a decrease in coverage, **we** will send to the **insured** written notice of such changed terms by first class mail at least forty-five (45) days prior to the expiration date of this policy.  Proof of mailing is sufficient proof of notice.

If the notice of changed terms is not provided within the time required, the **insured** may elect to extend this policy for thirty (30) days beyond the expiration date of this policy.  The earned premium for this extension will be calculated pro rata based on the expiring policy's rates and must be tendered or paid to **us** on or before the expiration date of this policy.

This provision does not apply if the increase in premium is due to a change in risk of exposure of the **insured**.

7.   If this policy or any endorsement attached thereto is issued on a Claims-Made basis, it is hereby understood and agreed that the policy (as amended by any endorsement attached thereto) is modified to the extent necessary to provide the following:

In the event of cancellation or nonrenewal, **we** will provide, at no additional premium, a period of thirty (30) days, beginning on the effective date of cancellation or nonrenewal during which the **insured** shall be permitted to report to **us claims** first made against **you** during such thirty (30) day period that are for or based upon acts committed or allegedly committed after the applicable **retroactive date** and prior to the effective date of cancellation or nonrenewal and otherwise covered by this policy.  Such extension of coverage shall be referred to as the "Automatic Extended Reporting Period."

8.   If this policy or any endorsement attached thereto is issued with a terrorism exclusion, it is hereby understood and agreed that the policy (as amended by any endorsement attached thereto) is modified to the extent necessary to provide the following:

MED E2816 (09/10)

**DECLARATION**

# HISCOX

**Hiscox Insurance Company Inc**

Hiscox Inc. 357 Main Street Armonk NY 10504   T +1 914 273 7400

**Policy Number:  US UUA 2619952.11**

Notwithstanding any provision to the contrary within this insurance or any endorsement thereto it is agreed that this insurance excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss;

1) war, invasion, acts or foreign enemies, hostilities or warlike operation (whether war be declared or not), civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power; or

2) any **Act of Terrorism.**

For the purpose of this endorsement, an **Act of Terrorism** means any violent act or an act that is dangerous to human life, property or infrastructure, results in damage within the United States and its territories, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission, and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

This  exclusion shall apply provided one or more of the following exist(s):

    A.  Total industry wide insured losses exceeds twenty-five million dollars ($25,000,000) for related incidents that occur within a 72-hour period;
    B.  Fifty(50) or more persons sustain death or serious physical injury as a result of related incidents that occur within a 72-hour period;
    C.  The act involves the use, release or escape of nuclear materials, or that directly or indirectly results in nuclear reaction or radiation or radioactive contamination;
    D.  The act is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials;
    E.  Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism  was to release such materials.

        For purposes of (B) above, serious physical injury means:
    1.  physical injury that involves a substantial risk of death; or
    2.  protracted and obvious physical disfigurement; or
    3.  protracted loss of or impairment of the function of a bodily member or organ.

All other terms and conditions remain unchanged.

MED E2816 (09/10)



# ECONOMIC AND TRADE SANCTIONS POLICYHOLDER NOTICE

Hiscox is committed to complying with the U.S. Department of Treasury Office of Foreign Assets Control (OFAC) requirements. OFAC administers and enforces economic sanctions policy based on Presidential declarations of national emergency.  OFAC has identified and listed numerous foreign agents, front organizations, terrorists, and narcotics traffickers as Specially Designated Nationals (SDN's) and Blocked Persons.  OFAC has also identified Sanctioned Countries.  A list of Specially Designated Nationals, Blocked Persons and Sanctioned Countries may be found on the United States Treasury's web site http://www.treas.gov/offices/enforcement/ofac/.

Economic sanctions prohibit all United States citizens (including corporations and other entities) and permanent resident aliens from engaging in transactions with Specially Designated Nationals, Blocked Persons and Sanctioned Countries.  Hiscox may not accept premium from or issue a policy to insure property of or make a claim payment to a Specially Designated National or Blocked Person.  Hiscox may not engage in business transactions with a Sanctioned Country.

A Specially Designated National or Blocked Person is any person who is determined as such by the Secretary of Treasury.

A Sanctioned Country is any country that is the subject of trade or economic embargoes imposed by the laws or regulations of the United States.

In accordance with laws and regulations of the United States concerning economic and trade embargoes, this policy may be rendered void from its inception with respect to any term or condition of this policy that violates any laws or regulations of the United States concerning economic and trade embargoes including, but not limited to the following:

(1) Any insured under this Policy, or any person or entity claiming the benefits of such insured, who is or becomes a Specially Designated National or Blocked Person or who is otherwise subject to US economic trade sanctions;

(2) Any claim or suit that is brought in a Sanctioned Country or by a Sanctioned Country government, where any action in connection with such claim or suit is prohibited by US economic or trade sanctions;

(3) Any claim or suit that is brought by any Specially Designated National or Blocked Person or any person or entity who is otherwise subject to US economic or trade sanctions;

(4) Property that is located in a Sanctioned Country or that is owned by, rented to or in the care, custody or control of a Sanctioned Country government, where any activities related to such property are prohibited by US economic or trade sanctions; or

(5) Property that is owned by, rented to or in the care, custody or control of a Specially Designated National or Blocked Person, or any person or entity who is otherwise subject to US economic or trade sanctions.

Please read your Policy carefully and discuss with your broker/agent or insurance professional.  You may also visit the US Treasury's website at http://www.treas.gov/offices/enforcement/ofac/.



**NOTICE TO GEORGIA INSUREDS**
O.C.G.A. §33-24-7 – Representations in Applications

---

**GEORGIA POLICYHOLDER NOTICE – ADDENDUM TO THE APPLICATION**

The following is added to the Application and supersedes any language to the contrary, whether contained in the Application, policy or any endorsement thereto:

**SHOULD INSURER ISSUE A POLICY, THE APPLICANT AGREES THAT SUCH POLICY IS ISSUED IN RELIANCE UPON THE TRUTH OF THE STATEMENTS AND REPRESENTATIONS IN THIS APPLICATION OR INCORPORATED BY REFERENCE HEREIN. ANY MISREPRESENTATION, OMISSION, CONCEALMENT OR INCORRECT STATEMENT OF A MATERIAL FACT, IN THIS APPLICATION, INCORPORATED BY REFERENCE OR OTHERWISE, SHALL BE GROUNDS FOR CANCELLATION OF THE POLICY AND/OR DENIAL OF COVERAGE.**



**Hiscox Insurance Company Inc.**

**US TMT Multimedia Liability (Admitted)**
Policy form

Defense costs are within the policy limit

©2006 Hiscox Inc. All rights reserved.



# US TMT Multimedia Liability (Admitted)
Policy form

| | |
|---|---|
| **About this policy** | **Please note that all sums payable under this policy, including but not limited to all defense cost payments, are included within and are not in addition to the policy limit. It is also important that you understand the full extent of your and our rights and duties under this policy so we urge you to read the entire policy carefully. All words and phrases that appear in bold type (except headings) have special meaning and are defined under DEFINITIONS (Section VIII) of this policy.** |

**I.   Our promise to you**

**We** will indemnify **you** for **defense costs** and **damages** incurred as a result of a **claim** that falls within WHAT HAS TO GO WRONG (Section II) under this policy, WHAT WE WILL PAY (Section IV) under this policy, and HOW MUCH WE WILL PAY (Section V) under this policy.

**We** will not make any payment in connection with any **claim** unless **we** are notified in accordance with WHAT YOU MUST NOTIFY AND WHEN (Section III) under this policy, the premium and applicable **retention** are paid, and **you** are in compliance with YOUR OBLIGATIONS TO US (Section VII) under this policy. Also, **we** will not make any payment that is excluded by WHAT WE WILL NOT PAY (Section VI) under this policy.

**II.   What has to go wrong**

Media, personal injury and negligent media content liability

The performance of **media activities** by **you** or anyone on **your** behalf during the **policy period** results in a **claim** against **you** that arises from **covered media** or **advertising**, regardless of when such **claim** is made or where such **claim** is brought, and including but not limited to any **claim** for any actual or alleged:

a.   copyright infringement, trademark infringement, trademark dilution, trade dress infringement, publicity rights violations, cyber squatting violations, moral rights violations, any act of passing-off, or any misappropriation of content, formats, characters, trade names, character names, titles, plots, musical compositions, voices, slogans, graphic material or artwork;

b.   breach of a license **you** have acquired to use a third party's trademark and/or copyrighted material, but only to the extent **your** use inadvertently exceeds limitations expressly set forth in the license regarding the territory, duration, or media in which the material may be used and only if such breach is asserted in conjunction with and based on the same factual allegations as a **claim** under (a) above;

c.   plagiarism, piracy, or breach of an implied-in-fact or implied-in-law contract based on **your** use of a third party's creative idea;

d.   defamation, including but not limited to libel, slander, trade libel, product disparagement, and injurious falsehood;

e.   infliction of emotional distress or outrage;

f.   breach of any duty of confidentiality, invasion of privacy or violation of any other legal protections for personal information, including but not limited to false light, intrusion upon a person's seclusion, public disclosure of a person's private information, misappropriation of a person's picture, name, voice or identity for commercial gain, or unauthorized interception or recording of sound or data in violation of a civil anti-wiretap statute;

g.   promissory estoppel or breach of contract brought by **your** newsgathering source, but only to the extent such **claim(s)** directly stem from **your** promise to protect the anonymity of that source;

h.   failure to give credit or attribution of authorship in accordance with any agreement to which **you** are a bound signatory;

i.   unfair competition, deceptive business practices, or false designation of origin, but only when asserted in conjunction with and based on the same factual allegations as a **claim** under (a), (b), (c), (d) or (e) above;

j.   trespass, false arrest, wrongful entry, unlawful detention, false imprisonment, wrongful eviction, eavesdropping, or malicious prosecution;

k.   disclosure of a trade secret, but only where the disclosure alleged was to the public in a newsworthy publication included within **covered media**;



**US TMT Multimedia Liability (Admitted)**
Policy form

l.  negligent supervision of an employee, but only when asserted in conjunction with and based on the same factual allegations as a **claim** under (a), (b), (c), (d), or (e) above; and/or

m.  any form of negligence (including any negligent act, negligent error, negligent omission, negligent misrepresentation, negligent misstatement, including negligent transmission of a computer virus) but only where arising from **your media content** disseminated in **covered media** or **advertising**.

### III.  What you must notify and when

**You** must notify **us** of **claims** against **you** as soon as practicable.  Proper notification must be sent in accordance with the instructions set forth under the Declarations.

### IV.  What we will pay

Payments toward defense costs

**We** will pay covered **defense costs** as incurred by **you**.

Payments toward claim resolution

**We** will pay covered **damages** as incurred by **you**.

Payments toward your own declaratory relief actions

**We** will pay reasonable attorney's fees incurred by **you** to prosecute **your** own declaratory relief action if:

a.  a claimant has advised **you**, in writing, that **you** are committing copyright or trademark infringement;

b.  after that claimant has asserted such a written **claim**, and after **you** have filed a declaratory relief action directly in response to that **claim**, the claimant files a counterclaim against **you** alleging copyright or trademark infringement; and

c.  the counterclaim is covered under this policy and pending against **you** while **you** are prosecuting **your** declaratory relief action.

Payments on your behalf

**We** will always advance covered **defense costs**, **damages** and payments toward **your** own declaratory relief actions, as described above, in excess of the applicable **retention**, rather than require **you** to pay those sums in the first instance.

### V.  How much we will pay

Our maximum payment

The **policy limit** is the maximum **we** will pay under this policy for any single **claim** (inclusive of **defense costs** and **damages)** and the maximum **we** will pay for the total aggregate of all **claims** (inclusive of **defense costs** and **damages**) and all other payments expressly covered under this policy.

Upon payment of the **policy limit**, **our** obligations under this policy shall be completely fulfilled and **we** shall have no further liability of any kind under this policy. At any time, **we** can pay to **you** the remainder of the **policy limit**, after which **we** will have no further liability of any kind under this policy.

### VI.  What we will not pay

Exclusions

**We** will not make any payment, including **defense costs** and **damages**, toward any portion(s) of any **claim** for, alleging, or arising from:

a.  any infringement or use of a patent;

b.  any misappropriation, use, or disclosure of a trade secret; provided, however, that this exclusion will not apply to any covered portion(s) of any **claim** under WHAT HAS TO GO WRONG (Section II) (k);

c.  any fraudulent or dishonest conduct or willful violation of law, whether committed by **you** or by another whose actions **you** have ratified or condoned; provided, however, that this



## US TMT Multimedia Liability (Admitted)
Policy form

exclusion will not apply:

(i)   until such conduct or violation has been established by final decision in a judicial, administrative or alternative dispute resolution proceeding, or by **your** own admission in such a proceeding or otherwise (or by the admission in such a proceeding or otherwise of the person whose actions **you** have ratified or condoned), at which time **you** shall reimburse **us** for all payments made by **us** in connection with any **claim** arising from such conduct or violation of the law and **our** obligations under this policy with respect to such **claim** shall cease; or

(ii)   at all if such conduct or violation occurred in connection with **your media activities** for **covered media**, the conduct or violation was approved in advance by **your** legal counsel on the basis of a good faith belief that it would be protected from liability by the First Amendment to the U.S. Constitution, and the **claim** based on the conduct or violation falls under WHAT HAS TO GO WRONG (Section II) (d), (e), (f), (g), (j) or (k);

d.   any unfair competition; deceptive trade practices; restraint of trade or violation of any antitrust or consumer fraud statute, legislation or regulation; however, this exclusion will not apply to any covered portion of any **claim** for unfair competition, deceptive trade practices, or false designation of origin under WHAT HAS TO GO WRONG (Section II) (i);

e.   any enforcement of any state or federal regulation, including but not limited to any regulation promulgated by the Federal Trade Commission, Federal Communications Commission, Federal Election Commission or the Securities and Exchange Commission;

f.   any liability or breach of any duty or obligation owed by **you** due to any statement, representation (express or implied), or omission in respect of **your** financial reports or filings, or directly or indirectly arising from any fiduciary duty owed by **you** or financial advice given by **you**;

g.   any liability or breach of any duty or obligation owed by **you** as an employer, including but not limited to any allegation of discrimination, harassment, wrongful termination, or arising from any duty or obligation owed by **you** in connection with the administration of any health, pension, or other form of employee benefit plan;

h.   any disputes with any of **your** present or former directors, officers, trustees, partners in **you**, joint venturers, employees, agents, or independent contractors concerning ownership of or the exercise of rights relating to **media content**, material, or services supplied to **you** by any of them;

i.   any disputes with any of **your** present or former directors, officers, trustees, partners in **you**, joint venturers, employees, agents, or independent contractors concerning **your** disclosure of their personally identifiable information;

j.   **your** provision of any sweepstakes, gambling activities or lotteries or from any over redemption or under redemption of coupons, discounts, awards or prizes from advertisements, promotions, contests or other games of chance; provided however, that this exclusion does not apply to the extent that a **claim** falls under paragraphs (a), (b), (c), (d) or (f) of What Has to Go Wrong (Section II) of the policy;

k.   any pollution, contamination, or toxic exposure;

l.   any bodily injury, including but not limited to death and emotional injury; however, this exclusion will not apply to any portion of a covered **claim** seeking **damages** for emotional anguish or distress;

m.   any damage to, or destruction or loss of use of any tangible property; however, this exclusion will not apply to any covered **claim** for trespass;

n.   any intentionally false, fraudulent, deceptive, or misleading **advertising** with respect to **your** own goods or services; and this exclusion shall apply separately from and not be subject to any of the limitations set forth in paragraph (c) above;

o.   any breach of any written, oral, express or implied contract or warranty; provided, however, that this exclusion will not apply to any covered liability **assumed under agreement**; to any covered portion(s) of a **claim** under WHAT HAS TO GO WRONG (Section II) (b), (c), (g), (h) or (i); or to any legal obligation **you** would otherwise owe in the absence of such contract or warranty;



# US TMT Multimedia Liability (Admitted)
Policy form

p.  any unauthorized use of or access to **your** computer network or computer code; however, this exclusion will not apply to:

(i)  any covered portion(s) of a negligence **claim** brought against **you** that is based on **your** negligent transmission of any malicious code but only where arising from **your media content** disseminated in **covered media** or **advertising**;

(ii)  any computer virus, worm, logic bomb, or Trojan horse that was solely and specifically targeted at **your** computer network;

(iii)  any unauthorized access to or posting of any online content to **your** web site that results in a covered **claim** for defamation, intellectual property infringement, breach of privacy, outrage, infliction of emotional distress, or negligent publication;

q.  any violation of:

(i)  the CAN-SPAM Act of 2003 or any subsequent amendments to that Act;

(ii)  the Telephone Consumer Protection Act (TCPA) of 1991 or any subsequent amendments to that Act; or

(ii)  any other law, regulation or statute relating to unsolicited communication, distribution, sending or transmitting of any communication via telephone or any other electronic or telecommunications device; or

r.  any **claim** that has been or properly could have been the subject of notice to any insurance carrier prior to the **policy period**.

## VII.  Your obligations to us

Your representations

**You** agree that all representations (whether oral or written) made by **your** board member(s), executive officer(s), in-house counsel, or risk manager(s) in connection with the application for this policy and all materials submitted by them or on **your** behalf in connection with the application for this policy are true, accurate, and not misleading, and were relied upon by **us** and were material to **our** decision to issue this policy. If **we** determine that such representations or submitted materials were untrue, inaccurate, or misleading, in any material respect, then **we** are entitled to rescind this policy and treat it as if it had never existed.

In reaching this determination, only facts and knowledge possessed by **your** board member(s), executive officer(s), in-house counsel, or risk manager(s) or any other person whose signature appears on the application, shall be imputed to **you**.

Notifying us of changes to your business

**You** must promptly tell **us** if **you** materially change **your** business, acquire or merge with another business or if any party acquires **your** business. **We** will only provide coverage under this policy for such a change if **we** have given **our** written approval and **you** have agreed to all additional coverage terms and/or additional premium **we** may request to cover the change in risk. However, **you** have no obligation to notify **us** under this section of any entity that falls within subsection (1) of the definition of **acquired entity** under DEFINITIONS (Section VIII) of this policy.

Providing us with information and assistance

**You** shall provide **us** with full, timely and accurate information about any **claim** or declaratory relief action that **you** contend falls within the coverage afforded by this policy.

**You** shall:

1.  give **us**, or anyone appointed by **us**, at **your** expense, such assistance, cooperation and information as **we** reasonably require under this policy, to avoid, minimize, or resolve any **claim**; and

2.  notify **us** as soon as practicable of all settlement offers made by a claimant in connection with any **claim**; and

3.  give **us** all assistance and cooperation **we** reasonably require to pursue at **our** expense any subrogated right of recovery **we** may have in connection with any **claim** or declaratory relief action.



## US TMT Multimedia Liability (Admitted)
Policy form

If **you** or anyone on **your** behalf tries to deceive **us** by deliberately giving **us** false information in connection with such a **claim,** then **we** will not make any payment arising out of or relating to that **claim**.

**Satisfying your retention**

**We** will not make any payment under this policy unless **you** first pay the applicable **retention**. The **retention** shall apply separately to each **claim** unless it is reasonably established that a series of **claims** against **you** directly arise from:

1. the same original cause, a single source or a repeated or continuing problem in **your media activities**; or

2. a single or continuing investigation or a common set of facts or state of affairs in relation to a defamatory statement;

then all such **claims** that **we** agree are related will be treated as a single **claim** and **you** need only pay a single **retention** and they shall be subject to a single **policy limit**.

Any combination of **defense costs** and **damages** with respect to a **claim** may satisfy the **retention**. The **policy limit** is excess of the **retention.**

**Subrogation**

In the event of any payment under this policy, **we** shall be subrogated to all of **your** rights of recovery against any person or entity for such payments and **you** shall fully cooperate with **us** in asserting such rights of recovery, including executing all papers required and by permitting **us** to prosecute an action in **your** name at **our** expense if so requested, and **you** shall do nothing to prejudice such rights. **We** shall have no subrogation rights against **you**.

Any recovered amounts shall first be applied on a pro-rata basis to **you** and to **us** for sums **you** or **we** incurred to pursue the subrogation action. The remainder of any recovered amounts shall be distributed on a pro-rata basis both to **you** for payments made under the **retention** and to **us** for **our** payments made in excess of the **retention**.

## VIII.  Definitions

All phrases and words that appear in bold type in this policy (excluding headings), either in singular or plural form, have the meaning that is given to them below:

**Acquired entity**

"Acquired entity" means:

1. any entity that the **insured** or **existing subsidiary** directly or indirectly acquires or creates during the **policy period**, but only to the extent that the entity produces the same type of **covered media** as the **insured** or **existing subsidiary** and only if the annual revenue or the total book value of the consideration provided in return for acquiring control of the entity is less than 10% of the **insured's** annual revenue at the time of acquisition or creation, and, at the time of acquisition or creation, no **claim** exists against such entity that has resulted or is reasonably likely to result in a payment in excess of 50% of the **retention** (including **defense costs**); it being agreed and understood that at renewal of this policy, **we** shall be entitled to impose such additional premium in connection with these **acquired entity(ies)** which **we** may require;

2. any entity that the **insured** or **existing subsidiary** directly or indirectly acquires or creates during the **policy period** which has an annual revenue of more than 10% of the **insured's** annual revenue, but only if **you** have provided **us** with written notification of the acquisition or creation within 90 days of such, and only if **we** have provided **our** written consent to insure that entity under this **policy**, such consent never to be unreasonably withheld, and **you** have agreed to pay such additional premium as **we** may require.

For purposes of this definition, "acquires" means taking ownership of over 50% of the outstanding voting stock or interest, or assets of any business entity.

**Additional insured**

"Additional insured" means:

1. any third party but only with respect to the **covered media** furnished by **you** to such "additional insured" and arising out of **your media activities**, and only upon the **insured's** written consent following the **insured's** review of a **claim**; or



## US TMT Multimedia Liability (Admitted)
Policy form

2. any third party, including but not limited to freelancers, correspondents, stringers, photographers, volunteers and "leased employees," commissioned or engaged to provide **media content** by the performance of **media activities** for or on behalf of the **insured**, **existing subsidiary**, or **acquired entity** for **covered media**; but only with respect to **claims** arising out of such **media content** or **media activities** and only upon the **insured's** written consent following the **insured's** review of a **claim**.

| | |
|---|---|
| Advertising | "Advertising" means advertising, publicity, or promotion in or of **covered media**. |
| Assumed under agreement | "Assumed under agreement" means any obligation assumed by the **insured**, **existing subsidiary**, and/or **acquired entity** to hold harmless or indemnify a party against losses directly resulting from the **media content** of **covered media** supplied by the **insured**, **existing subsidiary**, and/or **acquired entity**, but only if such obligation was assumed by the **insured**, **existing subsidiary**, and/or **acquired entity** orally or in writing prior to any such loss being suffered. |
| Claim | "Claim" means any written assertion of liability or any written demand for financial compensation or injunctive relief or any request to toll or waive any applicable statute of limitations; however, "claim" does not mean any criminal proceeding of any kind. |
| Covered media | "Covered media" means the specific media described as "covered media" in the Declarations. |
| Damages | "Damages" means any monetary amount **you** become legally obligated to pay as a result of any judgment, settlement, arbitration award or liability **assumed under agreement**, including punitive and exemplary damages if insurable under applicable law, pre-judgment interest and post-judgment interest or any judgment or award ordering payment of attorney's fees or costs, in connection with a covered **claim** insured under this policy, but not including any: |

1. civil, regulatory or criminal fines, sanctions, taxes, or penalties, including those imposed by any federal, state, or local governmental body or by ASCAP, SESAC, BMI or other similar licensing organizations;

2. the costs of complying with any injunction or other equitable order or equitable judgment;

3. the costs of recalling, correcting, producing, reproducing, or reprinting any **media content** or the costs of any services incurred in connection therewith or any overhead costs, loss of revenue, salaries, wages or any future cost of doing business;

4. past or future royalties or license fees or any payment owed to a licensor under a license; however, this provision will not apply to any covered portion(s) of any trademark and/or copyright **claim** that results in a damage award that is measured by the amount a claimant would have received had **you** paid to license the claimant's infringed work; or

5. disgorgement of profits or restitution of sums to which **you** were not entitled.

In determining the insurability of punitive damages in connection with a claim, this policy shall apply to the fullest extent permitted by the law of any jurisdiction applicable to the **claim**, and it is understood and agreed that **we** will not affirmatively assert that punitive damages are uninsurable if **we** may refrain from doing so under such applicable law.

| | |
|---|---|
| Defense costs | "Defense costs" means: |

1. all reasonable and necessary attorneys' fees and legal costs incurred in responding to a demand for a retraction or correction in connection with a **claim** insured under this policy;

2. all reasonable and necessary attorneys' fees and legal costs incurred investigating, settling, defending and/or appealing a **claim** insured under this policy; and

3. any premiums on attachment or appeal bonds as a result of a **claim** insured under this policy; however, **we** are under no obligation to apply for or furnish such bond.

"Defense costs" does not include any overhead expenses, general business expenses, salaries, or wages incurred by **you** except under prior written consent from **us**.

| | |
|---|---|
| Existing subsidiary | "Existing subsidiary" means any entity in which the **insured** directly or indirectly owns more than 50% of the assets or outstanding voting shares as of the first day of the **policy period** and if the |



# US TMT Multimedia Liability (Admitted)
Policy form

revenue is included on **your** application for this policy.

| | |
|---|---|
| Insured | "Insured" means the entity identified as "the insured" on the Declarations. |
| Media activities | "Media activities" means: |

1. the gathering, acquisition, investigation, collection, researching, creation and compilation of **media content**;

2. any broadcast, transmission, dissemination, telecast, cablecast, syndication, serialization, podcast, streaming, or production of **media content**;

3. any publication, republication, or dissemination of **media content** including any special editions or supplements to such **media content**;

4. any digital, online, or electronic dissemination of **media content**;

5. the release, distribution, licensing, sale, lease, or exhibition of **media content**;

regardless of the mode or method of communication of such **media content**.

| | |
|---|---|
| Media content | "Media content" means the substance of any communication of any kind whatsoever within **covered media** or **advertising**, regardless of the nature or form of such "media content" or the medium by which such "media content" is communicated, including but not limited to language, data, facts, fiction, music, photographs, images, advertisements, artistic expression, or visual or graphical materials. |
| Policy limit | "Policy limit" means the amount stated as the "policy limit" on the Declarations. |
| Policy period | "Policy period" means the period of time stated as the "policy period" on the Declarations, unless this policy is cancelled, in which case the "policy period" ends on the effective date of cancellation. |
| Retention | "Retention" means the amount stated as the "retention" on the Declarations. |
| We/Us/Our | "We," "Us," and "Our," means the insurance company that provides this insurance. |
| You/Your | "You" and "Your" means: |

1. the **insured,** any **existing subsidiary** or any **acquired entity**;

2. any person who was, is or becomes a director, officer, trustee, partner in, or employee of the **insured**, any **existing subsidiary** or any **acquired entity** but only in respect to **claims** arising out of the course and scope of their duties as such and in the event of their death, incapacity or bankruptcy, any **claim** against their estates, heirs, legal representatives or assigns shall be considered a **claim** against them;

3. any person or entity that takes legal control of the **insured**, **existing subsidiary** or **acquired entity** upon the insolvency or bankruptcy of the **insured**, **existing subsidiary** or **acquired entity**; and

4. any **additional insured**.

## IX.   General matters

| | |
|---|---|
| Defense arrangements | This is a duty to pay policy, not a duty to defend policy.  Therefore, **you** have the duty to defend **claims** on **your** own behalf under this policy.  This means that, if a **claim** is made against **you**, **you** have the responsibility to retain counsel to defend **you**.  **You** have a choice of requesting that **we** consent to **your** retention of qualified counsel, **our** consent not to be unreasonably withheld, or **you** may retain counsel from the Hiscox Media Panel Counsel List.  **You** may settle a **claim** on **your** own behalf and within the applicable **retention** without **our** prior consent. |

**We** shall at all times have the right and opportunity to effectively associate with **you** and **your** counsel in the investigation, defense and settlement of any **claim** under this policy.  While **we** do not have the duty to defend **you**, **we** have the right and option to assume the defense of a **claim** against **you** if **you** fail to comply with any of YOUR OBLIGATIONS TO US (Section VII) under this policy.

**We** will not make any payment in excess of the applicable **retention**, unless such **defense costs**



## US TMT Multimedia Liability (Admitted)
Policy form

or **damages** payments are incurred with **our** prior consent.

**You** may not admit any liability for, make any settlement offer with respect to, or settle any **claim** in excess of the applicable **retention** without **our** prior consent.

**We** will not make any payments of any kind on account of any portion(s) of **claims** or declaratory relief actions not covered under this policy, nor will such payments by **you** apply to satisfy any applicable **retention**.  **We** and **you** agree to use best efforts to determine a fair allocation of payments (including **defense costs** and **damages**) between portion(s) of **claims** that are covered under this policy and portion(s) that are not covered under this policy.  If a fair allocation cannot be agreed upon, **we** and **you** shall submit the issue to an alternative dispute resolution proceeding in accordance with the Alternative Dispute Resolution provision set forth in GENERAL MATTERS (Section IX) of this policy.  During the alternative dispute resolution proceeding, **we** shall be obligated to pay only that portion of any **defense costs** or **damages** that **we** in good faith believe is properly allocated to **us**.

Settlement of claims

If a situation arises where **we** have a good faith belief that a claimant's monetary offer to settle a covered **claim** is reasonable when **you** do not, then **we** will neither compel **you** to accept the settlement offer nor will **we** cease providing coverage for such a **claim** merely because **you** did not accept the offer. However, if **we** recommend that **you** do accept such an offer and **you** elect not to, then **our** maximum payment toward that particular **claim** following the rejection or expiration of that offer will be the outstanding covered **defense costs** incurred up to the date the settlement offer was rejected or expired, plus the amount of the unaccepted settlement offer, minus **your** remaining **retention** on the day the settlement offer is rejected or expires. If this amount is in excess of the **retention**, then at **your** request and subject to **our** discretion **we** will pay this amount to **you** in a lump payment in return for **you** fully releasing **us** from all liability with respect to the unsettled **claim**.

In exchange for this release, **we** will not seek reimbursement for any portion of **our claim** payment to **you**, even if the **claim** is later resolved for less than the amount **we** paid to **you**.

Date of performance of media activities

For purposes of this policy, relevant **media activities** shall all be deemed to have been performed on the date of first dissemination of **your media content** that is the subject of any **claim**. Where a **claim** is made but there has not yet been dissemination of **your media content**, then the relevant **media activities** shall all be deemed to have been performed on the date of the first act in preparation for dissemination of **your media content**, such as the first act of gathering, acquiring or otherwise preparing **your media content** for dissemination.

For purposes of determining the date of performance of relevant **media activities**, where a **claim** or multiple **claims** arise from a series of the same, or substantially the same factually or logically related events, such as multiple broadcasts of the same television advertisement or multiple acts in the course of preparation of the same **media content**, they will all be deemed to have been performed on the date of the very first dissemination or act in preparation of such **media content** and, if such date falls within the **policy period**, they will be treated as related **claims** subject to a single **retention** and a single **policy limit**.

**We** shall have no obligation under this policy to pay any portion of any **claim** or related **claims** that is attributable to relevant **media activities** in or for **your covered media** that were performed or are deemed by operation of this provision to have been performed prior to or after the **policy period**. In no event shall a series of **media activities** giving rise to a **claim** or related **claims** trigger any obligations by **us** under more than one policy issued by **us**.

Confidential sources

**Your** rights under this policy shall not be prejudiced by **your** refusal to reveal the identity of a confidential source, the accidental or unintentional identification of a confidential source, or **your** refusal to produce reporter's notes or any other documents or information **you** obtain in the course of **your media activities** with respect to which **you** have asserted a reporter's privilege or its equivalent under the First Amendment, statute or common law.

Retractions and corrections

**You** shall maintain sole discretion as respects the retraction or correction of **media content** in **your covered media**.

Other insurance

Any payment due under this policy is specifically excess of and will not contribute with any other valid insurance, regardless if the insurance is collectible or not, unless such other insurance is specifically stated to be in excess of this policy. This policy is not subject to the terms set forth in



**US TMT Multimedia Liability (Admitted)**
Policy form

any other insurance policy.

| | |
|---|---|
| Cancellation | The **insured** may cancel this policy at any time by mailing to **us** written notice stating when such cancellation shall be effective. Any unearned premium will be calculated in accordance with the customary short rate table and procedure. |

**We** will only cancel this policy if the premium is not paid by the due date, or **you** intentionally make a material misrepresentation to **us** in regard to any **claim** or notice given to **us** under this policy, in which case **we** will provide to the **insured** notice of cancellation in accordance with applicable law. In the event of cancellation for misrepresentation, **we** will return a pro-rata amount of premium unless a **claim** has been made or is pending under this policy before such cancellation takes effect.

**We** are not required to renew this policy upon its expiration.

| | |
|---|---|
| Severability | If a board member, executive officer, in-house counsel, or risk manager of the **insured**, an **existing subsidiary** or an **acquired entity** breaches a condition of or obligation under the policy, their breach shall be attributable to themselves and to all of **you**. If a condition of or obligation under the policy is breached by a person or entity who is not a board member, executive officer, in-house counsel, or risk manager, their breach shall be attributable only to themselves and to any persons among **you** who have condoned, ratified or remained passive after learning of such breach, but not to any of the others of **you**. |

| | |
|---|---|
| Alternative dispute resolution | **We** and **you** agree that any dispute arising out of or relating to this policy, including but not limited to its construction, application and validity, or any breach thereof, shall be resolved through either non-binding mediation or binding arbitration in accordance with the commercial arbitration rules of the American Arbitration Association ("AAA") in effect at the time of the dispute, as amended by this policy. Either **you** or **we** may elect the type of Alternative Dispute Resolution ("ADR") to resolve a dispute under this policy. However, **you** have the right to reject **our** choice of ADR process at any time prior to its commencement, in which case **your** preferred choice of either non-binding mediation or binding arbitration shall control. If the first ADR process commenced for a particular dispute is an unsuccessful non-binding mediation, then **you** and **we** agree that such dispute shall only be resolved through binding arbitration in accordance with this provision and that such arbitration proceeding shall not be commenced until a 60-day cooling off period following the last date of the failed mediation has first elapsed. |

Each party shall bear its own fees and costs in connection with any arbitration, but the costs incurred through AAA, including the fees and expenses of the arbitrator, shall be shared equally by the parties unless the arbitration award provides otherwise. No award of punitive damages shall be made in any arbitration. All arbitration proceedings shall be held only in a city where either **you** or **we** have a place of business in the United States, at the election of the party commencing arbitration. The decision of the arbitrator or arbitrators is final and binding and any award may be confirmed and enforced in any court of competent jurisdiction.

| | |
|---|---|
| Bankruptcy or insolvency | **Your** bankruptcy or insolvency shall not relieve **us** of any of **our** obligations under this policy. |
| Currency | All references to dollar amounts in this policy are references to and payable in the currency of the United States of America. |

# EXHIBIT B

Case 8:20-cv-00221-JSM-SPF   Document 18-1   Filed 02/26/20   Page 52 of 166 PageID 242

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, FLORIDA

TERRY GENE BOLLEA professionally known
as HULK HOGAN,

        Plaintiff,

vs.                               Case No. _____

DON BUCHWALD & ASSOCIATES, INC.;
TONY BURTON; MICHAEL CALTA aka
"Cowhead"; MATTHEW CHRISTIAN LOYD
aka "Matt Loyd" aka "Spice Boy"; KEITH M.
DAVIDSON; KEITH M. DAVIDSON &
ASSOCIATES, P.L.C.; COX RADIO, INC.,
TASHA NICOLE CARREGA; LORI
BURBRIDGE and GAWKER MEDIA, LLC,

        Defendants.

_____/

## **COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, Terry Gene Bollea, professionally known as "Hulk Hogan" ("Plaintiff" or "Mr. Bollea"), sues Defendants, Don Buchwald & Associates, Inc. and Tony Burton (collectively, the "Buchwald Defendants"), Michael Calta aka "Cowhead," Matthew Christian Loyd aka "Matt Loyd" aka "Spice Boy," and Cox Radio, Inc. (collectively, the "Cox Defendants"), Keith M. Davidson, Keith M. Davidson & Associates, P.L.C., Tasha Nicole Carrega and Lori Burbridge (collectively, the "Davidson Defendants"), and Gawker Media, LLC ("Gawker"), (together collectively, "Defendants"), and alleges as follows:

## **NATURE OF THIS ACTION**

1.     Over the past several years, Mr. Bollea has been repeatedly victimized by the use, disclosure, dissemination and exploitation of surreptitiously recorded and illegally obtained

video of Mr. Bollea naked, engaged in sexual activity, and having private conversations in a private bedroom, without his knowledge or consent.

2.      In October 2012, Mr. Bollea sought the assistance of state and federal law enforcement to investigate and prosecute those responsible for obtaining, using, disclosing, disseminating and exploiting the contents of these illegal recordings.

3.      Unfortunately, the United States Government and the State of Florida declined to prosecute anyone involved in the improper use and disclosure of the contents of the illegal recordings.

4.      Consequently, Mr. Bollea brings this action to seek redress for the damages and injuries caused by the use, exploitation and public dissemination of the contents of the illegally recorded footage, including a willful and malicious conspiracy to extort him, invade his privacy, profit from his name and likeness and the contents of the illegally recorded footage, and to destroy Mr. Bollea economically and emotionally, ruin his career and reputation and eradicate his legacy, including the following:

        a.      The Buchwald Defendants, and each of them, individually or in concert with and/or as an agent for one another, engaged in acts of civil conspiracy, aiding and abetting civil extortion, violation of Plaintiff's rights of privacy, public disclosure of private facts, invasion of privacy by intrusion, intentional infliction of emotional distress, interference with Plaintiff's contractual and advantageous business relationships, and violation of Florida's Security of Communications Act;

        b.      The Cox Defendants, and each of them, individually or in concert with and/or as an agent for one another, engaged in acts of civil conspiracy, civil

extortion, aiding and abetting civil extortion, violation of Plaintiff's rights of privacy, public disclosure of private facts, invasion of privacy by intrusion, intentional infliction of emotional distress, interference with Plaintiff's contractual and advantageous business relationships, and violation of Florida's Security of Communications Act;

c.     The Davidson Defendants, and each of them, individually or in concert with and/or as an agent for one another, engaged in acts of civil conspiracy, civil extortion, aiding and abetting civil extortion, violation of Plaintiff's rights of privacy, public disclosure of private facts, invasion of privacy by intrusion, intentional infliction of emotional distress, interference with Plaintiff's contractual and advantageous business relationships, and violation of Florida's Security of Communications Act; and

d.     Gawker intentionally interfered with Plaintiff's contractual and advantageous business relationships, and intentionally inflicted  emotional distress upon him by leaking a sealed transcript of surreptitiously recorded private oral communications in a bedroom to the media.  (Mr. Bollea's claims against Gawker are based on events that transpired in the summer of 2015, and therefore do *not* overlap with the claims that Plaintiff brought against Gawker in the 2012 action titled *Bollea v. Gawker Media, LLC, et al*., Case No. 12012447-CI-011 in this Court (the "Prior Action")).

5.     Plaintiff seeks damages against the Buchwald Defendants, Cox Defendants and Davidson Defendants, jointly and severally, as well as a permanent injunction against said Defendants.

6.      Plaintiff seeks damages against Gawker, which are not duplicative of the damages sought in the Prior Action.

**JURISDICTION**

7.      This Court has jurisdiction because Plaintiff seeks relief in an amount greater than $15,000, exclusive of interest, attorneys' fees and costs.

8.      As more specifically set forth below, this Court has personal jurisdiction over Defendants under § 48.193, Florida Statutes, because they each personally or through an agent engaged in one or more of the following acts:

a.      committing tortious acts within the State of Florida;

b.      committing intentional torts expressly aimed at Plaintiff, the effects of which were suffered in Pinellas County, Florida;

c.      operating, conducting, engaging in, or carrying on a business or business venture within the State of Florida, or having an office in this State;

d.      engaging in substantial and not isolated activity within the State of Florida; and/or

e.      engaging in a conspiracy to commit tortious acts against Mr. Bollea within the State of Florida and/or engaging in overt acts in furtherance of that conspiracy within the State of Florida.

9.      As more specifically set forth below, sufficient minimum contacts exist between each Defendant and the State of Florida to satisfy the Due Process under the U.S. Constitution because Defendants have engaged in substantial and not isolated activity within the State of Florida, reside or maintain offices in the State of Florida, and/or committed or conspired to commit intentional torts expressly aimed at Plaintiff, the effects and harms of which were

calculated to and did cause injury to Plaintiff in the State of Florida; such that Defendants should have reasonably anticipated being sued by Plaintiff in the State of Florida.

10.     Venue is proper in this Court pursuant to section 47.011, Florida Statutes because, among other things, the claims at issue accrued within Pinellas County, Florida.

## PARTIES

11.     Plaintiff is a resident and citizen of the State of Florida, and resident of Pinellas County.

12.     At all relevant times, Defendant, Don Buchwald & Associates, Inc. ("Buchwald & Associates"), was and is a corporation organized and operating under the laws of the State of New York, with its principal place of business in the City of New York, County of New York, State of New York.  Buchwald & Associates is a talent agency that represents clients in, among other areas, the radio broadcasting industry; including clients within the State of Florida.

13.     At all relevant times, Defendant, Tony Burton ("Burton"), was and is a citizen, resident and domiciliary of the State of New York, and was and is a talent agent acting within the course and scope of his employment by Buchwald & Associates.  Burton's clients have included, and currently include, among others, Tampa radio personality, Defendant, Michael Calta aka "Cowhead."

14.     At all relevant times, Defendant, Michael Calta aka "Cowhead" ("Calta"), was and is a citizen, resident and domiciliary of Pasco County, Florida.  Calta was and is a radio personality in the Tampa Bay area, who hosts a radio show on "The Bone" 102.5 FM.  At all relevant times, Calta was acting within the course and scope of his employment by Defendant, Cox Radio, Inc.

15.     At all relevant times, Defendant, Matthew Christian Loyd aka "Matt Loyd" aka "Spice Boy" aka "Jim Janerro" ("Loyd"), was and is a citizen, resident and domiciliary of

Hillsborough County, Florida.  At certain times relevant hereto, Loyd was a radio personality in the Tampa Bay area, and was acting within the course and scope of his employment by Defendant, Cox Radio, Inc.

16.     At all relevant times, Defendant, Cox Radio, Inc. ("Cox"), was and is a corporation organized and operating under the laws of the State of Delaware, registered to do business in the State of Florida, with its principal place of business in the City of Atlanta, State of Georgia.  At all material times, Cox owned and operated several terrestrial radio stations broadcasting in Pinellas County, Florida, including "The Bone" 102.5 FM, which operates in and from offices located in Pinellas County, Florida.

17.     At all relevant times, Defendant, Keith M. Davidson ("Davidson"), was and is a citizen, resident and domiciliary of the State of California, and a resident of Los Angeles County, California.  Davidson is an attorney at law, licensed to practice in the State of California, with a record of discipline by the State Bar of California, and was suspended from practicing law in California for two years.  Davidson was retained to assist the Buchwald Defendants and Cox Defendants in the extortion of Plaintiff using the illegally obtained surreptitious video footage within Pinellas County, Florida.

18.     At all relevant times, Defendant, Keith M. Davidson & Associates, P.L.C. ("Davidson & Associates"), was and is a professional corporation organized and existing under the laws of the State of California, with its principal place of business in the State of California, County of Los Angeles.  At all relevant times, Davidson was acting within the course and scope of his employment by Davidson & Associates.

19.     At all relevant times, Defendant, Tasha Nicole Carrega ("Carrega"), was the wife of Defendant, Loyd, and a citizen, resident and domiciliary of Hillsborough County, Florida.

20.     At all relevant times, Defendant, Lori Burbridge ("Burbridge"), was a close friend of Carrega and a citizen, resident and domiciliary of Pasco County, Florida.

21.     At all relevant times, Defendant, Gawker Media, LLC ("Gawker"), was and is a limited liability company organized and operating under the laws of the State of Delaware, with its principal place of business in City of New York, County of New York, State of New York.

22.     At all relevant times, the Buchwald Defendant, Cox Defendants and Davidson Defndants, and each of them, were and are the agents, licensees, employees, partners, joint-venturers, co-conspirators, owners, principals, and employers of one another, and each of them are, and at all times herein mentioned were, acting within the course and scope of that agency, license, partnership, employment, conspiracy, ownership, or joint venture.  At all relevant times, the acts and conduct herein alleged of each of said Defendants were known to, authorized by, and/or ratified by the other said Defendants, and each of them.

## FACTS GIVING RISE TO THE CLAIMS

23.     Plaintiff is a former professional wrestler, and is a professional spokesperson, actor, television personality and product endorser who has enjoyed mainstream popularity as the character "Hulk Hogan."

24.     In or about June-July 2007, Plaintiff, without his knowledge or consent, was filmed with a hidden camera, naked and engaging in private sexual activity and having private conversations, in a private bedroom, with Heather Clem ("Heather Clem"), and having private conversations, in a private bedroom, with her then-husband Bubba the Love Sponge Clem ("Bubba Clem").  Plaintiff understood, believed and expected that his activities in the Clems' private bedroom were private and would not be viewed, heard by other persons nor recorded.

Had Plaintiff known that his private activities and conversations were being recorded, Plaintiff would not have engaged in any such activities or conversations.

25.     In or about early 2012, the Cox Defendants illegally obtained a copy of the surreptitious recordings of Plaintiff, and conspired with one another to use and disclose the contents of said recordings to harm Plaintiff and obtain an improper economic benefit.

26.     In or about early 2012, the Buchwald Defendants, Cox Defendants and Davidson Defendants conspired with one another to use and disclose the contents of the illegal recordings of Plaintiff to cause him harm and obtain an improper economic benefit; and in furtherance thereof sold information relating to the surreptitious recordings of Plaintiff to media companies including, among others, TMZ.com and TheDirty.com, which information included still images and/or portions of the audio and video recordings of Plaintiff.  TMZ.com reported on such information starting on or about March 7, 2012, and TheDirty.com reported on such information starting on or about April 19, 2012, which reports included still images from the surreptitious recordings of Plaintiff, as well as information regarding the contents of the audio portions of the surreptitious recordings.

27.     During 2012, Loyd and Calta communicated repeatedly regarding the formulation and execution of a plan to release the surreptitious recordings of Plaintiff, including their strategy for releasing portions of same to media outlets for the purposing of causing substantial economic harm to Plaintiff, among others; while also furthering their own radio broadcasting careers.

28.     Loyd and Calta were acting within the course and scope of their employment by Cox when they engaged in acts in furtherance of the scheme and conspiracy to use and disclose the contents of the surreptitious recordings of Mr. Bollea; and some or all of these acts were

committed at Cox's offices located in Pinellas County, Florida and/or with the knowledge and consent of Loyd and Calta's immediate supervisors.

29.     In or about late September 2012, Burton, in his capacity as a talent agent employed by Buchwald & Associates, and acting on behalf of and in concert with Calta, a client of Buchwald & Associates, communicated with A.J. Daulerio ("Daulerio"), who was then the Editor-in-Chief of Gawker.com, a popular weblog owned by Gawker.  In those communications, Burton stated to Daulerio that a DVD was being sent to Daulerio and Gawker containing a large portion of the surreptitious recordings of Plaintiff.  Within days of these communications, certain of the Buchwald Defendants, Cox Defendants and/or Davidson Defendants, or someone acting in concert with them or at their direction, sent to Daulerio and Gawker a DVD containing a little more than 30 minutes of surreptitious recordings of Plaintiff, including video images of him fully naked and engaged in consensual sexual activity with Ms. Clem, and also including oral communications between Plaintiff, Ms. Clem and Mr. Clem (the "30 Minute Video").  Burton, acting on behalf of and in concert with Buchwald Defendants, Cox Defendants and Davidson Defendants, knew and intended that Daulerio would publicly disclose content from the 30 Minute Video.

30.     Daulerio, edited the surreptitious recordings of Plaintiff contained within the 30 Minute Video into a one-minute and forty-second "highlight reel" video (the "1:41 Video"), which showed Plaintiff fully naked, receiving oral sex, and engaged in sexual intercourse.  The 1:41 Video also included Plaintiff's private oral communications with Ms. Clem.  Daulerio and Gawker included English subtitles to the 1:41 Video, to ensure that viewers understood every word spoken by Plaintiff and Ms. Clem during the 1:41 of their private encounter.  On October 4, 2012, Gawker posted the 1:41 Video to the Internet, along with an incidental, narrative

description of the contents of the 30 Minute Video, including portions not contained in the 1:41 Video. At least 7 million people watched the 1:41 Video on the Internet. At or around the same time, Loyd contacted Daulerio using the alias "Jim Janerro" to discuss additional surreptitious recordings of Plaintiff.

31. In October 2012, the Davidson Defendants, acting on behalf of and in concert with the Cox Defendants (collectively, the "Extortionists"), contacted counsel for Plaintiff seeking to extort money from Plaintiff. The Extortionists threatened to release the entirety of the surreptitious recordings of Plaintiff, if Plaintiff did not agree to make a very large payment in exchange for all copies of the recordings. Davidson, representing and acting on behalf of and in concert with the other Extortionists, specifically stated to Plaintiff's counsel that certain of the surreptitious recordings that were created illegally, and obtained illegally by the Extortionists, contained insensitive racial remarks which could have the effect of causing great economic harm to Plaintiff if released publicly. Initially, the Extortionists demanded $1 million.

32. Davidson, representing and acting on behalf of and in concert with the Extortionists, also told Plaintiff's counsel that the Extortionists (who acted in agreement with and the assistance of the Buchwald Defendants), arranged for the 30 Minute Video to be sent to Gawker as a "shot across the bow" as part of the scheme to extort money from Plaintiff.

33. The Extortionists and the Buchwald Defendants agreed and worked in concert with one another to send the 30 Minute Video to Gawker and Daulerio in furtherance of the scheme to extort Plaintiff with the surreptitious recordings, promote Loyd and Calta's broadcast careers (while injuring the career of a competitor), and cause substantial economic harm and severe emotional distress to Plaintiff through the release to Gawker and Daulerio of the 30 Minute Video.

34.     Plaintiff's counsel contacted local law enforcement agencies for assistance in investigating and prosecuting those involved in the recording, use, exploitation and disclosure of the surreptitious video.  However, local law enforcement advised Plaintiff's counsel that the statute of limitations for any criminal violations under Florida law had expired, because the recordings were made in 2007.

35.     Plaintiff's counsel then reported the Extortionists' threat to the Tampa, Florida office of the Federal Bureau of Investigation ("FBI").  The FBI subsequently set up a sting operation, which occurred on or about December 14, 2012, at a hotel in Clearwater Beach, Pinellas County, Florida.  On that day, the Extortionists followed through on their plan to use the surreptitious recordings to extort money from Plaintiff.  Specifically, the Extortionists turned over what they represented to Bollea's counsel were all copies of all surreptitious recordings of Plaintiff in the possession of the Extortionists, in exchange for a check from Plaintiff's counsel in the amount of $150,000 and a commitment to make subsequent payments of an additional $150,000, for a total extortion payment of $300,000.  Plaintiff and his counsel, David Houston, appeared at the Clearwater Beach hotel that day and met with Davidson and Burbridge (representing and acting in concert with the other Extortionists and in furtherance of their conspiracy) for the execution of a purported "settlement agreement" and the exchange of the all copies of the surreptitious recordings (from the Extortionists to Plaintiff) and a $150,000 check (from Plaintiff's counsel to the Extortionists).

36.     The FBI recorded the activities of the participants (Plaintiff, Houston, Davidson, Burbridge and a polygraph examiner who was working undercover for the FBI) in a room at the hotel.  The hotel room next door contained several armed FBI agents who recorded the activities in the adjacent room and prepared to make an arrest of the Extortionists.  When Houston handed

the check to the Davidson and Burbridge (representing the Extortionists), several FBI agents entered the room with guns drawn, arrested Davidson and Burbridge, and immediately removed Plaintiff and Houston from the room.

37.     On May 19, 2015, for the sole stated purpose of discovery in the Prior Action to determine whether Plaintiff knew he was being recorded by Mr. Clem in 2007, Gawker filed a separate federal lawsuit against the FBI under the Freedom of Information Act ("FOIA"), to obtain documents and information relating to the aforementioned FBI investigation and operation, styled *Gawker Media, LLC, et al, v. Federal Bureau of Investigation*, U.S. District Court, Middle District of Florida, Case No. 8:15-cv-01202-SCB-EAJ (the "Gawker-FBI Action").  In particular, Gawker sought to obtain other portions of the surreptitiously recorded video of Plaintiff which were not at issue in nor relevant to the Prior Action.

38.     As the Prior Action and the Gawker-FBI Action progressed, it became clear that Gawker misrepresented the reason why it was seeking discovery of the FBI extortion investigation and operation.  Gawker, having become aware through discovery in the Prior Action that other surreptitious recordings seized during the FBI sting operation purportedly contained racially insensitive statements by Plaintiff, used the Gawker-FBI Action to try to gain access to video and/or audio footage of Plaintiff making such statements, so Gawker could use such statements against Plaintiff to destroy him publicly and as leverage to try to force Plaintiff to settle or drop his claims heading into a jury trial in the Prior Action.

39.     During the Prior Action, Gawker threatened Plaintiff repeatedly with the public release of a written transcript (prepared by the Extortionists), containing racially insensitive remarks, derived from the 2007 surreptitious recordings of Plaintiff.  Plaintiff sought and

obtained a Protective Order in the Prior Action, prohibiting the release of the transcript or its contents.

40.     In mid-July 2015, following Gawker's repeated threats of releasing the racial statements during the preceding several months, Gawker's business went into a tailspin over a controversial story which alleged that an executive at a rival media company arranged a date with a male porn star and escort.  Hundreds of stories were published that were highly critical of Gawker in connection with its reporting.  As a result, several major advertisers stopped their advertising at Gawker, and others were threatening to do the same.  Moreover, several senior staff at Gawker resigned in connection with the scandal.  All such activity (the story, the backlash, the loss of advertisers and the resignations) happened within the course of only a few days.  Gawker needed an immediate, major public story to be released, to change the public discourse about Gawker, and deflect attention away from its wrongful business practices.

41.     Gawker found just the solution.  Dylan Howard, a senior editor at *The National Enquirer* and its sister publication RadarOnline.com (collectively, the "*Enquirer*"), who was a personal friend of Daulerio at the time, gave notice to Plaintiff's counsel on July 23, 2015 that the *Enquirer* intended to publish excerpts from the very court-protected, confidential, "sealed" transcript that Gawker had been threatening to release publicly for months (but which Gawker itself could not release because of the Protective Order in the Prior Action prohibiting its public dissemination).

42.     Shortly after Gawker's CEO, Nick Denton, published an article predicting that Mr. Bollea's "real secret" would soon be revealed, at 6:38 a.m. Eastern time on July 24, 2015, the *Enquirer* published a story quoting excerpts of the court-protected confidential transcript.  In

its report, the *Enquirer* confirmed that the excerpts came from the transcript that was "filed under seal in a Florida court."

43.     Only 14 minutes after the *Enquirer* posted the court-protected confidential transcript, at 6:52 a.m. Eastern time, Daulerio sent a tweet to Plaintiff's Twitter account stating: "XOXOXO" (*i.e.*, hugs and kisses) and attaching a link to the *Enquirer's* post releasing excerpts of the court-protected confidential transcript.  Based upon the timing and content of Daulerio's tweet, Daulerio was aware, in advance, of the *Enquirer*'s plans to publish the court-protected confidential transcript, and the harm that such publication would cause to Plaintiff.

44.     Plaintiff promptly issued a public apology for the offensive language used during an illegally-recorded private conversation in his then-best friend's bedroom in 2007—eight years earlier.

45.     The actions of all of Defendants culminated in the *Enquirer's* publication of the court-protected confidential transcript, which caused Plaintiff to be immediately terminated by his employer, World Wrestling Entertainment ("WWE").  Hundreds of articles were published by news organizations immediately thereafter, accusing Plaintiff of being a "racist."

46.     As a result of the Defendants' actions, Plaintiff's highly valuable global brand (which Plaintiff had developed through personal sacrifice, hard work, talent and an immense physical toll on his body over the course of more than 35 years) was decimated within days, and has been permanently damaged if not completely destroyed.  Among other things, all of Plaintiff's endorsement contracts were terminated shortly after the *Enquirer's* publication of the court-protected confidential transcript, and his name and likeness were erased from the WWE website and its Hall of Fame.

47.     Shortly before his 62nd birthday, because of Defendants' use, exploitation and dissemination of the contents of the illegally-recorded 2007 footage, Plaintiff's income was cut off, his legacy in entertainment was severely damaged (if not completely destroyed), and his global brand was forever tarnished.

48.     In the Prior Action, Plaintiff's counsel promptly brought a motion with the court requesting depositions of Daulerio, Nick Denton (Gawker's CEO) and others, and electronic discovery, to determine the extent of Gawkers' role in connection with the leak of the court-protected confidential transcripts.  Gawker vigorously opposed the motion, but the Court granted it, and ordered the requested discovery to occur (but with certain limitations imposed by the trial court *sua sponte*).  Gawker filed an emergency writ petition in the Florida Second District Court of Appeal ("DCA") along with a motion for a stay of the trial court's order pending the DCA's review.  The DCA granted the emergency motion for a stay, but as of the date of this Complaint has not issued a ruling on the substance of the writ petition.

49.     Gawker participated in, facilitated and/or contributed to the use and public dissemination of the content of court-protected confidential transcript to the *Enquirer*, which resulted in the loss of Plaintiff's employment and income, and severe damages to his personal and professional reputation, and valuable worldwide brand.

50.     For purposes of context, Gawker's strategy in the Prior Action was to deliberately and repeatedly file materials with the courts that contained the aforementioned offensive language, which was repeatedly and correctly held inadmissible and completely irrelevant by the Court in the Prior Action.  Although Gawker ostensibly filed these documents under seal, they were filed with the knowledge that due to the high level of publicity attendant to the Prior Action, the media would seek to unseal such materials and obtain the highly sensitive transcript

and audio of Plaintiff using offensive language.  Gawker's plan succeeded, as the news media eventually obtained an order from the Second DCA releasing the sensitive material that Gawker had placed in the court file, which emanated from the Defendants' tortious conduct directed to Mr. Bollea.

51.     The jury trial in the Prior Action proceeded from March 7 through 21, 2016, and the jury rendered a verdict on March 18, and a punitive damages award on March 21.

52.     All conditions precedent to the bringing and maintenance of this action and the granting of the relief requested have been performed, have occurred, or have been waived.

53.     Many of the facts alleged herein were discovered by Plaintiff through an investigation that has taken several years, and is still continuing.  Many of facts became known to Plaintiff as a result of an investigation by the Tampa Police Department, as reflected in their Report dated November 13, 2015 (seven months after the discovery cutoff in the Prior Action), a copy of which is attached hereto as **Exhibit A**, the contents of which are incorporated herein by this reference.

54.     Defendants, in doing the things alleged herein, acted with actual malice and reckless disregard of Plaintiff's rights.  Moreover, although none of the Defendants were acting in the capacity of a member of the "press" while engaging in the conduct forming the basis of this action, the actions of each of the Defendants, alleged herein, still served no legitimate public interest.

## FIRST CAUSE OF ACTION

**(Invasion of Privacy and/or Aiding and Abetting Invasion of Privacy
Against the Buchwald Defendants, Cox Defendants and Davidson Defendants)**

55.     Plaintiff repeats, re-alleges, adopts and incorporates each and every allegation contained in Paragraphs 1 through 54, inclusive, as though fully set forth herein.

56.     The Buchwald Defendants, Cox Defendants and Davidson Defendants, in engaging in the conduct alleged herein, grossly invaded Plaintiff's protected rights of privacy as recognized under the United States Constitution, Florida Constitution, and Florida common law.

57.     Among other things, the Buchwald Defendants, Cox Defendants and Davidson Defendants used, exploited and publicly disclosed intimate details of Plaintiff's private life by disseminating surreptitious recordings of Plaintiff to media companies including TMZ.com, TheDirty.com and/or Gawker, and/or aided and abetted in connection with such dissemination and distribution, for their own economic gain and self interests.

58.     The unauthorized distribution and dissemination of the surreptitious recordings of Plaintiff was highly offensive and objectionable to Plaintiff and to any reasonable person of ordinary sensibilities, and was not of legitimate public concern.

59.     The Buchwald Defendants, Cox Defendants and Davidson Defendants knew or should have known that:  (1) the surreptitious recordings of Plaintiff contained private and confidential information about Plaintiff; (2) Plaintiff had a reasonable expectation of privacy in being fully naked and engaged in consensual sexual activity, and having private conversations, in a private bedroom; (3) the recordings were taken without Plaintiff's knowledge or consent; (4) the surreptitious recordings would reveal private and personal things about Plaintiff which said Defendants had no right or authorization to use, disseminate, disclose or exploit; (5) the publication of these private facts about Plaintiff would be offensive and objectionable to a reasonable person of ordinary sensibilities; and, (6) the publication of these private facts constitutes a substantial violation of Plaintiff's right of privacy.

60.     The Buchwald Defendants, Cox Defendants and Davidson Defendants had no reasonable or legitimate purpose for their acts of using, distributing, disseminating, disclosing

and/or exploiting the surreptitious recordings of Plaintiff and/or aiding and abetting of same. Plaintiff had a reasonable expectation of privacy when he was fully naked and engaged in private consensual sexual activity and having private conversations in a private bedroom, and had no knowledge of, and did not consent to, the recording or public disclosure of any such private activities.

61. The intimate details of Plaintiff's private life that were used, distributed, disseminated, disclosed and/or exploited by the Buchwald Defendants, Cox Defendants and Davidson Defendants were in fact published by the aforementioned media companies, and would not have been published but for said Defendants' actions of using, distributing, disseminating, disclosing and/or exploiting such private facts, or said Defendants' acts of aiding and abetting same.

62. The Buchwald Defendants, Cox Defendants and Davidson Defendants violated Plaintiff's fundamental privacy rights by the conduct alleged herein, including the intrusion into Plaintiff's privacy and the outrageous use, distribution, dissemination, disclosure and/or exploitation of the surreptitious recordings of Plaintiff to media companies and others, and/or aiding and abetting of same, in an unprivileged manner calculated to financially capitalize therefrom and/or cause substantial harm to Plaintiff and others, in conscious disregard of Plaintiff's rights.

63. The Buchwald Defendants, Cox Defendants and Davidson Defendants acted with actual malice and reckless disregard of Plaintiff's rights.

64. As a direct and proximate result of the aforementioned acts by each of the Buchwald Defendants, Cox Defendants and Davidson Defendants, Plaintiff has suffered economic and emotional injury, damage, loss and harm, damage to reputation, anxiety,

embarrassment, humiliation, shame, and severe emotional distress in an amount subject to proof; which damages are continuing in nature and will be suffered in the future.

65.     Plaintiff also is entitled to preliminary and permanent injunctive relief enjoining the use, distribution, dissemination and disclosure of the surreptitious recordings of Plaintiff, and any portions and content thereof; mandating the delivery of all originals, reproductions, copies, and portions of same and all content derived therefrom to Plaintiff; and transferring to Plaintiff all right, title and interest in and to all originals, reproductions, copies, and portions of same and all content derived therefrom.

66.     The aforementioned acts of the Buchwald Defendants, Cox Defendants and Davidson Defendants were done intentionally or with a conscious and/or reckless disregard of Plaintiff's rights, and with the intent to vex, injure or annoy, such as to constitute oppression, fraud or malice.

## SECOND CAUSE OF ACTION

**(Public Disclosure of Private Facts and/or Aiding and Abetting Public Disclosure of Private Facts Against the Buchwald Defendants, Cox Defendants and Davidson Defendants)**

67.     Plaintiff repeats, re-alleges, adopts and incorporates each and every allegation contained in Paragraphs 1 through 54, inclusive, as though fully set forth herein.

68.     The Buchwald Defendants, Cox Defendants and Davidson Defendants disclosed to media companies, and thus the public, private facts concerning Plaintiff contained within the contents of the surreptitious recordings of Plaintiff which depicted him fully naked, engaged in private consensual sexual activity in a private bedroom, and engaged in private conversations, and/or said Defendants aided and abetted in connection with such public disclosure for their own economic gain and self interests.

69.     The Buchwald Defendants, Cox Defendants and Davidson Defendants knew or should have known that:  (1) the surreptitious recordings of Plaintiff contained private and confidential information about Plaintiff; (2) Plaintiff had a reasonable expectation of privacy in being fully naked and engaged in consensual sexual activity, and having private conversations in a private bedroom; (3) the recordings were taken without Plaintiff's knowledge or consent; (4) the surreptitious recordings would reveal private and personal things about Plaintiff which said Defendants had no right or authorization to use, disseminate, disclose or exploit; (5) the publication of these private facts about Plaintiff would be offensive and objectionable to a reasonable person of ordinary sensibilities; and, (6) the publication of these private facts constitutes a substantial violation of Plaintiff's right of privacy.

70.     The Buchwald Defendants, Cox Defendants and Davidson Defendants had no reasonable or legitimate purpose for their acts of using, distributing, disseminating, disclosing and/or exploiting the surreptitious recordings of Plaintiff and/or aiding and abetting of same. Plaintiff had a reasonable expectation of privacy when he was fully naked, engaged in private consensual sexual activity, and having private conversations, in a private bedroom, and had no knowledge of, and did not consent to, the recording of any such private activities.

71.     The private facts that were used, distributed, disseminated, disclosed and/or exploited by the Buchwald Defendants, Cox Defendants and Davidson Defendants were in fact published by the aforementioned media companies, and would not have been published but for said Defendants' actions of using, distributing, disseminating, disclosing and/or exploiting such private facts, or said Defendants' acts of aiding and abetting same.

72.     The actions of the Buchwald Defendants, Cox Defendants and Davidson Defendants as alleged herein are highly offensive and objectionable to Plaintiff, as well as to any

reasonable person of ordinary sensibilities, and are not of legitimate public concern.  Plaintiff did not consent to nor authorize any use, distribution, dissemination, disclosure or exploitation of the surreptitious recordings of him, or any portions or content thereof, whatsoever, or of the publication of same by anyone.

73.    The Buchwald Defendants, Cox Defendants and Davidson Defendants violated Plaintiff's fundamental privacy rights by the conduct alleged herein, including the intrusion into Plaintiff's privacy and the outrageous use, distribution, dissemination, disclosure and/or exploitation of the private facts contained within surreptitious recordings of Plaintiff to media companies and the public, and/or aiding and abetting of same, in an unprivileged manner calculated to financially capitalize therefrom and/or cause substantial harm to Plaintiff and others, in conscious disregard of Plaintiff's rights.

74.    The Buchwald Defendants, Cox Defendants and Davidson Defendants acted with actual malice and reckless disregard for Plaintiff's rights.

75.    As a direct and proximate result of the aforementioned acts by each of the Buchwald Defendants, Cox Defendants and Davidson Defendants, Plaintiff has suffered economic and emotional injury, damage, loss and harm, damage to reputation, anxiety, embarrassment, humiliation, shame and severe emotional distress in an amount subject to proof; which damages are continuing in nature and will be suffered in the future.

76.    Plaintiff also is entitled to preliminary and permanent injunctive relief enjoining the use, distribution, dissemination and disclosure of the surreptitious recordings of Plaintiff, and any portions and content thereof; mandating the delivery of all originals, reproductions, copies, and portions of same and all content derived therefrom to Plaintiff; and transferring to Plaintiff

all right, title and interest in and to all originals, reproductions, copies, and portions of same and all content derived therefrom.

77.     The aforementioned acts of the Buchwald Defendants, Cox Defendants and Davidson Defendants were done intentionally or with a conscious and/or reckless disregard of Plaintiff's rights, and with the intent to vex, injure or annoy, such as to constitute oppression, fraud or malice.

### THIRD CAUSE OF ACTION

**(Invasion of Privacy by Intrusion Upon Seclusion and/or
Aiding and Abetting Invasion of Privacy by Intrusion Upon Seclusion
Against the Buchwald Defendants, Cox Defendants and Davidson Defendants)**

78.     Plaintiff repeats, re-alleges, adopts and incorporates each and every allegation contained in Paragraphs 1 through 54, inclusive, as though fully set forth herein.

79.     The Buchwald Defendants, Cox Defendants and Davidson Defendants, without Plaintiff's consent and against Plaintiff's will, have grossly invaded Plaintiff's protected rights of privacy as recognized under the United States Constitution, Florida Constitution, and applicable common law, by obtaining, using, watching, distributing, disseminating, disclosing and/or exploiting the surreptitious recordings of Plaintiff which depicted him fully naked, engaged in private intimate consensual sexual activity, and included his private conversations, in a private bedroom, and/or aiding and abetting of such activity.

80.     The Buchwald Defendants, Cox Defendants and Davidson Defendants, through electronic means, enabled the general public to intrude into a place in which Plaintiff had a reasonable expectation of privacy and watch Plaintiff when he was fully naked, engaged in private sexual activity, and engaged in private conversations, in a private bedroom, without Plaintiff's knowledge, authorization or consent.

81.     The activities of the Buchwald Defendants, Cox Defendants and Davidson Defendants were not carried out for reasonable or legitimate purposes, but rather to reap financial rewards at the expense of Plaintiff and others and/or to cause substantial harm to Plaintiff and others.

82.     Plaintiff had a reasonable expectation of privacy in the location in which the surreptitious recordings were secretly made, and a reasonable expectation he was not being recorded while engaging in the private activities in which he was engaged; appearing fully naked, engaged in private consensual sexual activity, and having private conversations, in a private bedroom.  Plaintiff had no knowledge of, and did not consent to, the recording or disclosure and dissemination of such private activities.

83.     The actions by the Buchwald Defendants, Cox Defendants and Davidson Defendants are offensive and objectionable to Plaintiff, and would outrage or cause mental suffering, shame, humiliation or hurt feelings to a person of ordinary sensibilities.

84.     The Buchwald Defendants, Cox Defendants and Davidson Defendants knew or should have known that:  (1) the surreptitious recordings of Plaintiff contained private and confidential information about Plaintiff; (2) Plaintiff had a reasonable expectation of privacy in being fully naked and engaged in consensual sexual activity, and having private conversations, in a private bedroom; (3) the recordings were taken without Plaintiff's knowledge or consent; (4) the surreptitious recordings would reveal private and personal things about Plaintiff which said Defendants had no right or authorization to use, disseminate, disclose or exploit; (5) the publication of these private facts about Plaintiff would be offensive and objectionable to a reasonable person of ordinary sensibilities; and, (6) the publication of these private facts constitutes a substantial violation of Plaintiff's right of privacy.

85.     The Buchwald Defendants, Cox Defendants and Davidson Defendants violated Plaintiff's fundamental privacy rights by the conduct alleged herein, including the outrageous intrusion into Plaintiff's privacy and the use, distribution, dissemination, disclosure and exploitation of the surreptitious recordings of Plaintiff, in an unprivileged manner, calculated to financially gain therefrom, at the expense of Plaintiff and others, and/or to cause Plaintiff to suffer substantial harm therefrom, in conscious disregard of Plaintiff's right of privacy.

86.     The Buchwald Defendants, Cox Defendants and Davidson Defendants acted with actual malice and reckless disregard of Plaintiff's rights.

87.     As a direct and proximate result of the aforementioned acts by each of the Buchwald Defendants, Cox Defendants and Davidson Defendants, Plaintiff has suffered economic and emotional injury, damage, loss and harm, damage to reputation, anxiety, embarrassment, humiliation, shame, and severe emotional distress in an amount subject to proof; which damages are continuing in nature and will be suffered in the future.

88.     Plaintiff also is entitled to preliminary and permanent injunctive relief enjoining the use, distribution, dissemination and disclosure of the surreptitious recordings of Plaintiff, and any portions and content thereof; mandating the delivery of all originals, reproductions, copies, and portions of same and all content derived therefrom to Plaintiff; and transferring to Plaintiff all right, title and interest in and to all originals, reproductions, copies, and portions of same and all content derived therefrom.

89.     The aforementioned acts of the Buchwald Defendants, Cox Defendants and Davidson Defendants were done intentionally or with a conscious and/or reckless disregard of Plaintiff's rights, and with the intent to vex, injure or annoy, such as to constitute oppression, fraud or malice.

## FOURTH CAUSE OF ACTION

**(Intentional Infliction of Emotional Distress**
**Against the Buchwald Defendants, Cox Defendants and Davidson Defendants)**

90.     Plaintiff repeats, re-alleges, adopts and incorporates each and every allegation contained in paragraphs 1 through 54, inclusive, as if fully set forth herein.

91.     At all times herein, the Buchwald Defendants, Cox Defendants and Davidson Defendants acted intentionally, maliciously and without justification in causing the surreptitious recordings of Plaintiff to be disseminated and disclosed to third parties, and in participating and aiding a civil extortion scheme when they knew or should have known that Plaintiff would suffer severe emotional distress as a result.

92.     The conduct by the Buchwald Defendants, Cox Defendants and Davidson Defendants was intentional and malicious and done for the purpose of causing, or was known by said defendants to be likely to cause, Plaintiff to suffer humiliation, mental anguish and severe emotional distress, and was done with the wanton and reckless disregard of the consequences to Plaintiff.

93.     In doing the acts alleged hereinabove, the Buchwald Defendants, Cox Defendants and Davidson Defendants acted outrageously and beyond all reasonable bounds of decency, and intentionally inflicted severe emotional distress upon Plaintiff, to his detriment.

94.     The Buchwald Defendants, Cox Defendants and Davidson Defendants acted with actual malice and reckless disregard of Plaintiff's rights.

95.     As a direct and proximate result of the aforementioned acts by each of the Buchwald Defendants, Cox Defendants and Davidson Defendants, Plaintiff has suffered emotional injury, damage, loss, harm, anxiety, embarrassment, humiliation, shame, and severe

emotional distress in an amount subject to proof; which damages are continuing in nature and will be suffered in the future.

96.     Plaintiff is informed and believes and thereon alleges that the aforementioned acts of the Buchwald Defendants, Cox Defendants and Davidson Defendants were done intentionally or with a conscious and/or reckless disregard of Plaintiff's rights, and with the intent to vex, injure or annoy, such as to constitute oppression, fraud or malice.

97.     Plaintiff expressly disclaims any claims of negligence, including negligent infliction of emotional distress, against the Buchwald Defendants, Cox Defendants and Davidson Defendants.

## FIFTH CAUSE OF ACTION

**(Intentional Interference with Contractual Relations and Advantageous Business Relationships Against the Buchwald Defendants, Cox Defendants and Davidson Defendants)**

98.     Plaintiff repeats, re-alleges, adopts and incorporates each and every allegation contained in Paragraphs 1 through 54, inclusive as though fully set forth herein.

99.     At all times herein, the Buchwald Defendants, Cox Defendants and Davidson Defendants were aware that Plaintiff had specific employment, endorsement and other contracts, and said Defendants acted intentionally, maliciously and without justification in their wrongful acts described herein.  The Buchwald Defendants, Cox Defendants and Davidson Defendants knew or should have known that their actions would cause or were likely to cause substantial interference with Plaintiff's existing contracts and his advantageous business relationships.

100.    The conduct by the Buchwald Defendants, Cox Defendants and Davidson Defendants was intentional and malicious and done for the purpose of causing, or was known by them to be likely to cause, the termination of and substantial interference with Plaintiff's contracts and his advantageous business relationships.

101.    In doing the acts alleged hereinabove, the Buchwald Defendants, Cox Defendants and Davidson Defendants acted outrageously and beyond all reasonable bounds of decency.

102.    As a direct and proximate result of the aforementioned wrongful conduct by the Buchwald Defendants, Cox Defendants and Davidson Defendants, Plaintiff has suffered substantial economic injury, loss, damages and harm from the actual interference with Plaintiff's contracts and advantageous business relationships, in an amount subject to proof; which damages are continuing in nature and will be suffered in the future.

103.    The Buchwald Defendants, Cox Defendants and Davidson Defendants acted with actual malice and reckless disregard of Plaintiff's rights.

104.    Plaintiff is informed and believes and thereon alleges that the aforementioned acts of the Buchwald Defendants, Cox Defendants and Davidson Defendants were done intentionally or with a conscious and/or reckless disregard of Plaintiff's rights, and with the intent to vex, injure or annoy, such as to constitute oppression, fraud or malice.

105.    Plaintiff expressly disclaims any claims of negligence, including negligent interference, against the Buchwald Defendants, Cox Defendants and Davidson Defendants.

## SIXTH CAUSE OF ACTION

**(Violation of Section 934.10, Florida Statutes and/or
Aiding and Abetting of Violation of Section 934.10, Florida Statutes
Against the Buchwald Defendants, Cox Defendants and Davidson Defendants)**

106.    Plaintiff repeats, re-alleges, adopts and incorporates each and every allegation contained in Paragraphs 1 through 54, inclusive as though fully set forth herein.

107.    Plaintiff had a reasonable expectation of privacy in engaging in private oral communications in a private bedroom, and a reasonable expectation that said oral communications would not be recorded, and did not know about, nor consent to, the recording of such oral communications.

108.    The Buchwald Defendants, Cox Defendants and Davidson Defendants intentionally violated Plaintiff's rights under Section 934.10, Florida Statutes, by using, disseminating, disclosing and/or distributing to third parties the contents of private oral communications of Plaintiff.

109.    The Buchwald Defendants, Cox Defendants and Davidson Defendants knew or should have known that:  (1) the surreptitious recordings of Plaintiff contained private and confidential information about Plaintiff; (2) Plaintiff had a reasonable expectation of privacy while having private conversations, in a private bedroom; (3) the recordings were made without Plaintiff's knowledge or consent; (4) the surreptitious recordings would reveal private and personal things about Plaintiff which said Defendants had no or authorization to use, disseminate, disclose or exploit; (5) the use or disclosure of Plaintiff's oral communications or the contents thereof would be offensive and objectionable to a reasonable person of ordinary sensibilities; and, (6) the use and disclosure of Plaintiff's oral communications was unlawful.

110.    The actions of the Buchwald Defendants, Cox Defendants and Davidson Defendants have not served any legitimate public interest.

111.    The Buchwald Defendants, Cox Defendants and Davidson Defendants acted with actual malice and reckless disregard of Plaintiff's rights, including his right to privacy.

112.    As a direct and proximate result of the aforementioned acts by the Buchwald Defendants, Cox Defendants and Davidson Defendants, Plaintiff has suffered substantial actual damages; which are continuing in nature and will be suffered in the future. in an amount subject to proof.

113.    The aforementioned acts of the Buchwald Defendants, Cox Defendants and Davidson Defendants were done intentionally or with a conscious and/or reckless disregard of

Plaintiff's rights, and with the intent to vex, injure or annoy, such as to constitute oppression, fraud or malice.

## SEVENTH CAUSE OF ACTION

### (Civil Conspiracy Against Cox Defendants and Davidson Defendants)

114.   Plaintiff repeats, re-alleges, adopts and incorporates each and every allegation contained in Paragraphs 1 through 113, inclusive, as if fully set forth herein.

115.   The Buchwald Defendants, Cox Defendants and Davidson Defendants entered into an agreement to commit an unlawful act and/or perform a lawful act by unlawful means.

116.   Defendants, as more specifically set forth above, each performed overt acts in pursuance of their conspiracy.

117.   As a direct and proximate result of The Buchwald Defendants, Cox Defendants and Davidson Defendants acts, Plaintiff suffered substantial economic and emotional injury, damage, loss and harm, anxiety, embarrassment, humiliation, shame, damage to reputation and severe emotional distress, in an amount subject to proof; which damages are continuing in nature and will be suffered in the future.

## EIGHTH CAUSE OF ACTION

### (Intentional Interference with Contractual Relations and Advantageous Business Relationships Against Gawker)

118.   Plaintiff repeats, re-alleges, adopts and incorporates each and every allegation contained in Paragraphs 4(d), 6, 7 through 21, 23 through 25, 31, 32, 34 through 50, and 52 through 54, inclusive, as though fully set forth herein.

119.   At all relevant times herein, Gawker was aware that Plaintiff had specific employment, endorsement and other contracts, and advantageous business relationships, and acted intentionally, maliciously and without justification in causing the contents of a court-

ordered confidential transcript relating to Plaintiff to be disseminated to the media when Gawker knew or should have known that such actions would cause or were likely to cause substantial interference with Plaintiff's employment, endorsement and other contracts, and his advantageous business relationships, of which Gawker had knowledge.

120. The conduct by Gawker was intentional and malicious and done for the purpose of causing, or was known by Gawker to be likely to cause, the termination of and substantial interference with Plaintiff's employment, endorsement and other contracts, and his advantageous business relationships.

121. In doing the acts alleged hereinabove, Gawker acted outrageously and beyond all reasonable bounds of decency.

122. As a direct and proximate result of the aforementioned wrongful conduct by Gawker, Plaintiff has suffered substantial economic injury, loss, damages and harm from the actual interference with Plaintiff's employment, endorsement and other contracts, and advantageous business relationships in existence in July 2015, in an amount subject to proof. (Plaintiff does not seek against Gawker Defendants herein any liability or damages that would be duplicative of the liability determined and damages awarded in the Prior Action.)

123. Gawker acted with actual malice and reckless disregard of Plaintiff's rights.

124. The aforementioned acts of Gawker were done intentionally or with a conscious and/or reckless disregard of Plaintiff's rights, and with the intent to vex, injure or annoy, such as to constitute oppression, fraud or malice.

125. Plaintiff expressly disclaims any claims of negligence, including negligent interference with contractual relations or advantageous business relationships, against Gawker.

## NINTH CAUSE OF ACTION

### (Intentional Infliction of Emotional Distress
### Against Gawker)

126.   Plaintiff repeats, re-alleges, adopts and incorporates each and every allegation contained in Paragraphs 4(d), 6, 7 through 21, 23 through 25, 31, 32, 24 through 50, and 52 through 54, inclusive, as though fully set forth herein.

127.   At all times herein, Gawker acted intentionally, maliciously and without justification, in causing the contents court-ordered confidential transcript relating to Plaintiff to be disseminated to third parties when Gawker knew or should have known that Plaintiff would suffer severe emotional distress as a result.

128.   The conduct by Gawker was intentional and malicious and done for the purpose of causing, or was known by Gawker to be likely to cause, Plaintiff to suffer severe emotional distress, and was done with the wanton and reckless disregard of the consequences to Plaintiff.

129.   In doing the acts alleged hereinabove, Gawker acted outrageously and beyond all reasonable bounds of decency, and intentionally inflicted severe emotional distress upon Plaintiff, to his detriment.

130.   Gawker acted with actual malice and reckless disregard of Plaintiff's rights.

131.   As a direct and proximate result of the aforementioned acts by Gawker, Plaintiff has suffered emotional injury, damage, loss, harm, anxiety, embarrassment, humiliation, shame, and severe emotional distress in an amount subject to proof; which damages are continuing in nature and will be suffered in the future.  (Plaintiff does not seek against Gawker Defendants herein any liability or damages that would be duplicative of the liability determined and damages awarded in the Prior Action.)

132.    The aforementioned acts of Gawker were done intentionally or with a conscious and/or reckless disregard of Plaintiff's rights, and with the intent to vex, injure or annoy, such as to constitute oppression, fraud or malice.

133.    Plaintiff expressly disclaims any claims of negligence, including negligent infliction of emotional distress, against Gawker.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, Terry Gene Bollea, prays for judgment against each of the Defendants as follows:

1.    For an award of general and special damages in an amount in excess of the minimum jurisdictional limits of this Court in accordance with proof at trial together with interest thereon at the maximum legal rate;

2.    For costs of suit incurred herein;

3.    For reasonable attorneys' fees against only the Buchwald Defendants, Cox Defendants and Davidson Defendants, pursuant to the Sixth Cause of Action, only;

4.    For preliminary and permanent injunction against only the Buchwald Defendants, Cox Defendants and Davidson Defendants, including all persons acting under their control, prohibiting any and all activity that would cause the distributing, disseminating, disclosing, publishing, displaying, posting for view or access on or through the Internet or any other manner or media outlet, broadcasting, transferring, licensing, selling, offering to sell or license, or otherwise using, exploiting or attempting to exploit, the surreptitious recordings of Plaintiff, or any portions or content thereof or any copies thereof, in any and all formats and media, including all electronic and physical media;

5.    For an Order and Judgment requiring only the Buchwald Defendants, Cox Defendants and Davidson Defendants to turn over to Plaintiff all surreptitious recordings of

Plaintiff, or any portions or content thereof or any copies thereof, in any and all formats and media, including all electronic and physical media; and

6.    For such other and further relief as to this court may deem and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff, Terry Gene Bollea, hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

Dated:  May 2, 2016                                    /s/ Shane B. Vogt
                                                        Kenneth G. Turkel, Esq.
                                                        Florida Bar No. 867233
                                                        KTurkel@BajoCuva.com
                                                        Shane B. Vogt, Esq.
                                                        Florida Bar No. 257620
                                                        SVogt@BajoCuva.com
                                                        BAJO | CUVA | COHEN | TURKEL
                                                        100 N. Tampa Street, Suite 1900
                                                        Tampa, Florida  33602
                                                        Telephone:  (813) 443-2199
                                                        Facsimile:  (813) 443-2193

                                                        Charles J. Harder, Esq.
                                                        California Bar No. 184593
                                                        (*Pro Hac Vice* application to be filed)
                                                        CHarder@HMAfirm.com
                                                        HARDER MIRELL & ABRAMS LLP
                                                        132 S. Rodeo Drive, Suite 301
                                                        Beverly Hills, California  90212
                                                        Telephone:  (424) 203-1600
                                                        Facsimile:  (424) 203-1601

                                                        David R. Houston, Esq.
                                                        Nevada Bar No. 2131
                                                        (*Pro Hac Vice* application to be filed)
                                                        DHouston@houstonatlaw.com
                                                        LAW OFFICES OF DAVID R. HOUSTON
                                                        432 Court Street
                                                        Reno, Nevada  89501
                                                        Telephone:  (775) 786-4188
                                                        Facsimile:  (775) 786-5091

                                                        *Attorneys for Plaintiff Terry Gene Bollea,*
                                                        *professionally known as "Hulk Hogan"*

Filing # 40950062 E-Filed 05/02/2016 12:17:59 PM

# EXHIBIT A



**TAMPA PD**

**GENERAL OFFENSE HARDCOPY**
COPY FOR THE GENERAL PUBLIC

GO# 2014-332377 EXCEPTIONALLY CLEARED | 2100-8 EXTORTION

## General Offense Information

Operational status: **EXCEPTIONALLY CLEARED**
Reported on: **May-23-2014 (Fri.) 1015**
Occurred between: **Jan-05-2012 (Thu.) 600** and **Mar-01-2012 (Thu.) 1300**
Approved on: **May-24-2014 (Sat.)** by: **31598 - MARTINEAU, LISA M (Retired)**
Report submitted by: **42324 - FINE, RALPH**
Org unit: **Squad 102**
Address: **5021 NASSAU ST W**
      Municipality: **TAMPA**
      District: **1** Beat: **A4** Grid: **118**
Felony/Misdemeanor: **FELONY**
Bias: **None (no bias)**
Special study: **Not Applicable**
Family violence: **NO**

## Offenses (Completed/Attempted)

Offense: # **1 2100-8 EXTORTION - COMPLETED**
Location: **Commercial Off Bldg**
Offender suspected of using: **Not Applicable**
Criminal activity: **Not Applicable**
Weapon type: **Threat/Intimidation, Not Applicable**



**TAMPA PD**

**GENERAL OFFENSE HARDCOPY**
COPY FOR THE GENERAL PUBLIC

| GO# 2014-332377 EXCEPTIONALLY CLEARED | 2100-8 EXTORTION |
| --- | --- |

# Related Event(s)

CP          2014-332377

# Related Person(s)

### 1.  VICTIM # 1 - CLEM, BUBBA THE LOVE SPONGE

### (Case Specific Information)

Sex: **MALE**
Race: **WHITE**
Date of birth: **Apr-23-1966**
Address: **5021 W NASSAU ST**
          Municipality: **TAMPA , Florida   33607-**
**Phone Numbers**
          Home:  **(727)  241-8466**
          Business:  **(813)  832-1000**

### Particulars

Occupation: **RADIO HOST**
Employer: **SELF-EMPLOYED   5021 W NASSAU ST**
Citizenship: **America, United States of**
Marital status: **Single**
Ethnicity: **USA**
Language(s) spoken: **English**
Height: **5'10** Weight: **250** lbs.
Disability: **None Known**
Build: **Large**    Complexion: **MEDIUM**
Eye color: **HAZEL**
Hair color: **BROWN**
Hair style: **Short Length**

### Master Name Index Reference

Name: **CLEM, BUBBA THE LOVE  SPONGE  SPONGE**
Sex: **MALE**
Race: **WHITE**
Date of birth: **Apr-23-1966**
Ethnicity: **USA**
Address: **5021 W NASSAU ST**
          Municipality: **TAMPA , Florida   33607-**
**Phone numbers**
Home: **(727)  241-8466**
Business: **(813)  832-1000**

### Alias(es)/AKA

| Name: | Address: | Sex: | DOB: |
| --- | --- | --- | --- |
| **CLEM, TODD** | | **M** | **Apr-23-1966** |



**TAMPA PD**
## GENERAL OFFENSE HARDCOPY
### COPY FOR THE GENERAL PUBLIC

GO# 2014-332377 EXCEPTIONALLY
CLEARED

2100-8 EXTORTION

## Linkage factors

Resident status : **City (Tampa)**
Statement taken : **YES**
Age range : **30-49 Years**
Access to firearm : **NO**
Victim of :
**2100- 8  EXTORTION -  COMPLETED**

Victim's Relationship to Offender : **Victim Was Employer**
Person's role : **SUSPECT/OFF #1**
Person's name : **LOYD, MATTHEW C Feb-07-1979**

Victim's Relationship to Offender : **Victim Was Stranger**
Person's role : **SUSPECT/OFF #2**
Person's name : **DAVIDSON, KEITH M Apr-08-1971**

## Offender LEOKA details

## LEOKA details

Officer's experience (in years) : **0**

## 2.  VICTIM # 2 - BOLLEA, TERRY

## (Case Specific Information)

Sex: **MALE**
Race: **WHITE**
Date of birth: **Aug-11-1953**
Address: **1040 EL DORADO AV**
        Municipality: **CLEARWATER BEACH , Florida   33767-**
**Phone Numbers**
        Cellular:  **(727)  365-7174**
        Home:  **(727)  432-1084**
**Master Name Index Reference**
Name: **BOLLEA, TERRY**
Sex: **MALE**
Race: **WHITE**
Date of birth: **Aug-11-1953**
Address: **1040 EL DORADO AV**
        Municipality: **CLEARWATER BEACH , Florida   33767-**
**Phone numbers**
Home:  **(727)  432-1084**
Cellular:  **(727)  365-7174**
## Linkage factors

Age range : **50-64 Years**
Victim of :
**2100- 8  EXTORTION -  COMPLETED**



**TAMPA PD**
**GENERAL OFFENSE HARDCOPY**
COPY FOR THE GENERAL PUBLIC

| GO# 2014-332377 EXCEPTIONALLY CLEARED | 2100-8 EXTORTION |
|---|---|

Victim's Relationship to Offender : **Victim Was Acquaintance**
Person's role : **SUSPECT/OFF #1**
Person's name : **LOYD, MATTHEW C Feb-07-1979**

Victim's Relationship to Offender : **Victim Was Stranger**
Person's role : **SUSPECT/OFF #2**
Person's name : **DAVIDSON, KEITH M Apr-08-1971**

**Offender LEOKA details**

**LEOKA details**

Officer's experience (in years) : **0**

## 3.  SUSPECT/OFF # 1 - LOYD, MATTHEW CHRISTIAN

### (Case Specific Information)

Sex: **MALE**
Race: **WHITE**
Date of birth: **Feb-07-1979**
Address: **9601 WOODBAY DR**
    Municipality: **TAMPA , Florida   33626-**
**Phone Numbers**
    Home:   **(727)  776-1855**

**Particulars**

Occupation: **UNK**
Employer: **UNK**

**Master Name Index Reference**

Name: **LOYD, MATTHEW  CHRISTIAN**
Sex: **MALE**
Race: **WHITE**
Date of birth: **Feb-07-1979**
Address: **9601 WOODBAY DR**
    Municipality: **TAMPA , Florida   33626-**
**Phone numbers**
Home:  **(727) 776-1855**

**Linkage factors**

Resident status : **City (Tampa)**
Age range : **30-49 Years**
Access to firearm : **NO**

**Offender LEOKA details**

**LEOKA details**

Officer's experience (in years) : **0**

## 4.  SUSPECT/OFF # 2 - DAVIDSON, KEITH M



**TAMPA PD**
**GENERAL OFFENSE HARDCOPY**
COPY FOR THE GENERAL PUBLIC

GO# 2014-332377 EXCEPTIONALLY
CLEARED

2100-8 EXTORTION

## (Case Specific Information)

Sex: **MALE**
Race: **WHITE**
Date of birth: **Apr-08-1971**
Address: **8383 WILSHIRE BLVD**    Apartment: **510**
　　　　Municipality: **BEVERLY HILLS , California   90211-**
**Phone Numbers**
　　Business:　**(323)  658-5444**
　　Cellular:　**(310)  936-5361**

## Particulars

Place of birth: **Massachusetts**
Occupation: **ATTORNEY**
Employer: **SELF**

## Master Name Index Reference

Name: **DAVIDSON, KEITH  M**
Sex: **MALE**
Race: **WHITE**
Date of birth: **Apr-08-1971**
Address: **8383 WILSHIRE BLVD**    Apartment: **510**
　　　　Municipality: **BEVERLY HILLS , California   90211-**
**Phone numbers**
Business: **(323)  658-5444**
Cellular: **(310)  936-5361**

## Linkage factors

Resident status : **Out of State**
Age range : **30-49 Years**

## Offender LEOKA details

## LEOKA details

Officer's experience (in years) : **0**

## 5.  INVOLVED # 1 - CARREGA, TASHA NICOLE

## Master Name Index Reference

Sex: **FEMALE**
Race: **WHITE**
Date of birth: **Feb-27-1984**
Address: **9601 WOODBAY DR**
　　　　Municipality: **TAMPA , Florida   33626-**
**Phone numbers**
Home: **(813)  810-3533**
Cellular: **(813)  810-3533**

## Particulars



**TAMPA PD**
**GENERAL OFFENSE HARDCOPY**
COPY FOR THE GENERAL PUBLIC

GO# 2014-332377 EXCEPTIONALLY
CLEARED
2100-8 EXTORTION

Height: **5'6**
Build: **Medium**   Complexion: **MEDIUM**
Hair color: **BLOND/STRAWBERRY**

**Linkage factors**

Resident status : **County (Hillsborough)**
Age range : **22-29 Years**

**Offender LEOKA details**

**LEOKA details**

Officer's experience (in years) : **0**

## 6.  INVOLVED # 2 - BURBRIDGE, LORI

**Master Name Index Reference**

Sex: **FEMALE**
Race: **WHITE**
Date of birth: **Apr-25-1984**
Address: **107 KARDE CIRCLE**   Apartment: **D**
          Municipality: **BRANDON** , **Florida   33510-**

**Phone numbers**
Home:  **(813)  802-4107**
Business:  **(727)  238-4038**
Cellular:  **(813)  475-8038**

**Linkage factors**

Resident status : **County (Hillsborough)**
Age range : **22-29 Years**

**Offender LEOKA details**

**LEOKA details**

Officer's experience (in years) : **0**



**TAMPA PD**

**GENERAL OFFENSE HARDCOPY**
COPY FOR THE GENERAL PUBLIC

GO# 2014-332377 EXCEPTIONALLY
CLEARED

2100-8 EXTORTION

## Related Text Page(s)

Document: **CASE SUMMARY**
Author: **42324 - FINE, RALPH**
Related date/time: **May-23-2014  (Fri.) 1015**

The victim reported that personal property taken from him in 2012, without
his knowledge or permission, was tweeted to him in a photo on today's date.
The victim believes the tweeted photo was intended as a personal threat
because the release of its content has the potential to negatively affect
his reputation and his livelihood.



**TAMPA PD**
**GENERAL OFFENSE HARDCOPY**
COPY FOR THE GENERAL PUBLIC

GO# 2014-332377 EXCEPTIONALLY
CLEARED

2100-8 EXTORTION

## Related Text Page(s)

Document: **INITIAL REPORT**
Author: **42324 - FINE, RALPH**
Related date/time: **May-23-2014 (Fri.) 1015**

I responded to 5021 W. Nassau St. where I met with the victim. The victim (W/M Clem) provided me with a photocopy of a tweeted message he received to his BTLS (Bubba The Love Sponge Show) account. The message was provided via a subject identified through his Twitter account as "Joshisinthecity." The message stated that a letter and DVD was left on his vehicle because he has a "Bubba Army" bumper sticker attached to his vehicle. The tweeted message asked for a contact number and that he was attempting to return the DVD left in his possession.

The photo of the DVD had the name "Denzel" written on it and W/M Clem identified "Denzel" as a close personal friend.

W/M Clem also identified the handwriting on the DVD in the photo as his own.

I collected the photocopies of the tweeted message and took W/M Clem's statement. I then provided W/M Clem a report number.

As of the completion of this report, there are no other known investigative leads beyond the twitter account, "Joshisinthecity."



**TAMPA PD**
**GENERAL OFFENSE HARDCOPY**
COPY FOR THE GENERAL PUBLIC

GO# 2014-332377 EXCEPTIONALLY
CLEARED

2100-8 EXTORTION

## Related Text Page(s)

Document: **STATEMENT**
Author: **42324 - FINE, RALPH**
Related date/time: **May-23-2014  (Fri.) 1015**

W/M Clem was sworn and advised the statement he provided is true and accurate.

W/M Clem advised that he is the host of a syndicated radio program and is a known public figure.

W/M Clem advised that during October of 2011, he and his ex-wife began divorce proceedings. During this time, their relationship was contentious and he had concerns that personal information could potentially be made public by his wife that could affect his reputation as a public figure in the media. The primary focus of his concern involved the existence of several homemade DVD's depicting consensual sexual contact between his wife and other subjects of which he was a knowing participant. As a result of his concern, W/M Clem transferred the DVD's from his home to his workplace where he believed they would be more secure.

During the months of December 2011 and January 2012, he and his staff moved equipment and property from one radio studio to a newer radio studio at his current location. W/M Clem advised he specifically remembered moving the DVD's to an upstairs office/storage area in his new studio that was designated for his own personal items.

In March of 2012, W/M Clem learned that a screen shot of a portion of one of his personal DVD's had been leaked to the media. This screen shot depicted a still video image of his then wife and a close personal friend, professional wrestler and media figure Hulk Hogan, as they were involved in a consensual sexual encounter. At that time, W/M Clem immediately responded to the office/storage area and became aware that each of his DVD's were now missing.

W/M Clem advised that at that time, he did not believe his wife was involved in releasing the screen shot to the media or was responsible for their disappearance however, he could not rule out that she had been able to copy the DVD's prior to his moving them to his workplace. His minimal suspicions of her were also the result of the contentiousness of their ongoing divorce at that time.

W/M Clem advised that he had stronger suspicions that a former co-worker had taken the DVD's from the office/storage area. W/M Clem advised that



**TAMPA PD**
**GENERAL OFFENSE HARDCOPY**
COPY FOR THE GENERAL PUBLIC

| GO# 2014-332377 EXCEPTIONALLY CLEARED | 2100-8 EXTORTION |
| --- | --- |

Matt Loyd (AKA "Spice Boy") was formerly an employee and an on-air member of his radio show. During the months of January and February 2012, W/M Loyd began to lobby with corporate executives to be granted a hosting position of his own radio program. W/M Clem believes that Loyd wanted to be considered as an available replacement to host his (The Bubba The Love Sponge Show) show in the event that he (W/M Clem), was fired. Shortly after this in April of 2012, Matt Loyd began to host his own radio program.

On today's date, W/M Clem received a tweet via social media to his radio show's twitter account. The tweet depicted a photo of one of the DVD's taken from W/M Clem's office/storage area in 2012. W/M Clem recognized the handwriting on the DVD as his own. W/M Clem related that he knew the DVD contained footage of a similar nature to other DVD's involving his ex-wife and was intended for his own personal use.

W/M Clem advised that he believes the tweeted photo of his stolen personal property is intended as a message and a threat to him. The personal footage depicted on the tweeted DVD has the potential to negatively affect his reputation and also, potentially, his livelihood were it released publicly.

W/M Clem related that he believes Matt Loyd had both the means and the motive to steal his personal DVD's. During his employment on The Bubba The Love Sponge Show, he had unrestricted access to all areas of the building including the office/storage area. He also, based upon his knowledge of Loyd's actions in 2012, believes that Loyd had a desire to take over as a host of his show. W/M Clem believes that Loyd took the DVD's with the intent to expose their content to the media and effectively cause his dismissal as a result of the associated scandal.

W/M Clem also advised that there are an additional 12 employees who work in his studio and each of them have access to the upstairs office/storage area. He does not suspect any current or prior employees of the theft of the DVD's other than Matt Loyd.

W/M Clem related in conclusion that he made a conscious decision to not report the theft of the DVD's originally in 2012 when he became aware of their disappearance. His rationale for this was that although Hulk Hogan had been exposed as a result of the release of the specific DVD involving him, other involved subjects had not yet been exposed and he hoped by not reporting the theft, he could protect them from potential scandal that could result from his offense report.



**TAMPA PD**

**GENERAL OFFENSE HARDCOPY**

COPY FOR THE GENERAL PUBLIC

| GO# 2014-332377 EXCEPTIONALLY CLEARED | 2100-8 EXTORTION |
|---|---|

## Related Text Page(s)

Document: **INVEST REPORT**
Author: **47801 - SCHLEMMER, JOHN**
Related date/time: **May-27-2014  (Tue.)**

On 05/27/14 I received this assigned case reference latent investigation. The phone numbers listed for Clem were longer valid so I left a message with Cox Media Group for him to call me.

On 05/28/14 I received a call from Clem's agent, Tom Bean.
Bean provided me with his phone number and said he would be able to have Clem call me should it become necessary. I informed Bean that I would like to speak with Clem about responding back to the tweet he received before I subpoenaed Twitter.
Bean stated he would have Clem call me.

On 05/30/14 I received a call from Clem. I informed him of Twitter's policy to notify the account holder when a subpoena is issues. Therefore, I would like for him to respond to the tweet. Clem agreed and it was decided that he would tweet something similar to "hey buddy, thanks for looking out." And then see if there was a response.

On 06/24/14 I attempted to contact Clem and left a message.

On 06/25/14 I completed a Subpoena for Records requesting information for the Twitter handle #Joshisinthecity which was used to send the tweet regarding the DVD. The subpoena was reviewed and approved by ASA Goldstein.

On 07/08/14 I received the subpoena information from Twitter which showed the account was created on 05/17/14 at 2306 hours, using the email address of radiomanflavor1970@gmail.com, from an IP address of 97.76.206.251. A computer check of the IP address used to create the Twitter account came back to being a Time Warner account.
I prepared a subpoena for records request to Time Warner for account information. The subpoena was reviewed and approved by ASA Traina

On 07/09/14 I contacted Clem and informed him of the email address used to create the Twitter account. He stated that it did not sound familiar to him.
Clem informed me that he had received a tweets from the subject and would email them to me.
The tweets Clem emailed me were as follows:
Clem: 6/4/14, 10:39 AM "I'm trying to reach out to you"
Josh: 6/4/14, 11:05 PM "Sorry was outta town My girlfriend told me not to give it back to you because of all the stuff going on. I like ya and dont know                                                      what 2 do".
Clem: 6/6/14, 4:08 AM "Well i would like to get it back".



**TAMPA PD**

**GENERAL OFFENSE HARDCOPY**
COPY FOR THE GENERAL PUBLIC

GO# 2014-332377 EXCEPTIONALLY                    2100-8 EXTORTION
CLEARED

Josh: 7/2/14, 7:55 AM "Just got back & listening. You fired Shanon? He was my favorite".

Clem: 7/2/14, 10:25 AM "No I didn't fire him at all. It was his choice to leave".

Clem: 7/2/14, 10:26 AM "U ever going 2 meet me to pick up that DVD".

Clem informed me that there has been no other contact from the subject..

On 07/17/14 I received information from Time Warner that the IP address belonged to Bright house Networks.

I prepared a subpoena for records to Bright house Networks account holder information regarding the IP address. The subpoena was reviewed and approved by ASA Goldstein.

On 07/23/14 I received the information from Bright house Networks which showed the IP address as being assigned to Knight Global Entertainment, 18 2nd Street North in St Petersburg, FL. The listed contact on the account was J C Harkins.

A computer search of the address, 18 2nd Street North in St Pete came back to Jannus Live where concerts as well as as Jannus Live TV show featuring Matt "spice boy" Loyd, is filmed.

On 08/20/14 MPO Miller and I responded to Janus Live and met with office manager J C Harkins. I informed Harkins that I would like to speak with him concerning the IP address in question. Harkins told me that the IP address is used on the third floor in an area were several of the Jannus Live show workers use. Harkins informed me that on the night of 05/17/14 a group called "Soul Circus Cowboys" was performing.

I informed him that I would like to speak with Matt Loyd and his cameraman, Josh Vozda.

Harkins contacted them and they agreed to meet with us in the business's office.

Josh Vozda arrived withing a few minutes. I explained to Vozda that a twitter account had been created on 05/17/14 at 11:06 PM from the business using the handle Joshisinthecity. He denied having any knowledge of the Twitter account and stated that he hardly ever uses the third floor office. He believes that on the night of 05/17/14 he left immediately after the show which would have ended at 11:00 PM.

Approximately twenty minutes later Matt Loyd arrived. MPO Miller, J C Harkins, Matt Loyd and I sat down in their conference room.

I informed Loyd that I was conducting an investigation that involved a Twitter account created on 05/17/14 from an IP address at the business and that this Twitter account has been used in possible criminal activity. Loyd denied knowing anything about it. I informed him that the account was opened using an email of radiomanflavor1970@gmail.com and that I thought it was him do to him being in radio, radioman, and his nickname being spice boy, flavor.

Loyd stood up and asked if we could speak in private.

MPO Miller and I followed Loyd into a side office. Once in the office Loyd stated, "ok, I created that twitter account, where do we go from here?".

I asked Loyd why he would go to the trouble of creating a fictitious email and then using the email address to create the twitter account. He responded by saying "I didn't want him to know it was me. I wanted him



**TAMPA PD**

**GENERAL OFFENSE HARDCOPY**
COPY FOR THE GENERAL PUBLIC

GO# 2014-332377 EXCEPTIONALLY                                    2100-8 EXTORTION
CLEARED

to squirm. He is a very bad man and has a lot of connections, even in law enforcement. I have seen him make a phone call and people get arrested."

I asked Loyd where the DVD was. He stated, "I don't have it. I made the one in the picture from a blank disc and wrote on it."

I informed Loyd that Clem identified the DVD in the photo as being his, with his handwriting.

Loyd stated "I made the one in the picture. I took a blank disc and wrote on it with a sharpie".

I asked Loyd how he knew Clem was missing a DVD with Denzil on it. He stated, "everyone knew his cop buddy and ex-wife's sex tape was missing".

I asked Loyd how he came up with the date on the disc. He stated "I just made it up".

I informed Loyd that the date was significant because that is the exact date the stolen DVD was made.

Loyd then stated "I am just trying to focus on my family and put this all behind me".

Loyd admitted to creating the Twitter account and sending the messages to Clem, along with the photo of the DVD. Loyd stated that the DVD in the photo was just a blank one he made to look like one of Clem's missing DVDs.

I informed Loyd that Clem identified, from the tweet photo, the DVD as being his. Loyd denies taking any of Clem's DVDs and insisted that he made the one in the photo.

Loyd said he did this as a prank because Clem is always talking bad of him in the media and on the radio.

Loyd swore that the statements he made to us were the truth.


On 12/26/14 I contacted Clem and informed him of the status of his case. I informed him that I would like to obtain some handwriting samples of his and we agreed to meet on 12/31/14 at 1100 hours, at his office, 5021 W Nassau Street in Tampa.


On 12/31/14 I met Clem at his office and swore him in. Clem informed me that during the course of his divorce, his ex-wife Heather Clem had made references to the sex tapes she had made with Terry Bollea, Hogan, and also his childhood friend Denzil Washington, who is a Terre Haute Indiana Police Sergeant.

Clem was concerned that she would release these videos to the public and removed them from his home. He stored them at his studio, 5025 W lemon St in Tampa.

In March of 2012 his business moved to their current studio at 5021 Nassau Street in Tampa. During the move he distinctly recalls the Hogan, Denzil and Angie sex DVDs being in a box along with numerous other DVDs, CDs and headphones. This box was moved into an unoccupied upstairs office. The rest of the upstairs was unfinished. None of the employees at that time utilized the upstairs.

Clem stated that the Hogan DVD had been in a round DVD case. The type that holds multiple discs.

He stated that the Denzil DVD had been in it's own individual clear plastic case and that the Angie DVD was in a separate case similar to the Hogan case.

Clem said he realized the DVDs were missing once a video clip from the Hogan recording showed up on-line. Clem said he went to the box upstairs and noticed the only things missing were the sex tape DVDs.

Clem stated "you can't have one of the discs without the others".



**TAMPA PD**
**GENERAL OFFENSE HARDCOPY**
COPY FOR THE GENERAL PUBLIC

GO# 2014-332377 EXCEPTIONALLY                    2100-8 EXTORTION
CLEARED

Clem provided me with (6) discs that he had previously written on with a Sharpie. The handwriting appears to be the same as the handwriting on the DVD in the photo Loyd tweeted to Clem.

Clem informed me that the FBI had conducted an investigation involving the Bollea DVDs and he thought that case was over.
Clem desires to prosecute anyone involved in the theft and illegal use of his property.

I contacted the Tampa FBI Field office regarding the Bollea DVD investigation and was told that Special Agent Shearn was the lead Agent.

I then contacted Agent Shearn who informed me that he had conducted an investigation regarding the Bollea sex video and the US Attorney's Office declined to file charges. I informed Agent Shearn of my investigation and the admission from Matt Loyd.

Agent Shearn told me he would have to speak with the Assistant US Attorney to obtain approval before discussing the case with me.

On 01/15/15 I was contacted by FBI SA Jason Shearn. He informed me that Assistant US Attorney Sweeney had authorized him to provide me with non-grand jury subpoena information reference the case. SA Shearn informed me that the FBI obtained the original DVDs during an operation. The operation was the result of an extortion involving Matt Loyd, attorney Keith Davidson, and Lori Burbridge. During this operation the original DVDs were delivered by Lori Burbridge, a female associated with Matt Loyd, via an attorney named Keith Davidson. SA Shearn and I made an appointment for 1/20/2015 at 1330 hours to review his case.

I contacted Assistant State Attorney Division Chief Matt Smith to discuss my investigation and informed him of the FBI's closed case which was related. ASA Smith agreed to accompany me to view the case at the FBI office.

On 01/20/15 ASA Division Chief Matt Smith and I responded to the FBI Pinellas office. SA Shearn showed us the original DVDs that he was currently holding as evidence. The DVDs were delivered by Lori Burbridge during a controlled transaction on 12/14/2012. The DVDs were in a black and silver hard case. Inside the case were several DVD sleeves. There were three DVDs total. One was labeled HOGAN 7/13/07, another was labeled HOOTIE 7/3/07, and the third was labeled HOOTIE with no date.

ASA Smith, SA Shearn and I viewed the DVDs and noted the following;

Disc marked HOGAN 7/13/07 contained Heather Clem and Terry Bollea engaging in sex. Bollea does not look at the camera. The camera appears to be on a high ledge in the master bedroom behind a plant. There is no discussion about them being recorded.



**TAMPA PD**
**GENERAL OFFENSE HARDCOPY**
COPY FOR THE GENERAL PUBLIC

GO# 2014-332377 EXCEPTIONALLY                                    2100-8 EXTORTION
CLEARED

The disc marked HOOTIE 7/3/07 showed the camera to be in the same location as the previously mentioned disc. Bollea and Heather are standing next to the bed, Heather is topless and facing Bollea as Bubba walks into view and comments about a scratch she has on her back. Bubba then leaves the room. Bollea and Heather engage in sex.

The disc marked HOOTIE with no date shows that Bubba walks in after sex between Bollea and Heather. Bollea, Heather and Bubba have conversation. Bollea leaves. Bubba makes comment about tape being used for retirement. Bubba says he is going to get the tape and walks out. Tape ends.

I reviewed the case reports and noted that on 10/16/2012 Atty David Houston and his client, Terry Bollea, meet with the FBI at the Pinellas Office. Houston informed them that he had contacted Clearwater PD and the St Petersburg PD reference the filming of his client. He was told that the filming was "out of statute" and was encouraged to contact the FBI.

The FBI then began their investigation which lead to recorded phone conversations, a recorded operation to purchase the DVDs, and interviews. SA Shearn provided me with copies of the recorded phone calls and the recordings made during the transaction to obtain the DVDs.

I listened to the recorded phone conversations between Keith Davidson and David Houston which were provided by the FBI. The following is a summary of each call:
10/22/12 call
    KD - We can say they came from the hand of Bubba
    KD - You're buying the original or a copy made by Bubba
    KD - There's no indication at all that your client knew it was running
    KD - Viewed them through a streaming service
    KD - He seems like a really nice guy going through a bad part in life
    KD - He confides in Clem, talking about deteriorating marriage.
    KD - Wants to start negotiating
    DH - $1.00
    KD - $1 million
    KD - reference dollar figure "you know I still need to talk to my people".

10/28/12 call
    KD - Client is under the impression that it went from Bubba's hands into his own.
    KD - As far as assurances for your client, everything that I said on prior occasion stands. Like representation and warranties and the agreement.

11/2/12 call
    KD - I have authority, bottom line $400,000
    KD - Three separate DVD's
    DH - Asks if they would be willing to split them up. Says one is already out there. So only interested in other two.



**TAMPA PD**
**GENERAL OFFENSE HARDCOPY**
COPY FOR THE GENERAL PUBLIC

| GO# 2014-332377 EXCEPTIONALLY CLEARED | 2100-8 EXTORTION |
| --- | --- |

KD - ...there's one that's more inflammatory than the others and then carries the lion share of the value.

KD - have gone twice at a million and dropped it to $400,000 and have heard nothing in response.

KD - As with any settlement, you're trying to eliminate risk.

DH - TMZ, Gawker, Dirty.com, Hersch at Vivid, Sexlink.com, these are the five entities that claim to have seen these things or have copies.

KD - Understanding is that the materials in client's possession are the materials which were shared.

KD - The materials were streamed to me.

KD - Agrees on $300,000. 50% down at execution, 25% in 9 months, 25% in 16 months from the date of execution.

KD - Acknowledges he knows Terry holds copyrights to the videos and by Gawker continuing to run the video violates his copyright.

KD - If fails polygraph. So now you're in a position where you say, ok, are you really going to let my pissed off client walk out with the tapes, you know what I                                    mean? It's so, it really does nothing because the deal has to close.


11/27/12 call

They have a discussion of the agreement and the uses of names.


The following is a summary of the 12/14/12 transaction recordings provided to me by the FBI:

12/14/12              11:00 Davidson enters. Introductions are made.

Davidson explains content of DVDs.

11:08 Davidson agrees that the person they are meeting today is the one who leaked to Gawker and has possessed the tapes.

11:09 Houston asks which tape has the issues. Davidson says tape 2 talks about his son's twin girlfriend. Davidson says tape 3 talks about n word,                                    Brooke dating black guy, etc.

Davidson says tape 3 around the 49 minute mark.

11:17 Houston asks "Do you know where she got them from Keith". Davidson says "Yes, she bought the case and does not know where she bought                                    them from. Someone who was close to Todd and is no longer close to Todd gave them to her. There was an education process with my client.                                    My client gave her the tapes."

"Something you will have to deal with Bubba, we know these things came from him" (meaning Bubba).

Davidson says you have 2 loose ends, Bubba and this.

11:21 Davidson says "my client is in no way associated with Heather". Houston says sounds like a Bubba girlfriend. Davidson says "no, more like a                                    professional relationship". Davidson says "I think it is a former employee or something like".

Davidson says "I can't disclose everything or they are going to walk".

11:24 Houston asks why does Bubba give it to a former employee when he feels its valuable enough to retire on.



**TAMPA PD**
**GENERAL OFFENSE HARDCOPY**
COPY FOR THE GENERAL PUBLIC

GO# 2014-332377 EXCEPTIONALLY                                    2100-8 EXTORTION
CLEARED

Davidson asks Houston if they can speak in private and they enter bathroom.

Davidson says came from a former employee of Bubba who hates Bubba. He says "I don't know if they were stolen and quite frankly I don't                    want to know if they were stolen".

11:37 Davidson leaves to get LB.

11:42 LB and Davidson enter room.

12:00 Houston, Davidson and Bollea leave room and go to hotel restaurant.

Davidson says he does not know any of these people. It's his understanding that Bubba has a unique personality he can be a vindictive person.

Davidson says he heard Bubba and Heather met Petraeus at a swingers party and it is rumored they have video.

13:05 Davidson gives his word he will aggressively work to have Gawker take it off the site.

13:06 Davidson offers to show tapes for authenticity. Hogan does not want to watch them. Houston says to have them view beginning then fast forward                    to end.

13:55 Houston, Bollea and Davidson are viewing tapes.

13:58 Davidson said Mr. X was shown tapes is how he knew they were there.

Heather refuses to sign off her rights to the videos according to Houston.

Davidson says it is his understanding that Heather has no involvement.

14:02 Discussion about why Heather refuses to sign a walk away agreement.

Hogan asks for verification these tapes were stolen

Davidson says I can't say that but a reasonable person would believe that.

14:06 Davidson says if Gawker will not take it down he will prepare a declaration that he represents the possessor of the tapes who stole them.

Houston says Gawker indicates that JW Moreno gave them the footage of Hogan.

14:10:33 tape ends.

Session#2

14:10:34 tape begins with the sound of them walking.

14:12:33 back in the room with LB and polygraph operator Orr.

14:19 signing agreement and accepting DVDs.

14:21 Houston explains to Davidson error in his office making the check $150,000. They change agreement to reflect that.

14:26:03 FBI enter. Sounds like Houston and Hogan walked out.

14:27:02 tape ends.

I reviewed the FBI reports and noted that on 12/14/12 Lori Burbridge, in a post Miranda interview with the FBI, stated that she was instructed by Atty Keith Davidson and Matt Loyd to say she and "Mr. X" (Matt Loyd) were the ones who leaked the Hogan clip to Gawker in order to complete negotiations with Bollea and his attorney.

Burbridge says Loyd leaked the stills to THE DIRTY.COM which did not create enough buzz in the media.



**TAMPA PD**
**GENERAL OFFENSE HARDCOPY**
COPY FOR THE GENERAL PUBLIC

| GO# 2014-332377 EXCEPTIONALLY CLEARED | 2100-8 EXTORTION |
|---|---|

Loyd, who possessed the tapes, contacted TMZ who in turn put him in touch with Atty Keith Davidson.

Around this time a clip was leaked to Gawker. Carrega (Loyd's wife) contacted Burbridge and explained that Loyd had the Bollea sex tapes and was actively trying to sell them. Burbridge was asked to become involved in exchange for $10,000.00 compensation.

Burbridge states that on Veteran's Day 2012 (November 11) she went to Loyd and Carrega's house for a conference call with Atty Davidson. Loyd and Carrega had Burbridge view all three videos. While viewing the videos Burbridge and Carrega took handwritten notes.

Burbridge states that on 12/11/2012 Loyd and Carrega came to her work, Bank of America, to review the Settlement Statement.

Burbridge says that on 12/13/2014 Loyd, Carrega, Davidson and her go to dinner at Ceviche's in St Petersburg prior to the settlement meeting. She questions the legality of what they are doing and Atty Davidson brags about handling several similar cases.

Burbridge said that in preparation for the 12/14/2012 settlement meeting Loyd gave her $200 to rent a car in case someone followed her after the meeting. Burbridge was instructed to return the car to the airport and not at the location she rented it from. Carrega was to pick her up at the airport.

Burbridge said she was to receive $5000 as partial payment for her involvement which she was to pay towards her repossessed car. The remaining $5000 was to come from Loyd.

Burbridge stated that Loyd leaked the clip to TMZ and was paid $8500. To remain anonymous Loyd had Burbridge sign the tax form for the money and was told that Loyd and Carrega would help her with the taxes on the income.

Burbridge said she received a TMZ check, via Fed-Ex, that she deposited into her bank account. She then got an $8000 cashier's check made out to Matt Loyd.

Burbridge said she received a total of $500 for assisting Loyd with the TMZ transaction.

Burbridge stated that "Janerro" was the name Loyd used when dealing with Gawker.

Burbridge states Loyd and Carrega used multiple fake email accounts, potentially Gmail, to converse and deal with media sites regarding these tapes. Once used, they would shut them down to avoid being traced.

Burbridge states Bubba Clem has nothing to do with the leaks or sale of the tapes. She said Loyd is afraid of Bubba and is afraid of him finding out he was selling the tapes.

On 12/17/12 Burbridge was called by the FBI. She informed them that she rented the car for the transaction with her debit card at the Enterprise Car Rental near Webb Road and Hillsborough Avenue. She says she was reimbursed by Loyd.

Burbridge informed the FBI that Loyd and Carrega deposited the cashier's check into their son, Jayden Carrega's, account.

She stated that she has not had contact with either Loyd or Carrega.

On 12/20/12 Burbridge calls the FBI and informs them she found her hand written notes from the Veteran's Day meeting with Loyd and Carrega. She says she had watched the videos on Loyd's MacBook computer.



**TAMPA PD**
**GENERAL OFFENSE HARDCOPY**
COPY FOR THE GENERAL PUBLIC

GO# 2014-332377 EXCEPTIONALLY                                    2100-8 EXTORTION
CLEARED

On 01/22/15 I contacted Denzil Lewis, who had been recorded having sex with Heather Clem which was documented on the DVD marked Denzil. Lewis informed me that he had been visiting the Clem's between 2/15/08 and 2/18/08. Bubba and Heather agreed to him having sex with Heather and he knew it would be recorded.

On 01/22/15 I called Burbridge who agreed to meet with me at her residence. TPD MPO D. Miller and I met with Burbridge at 1825 hours. I informed Burbridge that I would like to talk with her concerning the transaction she had participated in regarding some DVDs. She said she thought that was over. I informed her that I was working a case where another one of the originally stolen DVDs had surfaced. She was concerned that she needed to get something in writing to protect herself from being prosecuted. She said she should have done that earlier when dealing with the FBI. Burbridge has two children, one 10 years old and one 4 years old. The younger one kept interrupting our attempts at talking and it was agreed that we would meet the following Tuesday when she is off work and her kids are in school.

On 01/23/15 I provided Burbridge an Investigative Witness Subpoena issued by ASA Division Chief M. Smith. Burbridge accepted the subpoena and agreed to meet as requested.

On 01/26/15 I was informed ASA Smith that Burbridge had sought council and the interview would be postponed.

On 02/03/15 at 0900 hours Lori Burbridge, her attorney David Weisbrod, ASA M. Smith and I met at the State Attorney's office for the purpose of conducting an interview of Lori Burbridge. A court reporter was also present and recorded the interview. The following is a summary of the interview:
Burbridge stated that Tasha Carrega, Matthew Loyd's wife, and her have been friends for years. Regarding the transaction from 12/14/12, Tasha called her and told her they had the tapes with Hogan to sell. They had already obtained Davidson as their counsel for the exchange. She believed that Davidson was referred to them by someone from TMZ. Tasha asked her to be the person trying to sell the tapes. Burbridge said she went to Tasha and Matt's house and watched the DVDs so she would have historical info to be able to present herself as the seller. She remembers watching the videos on Matt's MacBook laptop. She said there were (3) videos and thinks they were in folders on the laptop. She said the only time she actually saw the discs was the day everything happened, when she met Hulk and his attorney. She said that while they are watching the videos Matt is the one pulling up the videos to view. Matt had told her she would get $5000.00 for her part. Burbridge said they were watching the DVDs in preparation to speak with attorney Davidson. Burbridge said a speaker phone call with Davidson was then made, Tasha and Matt were present. Burbridge remembers Davidson stating that she needed to say, and he included in the contract, that she was the one who sold the video to Gawker. If they didn't the whole deal possibly would not go through. Burbridge said it was pretty clear that Davidson knew they hadn't leaked it to Gawker. They discussed how Matt obtained the tapes and he came up with a story about purchasing them at a Bubba yard sale. Davidson did not like that story and suggested they instead bought a laptop with them on it. Matt had explained to her that there were copies going the station and that is how she thought he obtained them. Burbridge said that once the contract was written Matt brought it to her work for her to sign. At that time she was working at the Bank of America on Hillsborough Ave in Tampa. Burbridge said she was not involved in the actual TMZ deal. She said that was all Matt. Tasha had called her and asked her to receive the money



**TAMPA PD**

**GENERAL OFFENSE HARDCOPY**
COPY FOR THE GENERAL PUBLIC

| GO# 2014-332377 EXCEPTIONALLY CLEARED | 2100-8 EXTORTION |
|---|---|

since they were trying to keep a distance from their names. Burbridge recalls the TMZ check as being $10000.00 written in her name. The check came to her in Brandon by FedEx. She cashed it and gave Matt a cashier's check. Matt paid her $500.00 for her part. She said the purpose of leaking the clip to TMZ was to build up interest. She believes Matt became involved with Davidson through TMZ. Davidson told them if they did not claim to be the ones to release it to Gawker the deal they were working on would not go through. Burbridge recalls meeting with Davidson, Matt, and Tasha the day before the transaction at the Ceviche restaurant in St Petersburg. During this meeting Davidson said he had brokered other sex tapes with celebrities that could have put them in a bad light, such as Kanye West. Lori said the day of the transaction she met with Davidson at the Sand pearl Resort in Clearwater. Davidson told her that the cat was out of the bag and that they knew she was not Mr. X but they would say she represents someone who they are going to call Mr. X.

Burbridge stated that she spoke with Matt Loyd prior to this interview. She told him that I had mentioned the DVD he tweeted to Bubba. Burbridge said Matt told her he was trying to make Bubba sweat. He told her he worked for Bubba for years and he can forge his handwriting. He told her he posted it on Twitter.

At 1400 hours a telephone conference call was conducted at the State Attorney's office with David Houston, the attorney for Terry Bollea. Houston stated that Davidson clearly indicated the tapes were stolen. He said Gawker was aware of Matt Loyd's activities. Houston informed us that there was a civil trial against Gawker set for 7/6/15. Houston agreed to contact Bollea so he could be interviewed.

On 02/04/2015 ASA Division Chief Matt Smith and I responded to 5021 W Nassau Street to meet with Bubba Clem. ASA Smith contacted Clem's attorney, Diaco, who agreed to the interview. We met in Clem's personal office with the door closed. Clem was introduced to ASA Matt Smith. Clem was informed that there were some additional questions regarding this case. Clem was asked about a "Bubba Yard Sale". Clem said that he has had four previous "Bubba Yard Sales" during which he sells different items from the show and donates the money for charity. Clem said he has heard allegations that the leaked videos were purchased at one of these yard sales which he says is not true.
Clem was asked if he has had any involvement with Tony Burton of the Buchwald Group. Clem stated that he never has, but he knows that Burton is Mike Calta's agent. He also said that Howard Stern had been represented by the Buchwald Group.
I asked Clem why the sex tapes were such a big topic of his divorce mediation with Heather. Clem said he had a pre-nuptial agreement with Heather which did not leave her with very much.
Clem was asked if Bollea knew he was being recorded in the sex tapes. Clem said "no, he did not know he was being recorded".
Clem said the recordings that he knew of involving his ex-wife Heather and others were; Hogan, Denzil, a black guy from Miami, and a girl named Angie. Clem said when he received the DVDs from Heather he did not look in the bag and take an inventory. He said he just put the bag in his desk drawer.
Clem confirmed that his employee "twenty five cent" is Broderick E. Epps. Clem said that Matt Loyd and Epps used to be very close friends. Clem does not believe that Epps had anything to do with the sex tapes being stolen or exposed.
I asked Clem if he had shown the sex tapes to anyone and he said no.



**TAMPA PD**
**GENERAL OFFENSE HARDCOPY**
COPY FOR THE GENERAL PUBLIC

GO# 2014-332377 EXCEPTIONALLY                                          2100-8 EXTORTION
CLEARED

I also asked Clem if Loyd or Calta had sex with Heather. He said no.

On 02/06/15 I met with Broderick Epps, also known as "twenty five cent", at the studio on Nassau Street in Tampa. Epps was sworn in and stated the following: He currently works on Bubba's radio show as an on air personality. He had previously worked on the Bubba show from 2005 until September of 2012 when he quit due to a conflict between him and Bubba. Epps said he and Mat Loyd, also known as "spice boy", worked together on the Bubba show until Loyd got his own show. He said Loyd was always looking for "dirt" on Bubba to use on his show. Epps said he had never seen sex videos with Bubba's wife and does not remember Bubba ever saying he had them prior to them being exposed.

I subpoenaed the phone records for Matt Loyd's known phones which showed that from 3/7/12 to 10/16/12 he had 38 calls with Mike Walters from TMZ.

I made several attempts to contact Mike Walters of TMZ, which were unsuccessful.
I subpoenaed and obtained phone records from both Matt Loyd's and Keith Davidson's phones. The records show they made 35 calls to each other between 10/10/12 and 12/14/12, the day of the FBI operation. The records show they had no contact after then.
Burbridge's and Carrega's phone records were also subpoenaed. The records confirmed that phone calls referenced in interviews were made.


On 0/12/15 I met with Agent Shearn who released the following items of evidence to me:
-(1) Silver box containing (3) DVDs
-(1) Check made to Keith Davidson from David Houston for $150,000
-Settlement Agreement signed on 12/14/12

On 03/12/15 I delivered the silver box containing the (3) DVDs to TPD print examiner Thomas Gonzalez for processing. Two of the DVDs had print evidence positive for ridge and were submitted through AFIS receiving negative results.

On 04/01/15 Heather Cole, Bubba Clem's ex-wife, was interviewed at her attorney's office. ASA Matt Smith and a court reporter were also present. Cole was sworn in and stated the following: She stated that she works in public access TV and that is how she met Bubba. Cole said they dated off and on for about (4) years and were married in January of 2007. She said they were married for 56 months. Cole stated that the sex she had with others during her marriage to Bubba was consensual. She stated that Bubba insisted on it being videoed. I asked Cole if Bollea knew he was being recorded and she said no. I told Cole that the in the videos it appears as though she is positioning Bollea for the camera. She said she did that because that is what Bubba wanted. Cole said Bubba could be very controlling. Cole said she remembers Bubba coming to the house after they had separated and requesting the DVDs sometime around the end of 2011.

On 04/16/15 I called Mike Calta and left a phone message. My message was returned on 04/21/15 by Calta's attorney, Dominic Fariello. We made arraignments for Calta and me to meet the following morning at



**TAMPA PD**
**GENERAL OFFENSE HARDCOPY**
COPY FOR THE GENERAL PUBLIC

| GO# 2014-332377 EXCEPTIONALLY CLEARED | 2100-8 EXTORTION |
|---|---|

Fariello's office in Tampa. I received a call, later that same day, from Fariello who said Calta would not agree to meet.

On 05/12/15 Tasha Carrega, Matt Loyd's wife, was interviewed at the Hillsborough County State Attorney's office. Her attorney was present along with ASA Matt Smith and a court reporter.

The following is a summary of her interview: Carrega stated that she was married to Matt Loyd on 6/22/13. She said she has been "best friends" with Lori Burbridge since High School. When asked how she became involved with the Bollea sex tapes she stated that Loyd and she were at a Bubba yard sale in 2010 or 2011 where they purchased a Rocky DVD movie box set. Approximately (2) weeks after the purchase they went to play the Rocky movies and discovered the sex tapes inside. She recalls there being 4 to 6 DVDs. Carrega stated that she did not recall much about the tapes. I asked her if she recalled viewing the videos and taking notes. She said she did not recall. I showed her a copy of her handwritten notes depicting the content of each video. She then acknowledged it was her handwriting but did not recall why she wrote them. She did not recall conversations, phone calls or meetings regarding this case. Carrega stated that she was at the West Shore mall in Tampa with Loyd during the 12/14/12 transaction. She said Loyd received a text message from Davidson saying "raided, need legal representation".

On 06/16/15 Detective Kirlangitis and I met with Terry Bollea at his residence. I informed Bollea of my current investigation and informed him that the DVDs involving him and Cole had been stolen at the same time as the one tweeted to Clem by Loyd. Bollea was asked if he desired to proceed with prosecution for the Extortion. He said he was interested but would need to confer with his attorney.

On 07/16/15 Detective Kirlangitis and I met with Patrick Fowler, aka Tuddle, in the TPD CIB conference room. Fowler swore to tell the truth and stated the following. Fowler currently works for Clem on the radio show. He remembered that sometime in 2012 Loyd and Calta were watching something on a desktop computer at Cox media group's office in St Petersburg. He said they were laughing and making voices to try and sound like "Hogan". Fowler said he went over to see what they were watching and it was a video of "Hogan" and Bubba's then wife having sex. He stated that he only watched for a few seconds but he remembers the computer monitor as having a smaller window where the video was being played and the desktop screen background with icons behind it. He did not see any disc and did not know if what he was watching was the clip from Gawker or from some other source. Fowler said in his opinion anyone with I-movie on an Apple device could have created the clip he saw on Gawker.

During the video of the FBI operation on 12/14/12, Lori Burbridge acknowledged viewing all (5) videos involving Clem's wife which would have included the "Denzil" video. This statement, along with the statement of Carrega confirms that Loyd had been in possession of the DVDs stolen from Clem.

Matt Loyd's phone records confirm calls to the media outlets attorney David Houston say he was contacted by.

Matt Loyd's phone records show he initially contacted attorney Keith Davidson and call blocked his number.



**TAMPA PD**

**GENERAL OFFENSE HARDCOPY**
COPY FOR THE GENERAL PUBLIC

GO# 2014-332377 EXCEPTIONALLY                                       2100-8 EXTORTION
CLEARED

Ceviche and Sand Pearl were subpoenaed and provided transaction records confirming Davidson was at both the 12/13/12 Ceviche meeting and that he stayed at the Sand Pearl resort.

Enterprise car rental was subpoenaed and provided the rental agreement for the vehicle Lori Burbridge used during the Sand Pearl meeting.

Conclusion: Matthew Loyd stole several sex tape DVDs from Bubba Clem's office building. He then shopped clips of the Hogan DVDs to build interest, selling to TMZ, and concealing his identity by having Lori Burbridge accept payment for him.

Mathew Loyd then contacts attorney Keith Davidson from California to engage in the extortion of Terry Bollea. At the time of this contact and throughout the negotiations Davidson is suspended from practicing law by the California Bar.

Davidson translates the necessity for Bollea to purchase these videos to Bollea's Attorney Houston via FBI recorded phone conversations. Davidson's only option to keep from exposing the multiple videos and the damaging content is to obtain payment which starts out at $1 Million. Davidson also acknowledges that his client obtained them from his former employer without that former employers knowledge. Davidson assisted Loyd in coming up with a more suitable story as to how the videos were obtained. He also instructed Loyd they would have to admit to the Gawker leak or the deal may not go through.

On 10/08/15 ASA Matt Smith and I met with State Attorney Mark Ober, Chief Assistant State Attorney Mike Sinacore, Felony Bureau Chief Chris Moody, and Chief of Investigations Mark Cox. The case was presented to them and they are determining prosecution for Conspiracy to Extort and Dealing in stolen property. It was determined that the Statewide Prosecutors Office would review the case to determine jurisdiction.

On 11/10/15 I met with Statewide Prosecutors Nick Cox and Mike Williams this case was presented to them for consideration of prosecution.  Statewide Prosecutor Cox stated that he would speak with his superiors and get back.

On 11/13/15 I was informed that the Hillsborough County State Attorney's Office as well as the Office of the Statewide Prosecutor declined to prosecute or file charges in this case.

Therefore this case is EXCEPTIONALLY cleared.



**TAMPA PD**
**GENERAL OFFENSE HARDCOPY**
COPY FOR THE GENERAL PUBLIC

GO# 2014-332377 EXCEPTIONALLY
CLEARED

2100-8 EXTORTION

## Related Text Page(s)

Document: **IDENT REPORT**
Author: **45100 - GONZALEZ, THOMAS G**
Subject: **FINGERPRINT PROCESS**
Related date/time: **Mar-12-2015 (Thu.) 1141**

Report Number: 14-332337

Requested By: Det J Schlemmer

Details:

Items were submitted for processing in this case.  The results are as follows:

| *Item | Development Media | *Processing Results |
|---|---|---|
| DVD-R "Hootie 7/3/07" | Black Powder | Postive for ridge detail |
| DVD-R "Hogan 7/13/07" | Black Powder | Postive for ridge detail |
| DVD-R | Black Powder | Negative for ridge detail |
| Sleeves of DVD case | Black Powder | Negative for ridge detail |

Latents Collected/Developed BY:   LFS T Gonzalez        Date processed:  03-12-15

Lifts were released to Det J Schlemmer for case file.

Author:  Latent Fingerprint Specialist
Thomas Gonzalez



**TAMPA PD**
### GENERAL OFFENSE HARDCOPY
**COPY FOR THE GENERAL PUBLIC**

GO# 2014-332377 EXCEPTIONALLY                    2100-8 EXTORTION
CLEARED

## Related Text Page(s)

Document: **IDENT REPORT**
Author: **45100 - GONZALEZ, THOMAS G**
Subject: **FINGERPRINT AFIS/CAFIS SEARCH**
Related date/time: **Mar-17-2015  (Tue.) 1446**

Report Number:  14-332337

Requested By: Det J Schlemmer

Details:

Initial analysis of this case determined that there are latents of Comparison Value.  Print(s) were searched in AFIS with the following results.

| *Location of latent | *Comparison Results | *Subject Identified |
|---|---|---|
| DVD-R "Hootie 7/3/07" | AFIS and CAFIS Search Negative | |
| DVD-R "Hogan 7/13/07" | AFIS Search Negative | |

Latents Collected/Developed BY:    LFS T Gonzalez        Date processed:  03-12-15

Lifts were released to Det J Schlemmer for case file.

Author:  Latent Fingerprint Specialist
Thomas Gonzalez



**TAMPA PD**

**GENERAL OFFENSE HARDCOPY**
COPY FOR THE GENERAL PUBLIC

GO# 2014-332377 EXCEPTIONALLY
CLEARED

2100-8 EXTORTION

Follow Up Report #   1

# Follow Up Report #   1

### Assignment Information

Assigned to: **47801 - SCHLEMMER, JOHN**     Rank: **Detective**
Capacity: **Investigate/Case Manager**    Org unit: **CIB**
Assigned on: **May-27-2014  (Tue.) 1253**    by: **43915 -  KENNEDY, PATRICK**
Report due on: **Jun-30-2015  (Tue.)**

### Submission Information

Submitted on: **Nov-13-2015  (Fri.) 1212**
Approved on: **Nov-13-2015  (Fri.)**    by: **35865 -  VICTOR, MICHAEL R**
**Follow Up Conclusion**
Follow Up concluded: **YES**



**TAMPA PD**

## GENERAL OFFENSE HARDCOPY
### COPY FOR THE GENERAL PUBLIC

| GO# 2014-332377 EXCEPTIONALLY CLEARED | 2100-8 EXTORTION |
| --- | --- |

## Clearance Information

Agency: **TPD**
Cleared status: **Exceptionally Cleared  - Prosecution Declined**
Cleared on: **Nov-13-2015  (Fri.)**
Cleared by Officer 1: **47801 -  SCHLEMMER, JOHN**
Org Unit: **SQ531 -  CIB**
Approved by: **35865 -  VICTOR, MICHAEL R**
Org Unit: **SQ531 -  CIB**
Complainant/Victim notified: **NO**
Notified by: **47801 -  SCHLEMMER, JOHN**
Notified on: **Nov-13-2015  (Fri.)**
How notified: **Telephone**



| | **TAMPA PD** |
| --- | --- |
| | **GENERAL OFFENSE HARDCOPY** |
| | **COPY FOR THE GENERAL PUBLIC** |

| **GO# 2014-332377 EXCEPTIONALLY CLEARED** | **2100-8 EXTORTION** |
| --- | --- |

# Related Property Report(s)

### Report Information

**Property Report #: 1490031**
Property case status: **STOLEN**
Submitted on: **May-23-2014  (Fri.)**    by: **FINE, RALPH**
Authority for disposal: **SCHLEMMER, JOHN**    Org unit: **CIB**
**Related:**
Offense: **GO  2014- 332377**
Related items: **0**

Flags = d (disposed) x (x-reference) n (entered on NCIC) *e (evidence)



**TAMPA PD**
**GENERAL OFFENSE HARDCOPY**
COPY FOR THE GENERAL PUBLIC

GO# 2014-332377 EXCEPTIONALLY
CLEARED

2100-8 EXTORTION

# Related Property Report(s)

## Report Information

**Property Report #: 1556111**
Property case status: **EVIDENCE/HELD**
Submitted on: **Nov-13-2014  (Thu.)**  by: **SCHLEMMER, JOHN**
**Related:**
Offense: **GO  2014- 332377**
General remarks: **LOYD,MATHEW 020779**
Related items: **4**

## Articles - Evidence

Status: **EVIDENCE/HELD**                     Tag #: **1556111- 1**
Article: **RCDISC- RADIO, TV, ENTERTAINMENT DEVICES**
Serial # 1: **UNKNOWN**                      OAN:
Value: **$0.00**                             Color:
Description: **GREY BOX CONTAINING 3 DVD'S**
Recovered date: -                           Recovered value: **$0.00**
Flags: **\*e**
Current Location: **IM WE WALL**

## Articles - Evidence

Status: **EVIDENCE/HELD**                     Tag #: **1556111- 2**
Article: **77-**
Serial # 1: **NONE**                         OAN:
Value: **$0.00**                             Color:
Description: **SETTLEMENT AGREEMENT AND MUTUAL RELEASE**
Recovered date: -      .                     Recovered value: **$0.00**
Flags: **\*e**
Current Location: **IM WE WALL**

## Articles - Evidence

Status: **EVIDENCE/HELD**                     Tag #: **1556111- 3**
Article: **77-**
Serial # 1: **UNKNOWN**                      OAN:
Value: **$0.00**                             Color:
Description: **ORIG CHECK USED DURING FBI TRANS SEALED IN ORIG PACKG BY FBI**
Recovered date: -                           Recovered value: **$0.00**
Flags: **\*e**
Current Location: **IM WE WALL**

## Articles - Evidence

Status: **EVIDENCE/HELD**                     Tag #: **1556111- 4**
Article: **RCDISC- RADIO, TV, ENTERTAINMENT DEVICES**
Serial # 1: **UNKNOWN**                      OAN:
Value: **$0.00**                             Color:
Description: **8 CD'S OF RECORDINGS OF PHONE CALLS & TRANS DURING FBI INV**



**TAMPA PD**

**GENERAL OFFENSE HARDCOPY**
**COPY FOR THE GENERAL PUBLIC**

**GO# 2014-332377 EXCEPTIONALLY
CLEARED**                                              **2100-8 EXTORTION**

Recovered date: -                    Recovered value:  **$0.00**
Flags:  **\*e**
Current Location: **IM WE WALL**

Flags = d (disposed) x (x-reference) n (entered on NCIC) \*e (evidence)



**TAMPA PD**

**GENERAL OFFENSE HARDCOPY**
COPY FOR THE GENERAL PUBLIC

GO# 2014-332377 EXCEPTIONALLY
CLEARED

2100-8 EXTORTION

**\*\*\* END OF HARDCOPY \*\*\***

# EXHIBIT C

**From:** Morris, Dorcas (CEI-Atlanta) <Dorcas.Morris@coxinc.com>
**Sent:** Thursday, May 5, 2016 8:27 AM
**To:** TMTClaims@hiscox.com
**Cc:** Stryszko, Don (CEI-Atlanta) <Don.Stryszko@coxinc.com>; Greenhill, Becky (CEI-Atlanta)
<Becky.Greenhill@coxinc.com>; Lovell, Lance (CMG-Atlanta) <Lance.Lovell@coxinc.com>; Doniger, Eden (CEI-Atlanta)
<Eden.Doniger@coxinc.com>; kelly.thoerig@marsh.com; Azriel, Rachel (CEI-Atlanta) <Rachel.Azriel@coxinc.com>;
Stepowany, Jessica (CEI-Atlanta) <Jessica.Stepowany@coxinc.com>; Vines, Sharron (CEI-Atlanta)
<Sharron.Vines@coxinc.com>
**Subject:** Notification of Complaint - Bollea a/k/a Hulk Hogan v. Cox Radio, Inc. - Original

RE:   Terry Gene Bollea a/k/a Hulk Hogan v. Cox Radio, Inc., et al., Sixth Judicial Circuit, Pinellas County, Florida

TMT Claims:

On behalf of Cox Radio, Inc., attached is a Complaint in the above-referenced lawsuit which includes claims of
invasion of privacy.  To our knowledge, the lawsuit has not yet been served.  Defense of Cox Radio, Inc. will be
provided by:

Tom Clyde
Kilpatrick Townsend
Suite 2800
1100 Peachtree Street, NE
Atlanta, GA 3309-4528
Tel: 404-815-6038
tclyde@kilpatricktownsend.com

Please acknowledge receipt of this notification by way of a return email.  If you have any questions, please call me at 678-645-0838.  Thank you,

Dorcas M. Morris

**Dorcas M. Morris**
**Sr. Paralegal, Cox Enterprises, Inc.**
**678-645-0838**

# EXHIBIT D



June 3, 2016
**Via Email**

Becky Greenhill
Cox Risk Manager
Cox Enterprises, Inc.
6205 Peachtree Dunwoody Rd., NE
Atlanta, Georgia 30328

Becky.Greenhill@coxinc.com

**Re: Cox Radio, Inc. adv. Terry Gene Bollea; Hiscox Ref. No. 170001769**


Dear Becky:

Thank you for providing Hiscox notice of the above lawsuit and for speaking with me about the matter. Hiscox has recorded this matter under the policy issued for the December 1, 2011 to December 1, 2012 policy period and assigned it a reference number of 170001769.

We have now had an opportunity to review the complaint and consider the information you provided. Based on that review, we are pleased to confirm the potential for coverage subject to the currently known information and the coverage points raised below.

This letter sets forth our understanding of the matter based primarily on the complaint. By citing to the allegations of the complaint, we do not intend to suggest that those allegations are true or have any legal merit. Those allegations, however, form the basis of the claim and, accordingly, the starting point for the determination of coverage. Nonetheless, please do let us know whether our understanding is incorrect or incomplete in any material respect because additional information could affect our coverage position.

**Our Understanding of the Matter**

This matter arises out of the dissemination of certain videos of Terry Bollea (a/k/a Hulk Hogan) engaged in sexual activity and making certain allegedly racist statements. Bollea contends that these videos were made in 2007 by Bubba Clem without Bollea's knowledge or consent.

The complaint alleges that Michael Calta and Matthew Loyd—two radio personalities on Cox Radio's Tampa station, 102.5 FM "The Bone"—conspired to disclose the contents of the videos to harm Bollea and to further their own radio broadcasting careers. It further alleges that Calta and Loyd were acting within the scope of their employment with Cox and with the knowledge of their superiors at Cox.

Cox allegedly obtained the videos in early 2012 and, in March or April 2012, disclosed portions of those recordings to TMZ.com and TheDirty.com.. Further, in September or October of 2012, Calta's talent agent—Tony Burton of Buchwald & Associates—provided to Gawker.com and its editor-in-chief, A.J. Daulerio, a 30 minute segment from one of the videos. In doing so, Burton was allegedly acting in concert with Cox. These disclosures resulted in the public dissemination of portions of the videos by TMZ.com, The Dirty.com, and Gawker.com.

Additionally, Calta and Loyd allegedly conspired to extort money from Bollea by threatening to release further portions of the recordings that revealed Bollea making racist statements. And, Gawker allegedly conspired to release those portions as a strategy in opposition to Bollea's pending lawsuit against it.

**Hiscox**
101 California St. Suite 1950
San Francisco, CA 94111

T +1 415 814 1448
F +1 415 291 8603
E tara.bodden@hiscox.com
**www.hiscox.com**

1

Becky Greenhill
June 3, 2016
Page 2 of 3

The complaint joins Calta, Loyd, and Cox Radio, Inc. (the "Cox Defendants"); Tasha Nicole Carrega—Loyd's wife—and her friend, Lori Burbridge; Don Buchwald & Associates, Inc. and Tony Burton; Keith Davidson and Davidson & Associates; and Gawker Media, LLC. It asserts seven causes of action against the Cox Defendants: Invasion of Privacy; Public Disclosure of Private Facts; Invasion of Privacy by Intrusion Upon Seclusion; Intentional Infliction of Emotional Distress; Intentional Interference with Contractual Relations; Violation of Fla. Stat. § 934.10; and Civil Conspiracy. It seeks general damages, special damages, and injunctive relief.

**The Policy**

Hiscox issued Multimedia Liability Policy No. US UUA2619952.11 to Cox Enterprises, Inc. for a policy period of December 1, 2011 to December 1, 2012. We are handling the claim under this policy in light of the alleged dissemination of portions of the video to various news outlets in the spring and fall of 2012. The policy provides a $15 million single aggregate limit of liability, subject to a $500,000 "each claim" retention. Defense costs are included in both the limit of liability and the retention.

**Coverage Analysis**

The initial scope of coverage is set out in Section II. What has to go wrong, and applies when the "performance of media activities by you or anyone on your behalf during the policy period results in a claim against you that arises from covered media or advertising."

As an initial matter, please note that coverage only extends to those entities or individuals falling within the definition of "you." Section VII. Definitions, defines that term to include an "existing subsidiary." We assume that Cox Enterprises, Inc. owns fifty percent or more of Cox Radio, Inc. and, thus, qualifies as an existing subsidiary, but we would appreciate confirmation of that fact. Moreover, the definition of "you" includes employees of an existing subsidiary. The complaint alleges that Calta and Loyd were, at relevant times, employees of Cox Radio, Inc. Accordingly, Hiscox will consider them as insureds as well, but please note that they are insureds only to the extent the claim arises out of activities they performed within the course and scope of their duties with Cox. If you contend that any of the other defendants are insured by the Hiscox policy, please let me know.

As to the substance of the complaint, some allegations may not fall within the initial scope of coverage. Section VII. Definitions, defines "media activities" as the dissemination of "media content," and "media content" means the substance of "covered media" or "advertising." Pursuant to the Declarations, "covered media" means "publications, programming and other communications (but not ordinary business communications not directly related to the preparation, dissemination or promotion of your multimedia products) produced or disseminated by you." The complaint does not allege that Cox created the videos or included any portion of the videos in its programming or publications. Cox's only alleged dissemination was the disclosure of the videos to other news outlets—such as TMZ.com and Gawker.com—for inclusion in their programming. In this context, the claim may not be the result of the dissemination of any "covered media."

We recognize, however, that the complaint alleges that Calta and Loyd disclosed the videos to promote their broadcasts on a Cox radio station. This raises the potential that the claim is the result of the creation or dissemination of "advertising," which is defined by Endorsement 1, paragraph 5, as "advertising, marketing, publicity, or promotion of [Cox's] own goods and services." Hiscox must respectfully reserve its rights to decline coverage, however, to the extent the actual facts establish that the disclosure of the tapes does not fall within the definitions of "covered media" or "advertising."

Additionally, please reference Section VI. What we will not pay. Exclusion c. applies to any claim arising from "any fraudulent or dishonest conduct or willful violations of the law." We raise this exclusion given the

Becky Greenhill
June 3, 2016
Page 3 of 3

allegations that Cox and certain of its employees engaged in deliberately wrongful conduct, such as extortion. Of course, we understand these allegations have not been proven and we do not imply that they are true. Nonetheless, we are required to notify you that the policy would not provide coverage to the extent such allegations are established by a final judicial decision—in which case Cox would be obligated to reimburse Hiscox for all payments it made in the defense of the action.

Finally, Section IV. What we will pay, states that Hiscox will only pay "damages" toward claim resolution. Section VII. Definitions, defines "damages" to expressly exclude the costs of complying with any injunctive or equitable relief or the costs of recalling or correcting any media content. We raise this provision in light of the complaint's request for injunctive relief and return of all copies of the videos.

**Conclusion**

Hiscox respectfully reserves its rights to raise the coverage issues identified above to limit or preclude coverage under the policy. While we have attempted to identify all applicable issues, subsequent legal and factual development of the lawsuit may raise additional issues. Accordingly, our identification of the specific issues here is not intended to be a waiver of any additional issues that may exist, and Hiscox must reserve its rights to supplement this letter at a later date, if necessary.

As you know, Section IX. General matters, states that this is a duty to pay policy, and Cox has the obligation to retain counsel, subject to Hiscox's consent, to defend the insureds. We understand that you have retained Tom Clyde, Esq. of Kilpatrick Lockhart, to which we formally consent. Pursuant to Section IV. What we will pay, Hiscox will pay defense costs as incurred, once the $500,000 retention is exhausted. Please forward to us the invoices for legal services as you receive them so that we can track the erosion of the retention.

Please let me know if you believe that we have overlooked or misinterpreted any facts or legal principals. We will be happy to consider any additional points that you may have and revise our coverage position if needed. We value Cox has a customer and want to provide it all coverage to which it is entitled.

I look forward to working with you and your counsel to bring this matter to a successful conclusion. As always, should you have any other questions or wish to discuss this matter, please feel free to call me.

Kind regards,

**Tara D. Bodden, Esq.**
Senior Vice President, Claims
Media & Technology Division
Hiscox Insurance Company Inc.

cc:     Kelly Theorig (kelly.theorig@marsh.com)
        David Hart
        Dorcas Morris, Cox Enterprises

# EXHIBIT E

STEVEN D. MANNING
DENNIS B. KASS
ANTHONY J. ELLROD
EUGENE P. RAMIREZ
FREDRIC W. TRESTER
LAWRENCE D. ESTEN
MILDRED K. O'LINN *
ALFRED M. DE LA CRUZ
ERWIN A. NEPOMUCENO *
BRIAN T. MOSS *
JEFFREY M. LENKOV
MARGUERITE L. JONAK *
JOHN D. MARINO
MICHAEL L. SMITH
LOUIS W. PAPPAS
EUGENE J. EGAN
CLIFFORD A. CLANCEY
RINAT B. KLIER-ERLICH
ROBERT B. ZELMS †
R. ADAM ELLISON
SCOTT WM. DAVENPORT
JASON J. MOLNAR *
DAVID V. ROTH
JENNIFER L. SUPMAN
KATHLEEN A. HUNT *
STEVEN J. RENICK
JAMES E. GIBBONS
DANIEL B. HERBERT *
MARK A. HAGOPIAN
DONALD R. DAY *
D. HIEP TRUONG
MICHAEL A. WEISMANTEL
JANET D. JOHN *
JOHN M. HOCHHAUSLER
ANTHONY S. VITAGLIANO†
KEVIN H. LOUTH
SHARON S. JEFFREY
JOHN M. COWDEN*
DAVID R. REEDER*
TOBY D. BUCHANAN
LADELL H. MUHLESTEIN
RICHARD G. GARCIA
DEBORA VERDIER †
JEANETTE L. DIXON

KENNETH S. KAWABATA
STEVEN AMUNDSON*
RICHARD MACK †
TONY M. SAIN
LALO GARCIA
CHRISTEEN DATOMI
ANGELA M.POWELL
ANTHONY CANNIZZO
GARY L. POPHAM, JR.*
ROLAND TONG
JONATHAN J. LABRUM*
JONATHON D. SAYRE
KAREN LIAO
ZUBIN FARINPOUR
MATTHEW E. KEARL
JULIE M. FLEMING
ROBERT E. MURPHY *
DONALD R. BECK
ROBERT P. WARGO*
SCOTT A. ALLES †
MAHASTI KASHEFI
HEATHER M. ANTOINE
JASON J. DOSHI
GRETHCHEN COLLIN
RODRIGO J. BOZOGHLIAN
ADAM ROEHRICK
TONYA N. MORA
EMILY EDWARDS
DANIEL SULLIVAN
PAUL MITTELSTADT
MAE ALBERTO
BRIAN SMITH
PAUL HARSHAW
ANDREA KORNBLAU
ANTHONY WERBIN
MICHAEL WATTS
NISHAN WILDE
LYNN CARPENTER
DAVID R. RUIZ
NATALYA VASYUK
DERIK SARKESSIANS
MARK WILSON
CRAIG SMITH
KARLY K. WHITE

KELSEY NICOLAISEN
FAROUK MANSOUR
KIRSTEN BROWN
JAMILEH HAWATMEH
JEFFREY TSAO
ERIN N. COLLINS
JESSICA SPINOLA
TIFFANY HENDERSON
JONATHAN HACK*
DAVID BREITBURG
EMILY ELISE
CURTIS GOLE
ERIC WAHRBURG
CAROL TREASURE
R. SCOOTT HARLAN
COURTNEY CASIANO
BRANDON DAWOODTABAR
COURTNEY ARNOLD
RONALD STEWART
MARLON RUFINO
JOSHIA FERGUSON
SALLY FREEMAN*
CHRISTINE LA VORGNA
DANYALE TAYLOR
LIZETTE ALVARADO
IAN KING
CAMERON ARONSON
SAMANTHA KATTAU
ARTHUR KHIRIN*
GRACE COLLER
TANYA PROUTY
ELLEN BURACH-ZION
JOSHUA BABATAHER
JUNE E. POYOUROW
CHRISANNE GULTZ
ANGELA LI
EVGENIA JANSEN
CHELSEA CLAYTON
NICHOLAS SCOTT
AIDE ONTIVEROS
ALINA SOOKASIAN
LUISA ROSARIO
CORY RAY
XENA MASHBURN

LILIT SHAMIRYAN
NICOLE GOSS
ANTOINETTE MARINO*
COURTNEY NAKATANI
GLENN JOHNSTON
SPENCER WONG
ELISE DVOROCHKIN
SABIRA SHERMAN
CLAYTON BLAZEK
RICHARD MCKIE
ALEXANDRIA DAVIS
EDWIN SASAKI
LARAYA PARNELL
AMY COOPER
NICOLE DYER
MADISON JUSCHIN
LAFAYETTE CLARKE
KEVIN D. CAMPBELL
MICHAEL ZAIDERMAN
CAMILLE DECAMP
DANE CUMMARO
NICOLE HOKKA
SHELAN TOMA
JOSEPH HOLMES
SHANE ABERGEL
REGINA PETERS
SARA ANTOUN
RIAHNA BACCHUS
TORI BAKKEN
TRO ISKEDJIAN
BREE BRYDENTHAL
GARROS CHAN
CHRISTINA TAPIA

OF COUNSEL
ARI MARKOW
TRISHA NEWMAN

*   Admitted in Multiple Jurisdiction
†   Admitted to Practice Law in Arizona
    only
‡   Admitted to Practice Law in Alabama

## MANNING & KASS
## ELLROD, RAMIREZ, TRESTER LLP
### ATTORNEYS AT LAW

M&K
ERT

ONE BATTERY PARK PLAZA
4TH FLOOR
NEW YORK, NEW YORK 10004
TELEPHONE:  (212) 858-7769
FACSIMILE:  (212) 858-7543
WEB SITE:  WWW.MANNINGLLP.COM

January 21, 2020

**VIA ELECTRONIC MAIL AND CERTIFIED RETURN RECEIPT**
**TRACKING NO.: 7019 1120 0001 5515 3146**
Joshua L. Blosveren
Houget Newman Regal & Kennedy, LLP
One Grand Central Place
60 East 42nd Street, 48th Floor
New York, NY 10165

E-Mail: jblosveren@hnrklaw.com

> Re:   Cox Radio Inc. adv. Terry Gene Bollea
>       Hiscox Reference Number 170001769

Dear Mr. Blosveren:

This office has been retained by Hiscox Insurance Company, Inc., ("Hiscox") which issued US TMT Multimedia Liability Policy No. US UUA 2619952.11 (the "Policy") to Cox Enterprises, Inc. ("Cox / Insured").  In light of the upcoming mediation presently scheduled for Thursday, January 23, 2020, we write to advise you of our position with respect to coverage under the Policy.  This letter shall replace and supersede all prior communications.

Hiscox has previously acknowledged the receipt of the Complaint captioned *Terry Gene Bollea professionally know as Hulk Hogan vs. Don Buchwald & Associates, Inc. et al.,* filed on May  2, 2019,  In the Circuit Court of the Sixth Circuit In and For Pinellas County, Florida, Case No. 16-002861-CI (the "Complaint").  Hiscox has further previously acknowledged the receipt of the Second Amended Complaint filed on January 4, 2019 (the "Second Amended Complaint") (henceforth jointly referred as the "Litigation") .  For reasons set forth below, based upon the

**DALLAS**
2911 Turtle Creek Blvd, Suite 300
Dallas, TX 75219
Telephone: (214) 953-7669

**LOS ANGELES**
801 S. Figueroa St, 15th Floor
Los Angeles, CA 90017-3012
Telephone: (213) 624-6900

**ORANGE COUNTY**
19800 MacArthur Blvd, Suite 900
Irvine, CA 92612
Telephone: (949) 440-6690

**PHOENIX**
3636 North Central Avenue, 11th Floor
Phoenix, AZ 85012
Telephone: (313) 5-5469

**SAN DIEGO**
225 Broadway, Suite 1200
San Diego, CA 92101
Telephone: (619) 515-0269

**SAN FRANCISCO**
One California Street, Suite 900
San Francisco, CA 94111
Telephone: (415) 217-6990

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
ATTORNEYS AT LAW

Joshua L. Blosveren
**Re:**    *Cox Radio Inc. adv. Terry Gene Bollea*
January 21, 2020
Page 2

information currently received to date, Hiscox maintains its position taken during the January 9, 2020 Mediation that there is no coverage for the Litigation and Hiscox thereby denies coverage for this matter in its entirety.

## I.    FACTUAL ALLEGATIONS:

The Second Amended Complaint alleges that plaintiff Terry Gene Bollea ("Bollea"), professionally known as Hulk Hogan, was the victim of an ongoing scheme orchestrated by the defendants, who beginning in early 2012 allegedly used Bollea as a pawn in a personal and professional vendetta, deep-seeded resentment, hostility, and desire for revenge between and amongst the defendants and Bubba "The Love Sponge" Clem ("Bubba Clem").  The Second Amended Complaint further alleges that the defendants repeatedly victimized Bollea by obtaining, using, disclosing, disseminating, and exploiting surreptitiously recorded and illegally obtained footage of Bollea naked, engaged in sexual activity, and having private conversations in a private bedroom (the " Bollea Footage"), which ultimately led to the destruction of Bollea's career in July 2015.  The Second Amended Complaint also alleges that defendants Christian Loyd ("Loyd") and Michala Calta ("Calta"), while acting in the course and scope of their employment of Cox Radio and in conjunction with Cox Radio, worked in concert with the other defendants to conspire to leak, sell and  "anonymously" send Footage to *TMZ*, *TheDirty.com*, and *Gawker.com*. and ultimately tried to extort money from Bollea in exchange for three DVDs, one of which contained recording in which Bollea was making racially insensitive comments.

The Second Amended Complaint asserts that Bollea was vindicated when he was awarded a $140.1 million dollar verdict in March 2016 against Gawker Media, LLC. ("Gawker"), Nick Denton and A.J. Daulerio for the "highlight reel" of some Bollea Footage posted by *Gawker.com* which allowed over seven million people to watch Bollea naked and having sex.  The Second Amended Complaint further asserts that Bollea resolved his judgment against Gawker, Denton and Daulerio, following bankruptcy proceedings, for $31 million dollars.  The Second Amended Complaint also asserts that Bollea filed this Litigation to hold the "remaining offenders" liable for their roles in the use, public disclosure and dissemination, and exploitation of the illegally recorded Bollea Footage and to recover the balance of the economic damage Bollea suffered to his career, reputation, legacy and earning ability.

The Second Amended Complaint specifically alleges ten causes of action: (1) Invasion of Privacy and/or Aiding and Abetting Invasion of Privacy; (2) Public Disclosure of Private Facts and/or Aiding and Abetting Public Disclosure of Private Facts; (3) Invasion of Privacy by Intrusion Upon Seclusion and/or Aiding and Abetting Invasion of Privacy by Intrusion Upon Seclusion; (4) Intentional Infliction of Emotional Distress; (5) Intentional Interference with Contractual Relations and Advantageous Business Relationships; (6)Violation of Section 934.10 Florida Statutes and/or Aiding and Abetting of Violation of Section 934.10, Florida Statutes; (7) Civil Conspiracy; (8) Negligent Retention – Cox & Buchwald; (9) Negligence – Cox; (10) Negligence – Buchwald.

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
ATTORNEYS AT LAW
M&K
ERT

Joshua L. Blosveren
**Re:** *Cox Radio Inc. adv. Terry Gene Bollea*
January 21, 2020
Page 3

The Second Amended Complaint seeks an award of general and special damages with interest at the maximum legal rate; cost of suit; reasonable attorneys' fees; permanent injunction, including all persons acting under the defendants discretion or control; an Order and Judgment requiring the defendants to turn over all surreptitious Footage of Bollea to Bollea; and such other and further relief as the Court may deem proper.

## II.    THE POLICY

Hiscox issued the Policy to Cox Enterprises, Inc. bearing effective dates of December 1, 2011 through December 1, 2012.  The Policy provides Multimedia Coverage up to the $15,000,000 Single Aggregate Limit, inclusive of defense costs and damages subject to a $500,000 Retention for Each and every claim inclusive of defense costs and damages.  Relevant policy provisions are referenced below. Please refer to the Policy for the complete terms and conditions.

The Policy provides, in pertinent part:

## III.    SPECIFIC COVERAGE DETAILS

**Definition of "Covered Media."** Where the phrase "covered media" appears within this policy (whether in singular or plural), it shall solely mean the following:

All publications, programming and other communications (but not including ordinary business communications not directly related to the preparation, dissemination or promotion of your multimedia products) produced or disseminated by you; including but not limited to content of personal appearances by your and all content disseminated via web sites owned or operated by you.

## US TMT MULTIMEDIA (ADMITTED)

**I.**    **Our promise to you**  We will indemnify you for **defense costs** and **damages** incurred as a result of a **claim** that falls within WHAT HAS TO GO WRONG (Section II) under this policy.  WHAT WE WILL PAY (Section IV) under this policy, and HOW MUCH WE WILL PAY (Section V) under this policy.

**II.**    **What has to go wrong**

Media, personal injury and negligent media content liability

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
ATTORNEYS AT LAW
M&K
ERT

Joshua L. Blosveren
*Re:*      *Cox Radio Inc. adv. Terry Gene Bollea*
January 21, 2020
Page 4

The performance of **media activities** by **you** or anyone on **your** behalf during the **policy period** results in a **claim** against **you** that arises from **covered media** or **advertising**, regardless of when such **claim** is made or where such **claim** is brought, and including but not limited to any **claim** for any actual or alleged:

d.       defamation, including but not limited to libel, slander, trade libel, product disparagement, and injurious falsehood;

e.       infliction of emotional distress or outrage;

f.       breach of duty of confidentiality, invasion of privacy or violation of any other legal protections for personal information, including but not limited to false light, intrusion upon a person's seclusion, public disclosure of a person's private information, misappropriation of a person's picture, name, voice, or identity for commercial gain, or unauthorized interception or recording of sound or data in violation of a civil anti-wiretap statute;

i.       unfair competition, deceptive business practices, or false designation or origin, but only when asserted in conjunction with and based on the same factual allegations as a **claim** under (a), (b), (c), (d), or (e) above;

l.       negligent supervision of an employee, but only when asserted in conjunction with and based on the same factual allegations as a **claim** under  (a), (b), (c), (d) or (e) above; and/or

m.       any form of negligence (including any negligent act, negligent error, negligent omission, negligent misrepresentation, negligent misstatement, including negligent transmission of a computer virus) but only where arising from **your media content** disseminated in **covered media** or **advertising**.


**IV.      What we will pay**

Payments toward defense costs          **We** will pay covered **defense costs** as incurred by **you**.

Payment toward claim resolution          **We** will pay covered **damages** as incurred by **you**.

*****

**VI.      What we will not pay**

Exclusions          **We** will not make any payments, including **defense costs** and **damages**, toward any portion(s) of any **claim** for, alleging, or arising from:

MANNING & KASS
ELLROD, RAMIREZ, TRESTER LLP
ATTORNEYS AT LAW
M&K
E|R|T

Joshua L. Blosveren
*Re:*    *Cox Radio Inc. adv. Terry Gene Bollea*
January 21, 2020
Page 5

c.      any fraudulent or dishonest conduct or willful violation of law, whether committed by **you** or by another whose actions **you** have ratified or condoned; provided, however, that this exclusion will not apply:

  (i)      until such conduct or violation has been established by final decision in a judicial, administrative, or alternative dispute resolution proceeding, or by **your** own admission in such a proceeding or otherwise (or by the admission in such a proceeding or otherwise of the person whose actions you have ratified or condoned), at which time **you** shall reimburse us for all payments made by **us** in connection with any **claim** arising from such conduct or violation of the law and our obligations under this policy with respect to such **claim** shall cease; or….

                 *****

l.      any bodily injury, including but not limited to death and emotional injury; however, this exclusion will not apply to any portion of a covered **claim** seeking **damages** for emotional anguish or distress;

q.      any violation of:

  (iii)      any other law, regulation or statute related to unsolicited communication, distribution, sending or transmitting of any communication via telephone or any other electronic or telecommunication device;

r.      any **claim** that has been or properly could have been the subject of notice to any insurance carrier prior to the **policy period.**

**VIII.   Definitions**             All phrases and words that appear in bold type in this policy (excluding headings), either in singular or plural form, have the meaning that is given to them below:

  Advertising             "Advertising" means advertising, publicity, or promotion in or of **covered media.**

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
ATTORNEYS AT LAW
M&K
ERT

Joshua L. Blosveren
*Re:*    *Cox Radio Inc. adv. Terry Gene Bollea*
January 21, 2020
Page 6

| | |
|---|---|
| Claim | "Claim" means any other written assertion of liability or any written demand for financial compensation or injunctive relief or any request to toll or waive any applicable statute of limitations; however, "claim" does not mean any criminal proceeding of any kind. |
| Covered Media | "Covered media" means the specific media describe as "covered media" in the Declarations. |
| Damages | "Damages" means any monetary amount you become legally obligated to pay as a result of any judgment, settlement, arbitration award or liability **assumed under agreement**, including punitive and exemplary damages if insurable under applicable law, pre-judgment interest and post judgment interest or any judgment or award ordering payment of attorney's fees or costs, in connection with a covered claim insured under this policy, but not including any: |

    1.    civil, regulatory or criminal fines, sanctions, taxes, or penalties, including those imposed by any federal, state, or local government body or by ASCAP, SESAC, BMI or other similar licensing organizations;

    2.    the costs of complying with any injunction or other equitable or equitable judgment;

*****

| | |
|---|---|
| Defense costs | "Defense costs" means: |

    2.    all reasonable and necessary attorneys' fees and legal costs incurred investigating, settling, defending and/or appealing a **claim** insured under this policy;

*****

| | |
|---|---|
| Insured | "Insured" means the entity identified as "the insured" on the Declarations. |
| Media activities | "Media activities" means: |



MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
ATTORNEYS AT LAW

Joshua L. Blosveren
*Re:*     *Cox Radio Inc. adv. Terry Gene Bollea*
January 21, 2020
Page 7

1.     the gathering, acquisition, investigation, collection, researching, creation and compilation of **media content**;

2.     any broadcast, transmission, dissemination, telecast, cablecast, syndication, serialization, podcast, streaming, or production of **media content;**

3.     any publication, republication, or dissemination of **media content** including any special editions or supplements to such **media content**;

4.     any digital, online, or electronic dissemination of **media content;…**

regardless of the mode or method of communication of such **media content.**

| | |
|---|---|
| Media content | "Media content" means the substance of any communication of any kind whatsoever within **covered media**  or **advertising**, regardless of the nature or form of such "media content" or the medium by which such "media content" is communicated, including but not limited to language, data, facts, fiction, music, photographs, images, advertisements, artistic expression, or visual or graphical materials. |
| Policy limit | "Policy limit" means the amount stated as the "policy limit" on the Declarations. |
| Policy period | "Policy period" means the period of time stated as the "policy period" on the Declarations, unless this policy is cancelled, in which case the "policy period" ends on the effective date of cancellation. |
| Retention | "Retention" means the amount stated as the "retention" on the Declarations. |
| We/Us/Our | "We", "Us", and "Our", means the insurance company that provides the insurance. |
| You/your | "You" and "Your" means: |

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
ATTORNEYS AT LAW
M&K
ERT

Joshua L. Blosveren
*Re:*    *Cox Radio Inc. adv. Terry Gene Bollea*
January 21, 2020
Page 8

1.      the **insured**, any **existing subsidiary…**

2.      any person who was, is or becomes a director, officer, partner in, or employee of the **insured**, any **existing subsidiary**…..but only with respect to claims arising out of the course and scope of their duties as such….any claim against their estates, heirs, legal representatives or assigns shall be considered a claim against them;

*\*\*\*\*\**

## IX.    General matters

Defense arrangements          This is a duty to pay policy, not a duty to defend policy. Therefore, you have the duty to defend claims on your own behalf under this policy….

We shall at all times have the right and opportunity to effectively associate with you and your counsel in the investigation, defense settlement of any claim under this policy.  While we do not have the duty to defend you, we have the right and option to assume the defense of the claim against you if you fail to comply with any of YOUR OBLIGATIONS TO US (Section VII) under this policy.

We will not make any payment in excess of the applicable retention, unless such defense costs or **damages** payments are incurred with **our** prior consent.

We will not make any payment of any kind on an account of any portion(s) of claims or declaratory relief actions not covered under this policy, nor will such payments by your apply to satisfy any applicable retention.  We and you agree to use best efforts to determine a fair allocation of payments (including defense costs and damages) between portion(s) of claims that are covered under this policy and portion(s) that are not covered under this policy.  If a fair allocation cannot be agreed upon, we and you shall submit the issue to an alternative dispute resolution proceeding in accordance with the Alternative Dispute Resolution provision set forth in GENERAL MATTERS (Section IX) of this policy. During the alternative dispute resolution proceeding, we shall be obligated to pay only that portion of any **defense costs** or **damages** that we in good faith believe is properly allocated to us.

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
ATTORNEYS AT LAW

Joshua L. Blosveren
*Re:*     *Cox Radio Inc. adv. Terry Gene Bollea*
January 21, 2020
Page 9


Date of performance of media activities

> For purposes of this policy, relevant **media activities** shall be
> deemed to have been performed on the date of first dissemination
> of **your media content** that is the subject of any **claim**….

> For purposes of determining the date of performance of relevant
> media activities, where a claim or multiple claims arise from a
> series of the same, or substantially the same factually or logically
> related events, such as multiple broadcasts of the same television
> advertisement or multiple acts in the course of preparation of the
> same media content, they will all be deemed to have been
> performed on the date of the first dissemination or act in
> preparation of such media content and, if such date falls within the
> policy period, they will be treated as related claims subject to a
> single retention and a single policy limit.

> We shall have no obligation under this policy to pay any portion of
> any claim or related claims that is attributable to relevant media
> activities in or for your covered media that were performed or are
> deemed by operation of this provision to have been performed
> prior to or after the policy period.  In no event shall a series of
> media activities giving rise to a claim or related claims trigger any
> obligations by us under more than one policy issued by us.

Other insurance          Any payment due under this policy is specifically excess of any
                         will not contribute to any other valid insurance, regardless if the
                         insurance is collectable or not, unless such other insurance is
                         specifically stated to be excess of this policy. This policy is not
                         subject to the terms set forth in any other insurance policy.

Alternative dispute resolution

> We and you agree that any dispute arising out of or relating to this
> policy, including but not limited to its construction, application and
> validity, or any breach thereof, shall be resolved through either
> non-binding mediation or binding arbitration in accordance with
> the commercial arbitration rules of the American Arbitration
> Association ("AAA") in effect at the time of the dispute, as
> amended by this policy….

We next direct you to Endorsements that may change, limit or preclude coverage as follows:

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
ATTORNEYS AT LAW

Joshua L. Blosveren
*Re:      Cox Radio Inc. adv. Terry Gene Bollea*
January 21, 2020
Page 10

**Endorsement 1**          **E60.1  Cox Amendments Endorsement**

In consideration of the premium charged and on the understanding that this endorsement leaves all other terms, conditions and exclusions unchanged, it is agreed that:

1. Under What Has To Go Wrong (Section II), Media, personal injury and negligent content liability, paragraph I. is deleted in its entirety and replaced with the following:

1.        negligent supervision of an employee, but only when asserted in conjunction with and based on the same factual allegations as a claim under (a) – (m); and or

5.        Under Definitions (Section VIII), "Advertising" is deleted and replaced with the following:

"Advertising" means advertising, marketing, publicity, or promotion of the Insured's exiting subsidiary's, or acquired entity's own goods and services and the goods and services of their clients.

6.        Under General Matters (Section IX), Alternative dispute resolution is deleted in its entirety and replaced with the following:

We and you agree that any dispute arising out of or relating to this policy, including but not limited to its construction, application and validity, or any breach thereof shall be submitted to non-binding mediation prior to the commencement of litigation by either party.  We and you shall mutually agree on the choice of a mediator, as well as a location for mediation.  Each party shall bear its own fees and costs in connection with any mediation but the fees and expenses of the mediator shall be shared equally by the parties.

8.        Under General Matters (Section IX), the following is added:

Choice of Law

This policy, including its construction, application and validity, is governed by the laws of the State of Georgia without reference to that state's choice of law principles.

MANNING & KASS
ELLROD, RAMIREZ, TRESTER LLP
ATTORNEYS AT LAW
M&K
E|R|T

Joshua L. Blosveren
*Re:*      *Cox Radio Inc. adv. Terry Gene Bollea*
January 21, 2020
Page 11

**Endorsement No. 6**     **E2386.1 Social Media Extension MM**

In consideration of the premium charged and on the understanding that
this endorsement leaves all other terms, conditions and exclusions
unchanged, it is agreed that with respect to DEFINITIONS (Section VIII),
Advertising is deleted in its entirety and replaced with the following:

"Advertising" means advertising, publicity, or promotion in or of **covered
media** regardless of the nature or form of such "advertising" including
"advertising" via any social media platforms (including but not limited to
Facebook, Twitter, LinkedIn or MySpace).

All other terms and conditions remain unchanged.

**Endorsement 8**     **E2405.1 Broad Form Errors and Omissions (BI/PD) Endorsement
MM/MAC**

In consideration of the premium charged and on the understanding that
this endorsement leaves all other terms, conditions and exclusions
unchanged, it is agreed that:

1. WHAT WE WILL NOT PAY (Section VI), paragraph (I), of the policy
is deleted in its entirety and replaced with the following:

any bodily injury, including but not limited to death and emotional injury;
however, this exclusion will not apply to any portion of a covered claim
seeking (i) damages for emotional anguish or distress; or (ii) bodily injury
arising out of the media content of your covered media or advertising.

**Endorsement 16**     **E286.2 Georgia Amendatory Endorsement MM/MAC**

In consideration for the payment of premium charged and in reliance on
the statement made and information provided to us:

2.      DEFINITIONS (Section VIII), Damages of the policy and any
endorsements attached thereto is modified to the extent necessary to
provide the following:

The Definition of Damages shall specifically include (subject to the
policy's other terms, and condition and exclusions) punitive and
exemplary damages.

3.      GENERAL MATTERS (Section XI), Other insurance, of the
policy is deleted in its entirety and replaced with the following:

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
ATTORNEYS AT LAW
M&K
ERT

Joshua L. Blosveren
*Re:* *Cox Radio Inc. adv. Terry Gene Bollea*
January 21, 2020
Page 12

This policy is specifically excess of and will not contribute with:

1.       any valid and collectible Multimedia Liability Insurance policy, Marketing, Advertising and Communications Liability insurance policy, Video, Film and Television Producers Liability insurance policy; or similar insurance; or

2.       any valid and collectible insurance under where there is a duty to defend;

whether such other insurance is stated to be primary, contributory excess, contingent, or otherwise, unless such other insurance is specifically excess of this policy.

If other valid and collectible insurance, other than the valid and collectible insurance described above, permits contribution by equal shares, we will follow this method also.

If other valid and collectible insurance, other than the valid and collectible insurance describe above, does not permit contribution by equal shares, we will contribute by limits.

This policy is specifically excess of and will not contribute with any indemnification that may be available to you from any entity other than the insured.

5.       GENERAL MATTERS (Section IX), Alternative dispute resolution is modified to the extend necessary to provide the following:

There can be no arbitration between us and the insured. Per O.C.G.A. 9-9-2 arbitration agreements may only exist between the Insureds and any claimants against the Insureds.

*****

All other terms and conditions remain unchanged

## III.   COVERAGE POSITION

The Policy indemnifies the insured for defense cost and damages caused by the performance of **media activities** by the insured or on behalf of the insured because of any actual or alleged claim arising from **covered media** or **advertising** during the policy period.

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
ATTORNEYS AT LAW

Joshua L. Blosveren
*Re:*   *Cox Radio Inc. adv. Terry Gene Bollea*
January 21, 2020
Page 13

We draw your attention to the applicable sections of the Policy, which state in pertinent part as follows:

**II.      What has to go wrong**

Media, personal injury and negligent media content liability

The performance of **media activities** by **you** or anyone on **your** behalf during the **policy period** results in a **claim** against **you** that arises from **covered media** or **advertising**, regardless of when such **claim** is made or where such **claim** is brought….

"Media activities" means:

1.       the gathering, acquisition, investigation, collection, researching, creation and compilation of **media content**;

2.       any broadcast, transmission, dissemination, telecast, cablecast, syndication, serialization, podcast, streaming, or production of **media content;**

3.       any publication, republication, or dissemination of **media content** including any special editions or supplements to such **media content**;

4.       any digital, online, or electronic dissemination of **media content;…**

regardless of the mode or method of communication of such **media content.**

"Media content" means the substance of any communication of any kind whatsoever within **covered media**  or **advertising**, regardless of the nature or form of such "media content" or the medium by which such "media content" is communicated, including but not limited to language, data, facts, fiction, music, photographs, images, advertisements, artistic expression, or visual or graphical materials.

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
ATTORNEYS AT LAW


Joshua L. Blosveren
*Re:*     *Cox Radio Inc. adv. Terry Gene Bollea*
January 21, 2020
Page 14

### III.     SPECIFIC COVERAGE DETAILS

**Definition of "Covered Media."** Where the phrase "covered media" appears within this policy (whether in singular or plural), it shall solely mean the following:

All publications, programming and other communications (but not including ordinary business communications not directly related to the preparation, dissemination or promotion of your multimedia products) produced or disseminated by you; including but   not limited to content of personal appearances by your and all content disseminated via web sites owned or operated by you.

### Endorsement No. 6   E2386.1 Social Media Extension MM

In consideration of the premium charged and on the understanding that this endorsement leaves all other terms, conditions and exclusions unchanged, it is agreed that with respect to DEFINITIONS (Section VIII), Advertising is deleted in its entirety and replaced with the following:

"Advertising" means advertising, publicity, or promotion in or of **covered media** regardless of the nature or form of such "advertising"…                 .

The Second Amended Complaint was filed to hold the "remaining offenders" liable for their roles in the use, public disclosure and dissemination, and exploitation of the illegally recorded Bollea Footage.  The allegations within the Second Amended Complaint clearly allege that the Bollea Footage was taken by Loyd and disseminated by Loyd and/or through Calta to destroy Bollea's and Bubba Clem's friendship, as well as Bubba Clem's career.   Cox clearly does not fall within the category of a "remaining offender" as the Second Amended Complaint contains **NO** allegations that Cox ever acquired, collected, compiled, disseminated, or in any way publicly disclosed the Bollea Footage. In fact, the Second Amended Complaint make it abundantly clear that Cox did not own or maintain any control over the Bollea Footage and that the only connection Cox has to the Litigation is that it at one time Cox provided employment to Bubba Clem and Loyd and currently employs Calta.  Hence, as Cox did not use, disseminate, gather or in any way publicize the Bollea Footage, no **media activities** have been performed either by Cox or on the behalf Cox, therefore coverage has not been triggered under the Policy as set forth and required by **Section II. What has to go wrong.**

Nonetheless, even if  **media activities** were determined to be performed by Cox on the behalf of Cox in relation to the Bollea Footage, such promotion of publications, programming and other communications must directly relate to the preparation, dissemination or promotion of Cox's programs.  The disclosure of the Bollea Footage was clearly not disseminated to promote

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
ATTORNEYS AT LAW

Joshua L. Blosveren
**Re:**   *Cox Radio Inc. adv. Terry Gene Bollea*
January 21, 2020
Page 15

Cox's interest or programs but as an a personal crusade against Bubba Clem by Calta and Loyd due to years of personal differences for the personal satisfaction and benefit of Calta and/or Loyd.  Therefore, as the dissemination of the Bollea Footage did not promote Cox's interests or programs, any **media activities** allegedly performed by Cox or on behalf of Cox did not arise from **covered media** or **advertising** as defined by the Policy.  Hence, Hiscox denies coverage for the Litigation in its entirety.

Notwithstanding the above, **Endorsement 1, E60.1 Cox Amendments Endorsement**, **Section 6.,** as revised by **Endorsement 16, E286.2 Georgia Amendatory Endorsement MM/MAC, Section 5.**, requires that the parties submit any dispute relating to this party to non-binding mediation prior to the commencement of litigation. Therefore, Hiscox confirms its agreement to participate in the non-binding mediation currently scheduled for Thursday, January 23, 2020 at 10:00 am before Andrew Nadolna at JAMS New York City Offices located at 620 8th Avenue, New York, New York 10018.

Hiscox's position with respect to coverage for the matter is based on the documentation submitted to date and the currently known facts and allegations. Hiscox continues to fully reserves all of its' rights, privileges and defenses under the Policy and any other policies, at law and in equity, regardless of whether or not specially referred to herein, including the right to supplement coverage on additional or alternative bases as further investigation and development of facts and information may warrant; including any applications and information or documentation submitted to and relied upon by Hiscox's issuance of the Policy.

In the event that you and/or the Insured has any additional information that the it feels would either cause Hiscox to review its' position or would assist Hiscox in its' investigation or determination, Hiscox requests that you and/or the Insured advise Hiscox of such information as soon as possible.

Please feel free to contact the undersigned with any questions.

Very truly yours,

**MANNING & KASS**
**ELLROD, RAMIREZ, TRESTER LLP**

Jeanette L. Dixon, Esq.

JLD/axh

MANNING&KASS
ELLROD, RAMIREZ, TRESTER LLP
ATTORNEYS AT LAW
M&K
ERT

Joshua L. Blosveren
**Re:** ***Cox Radio Inc. adv. Terry Gene Bollea***
January 21, 2020
Page 16


cc:    Melissa Hill
       Head of Claims
       Hiscox USA
       Melissa.Hill@Hiscox.com

       Richard C. Mason
       Cozen O'Connor
       R.Mason@cozen.com

       Kelly Thoerig
       Marsh
       Kelly.Thoerig@Marsh.com

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Joshua L. Blosveren
Houget Newman Regal & Kennedy, LLP
One Grand Central Place
60 East 42nd Street, 48th Floor
New York, NY 10165

|||||| |||| ||| ||| || ||| ||| |||| ||| || |||
9590 9402 5355 9189 6970 56

2. Article Number *(Transfer from service label)*

7019 1120 0001 5515 3146

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X ☐ Agent
☐ Addressee

B. Received by *(Printed Name)*    C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery ($500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053    Domestic Return Receipt

USPS TRACKING #

9590 9402 5355 9189 6970 56

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

**United States
Postal Service**

• Sender: Please print your name, address, and ZIP+4® in this box•

MANNING & KASS

ELLROD, RAMIREZ, TRESTER LLP

— ATTORNEYS AT LAW —

M&K
ERT

ONE BATTERY PARK PLAZA, 4TH FLOOR

NEW YORK, NEW YORK 10004

ATTN: ANGELA HICKSON

# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| COX ENTERPRISES, INC., | **FIRST AMENDED COMPLAINT** |
| Plaintiff, | |
| -against- | Docket No. 1:20-cv-0415 |
| HISCOX INSURANCE COMPANY, INC., | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiff Cox Enterprises, Inc. ("CEI"), for its complaint for Breach of
Contract, Anticipatory Breach of Contract, Declaratory Judgment and Insurer Bad
Faith against Defendant Hiscox Insurance Company, Inc. ("Hiscox"), alleges as
follows:

## NATURE OF THE ACTION

1.      This action arises out of the bad faith failure and refusal of Hiscox to
honor its obligations under a Multimedia Liability Policy it issued to CEI (the
"Policy").  Hiscox agreed to insure, among other things, against losses arising out
of the media activities of CEI and its subsidiary, Cox Radio, Inc. ("Cox Radio").

2.      In 2016, Cox Radio, an employee of Cox Radio and a former
employee of Cox Radio were all named as defendants in a lawsuit filed in Florida

state court by Terry Bollea, better known as Hulk Hogan ("Bollea"), relating to their alleged dissemination of videos (and excerpts and transcripts thereof) (the "Bollea Action"), for which CEI submitted a claim for insurance coverage to Hiscox (the "Claim") on May 5, 2016.

3.      In a letter sent on January 21, 2020, Hiscox denied coverage for all claims asserted by Bollea against Cox Radio and purported to withdraw numerous communications (sent beginning on June 3, 2016) in which Hiscox had acknowledged the potential for coverage and agreed to pay Cox Radio's defense costs once the Policy's retention was exhausted.

4.      In its January 21, 2020 letter, which Hiscox sent to CEI less than two full days before a mediation between the parties was scheduled to occur, Hiscox premised its denial on two grounds, both of which are entirely frivolous and completely irreconcilable with the facts alleged by Bollea and the language of the Policy.

5.      Hiscox has not reimbursed CEI for any defense costs incurred by Cox Radio in connection with the Bollea Action.

6.      In this lawsuit, CEI seeks damages for Hiscox's breach of its contractual obligation to provide insurance coverage for the Claim, a declaration that Hiscox is obligated to indemnify CEI for all future losses incurred in

2

connection with the Claim, and extra-contractual damages for Hiscox's bad faith under O.C.G.A. § 33-4-6.

## THE PARTIES

7.     CEI is a corporation incorporated in Delaware, with its principal place of business in Georgia.  At all relevant times, CEI owned more than 50% of Cox Radio.

8.     Hiscox is a corporation incorporated in Illinois, with its principal place of business in Illinois.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy exceeds seventy-five thousand dollars ($75,000), exclusive of interest and costs.

10.     Venue in this District is proper under 28 U.S.C. § 1391(a) and (c) because the events and omissions giving rise to the controversy occurred in this District, and Hiscox transacts business and is subject to personal jurisdiction in this District.

3

# FACTS

## A.    The Policy

11.    Hiscox sold CEI the Policy, US TNT Multimedia Liability Policy No. US UAA 261.9952.11, with a policy period of December 1, 2011 to December 1, 2012.

12.    The basic insuring clause for the Policy provides:

> **We** will indemnify **you** for **defense costs** and **damages** incurred as a result of a **claim** that falls within WHAT HAS TO GO WRONG (Section II) under this policy, WHAT WE WILL PAY (Section IV) under this policy, and HOW MUCH WE WILL PAY (Section V) under this policy.

(Hiscox Policy, § 1.)

13.    To qualify for coverage, a claim must fall within the "**What has to go wrong**" section of the Policy, which provides that the Policy covers

> The performance of **media activities** by you or anyone on your behalf during the policy period results in a **claim** against you that arises from **covered media** or **advertising**, regardless of when such claim is made or where such claim is brought, and including but not limited to any claim for any actual or alleged:
>
> \* \* \*
>
> e. infliction of emotional distress or outrage;
>
> f. breach of any duty of confidentiality, invasion of privacy or violation of any other legal protections for

4

personal information, including but not limited to false light, intrusion upon a person's seclusion, public disclosure of a person's private information, misappropriation of a person's picture, name, voice or identity for commercial gain, or unauthorized interception or recording of sound or data in violation of a civil anti-wiretap statute;

l. negligent supervision of an employee, but only when asserted in conjunction with and based on the same factual allegations as a claim under (a) - (m).

m. any form of negligence (including any negligent act, negligent error, negligent omission, negligent misrepresentation, negligent misstatement, including negligent transmission of a computer virus) but only where arising from your media content disseminated in covered media or advertising.

(Hiscox Policy, § II and Endorsement 1.)

14.     The Policy defines "**media activities**" as

1. the gathering, acquisition, investigation, collection, researching, creation and compilation of **media content**;
2. any broadcast, transmission, dissemination, telecast, cablecast, syndication, serialization, podcast, streaming, or production of **media content**;
3. any publication, republication, or dissemination of **media content** including any special editions or supplements to such **media content**;
4. any digital, online, or electronic dissemination of **media content**;
5. the release, distribution, licensing, sale, lease, or exhibition of **media content**. . . .

(Hiscox Policy, § VIII.)

5

15.    "**Media content**" is defined by the Policy as "the substance of any communication of any kind whatsoever within **covered media** or **advertising**, regardless of the nature or form of such 'media content' or the medium by which such 'media content' is communicated, including but not limited to language, data, facts, fiction, music, photographs, images, advertisements, artistic expression, or visual or graphical materials."  (*Id.*)

16.    "**Covered media**" is defined by the Policy as "All publications, programming and other communications (but not including ordinary business communications not directly related to the preparation, dissemination or promotion of your multimedia products) produced or disseminated by you; including but not limited to content of personal appearances by you and all content disseminated via web sites owned or operated by you."  (Hiscox Policy at Declarations Page, § III.)

17.    "**Advertising**" is defined by the Policy as "advertising, marketing, publicity, or promotion of the **insured's**, **existing subsidiary's**, or **acquired entity's** own goods and services and of the goods and services of their clients. (Hiscox Policy, Endorsement 1).

18.    "**You**" and "**Your**" are defined by the Policy to include "the **Insured**, any **existing subsidiary**," and "any person who was, is or becomes . . . [an] employee of the Insured [or] any existing subsidiary . . . but only in respect to

6

claims arising out of the course and scope of their duties as such. . . ." (Hiscox Policy, § VIII.)

19.    **"Existing subsidiary"** is defined by the Policy to include "any entity in which the **Insured** directly or indirectly owns more than 50% of the assets or outstanding voting shares as of the first day of the **policy period** and if the revenue is included on **your** application for this policy." (*Id.*)

## B.    The Bollea Action

20.    Bollea filed his initial complaint on May 2, 2016.

21.    Bollea filed the current operative complaint, his second amended complaint, on January 4, 2019 (the "SAC").

22.    In the SAC, Bollea asserts nine causes of action against Cox Radio relating to an alleged conspiratorial effort among Cox Radio and its co-defendants, which include current Cox Radio employee Michael Calta ("Calta") and former Cox Radio employee Matthew Loyd ("Loyd"), to disseminate videotaped recordings (and excerpts, images and excerpts thereof) of sexual encounters between Bollea and Heather Clem, the then-wife of Tampa radio personality Bubba "The Love Sponge" Clem ("Clem").

23.    Bollea alleges that all of the named "Defendants repeatedly victimized Bollea by obtaining, using, disclosing, disseminating, and exploiting

7

surreptitiously recorded and illegally obtained video footage of Bollea naked, engaged in sexual activity, and having private conversations in a private bedroom (the 'Footage').''

24.     Bollea alleges that "[i]n March-April 2012, Defendants Loyd, Calta, Cox Radio [and others] worked in concert and conspired to leak and sell information about and excerpts from the Footage to *TMZ* and *TheDirty.com*." Thereafter, TMZ published a story about the Footage and TheDirty published screen shots from and stories about the Footage.

25.     Bollea alleges that "[i]n September-October 2012, these same Defendants worked in concert and conspired to 'anonymously' send a DVD containing some of the Footage to A.J. Daulerio, then-editor of *Gawker.com*—a website notorious for posting salacious images of celebrities online in order to destroy their careers—while intending and knowing that Daulerio would post the Footage online."   Thereafter, Gawker posted a video showing excerpts of the Footage.

26.     In July 2015, the *National Enquirer* published a story quoting excerpts from the footage of Bollea, which it described as coming from a court-protected, confidential transcript.  The transcript contained racist comments made

by Bollea.  Bollea alleges that "the actions of all of the Defendants set forth herein substantially contributed to the *Enquirer*'s publication. . . ."

27.    Calta was employed by Cox during the entire relevant period—and continues to be employed by Cox.  Bollea alleges that "[a]t all relevant times, Calta was acting within the course and scope of his employment by Defendant, Cox Radio, Inc."

28.    Loyd was employed by Cox when footage of the Bollea-Heather Clem encounters was sent to Gawker.  Bollea alleges that when employed by Cox Radio, "Loyd . . . was acting within the course and scope of his employment by Defendant, Cox Radio."

29.    Bollea further alleges that "[w]hile engaged in the misconduct alleged herein, Calta and Loyd were acting within the course and scope of their employment as 'shock jocks' for Cox, engaged in conduct of the kind they were hired to perform, within the time and space limits of their employment, and while motivated at least in part by a purpose to serve Cox."

30.    The nine causes of action asserted by Bollea against Cox Radio are as follows: Invasion of Privacy (First Cause of Action); Invasion of Privacy by Public Disclosure of Private Facts (Second Cause of Action); Invasion of Privacy by Intrusion (Third Cause of Action); Intentional Infliction of Emotional Distress

(Fourth Cause of Action); Intentional Interference with Contractual Relations (Fifth Cause of Action); Violation of Florida's Secure Communications Act, Section 934.10 Florida Statutes (Sixth Cause of Action); Civil Conspiracy (Seventh Cause of Action); Negligent Retention (Eighth Cause of Action); Negligence (Ninth Cause of Action).

31.     Cox Radio believes it has strong defenses to the claims asserted by Bollea and at all times has vigorously defended itself in the Bollea Action.

### C.     The Claim Falls Squarely within the Coverage Provided by the Policy

32.     All nine causes of action arise from the same set of operative facts, to wit, the alleged involvement of Cox and its employees, Calta and Loyd, in various disseminations of the unauthorized recordings of Bollea (and/or excerpts, images or transcripts thereof).

33.     For CEI's Claim to fall within the coverage provided by the Hiscox Policy, it must (1) arise from "media activities" by Cox Radio or anyone on its behalf that (2) results in a claim that arises from either "covered media" or "advertising."  The claims in the Bollea Action, and thus CEI's Claim, arise from media activities and both "covered media" and "advertising."

34.     As noted above, the Policy defines "media activities" to include, *inter alia*, the "gathering, acquisition, investigation, collection, researching,"

10

"compilation," "transmission, dissemination," "publication," "digital, online, or electronic dissemination," or "release" of "media content." The Claim satisfies the definition of "media activities" because Bollea's nine causes of action are all premised on the assertion that the defendants victimized him by "obtaining, using, disclosing, disseminating, and exploiting" the Footage. Bollea "seeks redress for the damages and injuries caused by the Defendants' use, disclosure, exploitation, and public dissemination of the contents of the illegal recorded Footage."

35. The Policy's definition of "media content" includes the "substance of any communication of any kind whatsoever." The Footage, and the excerpts, images and transcripts thereof, clearly satisfy this definition.

36. The Policy's definition of "covered media," includes "[a]ll . . . communications . . . disseminated by you." As noted above, Bollea expressly alleges that Cox Radio and Calta and Loyd—in the scope and course of their employment at Cox Radio—disseminated the Footage.

37. The Policy's definition of "advertising" includes "advertising, marketing, publicity, or promotion of the **insured's** . . . or **acquired entity's** own goods and services." As Hiscox has acknowledged, "the complaint alleges that Calta and Loyd disclosed the videos to promote their broadcasts on a Cox radio station."

11

**D.     Notice of CEI's Claim and Hiscox's Initial Response**

38.     On May 6, 2016, CEI provided notice of the Claim to Hiscox.

39.     On June 3, 2016, Hiscox issued a reservation-of-rights letter in which it acknowledged that the Claim "arises out of the dissemination of certain videos of Terry Bollea (a/k/a Hulk Hogan) engaged in sexual activity and making certain allegedly certain racist statements."

40.     Hiscox also acknowledged in that letter that Bollea alleges that Cox Radio disseminated the Footage through its "disclosure of the videos to other news outlets—such as TMZ.com and Gawker.com—for inclusion in their programming."

41.     Hiscox also acknowledged in that letter that Bollea "alleges that Calta and Loyd were acting within the scope of their employment with Cox and with the knowledge of their superiors at Cox."

42.     Hiscox also acknowledged in that letter that the claims in the Bollea Action might have arisen from the creation or dissemination of "advertising," as defined in the Policy.

43.     In that letter, Hiscox also acknowledged that the Policy is a "duty to pay policy," consented to Cox Radio's choice of Kilpatrick Townsend & Stockton

12

LLP's Tom Clyde as defense counsel, and promised that "Hiscox will pay defense costs as incurred, once the $500,000 retention is exhausted."

**E.    Hiscox's Insistence on an Allocation, Refusal to Propose One, and Failure to Pay Any Defense Costs**

44.    On July 11, 2017, CEI's Becky Greenhill emailed Hiscox's Tara Bodden to inquire whether Hiscox still intended to pay defense costs once the $500,000 retention was exhausted.

45.    On July 20, 2017, Ms. Bodden responded to Ms. Greenhill in an email in which she stated:  "We will be reimbursing defense costs . . . .  I will need to look at allocation for non-covered matters, but I need to take a peek at the complaint."

46.    Later that day, Ms. Greenhill responded to Ms. Bodden in an email in which she stated:  "We will look forward to hearing your thoughts on allocation, so that we can let our Media group know what to expect regarding reimbursement."

47.    On August 22, 2017, Ms. Bodden responded to Ms. Greenhill in an email in which she stated:  "No issue with allocation at this point."

48.    Later that day, Ms. Greenhill responded to Ms. Bodden in an email in which she stated: "Ok – thanks for confirming full defense coverage at this point."

49.    On March 19, 2018, Hiscox sent CEI a letter in which Hiscox stated: "We understand that Cox has recently exhausted the retention through the payment

13

of defense costs. In light of this and the development of the claim, we believe it is appropriate to discuss allocation of further defense costs." Hiscox did not propose an allocation or even identify in its March 19, 2018 letter, which claims asserted in the Bollea Action it believed might not be covered.

50.    On April 19, 2018, CEI responded to Hiscox's March 19, 2018 letter with a letter in which Cox stated: "Since Cox does not agree that this claim presents a situation of covered and non-covered matters, Cox also does not agree with Hiscox's views on allocation."

51.    On April 18, 2019, a telephone conference was held among representatives from CEI and Hiscox. On this call, CEI reiterated its position that 100% of the Claim should be covered by Hiscox and requested that Hiscox disclose its specific position.

52.    On April 30, 2019, Hiscox's then-outside counsel sent a letter stating that Hiscox "acknowledges that some of the allegations may fall within the scope of coverage" and made the "request that Cox engage in discussions to reach agreement to an appropriate allocation of defense costs." The April 30, 2019 letter did not propose an allocation or even identify which claims asserted in the Bollea Action it believed might not be covered.

53.     On October 17, 2019, CEI's outside counsel sent a letter to Hiscox's then-outside counsel stating that "we simply do not see any portion of the Claim not being covered under the Hiscox Policy such that Hiscox may invoke the policy's allocation provision" and "request[ing] that Hiscox, in accordance with the terms of the Hiscox Policy, immediately indemnify Cox Radio for the defense costs it has incurred to date in the Bollea Action.  As Hiscox has been advised, Cox Radio has incurred approximately $1.6 million in defense costs in the Bollea Action, which far exceeds the Hiscox Policy's self-insured retention."

54.     On December 27, 2019, CEI's outside counsel sent Hiscox's then-outside a counsel an email asking for "Hiscox's position on allocation as soon as possible."

55.     On December 31, 2019, Hiscox's then-outside counsel sent a letter to CEI's outside counsel stating that "Hiscox's position is the same as it has been for years—that it is happy to discuss and come to an agreement over a reasonable allocation."  The December 31, 2019 letter did not propose an allocation or even identify which claims asserted in the Bollea Action it believed might not be covered.

56.     To date, Hiscox has not paid any of Cox Radio's defense costs.

### F. Hiscox's Change in Counsel

57.    On January 13, 2020, CEI learned that Hiscox had hired a new law firm to provide it with outside counsel in connection with the Claim.

### G. Hiscox's Belated and Groundless Denial

58.    A scheduled mediation between CEI and Hiscox was held on January 23, 2020.

59.    At 6:55 p.m. on January 21, 2020, Hiscox's new outside counsel sent CEI's outside counsel a letter in which Hiscox, for the very first time, denied coverage for the Claim.  The January 21, 2020 letter stated that it "shall replace and supersede all prior communications."

60.    In the January 21, 2020 letter, Hiscox denied coverage on two grounds.

61.    First, Hiscox denied coverage on the stated grounds that while "the Bollea Footage was . . . disseminated by Loyd and/or through Calta," the "Second Amended Complaint contains **NO** allegations that Cox ever acquired, collected, compiled, disseminated, or in any way publicly disclosed the Bollea Footage."

62.    Second, Hiscox denied coverage on the stated grounds that "as the dissemination of the Bollea Footage did not promote Cox's interests or programs,

16

any **media activities** allegedly performed by Cox or on behalf of Cox did not arise from **covered media** or **advertising** as defined by the Policy."

63.　Both grounds for denial stated in the January 21, 2020 letter are frivolous and directly at odds with the explicit allegations in the SAC and the clear language of the Policy.

64.　Hiscox's first claimed basis for denial—that "Second Amended Complaint contains **NO** allegations that Cox ever acquired, collected, compiled, disseminated, or in any way publicly disclosed the Bollea Footage"—is frivolous for two reasons.

65.　First, the SAC explicitly alleges that Cox Radio, with the other Defendants, "repeatedly victimized Bollea by obtaining, using, disclosing, disseminating, and exploiting surreptitiously recorded and illegally obtained footage of Bollea naked, engaged in sexual activity, and having private conversations in a private bedroom (the 'Footage')." The SAC further alleges that Cox Radio, with the other Defendants, "worked in concert and conspired to leak and sell information about and excerpts from the Footage to *TMZ* and *TheDirty.com*" and to "'anonymously' send a DVD containing some of the Footage to" Gawker.

66.    Second, the Policy defines "covered media" to include "communications . . . disseminated by you" and defines "You" to include all employees of Cox Radio in acting "the course and scope of their duties as such." Hiscox has acknowledged that Calta and Loyd are alleged to have disseminated the Footage and that such actions were allegedly taken in the course and scope of their employment for Cox Radio.

67.    Hiscox's second claimed basis for denial—that "as the dissemination of the Bollea Footage did not promote Cox's interests or programs, any **media activities** allegedly performed by Cox or on behalf of Cox did not arise from **covered media** or **advertising** as defined by the Policy"—is also frivolous for two reasons.

68.    First, Hiscox does not cite any language in the Policy stating that a dissemination can only arise from "covered media" or "advertising" if it serves to "promote Cox's interests or programs," because that supposed requirement is a mere figment of Hiscox's imagination.

69.    Second, in any event, Hiscox has acknowledged that Bollea "alleges that Calta and Loyd disclosed the videos to promote their broadcasts on a Cox radio station."

18

## FIRST CAUSE OF ACTION
### (Breach of Contract)

70.     CEI repeats and realleges the allegations set forth in paragraphs 1 through 69 of this Complaint as if fully set forth herein.

71.     CEI has complied with all terms, conditions, and prerequisites to coverage set forth in the Policy and remains ready to perform all of its obligations under the Policy.

72.     Pursuant to the terms of the Policy, Hiscox is obligated to indemnify CEI for all sums that Cox Radio has paid or has or will become obligated to pay in connection with the Claim, including the costs of Cox Radio's defense.

73.     Hiscox has breached its obligations under the Policy by denying coverage and refusing to indemnify CEI for the costs incurred by Cox Radio in defending itself in the Bollea Action once the Policy's $500,000 retention was exhausted.

74.     As a result of Hiscox's breach of its obligations under the Policy, CEI has suffered and continues to suffer damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Anticipatory Breach of Contract)

75.     CEI repeats and realleges the allegations set forth in paragraphs 1 through 74 of this Complaint as if fully set forth herein.

76.     CEI has complied with all terms, conditions, and prerequisites to coverage set forth in the Policy and remains ready to perform all of its obligations under the Policy.

77.     Pursuant to the terms of the Policy, Hiscox is obligated to indemnify CEI for all sums that Cox Radio has paid or has or will become obligated to pay in connection with the Claim, including the costs of Cox Radio's defense.

78.     Hiscox has anticipatorily breached its obligations under the Policy by denying coverage and refusing to indemnify CEI for all sums that Cox Radio that will and may become obligated to pay, including the costs of Cox Radio's defense and the amount of any settlement payment or judgment.

79.     As a result of Hiscox's anticipatory breach of its obligations under the Policy, CEI will suffer damages in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### (Declaratory Judgment)

80.     CEI repeats and realleges the allegations set forth in paragraphs 1 through 79 of this Complaint as if fully set forth herein.

20

81.     CEI has complied with all terms, conditions, and prerequisites to coverage set forth in the Policy and remains ready to perform all of its obligations under the Policy.

82.     Pursuant to the terms of the Policy, Hiscox is obligated to indemnify CEI for all sums that Cox Radio has paid or has or will become obligated to pay in connection with the Claim, including the costs of Cox Radio's defense.

83.     By denying coverage, Hiscox has disputed and not honored this obligation.

84.     By reason for the foregoing, an actual and justiciable controversy exists between CEI and Hiscox regarding Hiscox's duty to pay defense costs and damages.

## FOURTH CAUSE OF ACTION
### (Insurer Bad Faith – O.C.G.A. § 33-4-6)

85.     CEI repeats and realleges the allegations set forth in paragraphs 1 through 84 of this Complaint as if fully set forth herein.

86.     The Claim is covered by the Policy.

87.     A demand for payment was made by CEI more than 60 days prior to the filing of this Complaint.

88.     Hiscox's denial of coverage and failure to pay was motivated by bad faith.

21

89.     As a result of Hiscox's bad faith under the Policy, CEI has suffered and will suffer damages in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, CEI respectfully requests that the Court enter a judgment:

(a)     Awarding CEI damages against Hiscox in an amount to be determined at trial;

(b)     Declaring that Hiscox is obligated to indemnify CEI for all sums that Cox Radio has paid or may become obligated to pay in connection with the Claim, including Cox Radio's defense costs;

(c)     Awarding CEI all damages available under O.C.G.A. § 33-4-6, including statutory penalties and attorneys' fees, in an amount to be determined at trial;

(d)     Awarding CEI all reasonable costs incurred by CEI as a consequence of having to prosecute this action, including attorneys' fees, as well as pre-judgment interest and post-judgment interest; and

(e)     Granting CEI such other and further relief as the Court deems just and proper.

## **Jury Trial Demanded**

CEI demands a trial by jury on all Counts so triable.

22

Dated:  January 31, 2020                    Respectfully submitted,

                                            */s/ Dara D. Mann*
                                            Petrina A. McDaniel
                                            Georgia Bar No.  141301
                                            petrina.mcdaniel@squirepb.com
                                            Dara D. Mann
                                            Georgia Bar No.  469065
                                            dara.mann@squirepb.com
                                            **SQUIRE PATTON BOGGS (US) LLP**
                                            1230 Peachtree Street, NE
                                            Suite 1700
                                            Atlanta, Georgia 30309
                                            Telephone:  678.272.3200
                                            Facsimile:   678.272.3211

                                            Joshua L. Blosveren (*pro hac vice*
                                            forthcoming)
                                            Andrew N. Bourne (*pro hac vice*
                                            forthcoming)
                                            **HOGUET NEWMAN REGAL & KENNEY, LLP**
                                            One Grand Central Place
                                            60 E. 42nd Street
                                            New York, NY 10165
                                            Telephone: 212.689.8808

                                            *Attorneys for Plaintiff Cox Enterprises, Inc.*