UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA, ATLANTA DIVISION

| | | |
|---|---|---|
| COX ENTERPRISES, INC., | * | CIVIL ACTION NO. |
| | * | |
| Plaintiff, | * | 1:20-cv-00415-MHC |
| | * | |
| VERSUS | * | |
| | * | |
| HISCOX INSURANCE COMPANY, | * | |
| | * | |
| Defendant. | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * *

## DEFENDANT'S RULE 12(b) MOTIONS TO DISMISS
## OR, ALTERNATIVELY, MOTION TO TRANSFER VENUE

Pursuant to Federal Rule of Civil Procedure 12(b)(1), (6), and/or (7) and 28 U.S.C. § 1404(a), Defendant Hiscox Insurance Company ("Hiscox") moves to dismiss, or in the alternative, to transfer, the Amended Complaint filed by Plaintiff Cox Enterprises, Inc. ("CEI"). Hiscox files this motion because CEI has no claim for coverage or damages against Hiscox and because it failed to join necessary and indispensable parties here. Accordingly, the Court should dismiss this action pursuant to Rule 12(b)(1), (6), and/or (7). In the alternative, if this Court decides dismissal under Rule 12(b) is not warranted, it should exercise its broad discretion under 28 U.S.C. § 1404(a) by transferring this action to the United States District Court for the Middle District of Florida, where a declaratory judgment action is pending involving the identical coverage dispute presented here and joining all of

the required parties.

In support of this motion, Hiscox relies on the accompanying memorandum of law, the complaints from the underlying lawsuit and Hiscox's declaratory judgment action, and the Hiscox insurance policy at issue, which is referenced and quoted from at length in CEI's Amended Complaint.

Respectfully submitted this 27th day of February 2020.

By: */s/ S. Gardner Culpepper*
S. Gardner Culpepper
(GA Bar No. 201210)
**ROGERS & HARDIN LLP**
2700 International Tower, Peachtree Center
229 Peachtree Street, N.E.
Atlanta, GA 30303-1601
404.522.4700 (telephone)
404.525.2224 (facsimile)
sculpepper@rh-law.com

Judy Y. Barrasso (LA Bar No. 2814)
(*pro hac vice pending*)
Andrea M. Price (LA Bar No. 30160)
(*pro hac vice pending*)
Robert J. Dressel (LA Bar No. 35757)
(*pro hac vice pending*)
**BARRASSO USDIN KUPPERMAN FREEMAN & SARVER, L.L.C.**
909 Poydras Street, Suite 2350
New Orleans, Louisiana 70112
Telephone: (504) 589-9700
jbarrasso@barrassousdin.com
aprice@barrassousdin.com
rdressel@barrassousdin.com

*Attorneys for Defendant Hiscox Insurance Company*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1(D), the undersigned counsel hereby certifies that the foregoing **DEFENDANT'S RULE 12(b) MOTIONS TO DISMISS OR, ALTERNATIVELY, MOTION TO TRANSFER VENUE** has been prepared in accordance with Local Rule 5.1(C) using 14-point Times New Roman font.

By: */s/ S. Gardner Culpepper*
S. Gardner Culpepper
(Ga. Bar No. 201210)
**ROGERS & HARDIN LLP**
2700 International Tower,
Peachtree Center
229 Peachtree Street, N.E.
Atlanta, GA 30303-1601
404.522.4700 (telephone)
404.525.2224 (facsimile)
sculpepper@rh-law.com

Judy Y. Barrasso (LA Bar No. 2814)
(*pro hac vice pending*)
Robert J. Dressel (LA Bar No. 35757)
(*pro hac vice pending*)
**BARRASSO USDIN KUPPERMAN FREEMAN & SARVER, L.L.C.**
909 Poydras Street, Suite 2350
New Orleans, Louisiana 70112
Telephone: (504) 589-9700
jbarrasso@barrassousdin.com
rdressel@barrassousdin.com

*Attorneys for Defendant Hiscox Insurance Company*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 27, 2020, I served all parties a true and correct copy of **DEFENDANT'S RULE 12(b) MOTIONS TO DISMISS OR, ALTERNATIVELY, MOTION TO TRANSFER VENUE**, by filing same with the clerk of court using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.

This 27th day of February, 2020.

By: */s/ S. Gardner Culpepper*
S. Gardner Culpepper
Georgia Bar No. 201210
**ROGERS & HARDIN LLP**
2700 International Tower,
Peachtree Center
229 Peachtree Street, N.E.
Atlanta, GA 30303-1601
404.522.4700 (telephone)
404.525.2224 (facsimile)
sculpepper@rh-law.com

Judy Y. Barrasso (LA Bar No. 2814)
(*pro hac vice pending*)
Robert J. Dressel (LA Bar No. 35757)
(*pro hac vice pending*)
**BARRASSO USDIN KUPPERMAN
  FREEMAN & SARVER, L.L.C.**
909 Poydras Street, Suite 2350
New Orleans, Louisiana 70112

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA, ATLANTA DIVISION

| | | |
|---|---|---|
| COX ENTERPRISES, INC., | * | CIVIL ACTION NO. |
| | * | |
| Plaintiff, | * | 1:20-cv-00415-MHC |
| | * | |
| VERSUS | * | |
| | * | |
| HISCOX INSURANCE COMPANY, | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM IN SUPPORT OF RULE 12(b) MOTIONS TO DISMISS OR, ALTERNATIVELY, MOTION TO TRANSFER VENUE

S. Gardner Culpepper
(GA Bar No. 201210)
**ROGERS & HARDIN LLP**
2700 International Tower,
Peachtree Center
229 Peachtree Street, N.E.
Atlanta, GA 30303-1601
Telephone: 404.522.4700
Facsimile:  404.525.2224
sculpepper@rh-law.com

Judy Y. Barrasso (LA Bar No. 2814)
(*pro hac vice pending*)
Andrea M. Price (LA Bar No. 30160)
(*pro hac vice pending*)
Robert J. Dressel (LA Bar No. 35757)
(*pro hac vice pending*)
**BARRASSO USDIN KUPPERMAN
  FREEMAN & SARVER, L.L.C.**
909 Poydras Street, Suite 2350
New Orleans, Louisiana 70112
Telephone: (504) 589-9700
Facsimile:  (504) 589-9701
jbarrasso@barrassousdin.com
aprice@barrassousdin.com
rdressel@barrassousdin.com

*Attorneys for Defendant Hiscox Insurance Company*

Pursuant to Federal Rule of Civil Procedure 12(b)(1), (6) and/or (7) and 28 U.S.C. § 1404(a), Defendant Hiscox Insurance Company ("Hiscox") moves to dismiss, or in the alternative, to transfer, the Amended Complaint filed by Plaintiff Cox Enterprises, Inc. ("CEI"). Because CEI has no claim for coverage or damages against Hiscox and because it failed to join necessary and indispensable parties here, the Court should dismiss this action pursuant to Rule 12(b)(1), (6) and/or (7). In the alternative, if this Court decides dismissal under Rule 12(b) is not warranted, it should exercise its broad discretion under 28 U.S.C. § 1404(a) by transferring this action to the United States District Court for the Middle District of Florida, where a declaratory judgment action is pending involving the identical coverage dispute presented here and joining all of the required parties.

In the case before this Court, CEI seeks to establish the existence of insurance that would cover the expenses and liabilities flowing from a tort action pending in Florida state court. But CEI is not even a defendant in that Florida case. Instead, Cox Radio, Inc. ("Cox Radio") and two of its employees at the time—none of whom have been joined as plaintiffs in this action—are the parties named as defendants in the Florida suit and are thus the only parties (if any) allegedly entitled to coverage. CEI does not and apparently cannot plead how it, instead of Cox Radio, can state a claim (or even assert standing to make a claim) for coverage or bad faith purportedly

belonging to its legally distinct alleged subsidiary. *See* Dkt. No. 5 at ¶¶ 1, 7. This flaw subjects the entire Amended Complaint to dismissal under Rule 12(b)(6) or 12(b)(1). Moreover, under black letter law, the plaintiff and at least certain defendants in the underlying Florida lawsuit, such as the Cox Radio employees also seeking coverage, are necessary and indispensable parties to the declaratory coverage action. None of these parties are joined here. Thus, the declaratory judgment claim must be dismissed under Rules 12(b)(7) and Rule 19.

Even if dismissal is not warranted under either theory articulated above, this case should be transferred, pursuant to 28 U.S.C. § 1404(a), to the Middle District of Florida, where the underlying suit and a declaratory judgment action filed by Hiscox (including all the necessary parties and raising the exact coverage issues now before this Court) already are pending. CEI's apparent hope to obtain some kind of home court advantage by filing here does not negate the fact that the witnesses, documents, and events relevant to this coverage dispute are in Florida and that the Florida courts, unlike this Court, have the ability to exercise jurisdiction over all interested parties.

## FACTUAL BACKGROUND

### *The Underlying Lawsuit*

Florida resident Terry Gene Bollea, also known as Hulk Hogan, sued Cox

Radio, Michael Calta and Matthew Christian Loyd (both employed by Cox Radio at times), and other individuals and entities for allegedly stealing and disseminating tawdry videotapes purporting to show Bollea in compromising situations (the "Underlying Lawsuit"). Bollea's lawsuit, captioned *Terry Gene Bollea professionally known as Hulk Hogan vs. Don Buchwald & Associates, Inc., et al.*, in the Circuit Court of the Sixth Circuit in and for Pinellas County, Florida, was originally brought in May 2016 and recently amended in January 2019. Ex. A, Second Amended Complaint, *Bollea v. Don Buchwald & Assocs., Inc., et al.*, Case No. 16-002861-CI, Jan. 4, 2019 ("Underlying Complaint").[1] CEI (Cox Radio's alleged ultimate parent and a separate corporate entity) is not a party to the Underlying Lawsuit.

Bollea alleges that he was the victim of a scheme orchestrated by defendants Loyd and Calta, both of whom are citizens of Florida allegedly employed by Cox Radio as "shock jocks" in the Tampa Bay area. *See id.* at ¶¶ 11–12, 30–31, 40; *see*

---

[1] "Courts may consider evidence extrinsic to the pleadings on a Rule 12(b)(6) motion to dismiss if (1) the documents are referred to in the complaint; (2) the evidence is central to the plaintiff's claim; and ([3]) the evidence's authenticity is not in question." *Bell v. Mortg. Elec. Registration Sys.*, No. 13-00807, 2013 WL 12111098, at *2 (N.D. Ga. Apr. 18, 2013). "A court may also take judicial notice of publicly filed documents at the motion to dismiss stage[.]" *Id.*

*also* Ex. B, Hiscox Complaint for Declaratory Judgment, *Hiscox Ins. Co., Inc. v. Cox Radio, Inc., et al.*, Case No. 20-cv-221, Jan. 28, 2020 ("Hiscox Dec. Compl.") at ¶¶ 5–6. Loyd and Calta allegedly victimized Bollea by obtaining, using, disclosing, selling, disseminating, and exploiting surreptitiously-recorded and illegally-obtained footage of Bollea naked, engaged in sexual activity, and having a private conversation in a private bedroom (the "Bollea Footage"), which included a recording in which Bollea was making racially insensitive comments. *See, e.g.*, Ex. A, Underlying Complaint at ¶¶ 14, 65, 68–70. The Underlying Complaint alleges that in 2012 and 2015 Loyd and Calta leaked and sold excerpts of the Bollea Footage to tabloid news outlets TMZ, TheDirty.com, Gawker.com, RadarOnline.com, and *The National Enquirer*, leading to the destruction of Bollea's career. *See, e.g.*, *id.* at ¶¶ 70, 75, 105, 208. Bollea alleges that the defendants' actions were intentionally malicious and unconnected with any news-gathering activity. *See id.* at ¶ 283. He further alleges that Loyd and Calta conspired with Tasha Nicole Carrega (Loyd's wife) and Lori Burbridge, also Florida residents, to carry out these actions, and that employees at Cox Radio's Florida facility were aware of these activities. *See* Ex. A, Underlying Complaint at ¶¶ 11, 35, 36. All of the alleged wrongful conduct relating to Loyd, Calta, and Cox Radio for which coverage is sought took place in Florida— more specifically, Tampa.

### *The Insurance Policy*

Hiscox issued an insurance policy to CEI, effective December 1, 2011, through December 1, 2012, providing Multimedia Coverage, designated policy no. US UUA 2619952.11 (the "Policy"). *See* Ex. C, Hiscox Policy.  The Policy provides Multimedia Coverage up to the $15,000,000 Single Aggregate Limit with a $500,000 self-insured retention. The policy purports to insure Cox Radio, as an alleged subsidiary of CEI, and its employees "but only in respect to claims arising out of the course and scope of their duties as such[.]" *See id.* at pp. 9, 17, 29; *see id.* at US TMT Multimedia Liability Policy Form § VIII p. 8. The Multimedia Coverage is limited to any claim against an insured "that arises from covered media or advertising." *Id.* at US TMT Multimedia Liability Policy Form § II p. 2. "Covered media" means "[a]ll publications, programming and other communications (but not including ordinary business communications not directly related to the preparation, dissemination or promotion of your multimedia products) produced or disseminated by [the insured] . . . ." *Id.* at Declaration § III p. 1.

### *The Declaratory Actions*

On the same day, January 28, 2020, both Hiscox and CEI respectively filed declaratory actions in federal court seeking to resolve the coverage dispute involving

the Underlying Lawsuit.[2] Hiscox filed its action in the Middle District of Florida, Tampa Division—the district in which the Underlying Lawsuit is pending, where all the relevant parties are located (and subject to jurisdiction) and where the actions upon which coverage rests primarily occurred. Ex. B, Hiscox Dec. Compl. Hiscox also named all of the defendants from the Underlying Lawsuit who are necessary and indispensable to this coverage dispute as they could potentially seek coverage under the Policy—Cox Radio, Matthew Christian Loyd, and Michael Calta—as well as plaintiff Terry Gene Bollea and CEI. *Id.*

By contrast, CEI filed its action in the Northern District of Georgia, without naming plaintiff Bollea or any of the defendants to the Underlying Lawsuit. Although CEI is not the insured entitled to seek coverage for the claims asserted in the Underlying Lawsuit, it brought suit only on its own behalf, omitting Cox Radio

---

[2]     In Hiscox's Florida action, CEI concedes that Hiscox commenced its declaratory action a few hours before CEI filed this action, thus implicating the first-filed rule. "Where two actions involving overlapping issues and parties are pending in two federal courts, there is a strong presumption . . . that favors the forum of the first-filed suit [.]" *Manuel v. Convergys Corp.*, No. 04-16032, 430 F.3d 1132, 1135 (11th Cir. 2005). Here, there is no compelling reason to deviate from this rule, as Hiscox did not "race to court" to forum shop. Rather, as shown below, Hiscox filed suit in the Middle District of Florida where all the necessary parties required to be joined reside or were doing business, not in a home court favorable for Hiscox. CEI, if anyone, obviously raced to the courthouse so fast it failed to include all the necessary parties, including, the insured sued in the Underlying Lawsuit.

(the actual defendant in the Underlying Lawsuit and the insured seeking coverage), seeking damages and bad faith penalties as well as a declaratory judgment.

## ARGUMENT

CEI alleges, without explanation, that "Hiscox is obligated to indemnify [it]" for sums that the real party in interest, Cox Radio, "has paid or has or will become obligated to pay" in connection with the Underlying Lawsuit. This reveals the glaring deficiency with the action initiated by CEI—the failure to include as a plaintiff the insured actually entitled to seek coverage for claims arising out of the Underlying Lawsuit. CEI's additional failure to join Loyd, Calta, and Bollea is likewise fatal to its claim, as all are necessary and indispensable parties under Rule 19. What's more, CEI, the alleged parent corporation of Cox Radio, is a distinct and separate legal entity from Cox Radio, Inc. CEI has no justiciable claim for relief against Hiscox—it is not a defendant in the Underlying Lawsuit and asserts no allegations as to why it would pay damages or attorney fees allegedly owed by Cox Radio. Cox Radio is the purported insured seeking coverage for its attorney fees and damages, not CEI. Thus, CEI's action against Hiscox should be dismissed pursuant to Rules 12(b)(1) and 12(b)(6). In the alternative to Hiscox's Rule 12(b) motions, if this Court determines dismissal is unwarranted, the Court should transfer this entire action to the Middle District of Florida, where a declaratory action initiated by

Hiscox is pending that names as defendants all required parties under Rule 19—Cox Radio, Calta, Loyd, and Bollea—as well as CEI, and where the pertinent witnesses and evidence regarding the threshold issue of coverage are located. *See* Ex. B, Hiscox Dec. Compl.

## I. CEI's declaratory action and other claims for relief are neither ripe nor claims upon which relief can be granted.

CEI is not a defendant in the Underlying Lawsuit (*see* Ex. A, Underlying Complaint) and is not the insured entitled to seek coverage for the claims asserted in the Underlying Lawsuit. CEI's alleged subsidiary, Cox Radio—which *is* a defendant in the Underlying Lawsuit (*see id.*) and *has* submitted a claim for coverage[3]—is a distinct and separate legal entity from CEI (*see* Dkt. No. 5 at ¶¶ 1, 7). CEI thus has no justiciable claim against Hiscox.

### A. CEI's action is not ripe, so this Court does not have subject matter jurisdiction and must dismiss this case under Rule 12(b)(1).

"Because a federal court's power extends only to cases and controversies . . . "[it] may only be called upon to adjudge the legal rights of litigants in actual controversies[.]" *Nat'l Union Fire Ins. Co. v. Hicks, Muse, Tate & Furst, Inc.*, No. 02-1334, 2002 WL 1482625, at *3 (S.D.N.Y. July 10, 2002) (citations omitted)

---

[3] While CEI alleges it submitted a claim on May 5, 2016 (Dkt. No. 5 at ¶ 2), it fails to disclose it did so expressly on behalf of Cox Radio. *See* Ex. D, 5/5/16 Notification of Complaint email.

(quoting *S. Jackson & Son, Inc. v. Coffee, Sugar & Cocoa Exch., Inc.*, No. 1102, 24 F.3d 427, 431 (2d Cir. 1994)). It is well settled that even declaratory judgment actions must be justiciable and for an insurance coverage declaratory action to be ripe, "[a]t the very least, there must be a claim against the insured to give rise to an anticipatory lawsuit[.]" *Id.* at *3–4.

Under the laws of Georgia and Delaware, where both Cox entities are headquartered and incorporated, respectively, parent corporations are distinct and maintain separate identities from their subsidiaries. *See, e.g.*, *Geary v. WMC Mortg. Corp.*, No. 1:05-CV-631-TWT, 2005 WL 8155448, at *2 (N.D. Ga. Oct. 14, 2005); *MicroStrategy Inc. v. Acacia Research Corp.*, No. 5735-VCP, 2010 WL 5550455, at *11 (Del. Ch. Dec. 30, 2010). "A parent/subsidiary relationship does not in and of itself establish the subsidiary as either the alter ego of the parent or as the parent's actual or apparent agent." *Monopoly Hotel Grp., LLC v. Hyatt Hotels Corp.*, No. 1:12-CV-1250-AT, 2016 WL 9735798, at *18 (N.D. Ga. Aug. 16, 2016) (quoting *Kissun v. Humana, Inc.*, No. S9G1225, 479 S.E. 2d 751, 754 (Ga. 1997)). These principles underlie the corporate form throughout the nation.

Following these well settled principles, a parent corporation that is not the insured at issue has no justiciable claim against the insurer. The case of *National Union Fire Insurance Company v. Hicks, Muse, Tate & Furst, Inc.*, No. 02-1334,

2002 WL 1482625 (S.D.N.Y. July 10, 2002) illustrates the application of these principles. There, an insurer brought a no-coverage declaratory action against a parent corporation over a lawsuit filed against the parent's subsidiary. *Nat'l Union Fire Ins. Co.*, 2002 WL 1482625, at *2. The parent was the first named insured in the policy and "was responsible for paying premiums for itself" and its subsidiary. *Id.* Finding no justiciable controversy between the insurer and parent corporation, the court dismissed the insurer's claim against the parent corporation for lack of subject matter jurisdiction because, as here, the parent had not made a demand for coverage, its subsidiary had; the parent had not received notice of any legal claims against it, rather only its subsidiary had been sued; and the parent had no liability. *Id.* at *4.

Here, too, the Court lacks subject matter jurisdiction because CEI's case is not ripe. As in *Hicks,* CEI, the parent corporation of Cox Radio, is a distinct and separate entity from Cox Radio. CEI is not the insured entitled to seek coverage for the claims asserted in the Underlying Lawsuit; rather its alleged subsidiary, Cox Radio, is and has. Nor does CEI have any claims for damages pending against it relating to the Underlying Lawsuit, and thus no liability or potential liability relating to the Underlying Lawsuit. *See* Ex. A, Underlying Complaint. Its case against Hiscox for coverage under the Policy and damages for breach of contract, anticipatory breach

of contract, and insurer bad faith are not ripe. *See Nat'l Union Fire Ins. Co.*, 2002 WL 1482625, at \*4. Accordingly, this entire action is not justiciable and it must be dismissed pursuant to Rule 12(b)(1). *See id.*

> **B.  Because CEI does not state a claim against Hiscox upon which relief can be granted, this entire action must be dismissed pursuant to Rule 12(b)(6).**

For largely the same reasons as CEI's complaint is not ripe, it also fails to state a claim. "A complaint may be dismissed if the facts as pled do not state a claim for relief that is plausible on its face." *Etienne v. MGC Mortg., Inc.*, No. 1:11-CV-3502-SCJ, 2012 WL 13009230, at \*2 (N.D. Ga. June 28, 2012) (citing *Ashcroft v. Iqbal*, No. 07-1015, 556 U.S. 662, 679 (2009); *Bell Atlantic Corp. v. Twombly*, No. 05-1126, 550 U.S. 544, 561–62, 570 (2007)). Dismissal is proper where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Gonzales v. Garner Food Servs., Inc.*, No. C. A. 1:93-CV-1639JOF, 855 F. Supp. 371, 372 (N.D. Ga. 1994) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957), *aff'd*, 89 F.3d 1523 (11th Cir. 1996)); *see also, e.g.*, *Nat'l Union Fire Ins. Co.*, 2002 WL 1482625, at \*3. Here, even accepting the amended complaint's allegations as true, CEI has failed to state any claim upon which it can obtain relief, including coverage and bad faith, because all of the claims for which

Case 8:20-cv-00415-MHC Document 17 Filed 02/27/20 Page 18 of 27

coverage is sought in the Underlying Lawsuit have been brought against Cox Radio and its alleged employees—not against CEI.

In *National Union*, the court dismissed the insurer's claims against the parent corporation pursuant to Rule 12(b)(6), finding that an insurer "cannot state a claim for a no coverage declaration against [the parent]" of a subsidiary when there was no contention the subsidiary was an alter ego of the parent or "any other allegation that might lead th[e] [c]ourt to disregard the corporate form of the subsidiary[.]" *Nat'l Union Fire Ins. Co.*, 2002 WL 1482625, at *4. The court concluded that the insurer's case was properly against the named defendant and insured in the underlying lawsuit, *i.e.*, the subsidiary corporation, not its parent, as the two entities were "legally distinct," notwithstanding that the parent corporation "(1) procured the policy in question; (2) [wa]s the first named insured on the policy; (3) pa[id] premiums on the policy; (4) ha[d] a 100% ownership interest in [the subsidiary]; and (5) ha[d] several directors and officers in common[with the subsidiary.]"[4] *Id.*

Here, CEI, like the parent in *National Union*, is a legally distinct and separate entity from its alleged subsidiary, Cox Radio. There is no contention that Cox Radio

---

[4]    The policy at issue in *National Union* included a provision stating it applied to each named insured as if it were the only named insured and separately to each insured against whom suit is brought. However, it does not appear this provision was dispositive in the court's ruling.

is CEI's alter ego "or any other allegation that might lead th[e] Court to disregard the corporate form of the subsidiary[.]" *Id.* at *4. Further, CEI (1) is not party to the Underlying Lawsuit, (2) is not defending itself in the Underlying Lawsuit, and (3) is not paying to defend against the Underlying Lawsuit—Cox Radio is doing all these things, as is alleged in CEI's amended complaint. The amended complaint here simply takes for granted that CEI should be treated as one and the same with Cox Radio, without alleging a single fact that would lead to this conclusion.

For the same reasons, CEI cannot state a claim for breach of contract, anticipatory breach of contract, or insurer bad faith. CEI is not the insured company to whom coverage is allegedly owed under the Policy—these claims purportedly belong to Cox Radio, its alleged subsidiary. Accordingly, CEI's action should be dismissed in its entirety pursuant to Rule 12(b)(6). *See id.*

## II.    The Court should dismiss CEI's declaratory action for failure to join indispensable parties Bollea, Cox Radio, Loyd, and Calta.

The Court may dismiss an action under Rule 12(b)(7) where the plaintiff fails to "join a party under Rule 19." Fed. R. Civ. P. 12(b)(7). Whether dismissal is, in fact, warranted requires a two-step analysis. The Court must first decide whether the missing parties—here, Bollea, Cox Radio, Loyd, and Calta—are "required" parties under Rule 19(a). Fed. R. Civ. P. 19(a); see also *Temple v. Synthes Corp.*, 498 U.S. 5, 7 (1990). Under Rule 19(a)(1), a "required party" is:

A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or
>
> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>
> > (i) as a practical matter impair or impede the person's ability to protect the interest; or
> >
> > (ii) leave an existing party subject to a substantial risk of incurable double, multiple, or otherwise inconsistent obligations because of the interest.

If a party is deemed required but nonetheless cannot be joined (for jurisdictional or other reasons), then Rule 19(b) governs whether the absent party is "indispensable" and the case should therefore be dismissed or whether, instead, the case should proceed without the required party. *Am. Safety Cas. Ins. Co. v. Condor Assocs., Ltd.*, No. 04-16378, 129 F. App'x 540, 541 (11th Cir. 2005) (upholding dismissal of declaratory judgment action because plaintiff failed "to join an indispensable party pursuant to . . . [Rule] 19(b)"). The Court considers the following factors in making this decision: (1) prejudice to an absent party or to the existing parties; (2) the extent to which any such prejudice can be lessened by the shaping of relief or other protective measures; (3) whether adequate relief can be given without

the absent party; and (4) whether the plaintiff has an adequate remedy if the action is dismissed. Fed. R. Civ. P. 19(b).

> **A.    Bollea is a required and indispensable party under Rule 19, and CEI's declaratory action should be dismissed for this reason alone.**

Eleventh Circuit law is well-settled that, in a declaratory judgment action between an insured and its insurer, the plaintiff in the underlying lawsuit against the insured—here, Bollea—is both a necessary and indispensable party under Rule 19. The seminal case is *Ranger Insurance Co. v. United Housing, Inc.*, 488 F.2d 682 (5th Cir. 1974).[5] There, an insurer brought a declaratory judgment action seeking to confirm the absence of coverage with respect to an underlying lawsuit in which injured plaintiffs brought tort claims against the insured. The insurer did not—and could not—join the underlying plaintiffs in the coverage action because doing so would have destroyed diversity jurisdiction. The Fifth Circuit affirmed dismissal of the declaratory judgment action, holding that the plaintiffs from the underlying suit (*i.e.*, the tort claimants) were necessary and indispensable parties under Rule 19 because (1) it was "nonsensical" that the tort claimants' interests would not be prejudiced by a finding of coverage or non-coverage for the insurer, as it would have a practical effect on their ability to recover damages; (2) no remedial option to

---

[5]    The Eleventh Circuit has explicitly stated that *Ranger* is binding on courts in the Eleventh Circuit. *Am. Safety Cas. Ins. Co.*, 129 F. App'x at 542.

protect the tort claimants' interest could be found; (3) repetitive litigation would ensue, whether coverage was found or not, if the tort claimants obtained a judgment against the insureds; and (4) the insurer had the option of seeking its declaratory judgment in an alternative forum, Texas state court. *Ranger Ins. Co. v. United Hous. of N.M., Inc.*, 488 F.2d 682, 682–84 (5th Cir. 1974); *see also, e.g.*, *Robison v. Casteel*, No. 1:19-CV-1182-MHC, 407 F. Supp. 3d 1324, 1328 (N.D. Ga. 2019) ("Georgia law is clear that plaintiffs in a lawsuit seeking damages against an insured are proper parties to a declaratory judgment action between the insurer and the insured.").

More recently, a section of this Court affirmed the same principle in *Colony National Insurance Co. v. Teaford Co., Inc.*, No. 10-0028, 2010 WL 4339369 (N.D. Ga. Oct. 26, 2010). There, a contracting company entered into an installation contract for a worksite in Alabama, which required the contractor to obtain separate insurance coverage for injuries and/or damages sustained to the worksite's own employees and property. *Id.* at *1. After an explosion occurred at the worksite, injured workers sued the contractor and their employer in Alabama state court. *Id.* at *1. The insurer then sued its insured, the contractor, the employer, and the injured employees in the Northern District of Georgia, seeking a declaratory judgment regarding coverage. *Id.* Because the injured employees were citizens of Alabama not

16

subject to personal jurisdiction in the Georgia federal courts, this Court dismissed the insurer's declaratory judgment action because the injured employees (*e.g.,* the plaintiffs in the underlying lawsuit) were "required parties to declaratory judgment actions under . . . [Rule] 19."[6] *Id.* at \*2.

As in *Ranger* and *Colony National Insurance*, as the tort claimant in the Underlying Lawsuit, Bollea is a required and indispensable party to this declaratory action under Rule 19. Nor is CEI without an adequate alternative remedy: If it has a valid claim, it can obtain a declaratory judgment and assert the other claims it has here in the Middle District of Florida proceeding. *See Ranger*, 488 F.2d at 684 ("Finally, we are not convinced that the appellant is without an adequate alternative remedy. It could seek its declaratory judgment in the state courts of Texas[.]"). Indeed, all parties—Hiscox, the Cox Radio Parties, Bollea—have an interest in avoiding inconsistent litigation or relitigation of the issues involved here. *See id.* (explaining why, under third Rule 19(b) factor, tort claimant is indispensable); *Westchester Fire Ins. Co. v. FC Fire Prot., Inc.*, No. 09-222, 2009 WL 10689858, at \*3 (N.D. Ala. July 24, 2009) (opining that insured and insurer have "the same

---

[6]     The Eleventh Circuit considers it an abuse of discretion not to follow the *Ranger* opinion. *Colony National Insurance Co.*, 2010 WL 4339369, at \*2 (citing *Am. Safety Cas. Ins. Co.*, 129 F. App'x at 542).

incentive" to include tort claimant and other individuals involved in underlying lawsuit in declaratory action). And, upon information and belief, joinder is not feasible because Bollea is a Florida resident and likely not subject to personal jurisdiction in a federal court in Georgia. *See Colony Nat'l Ins. Co.,* 2010 WL 4339369 at *2. Because Bollea, as the plaintiff in the Underlying Suit, is an indispensable party improperly omitted from the present declaratory judgment action, as in *Ranger,* and is likely not, as a Florida resident, subject to the personal jurisdiction of this Court, as in *Colony*, this declaratory action between insured and insurer must be dismissed.[7] *See, e.g.*, *id.*

### B. Cox Radio, Calta, and Loyd are required and indispensable parties and their absence further requires the dismissal of this declaratory action.

As putative insureds and as defendants in the Underlying Lawsuit, Cox Radio, Calta, and Loyd (collectively, the "Cox Radio Parties") are also required parties in

---

[7] Importantly, the Court is not required to consider whether Bollea could intervene in this declaratory action. *Am. Safety Cas. Ins. Co.*, 129 F. App'x at 542. Indeed, expecting Bollea to waive personal jurisdiction in order to protect his interests when another declaratory action is pending where Bollea is domiciled hardly seems equitable. Even if Bollea were not indispensable, which he is, courts "may even refuse declaratory relief for nonjoinder of interested parties who are not, technically speaking, indispensable." *Westchester Fire Ins. Co.*, 2009 WL 10689858, at *4 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 155 (1967), *abrogated on other grounds*).

a declaratory action regarding coverage related to the Underlying Lawsuit.[8] *See Owners Ins. Co. v. Bryant*, No. 305CV48CAR, 2006 WL 50488, at *8 (M.D. Ga. Jan. 9, 2006) (J. Royal) (citing *Range*r, 488 F.2d at 683) (holding insured's co-defendants in the underlying lawsuit are necessary parties in a coverage declaratory action for "the same reasons" the underlying plaintiff is a necessary party under Rule 19). Here, Cox Radio, Calta, and Loyd are not merely co-defendants in the Underlying Suit. They also could claim to be insureds entitled to coverage in their own right. Whether that is so hinges, at least in part, on whether their alleged wrongful conduct was within the scope of their employment and the scope of the Policy's media coverage. Litigating those issues, which may determine if these parties have any insurance coverage whatsoever, without joining them would be manifestly prejudicial, rendering them "required" parties under Rule 19(a)(1)(B) and "indispensable" under 19(b)(1).

The necessity of dismissing the instant declaratory action is further bolstered, under Rule 19(b)(4), by the obviously adequate remedy available to CEI in the face

---

[8] *See* Ex. C, Hiscox Policy at pp. 9, 17, 29; *see id.* at US TMT Multimedia Liability Policy Form § VIII p. 8 (defining "You" and "Your" as including "any existing subsidiary" and "any person who was, is or becomes a[n] . . . employee of . . . any existing subsidiary . . . but only in respect to claims arising out of the course and scope of their duties as such").

of such an order. If CEI has any claim for declaratory coverage relief (which it does

not, as argued above), it can obtain jurisdiction over Cox Radio, Calta, Loyd, and

Bollea in Florida, where all these individuals—and all other imaginably necessary

parties—have already subjected themselves to personal jurisdiction. The Court

should not strain to entertain this case, with its roster of jurisdictionally ineligible

but obviously interested absent parties, when an alternative forum is so readily

identifiable where complete and non-prejudicial relief can be afforded (without risk

of conflicting or inconsistent results). The Court should easily decide this suit could

have been brought in the Middle District of Florida, naming the proper parties as

plaintiffs and defendants, as a declaratory judgment action already is pending there.

**III.** **Alternatively, the Court should transfer this action to the Middle District of Florida, where a declaratory action is pending involving the identical coverage dispute with all required and indispensable parties.**

If the Court finds that outright dismissal is not warranted under Rule 12(b),

then it should transfer this entire action to the Middle District of Florida, pursuant to

section 28 U.S.C. § 1404(a), where this action could have been brought, as a

declaratory action including all necessary parties, including CEI, is already pending

there. The Court must consider the following factors in determining whether to

transfer venue:

> (1) the convenience of the witnesses; (2) the location of relevant documents and the relative ease of access to sources of proof; (3) the

convenience of the parties; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) a forum's familiarity with the governing law; (8) the weight accorded a plaintiff's choice of forum; and (9) trial efficiency and the interests of justice, based on the totality of the circumstances.

See, e.g., *Griffin Capital Co., LLC v. Essential Props. Realty Trust, Inc.*, No. 1:18-CV-4255-MHC, 2019 WL 5586547, at *2 (N.D. Ga. Jan. 18, 2019) (quoting *Manuel v. Convergys Corp.*, 430 F.3d 1132, 1135 n.1 (11th Cir. 2005) (citations omitted)). While the locus of some operative facts may favor Georgia, where the negotiations and issuance of the Policy allegedly took place, most of the pertinent facts pertaining to coverage occurred in Florida where the other parties and witnesses reside. And the other factors do not favor Georgia at all.

### A. The convenience of witnesses, location of relevant documents, and access to proof weigh in favor of transfer.

"The most important factor under [section] 1404(a) is the convenience of [key] witnesses[.]" *Griffin Capital Co.*, 2019 WL 5586547, at *4 (quoting *Collegiate Licensing Co. v. Am. Cas. Co. of Reading*, 842 F. Supp. 2d 1360, 1366 (N.D. Ga. 2012) (citation omitted)). "[K]ey witnesses are those which will have information regarding the liability of [d]efendant." *Id.* at *4 (quoting *Ramsey v. Fox News Network, LLC*, No. CIV. A. 1:03-CV-3976, 323 F. Supp. 2d 1352, 1357 (N.D. Ga. 2004) (citation omitted)). Three of the Complaint's four counts rest primarily on

whether coverage exists for the Underlying Lawsuit's claim. The threshold issues for determining coverage are whether the Cox Radio Parties were acting within the "course and scope of their [employment] duties" and whether the leaked Bollea Footage constitutes "covered media." *See e.g.*, Ex. C, Hiscox Policy at pp. 9, 17, 29. This determination will require the testimony of Cox Radio, its employees and their associates with knowledge of the underlying facts, including Tasha Nicole Carrega (Loyd's wife) and Lori Burbridge, both of whom are named defendants in the Underlying Lawsuit and alleged coconspirators who live in the greater Tampa Bay area. *See* Ex. A, Underlying Complaint at ¶¶ 11, 35, 36. Neither Loyd, Carrega nor Burbridge, at this time, are affiliated with Cox Radio or CEI.

Likewise, all the evidence relating to the threshold coverage determination upon which three of the four counts primarily rest is in Florida with the Cox Radio Parties (who are not party to this action), not in Georgia with CEI (who is not a party to the Underlying Lawsuit). The fourth count, the insurer bad faith claim, also favors Florida. It includes a determination of coverage as "there can be no recovery for bad faith when there is no coverage." *OneBeacon Am. Ins. Co. v. Catholic Diocese of Savannah*, 477 F. App'x 665, 673 (11th Cir. 2012). Any remaining witnesses regarding alleged bad faith likely are employees of CEI, Cox Radio, or Hiscox. Although these witnesses likely reside outside Florida, the weight accorded to

Hiscox or CEI, whose party witnesses likely are outside Florida, "is limited." *Griffin Capital Co.*, 2019 WL 5586547, at *4. Because key witnesses who are not parties to this action and the evidence are mainly in or near the Middle District of Florida, where the required and indispensable Cox Radio Parties are already named as defendants in Hiscox's declaratory action, these factors weigh in favor of transfer.

**B.     The availability of process to compel the attendance of unwilling witnesses weighs in favor of transfer.**

Calta and Loyd, upon information and belief, are not subject to personal jurisdiction in Georgia and cannot be compelled to testify in Georgia; nor are their coconspirators or other Cox Radio employees with knowledge of the Underlying Lawsuit. To the extent Cox Radio and CEI have witnesses based in Georgia who will testify as to the issuance and interpretation of the Policy, such testimony may be obtained in Florida, where both entities are parties to Hiscox's pending declaratory action. This factor weighs in favor of transfer.

**C.     The interests of justice and efficiency favor venue transfer.**

Among the factors the Court may consider in evaluating whether the interests of justice weigh in favor of transfer are "all other practical problems that make trial of a case easy, expeditious and inexpensive." *Plastican, Inc. v. Formel Indus., Inc.*, No. 12-00889, 2013 WL 12247039, at *4 (N.D. Ga. Feb. 19, 2013) (quoting *Ramsey*, 323 F. Supp. 2d at 1357). The Court should find that the interests of justice weigh in

favor of transfer to Florida, where Hiscox's declaratory action is pending and names as defendants all required and indispensable parties under Rule 19—Cox Radio, Calta, Loyd, and Bollea—as well as CEI. The interests of justice and judicial efficiency will not be served by severing and only transferring CEI's declaratory cause of action. Transfer to Florida reduces the risks of duplicative litigation and conflicting results because, upon transfer, it is likely this entire action and Hiscox's declaratory action can be consolidated. There simply is no reason this case must be litigated in Georgia, particularly when litigation arising from the same dispute and involving all of the indispensable parties is pending in Florida.

**D.  The other factors are either neutral or outweighed by the considerable importance of the factors discussed above.**

The convenience of the parties is neutral here. Neither Georgia nor Florida is convenient for Hiscox. Thus, a transfer to the Middle District of Florida would not merely shift inconvenience from the defendant to the plaintiff. CEI's choice of Georgia as the forum for this action—in which it failed to name indispensable parties—should not be treated with deference because CEI is not the proper insured entitled to seek coverage. "Courts do not give the parties' relative means great weight when, as is here, both parties are corporations," and thus this factor is also neutral. *Griffin Capital Co.*, 2019 WL 5586547, at *7.

# CONCLUSION

The Court should dismiss this action pursuant to Rules 12(b)(1) and 12(b)(6) because CEI is a distinct and separate entity from its alleged subsidiary, Cox Radio—and Cox Radio, not CEI, is the defendant in the Underlying Lawsuit seeking coverage. Further, CEI has failed to join both the putative insureds, the Cox Radio Parties, *and* Bollea, the Underlying Lawsuit tort claimant. These parties are required and indispensable under Rule 19, and the Court should dismiss this action pursuant to Rule 12(b)(7). Alternatively, the Court should exercise its discretion under 28 U.S.C. § 1404(a) by transferring this entire action to the Middle District of Florida, where an action with all of the necessary parties already joined is pending.

By: */s/ S. Gardner Culpepper*
S. Gardner Culpepper
(GA Bar No. 201210)
**ROGERS & HARDIN LLP**
2700 International Tower, Peachtree Center
229 Peachtree Street, N.E.
Atlanta, GA 30303-1601
404.522.4700 (telephone)
404.525.2224 (facsimile)
sculpepper@rh-law.com

Judy Y. Barrasso (LA Bar No. 2814)
(*pro hac vice pending*)
Andrea M. Price (LA Bar No. 30160)
(*pro hac vice pending*)
Robert J. Dressel (LA Bar No. 35757)
(*pro hac vice pending*)
**BARRASSO USDIN KUPPERMAN FREEMAN & SARVER, L.L.C.**
909 Poydras Street, Suite 2350
New Orleans, Louisiana 70112
Telephone: (504) 589-9700
jbarrasso@barrassousdin.com
aprice@barrassousdin.com
rdressel@barrassousdin.com

*Attorneys for Defendant Hiscox Insurance Company*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(D), the undersigned counsel hereby certifies that

the foregoing **MEMORANDUM IN SUPPORT OF RULE 12(b) MOTIONS**

**TO DISMISS OR, ALTERNATIVELY, MOTION TO TRANSFER VENUE**

has been prepared in accordance with Local Rule 5.1(C) using 14-point Times

New Roman font.

By: */s/ S. Gardner Culpepper*
S. Gardner Culpepper
(Ga. Bar No. 201210)
**ROGERS & HARDIN LLP**
2700 International Tower,
Peachtree Center
229 Peachtree Street, N.E.
Atlanta, GA 30303-1601
404.522.4700 (telephone)
404.525.2224 (facsimile)
aculpepper@rh-law.com

Judy Y. Barrasso (LA Bar No. 2814)
(*pro hac vice pending*)
Robert J. Dressel (LA Bar No. 35757)
(*pro hac vice pending*)
**BARRASSO USDIN KUPPERMAN**
  **FREEMAN & SARVER, L.L.C.**
909 Poydras Street, Suite 2350
New Orleans, Louisiana 70112
Telephone: (504) 589-9700
jbarrasso@barrassousdin.com
rdressel@barrassousdin.com

*Attorneys for Defendant Hiscox*
*Insurance Company*

# EXHIBIT A

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, FLORIDA

TERRY GENE BOLLEA professionally known
as HULK HOGAN,

      Plaintiff,

vs.

DON BUCHWALD & ASSOCIATES, INC.;
TONY BURTON; MICHAEL CALTA a/k/a
"Cowhead"; MATTHEW CHRISTIAN LOYD
a/k/a "Matt Loyd" aka "Spice Boy"; KEITH M.
DAVIDSON; KEITH M. DAVIDSON &
ASSOCIATES, P.L.C.; COX RADIO, INC.,
TASHA NICOLE CARREGA; and LORI
BURBRIDGE,

      Defendants.

Case No.: 16-002861-CI

_____/

## SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Terry Gene Bollea, professionally known as "Hulk Hogan" ("Plaintiff" or "Bollea"), sues Defendants, Don Buchwald & Associates, Inc. ("DBA"), Tony Burton ("Burton"), Michael Calta (a/k/a "Cowhead") ("Calta"), Matthew Christian Loyd (a/k/a "Matt Loyd" aka "Spice Boy") ("Loyd"), Cox Radio, Inc. ("Cox Radio"), Keith M. Davidson ("Davidson"), Keith M. Davidson & Associates, P.L.C. ("KMDA"), Tasha Nicole Carrega ("Carrega"), and Lori Burbridge ("Burbridge"), (together collectively, "Defendants"), and alleges as follows:

## NATURE OF THIS ACTION

1.    Bollea is a 65-year-old former professional wrestler who through his talent and decades of personal sacrifice and hard work achieved mainstream popularity as the character "Hulk Hogan."

```
EXHIBIT

A
```

Hiscox Motion to Dismiss or Transfer Exhibit A

2.     Bollea played a central role in making professional wrestling the world-wide phenomenon it is today.  He earned his iconic status in the entertainment industry by wrestling and entertaining fans around the globe for decades.

3.     In the later part of his career, Bollea was fortunate enough to have been enshrined in the World Wrestling Entertainment ("WWE") Hall of Fame, secured a lucrative contract working with the WWE, and had several profitable projects as a professional spokesperson, television personality, and product endorser.

4.     No longer able to wrestle, Bollea depended upon his WWE contract and endorsement deals to make a living.

5.     Bollea's livelihood depended upon his public image.

6.     In 2012, everything Bollea worked so hard to achieve slowly started being ripped away from him when, because of his celebrity status and then-friendship with Bubba "The Love Sponge" Clem ("Bubba"), the Defendants engaged in an ongoing scheme to injure and harm Bollea and use him as a pawn—an unwitting, innocent bystander—in a personal and professional vendetta between and amongst the Defendants and Bubba, which culminated in the July 2015 destruction of Bollea's career.

7.     In hopes of exacting revenge against Bubba, furthering their own careers, and profiting off of Bollea's iconic status and legacy, the Defendants repeatedly victimized Bollea by obtaining, using, disclosing, disseminating, and exploiting surreptitiously recorded and illegally obtained video footage of Bollea naked, engaged in sexual activity, and having private conversations in a private bedroom (the "Footage").

8. Defendants knew Bubba secretly recorded this Footage of Bollea without Bollea's knowledge or consent; yet, they each played a role in the conspiracy to use, publicly disseminate, disclose, and exploit the contents of this illegal Footage.

9. Defendants' actions violated Bollea's privacy rights and Florida's Security of Communications Act and ultimately destroyed Bollea's career, legacy, lifelong work and income streams.

10. Defendants, most of whom are veterans to and/or insiders in the entertainment industry, worked in concert with, aided, abetted, and/or conspired with one another to obtain and leak the secretly recorded Footage of Bollea to various tabloids.

11. In March-April 2012, Defendants, Loyd, Calta, Cox Radio, Burton, Carrega, and Burbridge worked in concert and conspired to leak and sell information about and excerpts from the Footage to *TMZ* and *TheDirty.com*.

12. In September-October 2012, these same Defendants worked in concert and conspired to "anonymously" send a DVD containing some of the Footage to A.J. Daulerio, then-editor of *Gawker.com*—a website notorious for posting salacious images of celebrities online in order to destroy their careers—while intending and knowing that Daulerio would post the Footage online.

13. Indeed, *Gawker* posted a "highlight reel" of some of the Footage—which enabled over seven million people to watch Bollea naked and having sex (the "*Gawker.com* Posting").

14. Defendants used the *Gawker.com* Posting as a spring-board to try to extort Bollea with more of the illegally recorded Footage. Acting on behalf of the conspiracy, Davidson demanded money from Bollea in exchange for three DVDs, one of which Defendants knew and

stated contained recordings in which Bollea could be heard making racially insensitive comments.

15.     Refusing to allow himself to be victimized, Bollea filed lawsuits over the *Gawker.com* Posting and enlisted the help of the FBI to try to stop the extortion.  The FBI opened an investigation that culminated in a sting operation in December 2012, at which three DVDs containing Footage were seized.

16.     Finally, in July 2015, while Bollea was in the midst of the litigation over the *Gawker.com* Posting, Calta and Cox Radio were embroiled in a vicious ratings war with Bubba, and Loyd was being criminally investigated for his role in obtaining and using video recordings (including the Footage of Bollea) stolen from Bubba, the Defendants' conspiracy caused racially insensitive comments from the illegal Footage of Bollea to be leaked to *The Enquirer* and *Radar Online*.   The aftermath was immediate and devastating:   all of Bollea's contracts were terminated, he was erased from the WWE Hall of Fame and website, he was branded as a racist in the media, and all of his work opportunities dried up.

17.     In March 2016, Bollea partially was vindicated when a Pinellas County Jury rendered a $140.1 million verdict against Gawker Media, LLC, Nick Denton and A.J. Daulerio for the *Gawker.com* Posting.  Following bankruptcy proceedings, Bollea agreed to resolve his judgment against Gawker, Denton and Daulerio for $31 million.

18.     Bollea filed this lawsuit to hold the remaining offenders liable for their roles in the use, public disclosure and dissemination, and exploitation of the illegally recorded Footage, and to recover the balance of the damages Defendants caused, such as the economic damages Bollea suffered to his career, reputation, legacy and earning ability.

19.     Bollea seeks redress for the damages and injuries caused by the Defendants' use, disclosure, exploitation, and public dissemination of the contents of the illegally recorded Footage, including the willful and malicious conspiracy to extort Bollea, invade his privacy, profit from his name and likeness and the contents of the illegally recorded Footage, and to destroy Bollea economically and emotionally.

20.     The Defendants' nefarious roles in the attacks against Bollea are undeniable—and in most cases already confirmed through law enforcement investigations, prior discovery, and phone records.

21.     Unfortunately, the United States Government and the State of Florida declined to prosecute anyone involved in the improper use and disclosure of the contents of the illegal Footage of Bollea.

22.     Consequently, Bollea brought this action to ensure that those who used, exploited, disclosed and disseminated the contents of the Footage are brought to justice.

## **JURISDICTION**

23.     This Court has subject matter jurisdiction because Plaintiff seeks relief in an amount greater than $15,000, exclusive of interest, attorneys' fees and costs.

24.     As more specifically set forth below, this Court has personal jurisdiction over Defendants under § 48.193, Florida Statutes, because they each personally, in concert with one another and/or through an agent or co-conspirator, engaged in one or more of the following acts:

  a.     committing tortious acts within the State of Florida;

  b.     committing intentional torts expressly aimed at Bollea, the effects of which were suffered in Pinellas County, Florida;

  c.     operating, conducting, engaging in, or carrying on a business or business venture within the State of Florida, or having an office in this State;

d.      engaging in substantial and not isolated activity within the State of Florida; and/or

e.      engaging in a conspiracy to commit tortious acts against Bollea within the State of Florida and/or engaging in overt acts in furtherance of that conspiracy within the State of Florida.

25.     As more specifically set forth below, sufficient minimum contacts exist between each Defendant and the State of Florida to satisfy the Due Process under the U.S. Constitution because Defendants have engaged in substantial and not isolated activity within and/or directed at the State of Florida, reside or maintain offices in the State of Florida, and/or committed or conspired to commit intentional torts expressly aimed at Bollea, the effects and harms of which were calculated to and did cause injury to Bollea, within the State of Florida; such that Defendants should have reasonably anticipated being sued by Bollea in the State of Florida.

26.     Venue is proper in this Court pursuant to section 47.011, Florida Statutes because, among other things, the claims at issue accrued within Pinellas County, Florida.

## **PARTIES**

27.     Bollea is a resident and citizen of the State of Florida, and resident of Pinellas County.

28.     At all relevant times, Defendant, DBA, was and is a corporation organized and operating under the laws of the State of New York, with its principal place of business in the City of New York, County of New York, State of New York.  DBA is a talent agency that represents clients in, among other areas, the radio broadcasting industry; including clients within the State of Florida.

29.     At all relevant times, Defendant, Burton, was and is a citizen, resident and domiciliary of the State of New York, and was and is a talent agent acting within the course and

scope of his employment by DBA. Burton's clients have included, and currently include, among others, Tampa radio personality, Defendant, Calta.

30.     At all relevant times, Defendant, Calta, was and is a citizen, resident and domiciliary of Pasco County, Florida. Calta was and is a radio personality in the Tampa Bay area who hosts a radio show on "The Bone" 102.5 FM. At all relevant times, Calta was acting within the course and scope of his employment by Defendant, Cox Radio, Inc.

31.     At all relevant times, Defendant, Loyd, was and is a citizen, resident and domiciliary of Hillsborough County, Florida. At certain times relevant hereto, Loyd was a radio personality in the Tampa Bay area and was acting within the course and scope of his employment by Defendant, Cox Radio.

32.     At all relevant times, Defendant, Cox Radio, was and is a corporation organized and operating under the laws of the State of Delaware, registered to do business in the State of Florida, with its principal place of business in the City of Atlanta, State of Georgia. At all material times, Cox Radio owned and operated several terrestrial radio stations broadcasting in the Tampa Bay area, including "The Bone" 102.5 FM, which operates in and from offices located in Pinellas County, Florida.

33.     At all relevant times, Defendant, Davidson, was and is a citizen, resident and domiciliary of the State of California, and a resident of Los Angeles County, California. Davidson is an attorney at law, licensed to practice in the State of California, with a record of discipline by the State Bar of California. Davidson was retained to assist and facilitate in the extortion of Bollea using the illegally obtained surreptitious video Footage within Pinellas County, Florida.

34.     At all relevant times, Defendant, KMDA, was and is a professional corporation organized and existing under the laws of the State of California, with its principal place of business in the State of California, County of Los Angeles.  At all relevant times, Davidson was acting within the course and scope of his employment by KMDA.

35.     At all relevant times, Defendant, Carrega, was the wife of Defendant, Loyd, and a citizen, resident and domiciliary of Hillsborough County, Florida.

36.     At all relevant times, Defendant, Burbridge, was a close friend of Carrega and a citizen, resident and domiciliary of Pasco County, Florida.

37.     At all relevant times, the Defendants were the agents, licensees, employees, partners, joint-venturers, co-conspirators, masters, and/or employers of one another, and each of them are, and at all material times herein mentioned were, acting within the course and scope of that agency, license, partnership, employment, conspiracy, ownership, or joint venture.  At all relevant times, the acts, failures to act, and misconduct herein alleged of each Defendant were known to, authorized, approved, and/or ratified by the other said Defendants, and each of them, and/or such acts, omissions, and misconduct were engaged in by the Defendants in concert or active participation with one another or in order to aid or abet one another.

38.     The actions, failures to act, and misconduct herein alleged of each Defendant produced and/or contributed substantially to producing the damages, injuries and harms Bollea seeks to recover through this action.

## OPERATIVE FACTS
### Tampa's Shock Jock Culture

39.     The sordid history between and amongst Bubba, Calta, Loyd, Cox Radio, and Burton includes a significant amount of personal and professional animosity, misconduct, and unlawful activity that provides the backdrop for the victimization of Bollea.

40.     Loyd, Calta, and Bubba have a troubled and well-known past as "shock jocks" in the radio broadcasting industry, dating back to the late 1990s.  At various times, Calta and Loyd worked on Bubba's radio shows; and at various times, Bubba had falling outs with each of them, which led to deep-seeded resentment, hostility, and the desire for revenge.

41.     Calta and Loyd began working for Clear Channel Communications ("Clear Channel") on Bubba's radio show in Tampa in 1996-97.  By 2000, Calta and Loyd were working on Bubba's morning show on Tampa radio station WXTB-FM "98 Rock."

42.     However, Bubba had a falling out with and fired Calta when Calta was expecting his first child.  Calta has since publicly expressed his antipathy toward of Bubba over this betrayal.

43.     In 2001, Bubba gained notoriety after he was arrested and charged with animal cruelty following a live segment during which a wild hog was slaughtered as sound effects were played to give the impression the hog was being harassed or abused.

44.     In early 2004, Clear Channel fired Bubba after the FCC levied a well-publicized $755,000 fine against Clear Channel for Bubba's radio segments that included graphic discussions about sex and drugs that were "designed to pander to, titillate and shock listeners." Bubba then began hosting his show on satellite radio.

45.     Eventually, Clear Channel hired Calta as Bubba's replacement.  Calta hosted "The Cowhead Show" on the 98 Rock morning drive (with co-host, Loyd).  This was Calta's first big break in the radio industry.

46.     However, just a few months after being hired, Calta and Loyd were fired over indecent comments made on their show.  Calta blamed their firing on a "competitor" who edited

Calta's bits to contain expletives and sent them to the station's advertisers. Calta's suspicions that Bubba was responsible are well-known.

47.    In July 2006, Cox Radio hired Calta to host the morning drive on 102.5 FM "The Bone."

48.    In October 2006, Bubba faced more trouble when he was sued by a pornographic actress who alleged that while appearing on a radio program together with another actress she was penetrated with an oversized sex toy against her will at Bubba's demand.

49.    In January 2008, despite actual knowledge of Bubba's checkered past in the radio industry and the animosity between Bubba and Calta, Cox Radio hired Bubba to take over the morning drive on 102.5 FN.  Bubba brought Loyd (as "Spiceboy") back into the fold on his show, while Calta was relegated to the afternoon time slot on 102.5 FM.

50.    

51.    Radio morning drive time slots are coveted because they are when the number of listeners is at its peak and when commercial radio can get paid the most for advertising.  Radio hosts and their agents, such as Burton, covet these morning slots because they can lead to syndication, which greatly increases the money the radio host, his agent, and his station can make.

52.     Burton started representing Calta while he was working for Cox Radio.  Burton and DBA are well-known for representing nationally recognized shock-jock Howard Stern, who at one time had a working relationship with Bubba on satellite radio.

53.     ████████████████████████████████████████████████

████████████████████████████████     ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████

54.     When Cox Radio hired Bubba, Loyd and Calta, they all were well known in the radio industry and Tampa Bay community for their "shock-jock" roles and propensities for misconduct.  Cox Radio knew about the various controversies each of the men were involved in over their careers, and their tendencies to test and cross-over the boundaries of decency, obscenity, and legality.

55.     In fact, this is the reason broadcasters such as Cox Radio hire shock jocks such as Bubba, Calta, and Loyd.  Cox Radio's motivation to boost ratings and revenues trumped the obvious risks of employing Bubba, Calta, and Loyd.  Cox Radio even encouraged, participated in, and approved of their outrageous behavior in order to win ratings wars.

56.     From 2008 through 2015, Cox Radio and Burton knew about the significant and escalating hostility between Bubba, Calta, and Loyd, and knew Bubba, Calta, and Loyd had a propensity for harming other people.

57.     ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████     ████████████████

██████████████████████████████████████████

██████████████████████    ████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████

58.     Although in 2011 Bubba, Calta and Loyd were all working together for Cox Radio at 102.5 The Bone, the personal and professional animosity amongst them was boiling over.  Bubba is notorious for treating the people worked on his show poorly (*i.e.,* Calta's 2000 firing) and for being vindictive against former associates (*i.e.,* Calta and Loyd's 2006 firing after replacing Bubba), and Calta was bitter over being demoted upon Bubba's arrival at 102.5.  Calta and Loyd also aspired to further their own careers and to get out from under Bubba's shadow, a goal which Bubba did not share with them.  Stated simply, Calta and Loyd shared a bitter enemy in Bubba.

59.     Burton maintained continuous and systematic contacts with Florida over the course of several years, was substantially involved in managing Calta's Florida career, and communicated with Calta with extreme frequency in Florida.  Between 2011 and 2015, Burton had thousands of phone calls with Calta in Florida, including calls about Calta's career and Florida radio show, Calta's professional decisions, and the content of Calta's show broadcasted in Florida.  Burton also had frequent calls with Cox Radio executives in Florida about Calta, his career, his show, and his professional obligations.  Burton also negotiated the terms of Calta's contracts with Cox Radio for payments and Calta's services to be provided in Florida, through which Burton benefitted financially.

60.     Burton also was directly involved in the infighting that persisted between Calta and Bubba from 2011-2015.   Burton had numerous phone calls with Calta, Cox Radio executives, and others in Florida about that infighting.

61.     In 2011, as the infighting between Bubba and Calta got worse, Cox Radio intervened and exercised its control over both Calta and Bubba. ████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████ Burton was personally involved in and had numerous calls with Calta and Cox Radio executives in Florida about this situation.

62.     ████████████████████████████████████████████████████████████

████████████████████████████████████████████ ██████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████ ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████ ██████████████████████████

████████████████████████████████████████████████ ████████████████

████████████████████████████████

63.     In late 2011, Bubba and his then-wife, Heather Clem (a/k/a "Heather Cole") ("Cole") were going through a nasty divorce.   During this time, their relationship was

contentious and the existence of several homemade DVDs depicting consensual sexual activity between Cole and other people (the "Cole DVDs") was of primary concern to Bubba because of the impact it could have on his career and reputation. As a result, Bubba moved the Cole DVDs from his home to his studio office. Upon information and belief, Loyd, Calta, and other Cox Radio employees and agents were aware of this situation and Bubba's concerns.

64. In or about December 2011 through January 2012, Bubba and his staff (including Loyd) moved Bubba's equipment and property to a new radio studio. Bubba moved the Cole DVDs to an upstairs office/storage area designated for his own personal items. At that time, Loyd was still working for Bubba's show on 102.5 The Bone and had access to the Cole DVDs.

65. It was during this time that, according to a law enforcement investigation, Loyd stole the Cole DVDs from Bubba's office/storage area; after which copies of DVDs containing Footage of Bollea began circulating amongst Cox Radio employees and agents. Cox Radio's employees, agents, and supervisors were aware of the existence of these DVDs and their circulation and knew materials such as these inevitably would be publicly disclosed by its shock jock agents and employees with a propensity for harming others and grudges against Bubba. However, Cox Radio failed to take any reasonable steps to stop that from happening.

66. ███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
█████

67. ████████████████████████████████████
████████████████████████████████████████████



68.     On the heels of Bubba's 2012 agreement with Cox Radio, Calta still coveted Bubba's morning drive slot on 102.5 The Bone and ████████████████████████ ████████████████ At the same time, Loyd was lobbying Cox Radio executives to host his own show on The Bone and started to implement the plan to use and exploit the Footage stolen from Bubba.

69.     In March 2012, Loyd, Calta, and Burton, as well as other non-parties such as Richard Peirce ("Peirce") and Broderick Epps ("Epps"), began discussing the Footage and its dissemination to the media.

70.     Between March 1, 2012 and April 29, 2012 (as more specifically alleged below), the conspiracy between Calta, Loyd, Carrega, Burbridge, Burton, DBA and Cox Radio took root and its principals carried out overt acts in furtherance of the conspiracy in Florida, including leaking Footage to *TMZ* and *thedirty.com*. During that time, there were numerous phone calls and conversations between and amongst Calta, Loyd, Cox Radio executives, agents, and employees, Burton, Peirce, Epps, *TMZ*, Mike Walters, Anthony Kotzev, *thedirty.com*, Steve

Hirsch, Burbridge, Carrega, Gina Rodriguez, and others emanating from or directed into Florida for purposes of carrying out the conspiracy.

71.    On April 19, 2012 (the day *thedirty.com* first published still images from the Footage), Loyd quit Bubba's show and was given his own radio program on 102.5.

72.    

73.    As animosity toward Bubba grew, Calta, Loyd, Burton, and other Cox Radio executives, agents and employees knew Bubba's friendship with Bollea was a soft-spot, the secretly recorded Footage of Bollea could be exploited to exert pressure on and instill fear in Bubba, and exposing the secretly recorded Footage could destroy Bubba and Bollea's friendship, get Bubba fired and/or possibly result in criminal charges against Bubba.

74.    By the fall of 2012, Calta was expecting his second child and facing yet another significant controversy of his own after Calta's show posted on its website a photo of a developmentally disabled child holding a doctored sign changed to read "RETARDED NEWS." That stunt eventually led to a multi-million dollar lawsuit against Cox and significant public backlash.  Burton was involved in managing Calta through that situation.

75.    As Calta's and Cox Radio's 2012 "RETARTED NEWS" scandal was unfolding, surreptitious Footage of Bollea again surfaced.  This time, in September 2012, Calta and Burton,

who had been and still was acting in his capacity as Calta's agent and an employee of DBA, worked in concert with each other and others to deliver a 30 minute "Hogan Sex Tape" to A.J. Daulerio and *Gawker.com*.

76. Shortly after that Footage was leaked to Gawker, Bubba started receiving anonymous messages about other DVDs featuring Cole, including photos of DVDs and threats about releasing them.

77. Following the *Gawker.com* Posting, Cox Radio knew Bubba suspected Loyd was involved in leaking Footage of Bollea to the media. In fact, Cox Radio is believed to have initiated an investigation into the leaks of Footage during this time period. However, Cox Radio did not take any steps to warn Bollea, stop Footage from being disseminated, or implement any measures to prevent future leaks despite its ability to do so.

78. In late 2012, as the animosity and hostility between Calta, Loyd, and Bubba continued to grow, the conspiracy to exploit Footage of Bollea moved to its next phase – the attempted extortion of Bollea.

79. After the FBI foiled the extortion plot in December 2012, the infighting between Calta, Loyd, and Bubba continued to escalate, and Bubba started pressuring Cox Radio to fire Loyd.

80. ██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████

81. In mid-August 2013, Cox Radio supervisory personnel met with Loyd about Bubba's claim Loyd was responsible for selling Footage and Loyd's concerns about Bubba

trying to get Loyd fired.  On August 20, 2013, Calta sent Burton an e-mail indicating Cox was contemplating letting Bubba go.

82.    On August 26, 2013, Cox fired Loyd.  Shortly after his departure, Loyd tweeted, "Revenge is the best revenge… right Bubba?  Just checking…"

83.    After Loyd's termination, the hostility between Calta and Bubba got worse.  In late 2013-early 2014, Cox Radio executives and Burton frequently were called on to intervene in on-air and social media attacks between Calta and Bubba.

84.    ███████████████████████████████████████████████
████████████████████████████████████████████████████
█████████████████████████████████████████

85.    ███████████████████████████████████████████████
██████████████████████████████████████████  █████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████  ████████████
███████████████████████████

86.    ███████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████  ██████████████████████
████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████

87.     In August 2014, Cox Radio declined to renew Bubba's 2012 agreement, which opened the door for Calta to host the 102.5 The Bone morning drive.

88.     Bubba's contract with Cox Radio ended December 31, 2014.

89.     As Bubba geared up to return to the Tampa airwaves to compete with Calta and Cox Radio in early 2015, Cox Radio executives started planning to deal with Bubba upon his return.

90.     In January 2015, Bubba returned to the morning drive on Tampa radio on Beasley radio station 98.7 FM.  The station ran a non-stop loop of Bubba's show 24/7 while it developed its permanent format.

91.     In February 2015, 98.7 FM launched its full format as the Bubba Radio Network and announced plans to change the station's call letters to WBRN.

92.     By March 2015, Bubba's new radio network was up and running at full speed and Bubba was in the midst of a vicious all-out assault against Cox Radio, Calta, and several Cox Radio executives.

93.     Bubba vowed to "Bury the Bone" and attacked Calta, Loyd, Lawless, and other Cox Radio executives on and off air in derogatory and humiliating ways.  Bubba even went so far as to attack Calta's family on social media and circled Cox Radio's building with his followers in cars, honking horns, and making obscene gestures.

94.     In April 2015, Bubba began overtaking Calta in the ratings war.

95. ████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

96.    During April-June 2015, Bubba surpassed Calta in the ratings.

97.    According to Bubba, "Cox's management team in the Tampa Market was extremely disappointed that [102.5] could not maintain the ratings success it had when [Bubba] was host of its morning drive show.  In an effort to reclaim [102.5's] No. 1 status in the Tampa Market, Cox, acting through its agents, sought ways to eliminate [Bubba] as a competition in the Tampa Market."

98.    As the "warfare" between Cox Radio/Calta and Bubba was playing out and Bubba's vicious attacks against Calta and Cox Radio executives continued, Calta and Burton were in frequent and constant communication about the events that were unfolding.

99.    During that same time, TPD's criminal investigation of Loyd was coming to a head, including interviews of Cole, Carrega and Patrick Fowler.  In late April 2015, TPD tried to interview Calta, which he refused to do.

100.    In May-June 2015, phone calls between Calta and Loyd, Calta and Cox Radio executives, and Calta and Burton in Florida about the situation with Bubba, ways to get revenge, Footage, and TPD's related criminal investigation increased in frequency and duration.

101. ████████████████████████████████████████

███████████████████████████████████████    █████████████

███████████████████████████████████

102.     On June 26, 2015, Loyd called Nielsen and Arbitron several times, and continued those calls over the ensuing days.  Loyd also had calls with Beasley Media, which operated the station where Bubba was broadcasting at the time.

103.     ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

104.     Bubba eventually was fired from 98.7 FM after Cox Radio's allegations of tampering with ratings.   Nielsen sued Bubba in Tampa Federal Court.   Bubba filed a Counterclaim against Nielsen in that lawsuit, which included allegations of a mid-2015 conspiracy involving Cox Radio and Calta, the goal of which was to eliminate Bubba as competition.

105.     As Calta, Loyd, Burton, and Cox Radio were conspiring in the ongoing war against Bubba, more illegal Footage of Bollea surfaced.  This time, in July 2015, when the animosity between Calta, Loyd, Cox Radio, and Bubba was at its peak and TPD's criminal investigation over Footage was coming to an end, the most damaging, racially insensitive portions of the illegally recorded Footage were leaked to *The Enquirer*.

### The Victimization of Bollea

106.     In the summer of 2007, Bollea was at a particularly low point in his life, dealing with several personal tragedies, and feeling the physical effects of decades of work inside the ring.  His wrestling career was nearing its end, and his first wife, Linda, left him and was moving to California after 24 years of marriage.

107.     Bollea had a very hard time dealing with the failure of his marriage and allowed himself to be manipulated by his then-best friend, Bubba, who convinced Bollea (after years of

pressure) to have sex with Cole. Bubba and Cole had an open marriage and had been pressuring Bollea to have sex with Cole for years.

108. Unbeknownst to Bollea, Bubba installed a hidden camera in his bedroom was disguised as a motion detector and hidden above some cabinets. Bubba secretly recorded Bollea naked and engaged in sexual activity with Cole, as well as Bollea's private conversations with Bubba and Cole before and after these encounters (the "Footage").

109. Bollea understood, believed and expected that his activities and conversations were private and would not be viewed, heard by other persons or recorded. Had Bollea known that his private activities and conversations were being recorded, he never would have engaged in any such activities or conversations.

110. Nearly *five years later*, on March 7, 2012, the tabloid website *TMZ.com* first reported on the possibility of a "Hulk Hogan Sex Tape." At that time, Bollea and his attorney, David Houston ("Houston"), gave an interview to *TMZ* and publicly stated that Bollea never consented to being taped having sex and would prosecute anyone who distributed such a tape. All Defendants were aware of Bollea's statements.

A.     **The *TMZ* Leak**

111. As set forth above, in March 2012, Bubba, Calta, and Loyd all worked for Cox Radio at 102.5 The Bone. Cox Radio knew about ongoing infighting between them and exercised direction and control over Bubba, Calta, and Loyd's on-air and off-air conduct. Loyd was pushing Cox Radio executives for his own show. Calta wanted his morning drive time slot back from Bubba, and he and Burton ████████████████████████████

████████████████████████████████.

112.     In the days leading up to the March 7, 2012, *TMZ* leak, Calta spoke on the phone in Florida with Burton several times and called and texted Richard Peirce ("Peirce"), who worked for Bubba until 2010, was identified by Loyd as possibly possessing Footage, and would later send Calta a detailed summary of Bollea Footage.  During the same time, Loyd had several calls with Broderick Epps ("Epps"), who was working on Bubba's show and identified by Loyd as possibly possessing Footage.  Loyd also had calls with Steve Hirsch ("Hirsch"), founder of Vivid Entertainment, an adult film and entertainment company that expressed interest in Bollea Footage once its existence was revealed.  Loyd also spoke with his friend, lawyer Morgan Barfield ("Barfield").  All of these calls related to the conspiracy and Footage.

113.     The day of the *TMZ* leak, Loyd spoke with *TMZ*'s Mike Walters ("Walters") four times and Barfield twice.  That same day, Loyd also spoke to Epps, and Calta had more calls in Florida with Burton and Peirce.  All of these calls related to the conspiracy and Footage.

114.     The next day, March 8, 2012, *TMZ* reported on a letter from Hirsch to Bollea expressing an interest in the Bollea sex tape and revealing Hirsch was shown "teaser images." That same day, Loyd spoke with Hirsch, and Calta had calls in Florida with Burton and texts with Peirce, all of which related to the conspiracy and Footage.

115.     Loyd provided *TMZ* access to still shots of Footage and a short video clip.  As *TMZ*'s reporting was unfolding, Loyd and Calta were communicating with Cox Radio Director of Programming Mike Oliviero ("Oliviero") and Cox Radio Program Director Mike Sharkey ("Shark") about the *TMZ* leaks.  Loyd also had extended calls with Barfield about the same.

116.     FBI and TPD investigations later confirmed that Loyd admitted to leaking information about the "Hogan Sex Tape" to *TMZ* in early March 2012.

117.     Calta continued texting Peirce over the ensuing days, and on March 12, 2012, Peirce e-mailed Calta a "DVD Details" summary of Footage of Bollea.  Calta immediately called Burton, and later that day Calta and Burton spoke several times about the conspiracy and Footage.  That day, Calta also spoke on the phone with Peirce several times, and Loyd spoke again with Hirsch.

118.     On March 13, 2012, Calta forwarded Burton the March 12, 2012 e-mail from Peirce with the attached "DVD Details" summary.  The "DVD Details" attachment to this e-mail included an overview of two DVDs containing illegally recorded Footage of Bollea.  According to Burton, Calta was considering talking about the DVDs on air.  Burton and Calta spoke three times on March 13, 2012 about Footage, and Calta also called Lawless and texted and called Peirce.   Loyd had two calls with Barfield, two calls with Oliviero, and a call with Walters.  All of these calls were related to the conspiracy and Footage.

119.     At that time, Calta, Burton, Loyd and Cox Radio knew Bollea was secretly recorded and the Footage described in the "DVD Details" summary could be devastating to Bollea's career if publicly disclosed.

120.     However, none of them took any steps to notify Bollea or Houston about the Footage.

**B.**     ***Thedirty.com Leak***

121.     Between March 13, 2012 and April 19, 2012, numerous phone calls and texts about the conspiracy and Footage continued between Burton and Calta, Calta and Peirce, Loyd and Epps, Loyd and Hirsch, Loyd and Barfield, and Cox Radio and Loyd and Calta.

122.     Then, on March 23, 2012, Loyd spoke with Gina Rodriguez ("Rodriguez"), a former adult film star turned talent agent who managed Stormy Daniels (for whom Defendant

Davidson negotiated an agreement with President Trump) about Footage. At the time, Rodriguez was dating Anthony Kotzev ("Kotzev"), who worked at *thedirty.com*.

123. Rodriguez is known to work with tabloids and sell stories to *TMZ* and the *Enquirer* and *Radar Online*, and to be a referral source to Davidson. *See* "'A LITTLE EXTORTION-Y'… This Guy Figured Out What Stormy Daniels' Old Lawyer ACTUALLY DOES – And It's Not Pretty!" *Huffington Post*, May 11, 2018 (https://www.huffingtonpost.com/entry/keith-davidson-stormy-daniels-hollywood_us_5ad7bbdae4b03c426daaf5ed).

124. On March 31, 2012 and April 7, 2012, Loyd and Burbridge spoke on the phone about the Footage and Burbridge's role in the conspiracy.

125. On April 11, 2012, Burton and Calta spoke three times, and Loyd called Carl Harris, a person Loyd identified as possibly possessing Footage. The following day, Loyd again spoke with Barfield, Hirsch twice, and Bruce Hammil, who produced "Bubba Raw" videos, was the owner of *voyeurdorm.com* and other adult content websites, and was identified by Calta and Loyd as someone who may have possessed Footage.

126. Over the ensuing days, Loyd had several more calls with Rodriguez, Kotzev, Epps, Lawless, Oliviero, Jason Meder (a Cox Radio GM in Orlando), and Patrick Fowler. During that same time, Calta had several calls with Peirce, Brennan and Burton, all of which related to the conspiracy and Footage. On April 15, Loyd also had a 23-minute call with Russ Bruno, who ran businesses that provided adult content over the Internet, presumably to assist in granting access to Footage online.

127. On April 17, 2012, Loyd had three calls with Rodriguez and three calls with Fowler. The Bone also called Loyd during Calta's afternoon drive time.

128. The following day, Calta again texted Peirce and had a call with Burton, and Loyd had a call with Fowler and three calls with Oliviero.

129.     On April 19, 2012, the website *TheDirty.com* published screen shots from the "Hulk Hogan Sex Tape." FBI and TPD investigations later confirmed that Loyd admitted to leaking these screen shots to *TheDirty.com*.

130.     *That same day*, Cox Radio promoted Loyd and announced that Loyd now would be hosting his own show on 102.5 The Bone.

131.     Also on April 19, 2012, Calta and Burton spoke twice for 35 minutes, Calta exchanged texts with Peirce, and Loyd had another call with Rodriguez, all of which related to the conspiracy and Footage.

132.     Once screen shots from the Footage surfaced on *TheDirty.com* and Loyd quit Bubba's show and was promoted by Cox Radio, the illegally recorded Footage and its source was a topic of discussion with Cox Radio; and Cox Radio's agents, employees, and supervisory personnel knew about, openly discussed and/or viewed Bollea Footage that had been stolen from Bubba's studio and circulated at Cox Radio's facilities.

133.     However, Calta, Loyd, Burton, Cox Radio, and DBA failed to take any steps to notify or warn Bollea or Houston about the Footage or to prevent the Footage from being disseminated, used and/or exploited.

134.     Cox, Calta, Loyd, Burton, Cox Radio, and DBA also failed to take any steps to prevent any further disclosure, dissemination or use of the Footage despite their ability to do so.

135.     In the days immediately after *thedirty.com* leak, Loyd and Calta's calls with Cox Radio executives and employees about the conspiracy and Footage continued.

136.     On April 22, 2012, Calta called Loyd and they spoke for approximately 20 minutes about the conspiracy and Footage.

137.    The following day, Loyd called Rodriguez and Epps, and Calta had calls with Burton, Peirce, and Fowler about the conspiracy and Footage.

138.    Calta and Burton also spoke on April 24, 2012 and April 25, 2012 for nearly an hour about the conspiracy and Footage.

139.    Then, on April 26, 2012, *thedirty.com* posted a second story about the Footage that referenced Bollea making statements about "black people."  That same day, Burton and Calta had four calls, and Loyd had calls with Kotzev, Hirsch, and Fowler about the conspiracy and Footage.  Also that same day, Calta e-mailed Burton a copy of *thedirty.com*'s April 26, 2012 story under the subject "The audio is out!!"  In response, Burton reminded Calta about what they talked about on the phone – "It's all about hulk and defend/deflect anything bubba."

140.    Over the Summer 2012, the calls about the conspiracy and Footage between and amongst Loyd, Calta, Burton, Cox Radio executives, employees, and agents, and other key players continued.

**C.    The Gawker Leak**

141.    In September 2012, Burton and Calta had numerous additional calls about Footage.  Throughout this time, Calta also spoke with Meder, Brennan, Oliviero and Peirce many times about Footage.  During the same time, Loyd also spoke to Oliviero, Epps, and Rodriguez about Footage.

142.    Between September 11, 2012 and October 8, 2012, Calta and Burton had at least 36 calls totaling over 276:30 minutes, during which they discussed Footage, the conspiracy, and leaking Footage to Gawker.

143.     On September 21, 2012, Loyd and Calta had another call at 1:07 a.m. and, later that day, Calta had three calls with Burton, a call with Cox Radio, and a call with Oliviero, all about the conspiracy and Footage.

144.     The following day, Calta and Loyd texted, Burton and Calta had another call, and Loyd had calls with Oliviero and Barfield about the conspiracy and Footage.

145.     On September 24, 2012, Calta had more of the same calls with Cox Radio, Brennan and The Bone.

146.     On September 25, 2012, Calta had a 20-minute call with Burton, two calls with Peirce, and a call with Meder, and Loyd had two lengthy calls with Epps and a call with Oliviero, about the conspiracy and Footage.

147.     On September 26, 2012, Calta had two calls with Oliviero at 1:24 and 1:38 a.m., a call with his lawyer, Dominic Fariello, another 33-minute call with Burton, and a call with Brennan about the conspiracy and Footage.  Loyd also received a call from The Bone during Calta's afternoon drive time.

148.     On September 27, 2012, Burton, acting at the behest of and in concert with Calta, and in his capacity as Calta's agent, an employee of DBA and member of the conspiracy, reached out to A.J. Daulerio ("Daulerio"), then-Editor-in-Chief of New York-based website, *Gawker.com* about the Footage.  Daulerio had made a name for himself by publishing salacious images of celebrities, and *Gawker.com* was infamous for attacking people in the entertainment and sports industries and trying to ruin their careers.

149.     As a New York based talent agent, Burton was well aware of Daulerio's and Gawker's reputations when he decided to contact Daulerio to arrange the "anonymous" delivery

of some of the Bollea Footage. Burton also was aware of the animosity between Calta and Bubba and shared Calta's goal of getting Bubba out of the way of Calta's career.

150. Burton e-mailed Daulerio that he had "a client that has a very significant DVD they want to send you." Burton's "client" was Calta.

151. Burton asked Daulerio for an address to send the DVD by mail for "anonymity" purposes. They subsequently spoke on the phone about the Footage of Bollea. Then, at 4:55 p.m., Burton e-mailed Daulerio's mailing address to Calta.

152. Later that day, Calta and Burton spoke on the phone, Calta had an extended call with Peirce, and Loyd had extended calls with Barfield and Greg Galvin, a co-host of Calta's radio show, all about the conspiracy and Footage.

153. The following day, Loyd also had an extended call with Epps and two calls with Oliviero, about the conspiracy and Footage.

154. Soon after Burton provided Calta Daulerio's mailing address, a DVD was sent to Daulerio which contained a little more than 30 minutes of the surreptitious Footage of Bollea, including video images of him fully naked and engaged in consensual sexual activity with Cole, and also including audio recordings of conversations between Bollea, Cole and Bubba (the "30 Minute Video").

155. As Calta's agent, Burton exercised control over Calta, particularly with respect to choices that could impact Calta's career. In that capacity, Burton already knew about the "Hogan Sex Tape" from Calta's March 13, 2012 e-mail and all of his above-referenced calls with Calta. Burton certainly would have discussed and did in his capacity as Calta's talent agent discuss what it was that Calta wanted to send to Daulerio and why Calta wanted to send it, before Burton agreed to help facilitate the "anonymous" delivery of a "significant DVD" to

*Gawker.com* for Calta. In fact, Calta and Burton spoke on the phone numerous times for extended periods about what they were doing and why they were doing it in the days leading up to the Gawker leak.

156. Burton had actual or constructive control over Calta such that he could have and should have stopped Calta from sending or procuring someone else to send the Footage to Daulerio or, at a minimum, could have and should have warned Bollea about the existence of the Footage, the "significant DVD," and/or the imminent delivery of the Footage to *Gawker.com*.

157. Instead, Burton chose to actively participate in the conspiracy and its dissemination and disclosure of the Footage, including through his numerous calls with Calta in Florida, thus placing his self-interests and those of his client, Calta, above Bollea's fundamental right to privacy, his emotional well-being, and his legacy and career.

158. ████████████████████████████████████████████

████████████████████████████████████████████

159. The 30 Minute Video sent to Gawker was one of the two DVDs summarized in the "DVD Details" attachment to Calta's March 2012 e-mail to Burton.

160. On October 2, 2012, Burton followed up with Daulerio to make sure that he received the 30 Minute Video. That same day, Burton and Calta had two calls and spoke for over 32 minutes, and Loyd called Epps, all of which related to the conspiracy and Footage.

161. Far from being a mere conduit for an address that Calta easily could have obtained himself on the Internet, Burton actively participated with Calta to send the 30 Minute Video to Daulerio because Burton admittedly had a relationship with Daulerio and—being based in New York—knew what Daulerio and Gawker were going to do with the Footage. Burton was an integral piece of the conspiracy because of his role in trying to cover-up leaking the Footage

to Daulerio by ensuring its sender and the conspiracy would be kept "anonymous." Moreover, Burton failed to prevent the Footage from being sent to Daulerio.

162.    Going even further, on October 3, 2012, after confirming for Calta that the "significant DVD" was received, Burton e-mailed Daulerio and stated "I hear there's a second DVD of the same but has more racist comments by Hogan."

163.    Burton's reference to audio portions of the Footage coincides with references in the summary of the second DVD in the "DVD Details" summary from Peirce, which Calta forwarded to Burton on March 13, 2012, and the audio portions of Footage referenced in *thedirty.com*'s April 26, 2012 story.

164.    Daulerio responded to Burton, "[s]o… we're gonna slice this up into a highlight reel then do some commentary on the stills. I just say this 'came across our desk' right?"

165.    At that time, Burton did not say or do anything to stop Daulerio from publicly disclosing the contents of the 30 Minute Video.

166.    Instead, Burton replied, "[h]owever you say you want to got it [*sic.*]. All I know is it was sent to you anonymously. Work for you?"

167.    After Burton and Daulerio's e-mail exchange on October 3, 2012, Calta and Burton spoke on the phone again for nearly 30 minutes about what was happening.

168.    Burton knew the implications of what he was doing, and knew that what he and his client were doing was wrong and would harm and injure Bollea.

169.    In fact, this is why Burton actively participated in and helped cover-up his and Calta's nefarious activities.

170.    Burton admittedly knew before the Footage was published by *Gawker.com* that the significant DVD was the "Hulk Hogan Sex Tape." Burton also knew and understood that

Calta had animosity against Bubba and Bollea, that they had a "radio war," and that Bubba needed to be fired to further Calta's career.

171. As an experienced agent, Burton also knew that the Footage he was actively involved in sending Daulerio would have a devastating impact on Bollea's life and career.

172. Burton later revealed that Calta pointed the finger at Loyd as being the person who gave the "Hulk Hogan Sex Tape" to Gawker, which confirms the conspiracy.

173. Certainly, Calta, Loyd, and Burton all played key roles in publicly disclosing, disseminating, and exploiting the illegal Footage of Bollea.

174. Daulerio edited the surreptitious Footage within the 30 Minute Video into a one-minute and forty-second "highlight reel" video (the "1:41 Video"), which showed Bollea fully naked, receiving oral sex, and engaged in sexual intercourse. The 1:41 Video also included Bollea's private conversations with Cole, as well as subtitles to ensure that viewers understood every word spoken.

175. On October 4, 2012, Gawker posted the 1:41 Video to the Internet, along with a graphic narrative description of portions of the 30 Minute Video not contained in the 1:41 Video (the "*Gawker.com* Posting"). At least 7 million people watched the 1:41 Video on the Internet.

176. That same day, Burton and Calta had nine phone calls and talked for nearly 30 minutes. Calta also called Peirce and Brennan. Oliviero called Loyd and Calta. Loyd called Epps and, using the alias "Jim Jannero," direct messaged Daulerio. All of these communications were about the conspiracy and Footage. Burton also forwarded Calta a story published on <u>heavydotcom</u> about the release of the Hulk Hogan sex tape, in response to which Calta replied "That's GREAT!!"

177.    The next day, October 5, 2012, Burton and Calta had five more calls and talked for over 41 minutes about Gawker, the conspiracy, and the Footage.  Calta and Peirce had three more calls, Calta also called Lawless, and Loyd called Epps, Rodriguez and Luther McLendon about the conspiracy and Footage.

178.    Over the ensuing days, Loyd had several more calls with The Bone during the time of Calta's afternoon show, as well as calls with Epps, Hammil, and Walters/*TMZ*; and Calta had numerous lengthy calls with Peirce and Burton about the conspiracy and Footage.

**D.    The Extortion Plot**

179.    On October 9, 2012, *TMZ* revealed to Bollea and Houston that Bubba could be heard at the end of an excerpt of the Footage talking about using the tapes for "retirement." These statements were not on the 30 Minute Video sent to Gawker.

180.    That same day, Loyd had numerous calls with Walters/*TMZ*.  Calta and Loyd also spoke twice; and after each call with Loyd, Calta called Burton.  All of those calls were about the conspiracy and Footage.

181.    Also on October 9, 2012, Loyd had calls with Epps, Hirsch, and Hammil, and Calta had several more calls with Peirce.  All of those calls were about the conspiracy and Footage.

182.    The TPD investigation of Loyd later confirmed that, between March 7, 2012 and October 16, 2012, Loyd had 38 phone calls with *TMZ* and during one of those calls *TMZ* referred Loyd to Davidson as someone who may be able to help sell the Footage.

183.    TMZ paid Loyd (between $8,500-$10,000) for the information he provided about, and as a licensing fee for access to and a transcript of Footage.  In order to cover his tracks, Loyd

directed *TMZ* to send that payment to Burbridge, who cashed the check, took a fee, and then gave the rest to Loyd and Carrega.

184. On October 10, 2012, the conspiracy's plot to use the Footage to extort Bollea started to unfold:

- Daulerio direct messaged Loyd to "call me ASAP;"

- Peirce and Calta had numerous calls from 12:43-1:08 a.m.;

- Burton called Calta at 1:47 a.m.;

- Loyd called Calta at 2:13 a.m.;

- Loyd called Epps at 2:40 a.m.;

- At 2:14 p.m., Davidson e-mailed Houston regarding "Hulk Hogan Tape;"

- Shortly thereafter, Burton and Calta and Loyd and Calta again spoke on the phone;

- Loyd then had a call with  Hirsch, 2 calls with Daulerio, 3 calls with Walters, a call with Barfield, and a call with Davidson; and

- At the end of the night, Lawless called Loyd.

185. On October 11, 2012, Daulerio direct messaged Loyd again for a call.  That same day, Burton and Calta had two calls lasting over an hour, and Loyd has several calls with Epps, Davidson, Bruno, and Barfield; all about the conspiracy and Footage.

186. On October 12, 2012, Davidson e-mailed Houston that he reviewed all of the materials and was prepared to talk.  Later that day, Burton and Calta had 2 calls and Loyd had calls with Barfield and Davidson about the conspiracy and Footage.

187. Davidson represented and acted on behalf of and in concert with Loyd, Carrega, Burbridge, and the conspiracy.  He spoke to Houston and told him that his client possessed surreptitious recordings of Bollea, one of which contained insensitive racial remarks which could

have the effect of causing great economic harm to Bollea if released publicly. Initially, Davidson requested $1 million for the DVDs. Davidson also said that the 30 Minute Video was sent to Gawker as a "shot across the bow."

188. Even though they all knew Bollea was secretly recorded, none of the Defendants turned over the illegally recorded Footage to Bollea.

189. Instead, over the ensuing weeks, Davidson exchanged numerous e-mails and calls with Houston to negotiate a "settlement agreement" requiring Bollea to buy the Footage from Davidson's then-undisclosed clients. Meanwhile, Houston had already reported the threat to the Tampa, Florida office of the FBI.

190. On October 15, 2012, Bollea sued Gawker over the *Gawker.com* Posting and held a press conference announcing the suit. Burton and Calta had five calls that day, one of which lasted over 30 minutes.

191. That same day, Daulerio e-mailed Burton to have another call, Calta had 2 more calls with Peirce, and Loyd had calls with Rodriguez and Epps about the conspiracy and Footage. Calta and Burton also exchanged e-mails about discussing the Footage and Bubba on air and coordinating the content of those discussions with Shark and Lawless.

192. On October 16, 2012, Bollea reported Davdison's contacts regarding the sex tape to the FBI.

193. That same day, Calta and Burton had seven calls and spoke for over 40 minutes, Calta and Peirce spoke three times for over 30 minutes, Loyd had several calls with Walters/*TMZ*, as well as more calls with Epps, Rodriguez and Davidson. All of these calls were about the conspiracy and Footage.

194.     Over the ensuing days, Burton and Calta have numerous additional calls about the conspiracy and Footage.  During the same time, Loyd had several more calls with Epps, Walters/*TMZ*, and Barfield, as well as a call with Al Borda, an adult film producer, about the conspiracy and Footage.

195.     On October 19, 2012, shortly after Loyd's calls with Walters, *TMZ* posted a story about there being multiple tapes of Cole with other men.  That same day, Calta and Burton had 3 calls and Calta made 2 calls to Brennan about the conspiracy and Footage.

196.     On October 22, 2012, Houston and Davidson spoke about the Footage.  That same day, an anonymous Twitter post with an image of a DVD was directed to Bubba and stated, "you want me to tell you (*sic*) public audience you have more tapes or shall I? @TMZ."

197.     That same day, Loyd had a lengthy call with Galvin and a call with Oliviero, Brennan called Calta, and Burton and Calta had 3 more calls about the conspiracy and Footage.

198.     Over the ensuing days, Calta had several more calls with Burton, Brennan, Peirce, The Bone, Meder, and Oliviero, and Loyd had several more calls with Davidson about the conspiracy and Footage.

199.     On November 2, 2012, Daulerio posted an article on *Gawker.com* titled "List of People Bubba's Ex-Wife Had Sex With on Camera," which was based on information he obtained from Loyd.

200.     Over the ensuing week, Loyd had numerous calls with Davidson, Walters/*TMZ*, Epps, Fowler, and Barfield, and Calta has several more lengthy calls with Burton and Fowler about the conspiracy and Footage.

201.     On November 6, 2012, Davidson e-mailed Houston a draft of the settlement agreement regarding the Footage.

202.     On November 9, 2012, Burton and Calta had another 30+ minute call about the conspiracy and Footage.

203.     Over Veterans Day weekend, Loyd, Carrega, and Burbridge met to watch Footage on Loyd's laptop computer so Burbridge could be familiar with its content when she participated in the sale of Footage Davidson was negotiating.  That weekend, Loyd again talked to Barfield.

204.     On November 13, 2012, Calta had another 30-minute call with Burton, this time at 12:02 a.m.  After that call, Calta called Galvin.  Later that day, Calta and Loyd texted each other before Loyd made a 15-minute call to Calta at 4:35 p.m.  After that call, Calta called Burton and they talked for nearly 20 minutes, immediately after which Calta called Meder and Brennan.  Later that night, Loyd called Epps.  All of these call were about the conspiracy and Footage.

205.     On November 14, 2012, The Bone called Loyd during the time of Calta's show, shortly after which Calta had a 21-minute call with Burton.  That day, Calta had several more calls with Burton and made calls to Lawless, Oliviero, and Brennan.  Lawless and Calta also talked for nearly 17 minutes that night, immediately after which Calta called Burton for a 10-minute call.  All of these calls were about the conspiracy and Footage.

206.     As Davidson negotiated with Houston and they began exchanging versions of the settlement agreement to buy the Footage over the next several weeks, the numerous calls between and amongst Calta, Loyd, Burton, Epps, Davidson, Burbridge, Walters/*TMZ*, Brennan, Meder, Lawless, Oliviero, Fowler, The Bone, Barfield and Cox Radio about Footage and the conspiracy continued.

207.     On December 4, 2012, Houston e-mailed the revised agreement to Davidson. That same day, Brennan and Calta had 3 calls, Calta had calls with The Bone, Lawless, Burton,

and Oliviero, and Loyd had calls with Oliviero, Bruno, and Epps. All of these calls were about the conspiracy and Footage.

208.    On December 5, 2012, Houston e-mailed Davidson about final edits to the agreement and meeting in Tampa for the DVD exchange.

209.    The following day, Burton and Calta had 3 more calls, Loyd had calls with Davidson, Oliviero, Epps, and Barfield, and Brennan called Calta; all about the conspiracy and Footage.

210.    On December 7, 2012, Calta and Loyd texted each other again, Burton and Calta had two more calls, Calta had calls with Peirce, Brennan, and Fariello, and Loyd called Galvin again; all about the conspiracy and Footage.

211.    The following day, Calta and Burton had 2 more calls about the conspiracy and Footage lasting about 35 minutes.

212.    On December 10, 2012, Davidson e-mailed the final version of the agreement to Houston and later initiated 3-way calls with Loyd and Burbridge to go over the deal and upcoming meeting to exchange the DVDs. Loyd and Barfield also spoke again.

213.    On December 11, 2012, Calta and Burton spoke for nearly 25 minutes shortly after midnight. Later that day, Davidson e-mailed an executed version of the settlement agreement for the Footage to Houston, and initiated another 3-way call with Loyd and Burbridge. Burton and Calta also had another call at 10:36 p.m. All of these calls were about the conspiracy and Footage.

214.    On December 12, 2012, Houston e-mailed the fully executed agreement to Davidson. That same day, Calta had lengthy calls with Peirce and Burton, and Loyd had an

extended call with Rodriguez and calls with Davidson and Shark. All of these calls were about the conspiracy and Footage.

215.    On December 13, 2012, the day before the planned exchange of the Footage as part of the extortion, Calta had more calls with Burton, Brennan, Oliviero, The Bone, and Lawless, and Loyd had several calls with Davidson. All of these calls were about the conspiracy and Footage. That night, Davidson, Loyd, Carrega, and Burbridge met for dinner and discussed the DVD exchange the following day.

216.    On December 14, 2012, the FBI set up the sting operation at the Sand Pearl Hotel in Clearwater Beach. Davidson and Burbridge, acting at the behest of and in concert with Loyd, Carrega, and the rest of their co-conspirators, met Houston and Bollea and turned over what they represented were all copies of the surreptitious Footage of Bollea in exchange for a check in the amount of $150,000 and a commitment to make subsequent payments of an additional $150,000, for a total extortion payment of $300,000. The parties exchanged a "Settlement Agreement," attached to which is a "transcript" summarizing three DVDs.

217.    The FBI recorded the activities of the participants (Bollea, Houston, Davidson, Burbridge and a polygraph examiner who was working undercover for the FBI) in a room at the hotel. When Houston handed the check to Davidson and Burbridge, several FBI agents entered the room with guns drawn, took Davidson and Burbridge into custody, and immediately removed Bollea and Houston from the room. The FBI seized three DVDs.

218.    The FBI interviewed Burbridge, who confirmed that Loyd leaked stills from surreptitious Footage to *TheDirty.com* and was paid by TMZ for leaking information about the Footage.

219.     Burbridge also explained to the FBI how she, Carrega, and Loyd watched the Footage on Veterans Day 2012 at Loyd's house on Loyd's computer, and later had a conference call and meeting with Davidson in Pinellas County, Florida to plan out their exchange with Bollea.

220.     Burbridge also claimed that they (her, Loyd, and Carrega) were not the ones who sent the 30 Minute Video to Gawker; but insisted that Davidson instructed her that she needed to lie to Bollea and say that they did leak the Footage to Gawker in order for the deal with Bollea to go through.

221.     In the days after the FBI sting, Calta and Burton had seven calls lasting nearly 1-1/2 hours, Calta had more calls with Brennan, Peirce and Fowler, and Loyd had calls with Oliviero and Epps, all about the conspiracy and Footage.

### E.     The *Enquirer* Leak

222.     Over the next several years, Bollea's lawsuit against Gawker, Denton, and Daulerio over the *Gawker.com* Posting progressed (the "Gawker Litigation").

223.     Meanwhile, unbeknownst to Bollea, Bubba filed a complaint with TPD in May 2014, after a photo of another of the Cole DVDs with "Denzel"[1] written on it was tweeted to Bubba from an alias twitter account.  TPD opened an investigation and traced the tweet to Loyd.

224.     On August 20, 2014, TPD interviewed Loyd and confirmed that Loyd was the one who sent the tweet, which Loyd claimed to have sent to "make Bubba squirm."

225.     TPD continued its investigation into Loyd over the next 15 months, including subpoenaing phone records and interviewing critical witnesses. In early 2015, TPD and the

---

[1]   TPD later confirmed that "Denzel" was Denzil Lewis, a friend of Bubba who also was recorded having sex with Cole.

Hillsborough County State Attorneys' Office ("HCSAO") interviewed Burbridge, Bubba, and Epps.

226.    Epps claimed to TPD that Loyd was always looking for "dirt" on Bubba and that Epps had never seen any sex videos with Cole and did not remember Bubba ever saying he had them prior to them being exposed in the tabloids.

227.    On April 1, 2015, TPD and the HCSAO interviewed Cole. That same day, Calta and Burton spoke for over 17 minutes. Late that night, Calta and Loyd started texting, and then Calta called Loyd. All these communications were about the conspiracy and Footage. In April 2015, Loyd no longer worked for Cox Radio.

228.    On April 2, 2015, Loyd and Calta had another call at 12:29 a.m., and then exchanged texts shortly thereafter. Calta called Loyd at 1:41 a.m. and they spoke for over 35 minutes. Later that night, Calta and Burton spoke for over 12 minutes. All of these calls and texts were about the conspiracy and Footage.

229.    On April 3, 2015, Calta had calls with Lawless, Oliviero, and Brennan about the conspiracy and Footage.

230.    On April 6, 2015, Oliviero called both Calta and Loyd. Soon thereafter, Loyd participated on a call originated from a VOIP that included several other callers and lasted nearly an hour. Soon after Loyd's conference call ended, Burton called Calta and that call originated from the same VOIP as Loyd's conference call.

231.    On April 8, 2015, Loyd participated on another call with  multiple callers that lasted over 73 minutes and originated from ████████████  That same day, Calta made a call originating from that same number.

232. On April 9, 2015, Calta and Loyd exchanged text messages throughout the evening about the conspiracy and Footage.

233. On April 10, 2015, Burbridge had a 15-minute call with Loyd at 1:34 a.m. At 1:56 a.m., Calta called Loyd and they spoke for nearly 30 minutes. Later that day, Calta had another 12-minute call with Burton. All of these calls and texts were about the conspiracy and Footage.

234. Over the next few days, Calta and Burton had two more calls lasting 45 minutes, and Calta had another 10-minute call with Brennan. All of these calls and texts were about the conspiracy and Footage.

235. On April 16, 2015, TPD called Calta and left a message asking him an interview in the Loyd criminal investigation.

236. On April 17, 2015, Calta had two calls with Fariello, and calls with Lawless and Brennan about the TPD investigation.

237. Calta and Lawless spoke again on April 19, 2015. That same day, Loyd and Barfield had another call.

238. On April 20, 2015, Calta had two more calls with Fariello, and Loyd had several calls with his criminal attorney, Jeff Brown ("Brown"). Loyd also had another conference-line call that lasted nearly 15 minutes. All of these calls were about the TPD, investigation, conspiracy and Footage.

239. On April 21, 2015, Fariello called TPD to make arrangements for Calta to be interviewed the following morning, but called back later that day to tell TPD Calta would not agree to meet. That night, Calta called Burton and had a call with Lawless about the TPD investigation, conspiracy and Footage.

240.     On April 22, 2015, Calta had multiple calls with Burton and Lawless, and a nearly 15-minute call with Peirce at 11:43 p.m. about the TPD investigation, conspiracy and Footage.

241.     On April 23, 2015, Calta had another 30-minute call with Burton and nearly 10-minute call with Brennan about the TPD investigation, conspiracy and Footage.

242.     On April 27, 2015, Calta called Loyd at 12:20 a.m. and Burton at 4:08 a.m.  Later that day, Burton and Calta had 3 additional calls and talked for over 30 minutes.  All of these calls were about the TPD, investigation, conspiracy and Footage.

243.     On April 28, 2015, Loyd participated in another conference-line call at 5:33 p.m. and, shortly thereafter, Calta and Burton had another call.  That night, Loyd had an over 12-minute call with Oliviero.  All of these calls were about the TPD, investigation, conspiracy and Footage.

244.     On April 29, 2015, Calta and Lawless had another 10-minute call at 5:04 p.m. Shortly thereafter, Calta had calls with Burton and Fariello before participating in an over 30-minute call on the Cox Media conference line.  Following the Cox Media conference call, Burton and Calta had a 30-minute call, after which Calta had calls with Fariello and Oliviero.  All of these calls were about the TPD, investigation, conspiracy and Footage.

245.     On April 30, 2015, Calta had two more lengthy calls with Burton, two calls with Fariello, and calls with Brennan, SiriusXM, and Lawless.

246.     Over the ensuing days, Loyd participated in several more conference-line calls and Calta had several more calls with Lawless, Fariello, Brennan, and Peirce.

247.     On May 12, 2015, TPD interviewed Carrega in the Loyd criminal investigation. That same day, Burton and Calta had three calls lasting 27 minutes about the conspiracy and Footage.

248.    The next day, Calta called Loyd at 2:38 a.m. and they talked for nearly 22 minutes.  Shortly thereafter, Brenan and Calta had a 21-minute call, following which Lawless called Calta.  All of these calls were about the conspiracy and Footage.

249.    Later that day, Calta and Burton spoke twice more for over 32 minutes, and Loyd and Calta had three more calls.  All of these calls were about the conspiracy and Footage.

250.    On May 14, 2015, Calta again called Loyd.  Soon thereafter, Calta and Burton had multiple calls lasting over 30 minutes.  Later that night, Loyd called Calta again.  All of these calls were about the conspiracy and Footage.

251.    On May 15, 2015, Calta had calls with Burton and Brennan, after which he participated in another conference-line call.

252.    On May 18, 2015, Loyd had another call with Brown and another call with Calta. All of these calls were about the conspiracy and Footage.

253.    On May 19, 2015, Loyd had a call with Beasley Media (Bubba's station) that lasted nearly 10 minutes.  That same day, Calta had a 17-minute call with Lawless and a 26-minute call with Burton.  All of these calls were about the conspiracy and Footage.

254.    On May 20, 2015, Calta and Loyd had another call.  That same day, Calta had calls with Brennan, Galvin, and The Bone, and Loyd had extended calls with Barfield and Brown. All of these calls were about the conspiracy and Footage.

255.    The following day, Loyd had another call with Barfield, as well as two more lengthy conference-line calls at 7:13 p.m. and 8:06 p.m.

256.    Over the ensuing weeks, Calta had several more calls with Burton, Brennan, Fariello, and Oliviero; and Loyd had several more calls with Burbridge, Brown, and Barfield about the conspiracy and Footage.

257. On June 10, 2015, Loyd and Calta had another call lasting almost 18 minutes, following which Calta called Lawless and Burton. That night, Calta and Lawless talked for almost 14 minutes. All of these calls were about the conspiracy and Footage.

258. On June 16, 2015, Loyd and Barfield had another call and Calta and Loyd had another lengthy call at 10:18 p.m. Burton called Calta at 12:31 a.m. the following morning. All of these calls were about the conspiracy and Footage.

259. ████████████████████████████████████████

████████████████████████

260. On June 25, 2015, Calta had a 25-minute call with Burton and several calls with Brennan and Fariello. Loyd had lengthy calls with Barfield and Brown, and a 16-minute conference-line call at 8:10 p.m.

261. On June 26, 2015, Calta had a 12-minute call with Brennan at 1:48 a.m., followed by a 12-minute call with Burton at 2:00 a.m. Later that day, Loyd made several calls to Nielsen and Arbitron.

262. Over the ensuing week, Loyd made more calls to Arbitron, and Calta had several more lengthy calls with Burton, Brennan, and Peirce.

263. On July 1, 2015, Loyd participated in another conference-line call lasting nearly 15 minutes at 2:15 p.m. That same day, Calta had a conference-line call lasting nearly 33 minutes at 3:35 p.m.

264. The next day, Calta and Burton had another 30-minute call, and Calta had several calls with Brennan about the conspiracy and Footage.

265.    On July 3, 2015, Loyd had a 20-minute call with Beasley Media, followed by a 13-minute call to SiriusXM and another conference-line call that originated from the same VOIP number as the early April 2015 calls.

266.    Over the ensuing weeks, Calta had several more lengthy calls with Burton, Lawless, Fariello, and Brennan about the conspiracy and Footage.

267.    Bollea originally was scheduled for trial against Gawker to commence the first week of July 2015.  In the days leading up to the trial, Bubba's on-air attacks against Loyd, Calta and Cox Radio, including statements about their involvement in publicly releasing the surreptitious Footage of Bollea, escalated.  However, due to an appellate decision by the Second DCA, the Gawker Litigation trial was cancelled on the eve of its commencement.

268.    During this same time period (as explained in detail above), Bubba, Cox and Calta were involved in their own battle.  Bubba was overtaking Calta's show in key ratings and, according to Bubba, Cox was looking for ways to eliminate Bubba as competition.

269.    On July 10, 2015, Calta had extended calls with Lawless and Brennan.

270.    On July 13, 2015, Loyd had calls with iHeart Media and Clear Channel, as well as an over 21-minute call with Barfield.

271.    Over the next few days, Loyd has several more calls with Clear Channel and a nearly 25-minute call with Barfield.

272.    On July 16, 2015, TPD interviewed Fowler.  Fowler told TPD that he recalled seeing Loyd and Calta together in 2012 watching a video of Bollea and Cole having sex, which they were viewing on a desktop computer at Cox Radio's office in St. Petersburg.

273.    The night of Fowler's TPD interview, Burton and Calta had another 20-minute call about the conspiracy and Footage.

274.    On July 22, 2015, Calta called Loyd at 1:47 a.m. and they talked for nearly 35 minutes, after which Burton and Calta had another 10-minute call about the conspiracy and Footage.

275.    The next day, Calta had another call with Brennan and a 16-minute call with Burton about the conspiracy and Footage.

276.    On July 24, 2015, two days after Loyd and Calta's 35-minute call and Calta's calls to Brennan and Burton, *The National Enquirer* and its sister publication *RadarOnline.com* (collectively, the "*Enquirer*"), gave notice to Bollea's counsel that the *Enquirer* intended to publish excerpts from what they claimed was a confidential "sealed" transcript of Footage from the Gawker Litigation.

277.    On July 24, 2015, the *Enquirer* published its story quoting excerpts from the surreptitious Footage of Bollea, which they described as coming from a court-protected, confidential transcript.  That same day, the *Enquirer's* Lachlan Cartwright tweeted that Gawker was not its source for its story, and that the *Enquirer* was provided with a "transcript" of Footage.  However, the *Enquirer* since confirmed it had no transcript or copies of any recordings of Bollea Footage.

278.    Although based on the hostile nature of the Gawker Litigation Bollea initially believed that Gawker may have been behind the *Enquirer* leak, Daulerio, Denton and Gawker's in-house counsel, Heather Dietrick, all declared under penalty of perjury that they had no involvement in the *Enquirer* leak.

279.    On July 24, 2015, Calta and Burton had four more calls and talked for over 33 minutes, Calta had two calls with Brennan and one with Fariello, and Loyd made calls to Barfield and Brown; all about the conspiracy and Footage.

280.     Defendants each at various times possessed, had access to and/or control over the material that was leaked to the *Enquirer*, and all of them had motive and opportunity to leak this material – particularly in July 2015, when the animosity between Cox Radio/Calta/Loyd and Bubba was at its peak and the criminal investigation of Loyd was coming to a head.

281.     Ultimately, the actions of all of the Defendants set forth herein substantially contributed to the *Enquirer's* publication of content from the illegally recorded Footage of Bollea, which caused Bollea to be immediately terminated by the WWE and erased from WWE's Hall of Fame, network and website.  Hundreds of articles and reports were published by news organizations immediately thereafter, accusing Bollea of being a "racist."

282.     Bollea promptly issued a public apology for the offensive language that was illegally in 2007 recorded during a momentary lapse in judgment at a very difficult time in his life, while he was having a private conversation in his then-best friend's bedroom.  However, the damage was already done and irreversible.

283.     Defendants, in doing the things alleged herein, acted with actual malice and reckless disregard of Bollea's rights.  Moreover, although none of the Defendants were acting in the capacity of a member of the "press" while engaging in the conduct forming the basis of this action, the actions of each of the Defendants, alleged herein, still served no legitimate public interest.

284.     All conditions precedent to the bringing and maintenance of this action and the granting of the relief requested have been performed, have occurred, or have been waived.

285.     Bollea has retained the undersigned attorneys to represent him in this action and is obligated to pay them a reasonable fee for their services.

## FIRST CAUSE OF ACTION

### (Invasion of Privacy and/or Aiding and Abetting Invasion of Privacy)

286.    Bollea repeats, re-alleges, adopts and incorporates each and every allegation contained in Paragraphs 1 through 285, inclusive, as though fully set forth herein.

287.    Defendants, in engaging in the conduct alleged herein, grossly invaded Bollea's protected rights of privacy as recognized under the United States Constitution, Florida Constitution, and Florida common law.

288.    Among other things, Defendants used, exploited and publicly disclosed intimate details of Bollea's private life by actively participating in, providing substantial assistance to and/or ratifying or approving the public disclosure and dissemination of surreptitious Footage of Bollea to tabloids including TMZ.com, *TheDirty.com*, *Gawker.com* and *Enquirer*, and/or acting in concert with and/or aiding and abetting oen another to accomplish such public disclosure and dissemination, for their own economic gain and self interests, and to harm Bollea.

289.    The unauthorized use, exploitation, disclosure and dissemination of the surreptitious Footage of Bollea was highly offensive and objectionable to Bollea and to any reasonable person of ordinary sensibilities, and was not of legitimate public concern.

290.    Defendants knew or should have known that:  (1) the surreptitious Footage of Bollea contained private and confidential information about Bollea; (2) Bollea had a reasonable expectation of privacy in being fully naked and engaged in consensual sexual activity, and having private conversations, in a private bedroom; (3) the Footage was taken without Bollea's knowledge or consent; (4) disclosure of the surreptitious Footage would reveal private and personal things about Bollea which Defendants had no right or authorization to use, disseminate, disclose or exploit; (5) the publication of these private facts about Bollea would be offensive and

objectionable to a reasonable person of ordinary sensibilities; and, (6) the publication of these private facts constitutes a substantial violation of Bollea's right of privacy.

291.    Defendants had no reasonable or legitimate purpose for their acts of participation in and assistance provided in using, distributing, disseminating, disclosing and/or exploiting the surreptitious Footage of Bollea, and/or for acting in concert with, aiding and abetting other Defendants to accomplish the same.  Bollea had a reasonable expectation of privacy when he was fully naked and engaged in private consensual sexual activity and having private conversations in a private bedroom, and had no knowledge of, and did not consent to, the recording or public disclosure of any such private activities.

292.    The intimate details of Bollea's private life that were illegally recorded, illegally obtained and then used, distributed, disseminated, disclosed and/or exploited by and as a result of the actions of the Defendants were in fact published and would not have been published but for the Defendants' actions of procuring, actively participating in, providing substantial assistance for, and/or ratifying or approving the use, distribution, dissemination, disclosure, and/or exploitation of such private facts, or Defendants acting in concert with, aiding and abetting such misconduct.

293.    Defendants violated Bollea's fundamental privacy rights by the conduct alleged herein, including the intrusion into Bollea's privacy and the outrageous use, distribution, dissemination, disclosure and/or exploitation of the surreptitious recordings of Bollea to tabloid websites and others, and/or acting in concert with, providing substantial assistance for, ratifying, approving, aiding, and/or abetting of the same, in an unprivileged manner calculated to financially capitalize therefrom and/or cause substantial harm to Bollea and others, in conscious disregard of Bollea's rights.

294.     Defendants acted with actual malice and reckless disregard of Bollea's rights.

295.     As a direct and proximate result of the aforementioned acts by each of the Defendants, Bollea has suffered economic and emotional injury, damage, loss and harm, damage to reputation, loss of income, anxiety, embarrassment, humiliation, shame, and severe emotional distress in an amount subject to proof; which damages are continuing in nature and will be suffered in the future.

296.     Bollea also is entitled to preliminary and permanent injunctive relief enjoining the use, distribution, dissemination and disclosure of the surreptitious Footage, and any portions and content thereof; mandating the delivery of all originals, reproductions, copies, and portions of same and all content derived therefrom to Bollea; and transferring to Bollea all right, title and interest in and to all originals, reproductions, copies, and portions of same and all content derived therefrom.

297.     The aforementioned acts of the Defendants were done intentionally or with a conscious and/or reckless disregard of Bollea's rights, and with the intent to vex, injure or annoy, such as to constitute oppression, fraud or malice.

### SECOND CAUSE OF ACTION

**(Public Disclosure of Private Facts and/or Aiding and
Abetting Public Disclosure of Private Facts)**

298.     Bollea repeats, re-alleges, adopts and incorporates each and every allegation contained in Paragraphs 1 through 285, inclusive, as though fully set forth herein.

299.     Defendants actively participated in, provided substantial assistance to and/or ratified, approved, aided and/or abetted the disclosure and dissemination of Footage and the contents of Footage to tabloid websites, and thus to the public, private facts concerning Bollea contained within the contents of the surreptitious Footage which depicted Bollea fully naked,

engaged in private consensual sexual activity in a private bedroom, and engaged in private conversations, and/or Defendants acted in concert with, aided and abetted one another in connection with such public disclosure, for their own economic gain and self interests and to harm Bollea.

300.    Defendants knew or should have known that:  (1) the surreptitious Footage of Bollea contained private and confidential information about Bollea; (2) Bollea had a reasonable expectation of privacy in being fully naked and engaged in consensual sexual activity, and having private conversations in a private bedroom; (3) the recordings were taken without Bollea's knowledge or consent; (4) the disclosure of the surreptitious Footage would reveal private and personal things about Bollea which said Defendants had no right or authorization to use, disseminate, disclose or exploit; (5) the publication of these private facts about Bollea would be offensive and objectionable to a reasonable person of ordinary sensibilities; and, (6) the publication of these private facts constitutes a substantial violation of Bollea's right of privacy.

301.    Defendants had no reasonable or legitimate purpose for their acts of participation in and assistance provided in using, distributing, disseminating, disclosing and/or exploiting the surreptitious recordings of Bollea and/or for acting in concert with, aiding, and abetting other Defendants in committing these acts.  Bollea had a reasonable expectation of privacy when he was fully naked, engaged in private consensual sexual activity, and having private conversations, in a private bedroom, and had no knowledge of, and did not consent to, the recording of any such private activities.

302.    The private facts that were illegally recorded, illegally obtained, and then used, distributed, disseminated, disclosed and/or exploited by and as a result of the actions of the Defendants were in fact published, and would not have been published but for Defendants'

actions of procuring, actively participating in, providing substantial assistance for and/or ratifying or approving the use, distribution, dissemination, disclosure and/or exploitation of such private facts, or Defendants' actions in concert with, or acts of aiding and abetting such misconduct.

303.    The actions of the Defendants as alleged herein are highly offensive and objectionable to Bollea, as well as to any reasonable person of ordinary sensibilities, and are not of legitimate public concern.  Bollea did not consent to nor authorize any use, distribution, dissemination, disclosure or exploitation of the surreptitious Footage of him, or any portions or content thereof, whatsoever, or of the publication of same by anyone.

304.    Defendants violated Bollea's fundamental privacy rights by the conduct alleged herein, including the intrusion into Bollea's privacy and the outrageous use, distribution, dissemination, disclosure and/or exploitation of the private facts contained within surreptitious Footage of Bollea to tabloid websites and the public, and/or acting in concert, providing substantial assistance for, ratifying, approving, aiding and/or abetting of same, in an unprivileged manner calculated to financially capitalize therefrom and/or cause substantial harm to Bollea and others, in conscious disregard of Bollea's rights.

305.    Defendants acted with actual malice and reckless disregard for Bollea's rights.

306.    As a direct and proximate result of the aforementioned acts by each of the Defendants, Bollea has suffered economic and emotional injury, damage, loss and harm, damage to reputation, loss of income, anxiety, embarrassment, humiliation, shame and severe emotional distress in an amount subject to proof; which damages are continuing in nature and will be suffered in the future.

307.     Bollea also is entitled to preliminary and permanent injunctive relief enjoining the use, distribution, dissemination and disclosure of the surreptitious Footage of Bollea, and any portions and content thereof; mandating the delivery of all originals, reproductions, copies, and portions of same and all content derived therefrom to Bollea; and transferring to Bollea all right, title and interest in and to all originals, reproductions, copies, and portions of same and all content derived therefrom.

308.     The aforementioned acts of Defendants were done intentionally or with a conscious and/or reckless disregard of Bollea's rights, and with the intent to vex, injure or annoy, such as to constitute oppression, fraud or malice.

## THIRD CAUSE OF ACTION

### (Invasion of Privacy by Intrusion Upon Seclusion and/or Aiding and Abetting Invasion of Privacy by Intrusion Upon Seclusion)

309.     Bollea repeats, re-alleges, adopts and incorporates each and every allegation contained in Paragraphs 1 through 285, inclusive, as though fully set forth herein.

310.     Defendants, without Bollea's consent and against Bollea's will, grossly invaded Bollea's protected rights of privacy as recognized under the United States Constitution, Florida Constitution, and applicable common law, by actively participating in, providing substantial assistance for and/or ratifying or approving, obtaining, using, watching, distributing, disseminating, disclosing and/or exploiting the surreptitious Footage of Plaintiff which depicted him fully naked, engaged in private intimate consensual sexual activity, and included his private conversations, in a private bedroom, and/or acting in concert with, aiding, and abetting one another to accomplish such misconduct.

311.     Defendants, through electronic means, enabled the general public to intrude into a place in which Bollea had a reasonable expectation of privacy and watch Bollea when he was

fully naked, engaged in private sexual activity, and engaged in private conversations, in a private bedroom, without Bollea's knowledge, authorization or consent.

312.     The activities of the Defendants were not carried out for reasonable or legitimate purposes, but rather to reap financial rewards at the expense of Bollea and others and/or to cause substantial harm to Bollea and others.

313.     Bollea had a reasonable expectation of privacy in the location in which the surreptitious Footage was secretly recorded, and a reasonable expectation he was not being recorded while engaging in the private activities in which he was engaged; appearing fully naked, engaged in private consensual sexual activity, and having private conversations, in a private bedroom.   Bollea had no knowledge of, and did not consent to, the recording or disclosure and dissemination of such private activities.

314.     The actions by the Defendants are offensive and objectionable to Bollea, and would outrage or cause mental suffering, shame, humiliation or hurt feelings to a person of ordinary sensibilities.

315.     Defendants knew or should have known that:  (1) the surreptitious Footage of Bollea contained private and confidential information about Bollea; (2) Bollea had a reasonable expectation of privacy in being fully naked and engaged in consensual sexual activity, and having private conversations, in a private bedroom; (3) the recordings were taken without Bollea's knowledge or consent; (4) the disclosure of the surreptitious Footage would reveal private and personal things about Bollea which Defendants had no right or authorization to use, disseminate, disclose or exploit; (5) the publication of these private facts about Bollea would be offensive and objectionable to a reasonable person of ordinary sensibilities; and, (6) the publication of these private facts constitutes a substantial violation of Bollea's right of privacy.

316.     Defendants violated Bollea's fundamental privacy rights by the conduct alleged herein in an unprivileged manner, calculated to financially gain therefrom, at the expense of Bollea and others, and/or to cause Bollea to suffer substantial harm therefrom, in conscious disregard of Bollea's right of privacy.

317.     Defendants acted with actual malice and reckless disregard of Bollea's rights.

318.     As a direct and proximate result of the aforementioned acts by each of the Defendants, Bollea has suffered economic and emotional injury, damage, loss and harm, damage to reputation, loss of income, anxiety, embarrassment, humiliation, shame, and severe emotional distress in an amount subject to proof; which damages are continuing in nature and will be suffered in the future.

319.     Bollea also is entitled to preliminary and permanent injunctive relief enjoining the use, distribution, dissemination and disclosure of the surreptitious Footage of Bollea, and any portions and content thereof; mandating the delivery of all originals, reproductions, copies, and portions of same and all content derived therefrom to Bollea; and transferring to Bollea all right, title and interest in and to all originals, reproductions, copies, and portions of same and all content derived therefrom.

320.     The aforementioned acts of the Defendants were done intentionally or with a conscious and/or reckless disregard of Bollea's rights, and with the intent to vex, injure or annoy, such as to constitute oppression, fraud or malice.

## FOURTH CAUSE OF ACTION

### (Intentional Infliction of Emotional Distress)

321.     Bollea repeats, re-alleges, adopts and incorporates each and every allegation contained in paragraphs 1 through 285, inclusive, as if fully set forth herein.

322.     At all times herein, the Defendants acted intentionally, maliciously and without justification, actively participated in, provided substantial assistance to, and/or ratified or approved misconduct that caused the surreptitious Footage of Bollea to be publicly disseminated, disclosed and used to third parties, including tabloid websites, and/or by acting in concert with, aiding and abetting in such activities and a civil extortion scheme, when Defendants knew or should have known that Bollea would suffer severe emotional distress as a result.

323.     The conduct by the Defendants was intentional and malicious and done for the purpose of causing, or was known by Defendants to be likely to cause, Bollea to suffer humiliation, mental anguish and severe emotional distress, and was done with the wanton and reckless disregard of the consequences to Bollea.

324.     In doing the acts alleged hereinabove, the Defendants acted outrageously and beyond all reasonable bounds of decency, and intentionally inflicted severe emotional distress upon Bollea, to his detriment.

325.     Defendants acted with actual malice and reckless disregard of Bollea's rights.

326.     As a direct and proximate result of the aforementioned acts by each of the Defendants, Bollea has suffered emotional injury, damage, loss, harm, anxiety, embarrassment, humiliation, shame, and severe emotional distress in an amount subject to proof; which damages are continuing in nature and will be suffered in the future.

327.     The aforementioned acts of the Defendants were done intentionally or with a conscious and/or reckless disregard of Bollea's rights, and with the intent to vex, injure or annoy, such as to constitute oppression, fraud or malice.

## **FIFTH CAUSE OF ACTION**

### **(Intentional Interference with Contractual Relations and Advantageous Business Relationships)**

328.    Bollea repeats, re-alleges, adopts and incorporates each and every allegation contained in Paragraphs 1 through 285, inclusive as though fully set forth herein.

329.    At all times herein, the Defendants were aware that Bollea had specific employment, endorsement and other contracts, including without limitation, his WWE contract/relationship, and Defendants acted intentionally, maliciously and without justification in their wrongful acts described herein, when Defendants knew or should have known that their actions would cause or were likely to cause substantial interference with Bollea's existing contracts and his advantageous business relationships.

330.    Defendants' conduct was intentional and malicious and done for the purpose of causing, or was known by them to be likely to cause, the termination of and substantial interference with Bollea's contracts and his advantageous business relationships.

331.    In doing the acts alleged hereinabove, the Defendants acted outrageously and beyond all reasonable bounds of decency.

332.    As a direct and proximate result of the aforementioned wrongful conduct by the Defendants, Bollea has suffered substantial economic injury, loss, damages and harm from the actual interference with Bollea's contracts and advantageous business relationships, in an amount subject to proof; which damages are continuing in nature and will be suffered in the future.

333.    Defendants acted with actual malice and reckless disregard of Bollea's rights.

334.    Defendants acted intentionally or with a conscious and/or reckless disregard of Bollea's rights, and with the intent to vex, injure or annoy, such as to constitute oppression, fraud or malice.

## SIXTH CAUSE OF ACTION

### (Violation of Section 934.10, Florida Statutes and/or
### Aiding and Abetting of Violation of Section 934.10, Florida Statutes)

335.    Bollea repeats, re-alleges, adopts and incorporates each and every allegation contained in Paragraphs 1 through 285, inclusive as though fully set forth herein.

336.    Bollea had a reasonable expectation of privacy in engaging in private oral communications in a private bedroom, and a reasonable expectation that his oral communications would not be recorded, and did not know about, nor consent to, the recording of such oral communications.

337.    Defendants intentionally, either directly or in active participation or concert with one another, or by providing substantial assistance to one another, violated, or aided and abetted in the violation of Plaintiff's rights under Section 934.10, Florida Statutes, by using, disseminating, disclosing and/or distributing to third parties, or procuring another to use, disseminate, disclose or distribute to third parties, the contents of Bollea's private oral communications.

338.    Defendants knew or should have known that: (1) the surreptitious Footage of Bollea contained private and confidential information about Bollea; (2) Bollea had a reasonable expectation of privacy while having private conversations, in a private bedroom; (3) the recordings were made without Bollea's knowledge or consent; (4) the disclosure of the surreptitious Footage would reveal private and personal things about Bollea which said Defendants had no or authorization to use, disseminate, disclose or exploit; (5) the use or disclosure of Bollea's oral communications or the contents thereof would be offensive and objectionable to a reasonable person of ordinary sensibilities; and, (6) the use and disclosure of Bollea's oral communications was unlawful.

339.    Defendants' actions have not served any legitimate public interest.

340.    Defendants acted with actual malice and reckless disregard of Bollea's rights, including his right to privacy.

341.    As a direct and proximate result of the aforementioned acts by the Defendants, Bollea has suffered substantial actual damages; which are continuing in nature and will be suffered in the future. in an amount subject to proof.

342.    The aforementioned acts of the Defendants were done intentionally or with a conscious and/or reckless disregard of Bollea's rights, and with the intent to vex, injure or annoy, such as to constitute oppression, fraud or malice.

## **SEVENTH CAUSE OF ACTION**

### **(Civil Conspiracy)**

343.    Bollea repeats, re-alleges, adopts and incorporates each and every allegation contained in Paragraphs 1 through 342, inclusive, as if fully set forth herein.

344.    Defendants entered into an agreement or agreements with one another as part of an ongoing scheme to commit an unlawful act or acts and/or perform lawful act(s) by unlawful means.

345.    Defendants, as more specifically set forth above, each performed overt acts in pursuance of their conspiracy.

346.    As a direct and proximate result of Defendants' acts, Bollea suffered substantial economic and emotional injury, damage, loss and harm, anxiety, embarrassment, humiliation, shame, damage to reputation, loss of income, severe emotional distress, in an amount subject to proof; which damages are continuing in nature and will be suffered in the future.

## EIGHTH CAUSE OF ACTION

### (Negligent Retention – Cox & Buchwald)

347.　Bollea repeats, re-alleges, adopts and incorporates each and every allegation contained in paragraphs 1 through 342, inclusive, as if fully set forth herein.

348.　During the course of Cox's employment of Calta and Loyd, and Buchwald's employment of Burton, Cox and Buchwald became aware or should have become aware of conduct and/or misconduct of Calta, Loyd and Burton that demonstrated their unfitness.

349.　Cox and Buchwald knew or should have known that Calta and Loyd and Burton, respectively, were predisposed to committing wrongs, harming others, and/or had a propensity for engaging in the misconduct alleged herein.

350.　Cox and Buchwald failed to take reasonable actions to investigate, prevent and/or avoid the misconduct alleged herein, thereby breaching a duty owed to Bollea.

351.　Cox and Buchwald also had the ability to control Calta, Loyd and Burton, such as to substantially reduce the probability of harm to others, specifically including Bollea.

352.　Bollea was injured by the acts of Calta, Loyd and Burton, which could reasonably have been anticipated by Cox and Buchwald and which, by exercising due diligence and authority over Calta, Loyd and Burton, could have been avoided.

353.　As a direct and proximate result of Cox and Buchwald's actions, Bollea has suffered economic and emotional injury, damage, loss and harm, damage to reputation, loss of income, anxiety, embarrassment, humiliation, shame, and severe emotional distress in an amount subject to proof; which damages are continuing in nature and will be suffered in the future.

## NINTH CAUSE OF ACTION

### (Negligence – Cox)

354.     Bollea repeats, re-alleges, adopts and incorporates each and every allegation contained in paragraphs 1 through 342, inclusive, as if fully set forth herein.

355.     As set forth above, Cox had actual or constructive control of the instrumentality, premises and/or tortfeasors that caused injury to Bollea.

356.     While engaged in the misconduct alleged herein, Calta and Loyd were acting within the course and scope of their employment as "shock jocks" for Cox, engaged in conduct of the kind they were hired to perform, within the time and space limits of their employment, and while motivated at least in part by a purpose to serve Cox.

357.     Alternatively, Cox's hiring, employment, promotion, and approval of misconduct of Calta and Loyd was calculated to, incited and encouraged imminent reckless behavior, such as the torts committed against Bollea.

358.     Cox had actual, constructive and/or implied knowledge of the imminent harm to Bollea, and owed Bollea a duty of care to prevent the misconduct of Cox's agents and employees, as well as misconduct on its premises and/or misconduct accomplished on or using its equipment and facilities.

359.     Cox breached its duty of care by failing to prevent its agents and employees from actively participating in, providing substantial assistance to, conspiring to, and acting in concert with others in procuring, disclosing, using, exploiting and disseminating the Footage, aiding and abetting others in doing the same, and otherwise failing to warn Bollea.

360.     As a direct and proximate result, Bollea has suffered damages, emotional injury, substantial economic injury, loss of income, harm, anxiety, shame, humiliation, emotional

distress, embarrassment, and damage to reputation, in an amount subject to proof; which damages are continuing in nature and will be suffered in the future.

## TENTH CAUSE OF ACTION

### (Negligence – Buchwald)

361.    Bollea repeats, re-alleges, adopts and incorporates each and every allegation contained in paragraphs 1 through 342, inclusive, as if fully set forth herein.

362.    As set forth above, Buchwald had actual or constructive control of the instrumentality, premises and/or tortfeasors that caused injury to Bollea.

363.    While engaging in the misconduct alleged herein, Burton was acting within the course and scope of his employment as an agent for Buchwald, engaged in conduct of the kind he was hired to perform, within the time and space limits of his employment, and while motivated at least in part by a purpose to serve Buchwald.

364.    Alternatively, Buchwald's employment and approval of the behavior of Burton was calculated to, incited and encouraged Burton's imminent reckless behavior, such as the torts committed against Bollea.

365.    Buchwald had actual, constructive and/or implied knowledge of the imminent harm to Bollea, and owed Bollea a duty of care to prevent the misconduct of Buchwald's agent and employee, as well as misconduct on its premises and/or misconduct accomplished or or using its equipment and facilities.

366.    Buchwald breached its duty of care by failing to prevent its agent and employee from actively participating in, providing substantial assistance to, conspiring to, and acting in concert with others in procuring, disclosing, using, exploiting and disseminating the Footage, aiding and abetting others in doing the same, and otherwise failing to warn Bollea.

367.     As a direct and proximate result, Bollea has suffered damages, emotional injury, substantial economic injury, loss of income, harm, anxiety, shame, humiliation, embarrassment, emotional distress, and damage to reputation, in an amount subject to proof; which damages are continuing in nature and will be suffered in the future.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, Terry Gene Bollea, prays for judgment against each of the Defendants as follows:

1.     For an award of general and special damages in an amount in excess of the minimum jurisdictional limits of this Court in accordance with proof at trial together with interest thereon at the maximum legal rate;

2.     For costs of suit incurred herein;

3.     For reasonable attorneys' fees;

4.     For a permanent injunction against Defendants, including all persons acting under their discretion or control or in active concert with them, prohibiting any and all activity that would cause the distributing, disseminating, disclosing, publishing, displaying, use, posting for view or access on or through the Internet or any other manner or media outlet, broadcasting, transferring, licensing, selling, offering to sell or license, or otherwise using, exploiting or attempting to exploit, the surreptitious Footage of Bollea, or any portions or content thereof or any copies thereof, in any and all formats and media, including all electronic and physical media;

5.     For an Order and Judgment requiring Defendants to turn over to Bollea all surreptitious Footage of Bollea, or any portions or content thereof or any copies thereof, in any and all formats and media, including all electronic and physical media; and

6.     For such other and further relief as to this Court may deem and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, Terry Gene Bollea, hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

Dated:  January 4, 2019.

/s/ Shane B. Vogt
Kenneth G. Turkel, Esq.
Florida Bar No. 867233
KTurkel@BajoCuva.com
Shane B. Vogt, Esq.
Florida Bar No. 257620
SVogt@BajoCuva.com
BAJO | CUVA | COHEN | TURKEL
100 N. Tampa Street, Suite 1900
Tampa, Florida  33602
Telephone:  (813) 443-2199
Facsimile:  (813) 443-2193

David R. Houston, Esq.
Nevada Bar No. 2131
(*Pro Hac Vice* application to be filed)
DHouston@houstonatlaw.com
LAW OFFICES OF DAVID R. HOUSTON
432 Court Street
Reno, Nevada  89501
Telephone:  (775) 786-4188
Facsimile:  (775) 786-5091

*Attorneys for Plaintiff Terry Gene Bollea,
professionally known as "Hulk Hogan"*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by

e-mail via the e-portal system this 4th day of January, 2019, to the following:

Morgan Barfield
Corless Barfield Trial Group, LLC
6812 West Linebaugh Avenue
Tampa, FL 33625
service@CorlessBarfield.com
MBarfield@CorlessBarfield.com
*Counsel for Matt Loyd and Tasha Carrega*

Erik R. Matheney
Ella Shenhav
Shutts & Bowen LLP
4301 West Boy Scout Boulevard, Suite 300
Tampa, FL 33607
ematheney@shutts.com
lwalter@shutts.com
eshenhav@shutts.com
shatfield@shutts.com
*Co-Counsel for Michael Calta a/k/a "Cowhead"*

Dominic Fariello
Law Offices of Dominic O. Fariello, P.A.
609 W. De Leon Street
Tampa, FL 33606
dominic@askthedom.com
*Co-Counsel for Michael Calta a/k/a "Cowhead"*

Gregory A. Hearing
Thompson, Sizemore, Gonzalez & Hearing, P.A.
One Tampa City Center
201 N. Franklin St., Suite 1600
Tampa, FL 33602
ghearing@tsghlaw.com
*Counsel for Cox Radio*

John A. Schifino, Esquire
William J. Schifino, Jr., Esquire
401 E. Jackson Street, Suite 2500
Tampa, FL 33602
wschifino@gunster.com
jschifino@gunster.com
cwarder@gunster.com
*Co-Counsel for Don Buchwald & Associates and Tony Burton*

Andrew M. Goldsmith, Esq.
Ilene S. Farkas, Esq.
Pryor Cashman LLP
7 Times Square
New York, NY 10036-6569
agoldsmith@pryorcashman.com
*Co - Counsel for Don Buchwald & Associates, Inc.*

Thomas Clyde
Lesli Gaither
Kilpatrick Townsend & Stockton LLP
Suite 2800, 1100 Peachtree Street NE
Atlanta, GA 30309-4528
tclyde@kilpatricktownsend.com
lgaither@kilpatricktownsend.com
*Pro Hac Vice Counsel for Cox Radio*

Keith M. Davidson
Keith M. Davidson & Associates, P.L.C.
8383 Wilshire Blvd., Suite 510
Beverly Hills, CA 90211-2406
keith@kmdlaw.com
*Counsel for Keith M. Davidson and Keith M. Davidson & Associates, P.L.C.*

David R. Houston, Esquire
Law Office of David R. Houston
432 Court Street
Reno, NV 89501

dhouston@houstonatlaw.com
krosser@houstonatlaw.com
*Co-Counsel for Plaintiff*

*/s/ Shane B. Vogt*
Attorney

# EXHIBIT B

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| HISCOX INSURANCE COMPANY, INC.,    ) | |
|                      ) | |
|       Plaintiff,          ) | |
|                      ) | |
| v.                               )      CASE NO. 20-cv-221 | |
|                      ) | |
| COX RADIO, INC., COX ENTERPRISES, INC.,  ) | |
| MICHAEL CALTA, MATTHEW CHRISTIAN   ) | |
| LOYD and TERRY GENE BOLLEA,        ) | |
|                      ) | |
|       Defendants.        ) | |
| _____) | |

## COMPLAINT FOR DECLARATORY JUDGMENT

HISCOX INSURANCE COMPANY, INC. ("Hiscox") pursuant to FED. R. CIV. P. 57 and

28 U.S.C. § 2201, respectfully submits this Complaint for Declaratory Judgment against

Defendants, COX RADIO, INC. ("Cox Radio"), COX ENTERPRISES, INC. ("Cox Enterprises"),

MATTHEW CHRISTIAN LOYD ("Loyd"), MICHAEL CALTA ("Calta") and TERRY GENE

BOLLEA ("Bollea"), and states as follows:

### Parties, Jurisdiction, and Venue

1.      Hiscox is a foreign corporation incorporated in the State of Illinois with its principal

place of business in Chicago, Illinois and is authorized to do business in the State of Florida.

2.      Bollea is an individual and plaintiff in the underlying action, resides in Pinellas

County, Florida, and is a citizen of the State of Florida.

3.      Cox Enterprises is a foreign corporation incorporated in the State of Delaware with

its principal place of business in Atlanta, Georgia, authorized to do business in the State of Florida.

4.      Cox Radio, is a foreign corporation incorporated in the State of Delaware with its

principal place of business in Atlanta, Georgia, authorized to do business in the State of Florida.

1

Hiscox Motion to Dismiss or Transfer Exhibit B

5.      Loyd is an individual and a named defendant in the underlying action and is a citizen of the State of Florida domiciled in Hillsborough County, Florida.

6.      Calta is an individual and a named defendant in the underlying action and is a citizen of the State of Florida domiciled in Pasco County, Florida.

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because of the complete diversity of citizenship and residency between Plaintiff and Defendant, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

8.      Venue is proper before this Court pursuant to 28 U.S.C. § 1391.

**Factual Background**

**A.      THE UNDERLYING LAWSUIT**

9.      On May 2, 2016, Bollea filed the underlying lawsuit captioned *Terry Gene Bollea professionally known as Hulk Hogan vs. Don Buchwald & Associates, Inc., et al*., in the Circuit Court of the Sixth Circuit in and for Pinellas County, Florida and assigned the Case Number 16-002861-CI.  (the "Underlying Lawsuit").

10.      On January 4, 2019, Bollea filed the Second Amended Complaint in the Underlying Lawsuit (the "Underlying Complaint"). A copy of the Underlying Complaint is attached hereto as Exhibit "A".

11.      The Underlying Complaint alleges that Bollea was the victim of an ongoing scheme orchestrated by defendants Calta and Loyd who allegedly victimized Bollea by obtaining, using, disclosing, selling, disseminating, and exploiting surreptitiously-recorded and illegally-obtained footage of Bollea naked, engaged in sexual activity, and having private conversation in a private bedroom (the "Bollea Footage").

12.     Specifically, the Underlying Complaint alleges that in 2012 and again in 2015, Defendants Loyd and Calta, leaked and sold excerpts of the Bollea Footage to tabloid news sites TMZ, TheDirty.com, and Gawker.com.

13.     The Underlying Complaint further alleges that Defendants Loyd and Calta ultimately tried to extort money from Bollea in exchange for the Bollea Footage—which included a recording in which Bollea was making racially insensitive comments.

14.     The Underlying Complaint alleges that the Bollea Footage allegedly led to the destruction of Bollea's career as it is alleged that Defendants Loyd and Calta conspired to leak, sell and anonymously send footage to websites, including TMZ.com, TheDirty.com, and Gawker.com.

**15.**     Bollea alleges in the Underlying Complaint:

77. Following the Gawker.com Posting, Cox Radio knew Bubba suspected Loyd was involved in leaking Footage of Bollea to the media. In fact, Cox Radio is believed to have initiated an investigation into the leaks of Footage during this time period.

*** 

81. In mid-August 2013, Cox Radio supervisory personnel met with Loyd about Bubba's claim that Loyd was responsible for selling Footage and Loyd's concerns about Bubba trying to get Loyd fired. On August 20, 2013, Calta sent Burton an e-mail indicating Cox was contemplating letting Bubba go.

82. On August 26, 2013, Cox fired Loyd. Shortly after his departure, Loyd tweeted, "Revenge is the best revenge. ... right Bubba? Just checking. . ."

83. After Loyd's termination, the hostility between Calta and Bubba got worse. In late 2013-early 2014, Cox Radio executives and Burton frequently were called on to intervene in on-air and social media attacks between Calta and Bubba.

***

105. As Calta, Loyd, Burton, and Cox Radio were conspiring in the ongoing war against Bubba, more illegal Footage of Bollea surfaced. This time, in July 2015, when the animosity between Calta, Loyd, Cox Radio, and Bubba was at its peak and TPD's criminal investigation over Footage was coming to an end, the most damaging, racially insensitive portions of the illegally recorded Footage were leaked to The Enquirer.

***

132. Once screen shots from the Footage surfaced on TheDirty.com and Loyd quit Bubba's show and was promoted by Cox Radio, the illegally recorded Footage and its source was a topic of discussion with Cox Radio; and Cox Radio's agents, employees, and supervisory personnel knew about, openly discussed and/or viewed Bollea Footage that had been stolen from Bubba's studio and circulated at Cox Radio's facilities.

133. However, Calta, Loyd, Burton, Cox Radio, and DBA failed to take any steps to notify or warn Bollea or Houston about the Footage or to prevent the Footage from being disseminated, used and/or exploited.

134. Cox, Calta, Loyd, Burton, Cox Radio, and DBA also failed to take any steps to prevent any further disclosure, dissemination or use of the Footage despite their ability to do so.

***

175. On October 4, 2012, Gawker posted the 1:41 Video to the Internet, along with a graphic narrative description of portions of the 30 Minute Video not contained in the 1:41 Video (the "Gawker.com Posting"). At least 7 million people watched the 1:41 Video on the Internet.

176. That same day, Burton and Calta had nine phone calls and talked for nearly 30 minutes. Calta also called Peirce and Brennan. Oliviero called Loyd and Calta. Loyd called Epps and, using the alias "Jim Jannero," direct messaged Daulerio. All of these communications were about the conspiracy and Footage. Burton also forwarded Calta a story published on heavydot.com about the release of the Hulk Hogan sex tape, in response to which Calta replied "That's GREAT!"

***

183. TMZ paid Loyd (between $8,500-$10,000) for the information he provided about, and as a licensing fee for access to and a transcript of Footage. In order to cover his tracks, Loyd directed TMZ to send that payment to Burbridge, who cashed the check, took a fee, and then gave the rest to Loyd and Carrega.

***

187. Davidson represented and acted on behalf of and in concert with Loyd, Carrega, Burbridge, and the conspiracy. He spoke to Houston and told him that his client possessed surreptitious recordings of Bollea, one of which contained insensitive racial remarks which could have the effect of causing great economic harm to Bollea if released publicly. Initially, Davidson requested $1 million for the DVDs. Davidson also said that the 30 Minute Video was sent to Gawker as a "shot across the bow."

***

218. The FBI interviewed Burbridge, who confirmed that Loyd leaked stills from surreptitious Footage to TheDirty.com and was paid by TMZ for leaking information about the Footage.

4

219. Burbridge also explained to the FBI how she, Carrega, and Loyd watched the Footage on Veterans Day 2012 at Loyd's house on Loyd's computer, and later had a conference call and meeting with Davidson in Pinellas County, Florida to plan out their exchange with Bollea.

*** 

276. On July 24, 2015, two days after Loyd and Calta's 35-minute call and Calta's calls to Brennan and Burton, The National Enquirer and its sister publication RadarOnline.com (collectively, the "Enquirer"), gave notice to Bollea's counsel that the Enquirer intended to publish excerpts from what they claimed was a confidential "sealed" transcript of Footage from the Gawker Litigation.

277. On July 24, 2015, the Enquirer published its story quoting excerpts from the surreptitious Footage of Bollea, which they described as coming from a court-protected, confidential transcript. That same day, the Enquirer's Lachlan Cartwright tweeted that Gawker was not its source for its story, and that the Enquirer was provided with a "transcript" of Footage. However, the Enquirer since confirmed it had no transcript or copies of any recordings of Bollea Footage.

*See* Underlying Complaint.

**16.** Notably, the Underlying Complaint concedes that the Defendants' actions were neither negligent nor news-gathering activities, stating at Paragraph 283 that:

Defendants, in doing the things alleged herein, acted with actual malice and reckless disregard of Bollea's rights. Moreover, although **none of the Defendants were acting in the capacity of a member of the "press" while engaging in the conduct forming the basis of this action, the actions of each of the Defendants, alleged herein, still served no legitimate public interest** . . .

*See* Underlying Complaint at ¶ 283 (Emphasis added).

**17.** Bollea asserts ten causes of action in the Underlying Complaint: (1) Invasion of Privacy and/or Aiding and Abetting Invasion of Privacy; (2) Public Disclosure of Private Facts and/or Aiding and Abetting Public Disclosure of Private Facts; (3) Invasion of Privacy by Intrusion Upon Seclusion and/or Aiding and Abetting Invasion of Privacy by Intrusion Upon Seclusion; (4) Intentional Infliction of Emotional Distress; (5) Intentional Interference with Contractual Relations and Advantageous Business Relationships; (6) Violation of Section 934.10 Florida Statutes and/or

5

Aiding and Abetting of Violation of Section 934.10, Florida Statutes; (7) Civil Conspiracy; (8)

Negligent Retention – Cox & Buchwald; (9) Negligence – Cox; and (10) Negligence – Buchwald.

## B.    THE INSURANCE POLICY

18.    Hiscox issued an insurance policy to Cox Enterprises, bearing effective dates of

December 1, 2011 through December 1, 2012 providing Multimedia Coverage, designated policy

no. US UUA 2619952.11 (the "Policy").  A true and correct copy of the Policy is attached hereto

as Exhibit "B".

19.    The Policy provides Multimedia Coverage up to the $15,000,000 Single Aggregate

Limit and is subject to a $500,000 Retention.

20.     The Policy states in relevant part:

> We will indemnify you for defense costs and damages incurred as a result of a claim
> that falls within WHAT HAS TO GO WRONG (Section II) under this policy,
> WHAT WE WILL PAY (Section IV) under this policy, and HOW MUCH WE
> WILL PAY (Section V) under this policy.

***

**II. WHAT HAS TO GO WRONG**

Media, personal injury and negligent media content liability

The performance of media activities by you or anyone on your behalf during the
policy period results in a claim against you that arises from covered media or
advertising, regardless of when such claim is made or where such claim is brought,
and including but not limited to any claim for any actual or alleged:

***

d. defamation, including but not limited to libel, slander, trade libel, product
disparagement, and injurious falsehood;

e. infliction of emotional distress or outrage;

f. breach of duty of confidentiality, invasion of privacy or violation of any other
legal protections for personal information, including but not limited to false light,

6

intrusion upon a person's seclusion, public disclosure of a person's private information, misappropriation of a person's picture, name, voice, or identity for commercial gain, or unauthorized interception or recording of sound or data in violation of a civil anti-wiretap statute;

\*\*\*

i. unfair competition, deceptive business practices, or false designation or origin, but only when asserted in conjunction with and based on the same factual allegations as a claim under (a), (b), (c), (d), or (e) above;

\*\*\*

l. negligent supervision of an employee, but only when asserted in conjunction with and based on the same factual allegations as a claim under (a), (b), (c), (d) or (e) above; and/or

m. any form of negligence (including any negligent act, negligent error, negligent omission, negligent misrepresentation, negligent misstatement, including negligent transmission of a computer virus) but only where arising from your media content disseminated in covered media or advertising.

\*\*\*

## IV. What we will pay

| | |
|---|---|
| Payments toward defense costs | We will pay covered defense costs as incurred by you. |
| Payment toward claim resolution | We will pay covered damages as incurred by you |

21.     The Policy also contains the following definitions:

Definition of "Covered Media." Where the phrase "covered media" appears within this policy (whether in the singular or plural), it shall solely mean the following:
All publications, programming and other communications (but not including ordinary business communications not directly related to the preparation, dissemination or promotion of your multimedia products) produced or disseminated by you; including but not limited to content of personal appearances by you and all content disseminated via web sites owned or operated by you.

\*\*\*
"Advertising" means advertising, publicity, or promotion in or of covered media.
\*\*\*

7

"Media activities" means:

1. the gathering, acquisition, investigation, collection, researching, creation and compilation of media content;

2. any broadcast, transmission, dissemination, telecast, cablecast, syndication, serialization, podcast, streaming, or production of media content;

3. any publication, republication, or dissemination of media content including any special editions or supplements to such media content;

4. any digital, online, or electronic dissemination of media content,… regardless of the mode or method of communication of such media content.

"Media content" means the substance of any communication of any kind whatsoever within covered media or advertising, regardless of the nature or form of such "media content" or the medium by which such "media content" is communicated, including but not limited to language, data, facts, fiction, music, photographs, images, advertisements, artistic expression, or visual or graphical

22.     The Policy is modified by Endorsement 1, which states:

In consideration of the premium charged and on the understanding that this endorsement leaves all other terms, conditions and exclusions unchanged, it is agreed that:

1. Under What Has To Go Wrong (Section II), Media, personal injury and negligent content liability, paragraph l. is deleted in its entirety and replaced with the following:

l. negligent supervision of an employee, but only when asserted in conjunction with and based on the same factual allegations as a claim under (a) - (m); and/or

2. Also under What Has To Go Wrong (Section II), Media, personal injury and negligent content liability, paragraph k. is deleted and replaced with the following:

k. disclosure of a trade secret, but only where the disclosure alleged was to the public within covered media;

***

5. Under Definitions (Section VIII), "Advertising" is deleted and replaced with the following:

8

"Advertising" means advertising, marketing, publicity, or promotion of the insured's, existing subsidiary's, or acquired entity's own goods and services and of the goods and services of their clients.

6. Under General Matters (Section IX), Alternate dispute resolution is deleted in its entirety and replaced with the following:

We and you agree that any dispute arising out of or relating to this policy, including but not limited to its construction, application and validity, or any breach thereof, shall be submitted to non-binding mediation prior to the commencement of litigation by either party. We and you shall mutually agree on the choice of a mediator, as well as a location for mediation. Each party shall bear its own fees and costs in connection with any mediation but the fees and expenses of the mediator shall be shared equally by the parties.

23.     To the extent that the Underlying Lawsuit alleges facts, the facts alleged do not implicate the Policy because the allegations fail to fall within the aforementioned definitions of "media activity," "media content," or "covered media," and thus the Policy does not provide coverage.

24.     Pursuant to the terms of the Policy, Hiscox attended mediation with Cox Radio and Cox Enterprises on January 23, 2020, to address and attempt to resolve the coverage issues between them, which mediation was unsuccessful.

## COUNT I - DECLARATORY JUDGMENT

25.     Hiscox realleges and incorporates the allegations contained in Paragraphs 1-24 above as if fully set forth herein.

26.     Hiscox seeks an Order from the Court determining the obligations of Hiscox to the Parties relative to the Underlying Lawsuit, including a determination that Hiscox is not obligated to defend and/or indemnify Cox Enterprises, Cox Radio, Loyd or Calta relative to the Underlying Lawsuit.

27. An actual, justiciable controversy exists between the Parties regarding Hiscox's obligations under the Policy in regards to the Underlying Lawsuit within the meaning of 28 U.S.C. § 2201 as demonstrated by the facts alleged herein.

28. Accordingly, Hiscox is uncertain as to its rights, duties and obligations under the Policy.

29. A bona fide, actual, present practical need for a declaration exists.

30. The declaration requested concerns a present, ascertained or ascertainable state of facts or present controversy as to a state of facts.

31. A privilege or right of the Plaintiff is dependent upon the facts or the law applicable to the facts.

32. The Parties have an actual, present, adverse and antagonistic interest in the subject matter, either in law or in fact.

33. The relief sought by Hiscox is not merely the giving of legal advice or the answer to questions propounded for curiosity.

34. Further, Hiscox seeks an Order awarding Hiscox such other relief as the Court deems proper.

WHEREFORE the Plaintiff, HISCOX INSURANCE COMPANY, INC., respectfully requests that this Court resolve this controversy pursuant to FED. R. CIV. P. 57 and 28 U.S.C. § 2201 and determine the rights and obligations of the Parties under the Policy relative to the Lawsuit, enter a declaration that Hiscox is not required to defend and/or indemnify Defendants COX RADIO, INC., COX ENTERPRISES, INC., MICHAEL CALTA and/or MATTHEW CHRISTIAN LOYD in relation to the claims raised by TERRY BOLLEA in the Underlying Lawsuit, and any other relief this Court deems just.

10

Respectfully submitted this 28 day of January, 2020,

LYDECKER |DIAZ
*Attorneys for Plaintiff,*
*HISCOX INSURANCE COMPANY, INC.*
1221 Brickell Avenue, 19th Floor
Miami, Florida 33131
(305) 416-3180 – Phone
(305) 416-3190 – Fax

By:     _/s/ Stephen Hunter Johnson_____
STEPHEN HUNTER JOHNSON
Florida Bar No. 12362
shj@lydeckerdiaz.com
SHAWN L.M. HAIRSTON
Florida Bar No. 110046
shairston@lydeckerdiaz.com

# EXHIBIT C



| DEBIT NOTE / COMMISSION STATEMENT |
| --- |

**HISCOX INSURANCE COMPANY INC. (A Stock Company)**

104 South Michigan Avenue, Suite 600, Chicago, IL 60603
(646) 452-2353

---

**Policy Number:  US UUA 2619952.11**

---

**Attention :**

**Eric Seyfried**

**Marsh Risk & Insurance Services**
**1166 Avenue of the Americas**
**New York, New York 10036-2774**

**Your Reference :**                                      **Transaction :**      Renewal Schedule

**Insured :**          Cox Enterprises, Inc.             **Effective Date :**  December 1st, 2011

**Address :**         6205 Peachtree Dunwoody Road, NE
                             Atlanta, Georgia 30328

| | | |
| --- | --- | --- |
| **Total amount :** | $ | ▮▮▮▮ |
| **Commission due to you :** | $ | ▮▮▮ |
| **Total due:** | $ | ▮▮▮▮ |

Please remit payment within agreed upon credit terms.  If statement reflects a return premium, please contact our accounting
department for further assistance via the email address usaccountsreceivable@hiscox.com
Kindly reference our policy number(s) on all checks, wire transfers and remittances.
Please email remittance advice for all premium payments to USAccountsreceivable@hiscox.com.
Please email all refund requests to USARefunds@hiscox.com.

**Wire transfer instructions:**                              **For 1st Class Mail:**
JP Morgan Chase Bank, NA                               Hiscox Inc.
New York, NY                                                    PO Box 5945
ABA # 021000021                                            New York, NY 10087-5945
Acct # 800795643
**For Mail Sent via Fedex, DHL, UPS (aka overnight payments):**
JP Morgan Chase
Attn R1 - lbx5945
4 Chase Metrotech Center 7Fl
Brooklyn NY 11245
Tele 718-242-0716

| EXHIBIT |
| --- |
| **B** |

<span style="color:red">**Hiscox Motion to Dismiss or Transfer Exhibit C**</span>



| | DECLARATION |
|---|---|

## HISCOX INSURANCE COMPANY INC. (A Stock Company)

104 South Michigan Avenue, Suite 600, Chicago, IL 60603
(646) 452-2353

## Policy Number:  US UUA 2619952.11

This declaration confirms the renewal of your insurance with us for the policy period set out below. Your insurance with us for this period is on the basis of the wording (as identified below) and any amendments that have been agreed to this wording are identified on this declaration.

### I.   GENERAL DETAILS

| | |
|---|---|
| **Policy Number** | US UUA 2619952.11 |
| **Insured** | Cox Enterprises, Inc. |
| **Insured's Contact Address** | 6205 Peachtree Dunwoody Road, NE<br>Atlanta, Georgia 30328 |
| **Underwriter** | Hiscox Insurance Company Inc |
| **Insured's Broker** | Marsh Risk & Insurance Services<br>1166 Avenue of the Americas<br>New York, New York 10036-2774 |
| **Insured's Payment** | Payment by Broker's Account |
| **Premium** |  |

### II.   COVERAGE DETAILS

| | |
|---|---|
| **Policy Wording** | US TMT Multimedia Liability (Admitted) |
| **Policy Period** | December 1st 2011 to December 1st 2012 at 12:01 am local time at the insured's contact address |

### III.   SPECIFIC COVERAGE DETAILS

#### MULTIMEDIA (ADMITTED)

**Definition of "Covered Media."**  Where the phrase "covered media" appears within this policy (whether in the singular or plural), it shall solely mean the following:

All publications, programming and other communications (but not including ordinary business communications not directly related to the preparation, dissemination or promotion of your multimedia products) produced or disseminated by you; including but not limited to content of personal appearances by you and all content disseminated via web sites owned or operated by you.

| | |
|---|---|
| **Policy Limit** | $ 15,000,000 Single Aggregate Limit, inclusive of defense costs and damages. |

Page 1



# DECLARATION

## HISCOX INSURANCE COMPANY INC. (A Stock Company)

104 South Michigan Avenue, Suite 600, Chicago, IL 60603
(646) 452-2353

**Policy Number:  US UUA 2619952.11**

| | |
|---|---|
| **Retention** | $ 500,000 Each and every claim inclusive of defense costs and damages. |
| **Geographical Limits** | Worldwide |
| **Applicable Courts** | Worldwide |

# DECLARATION

**HISCOX INSURANCE COMPANY INC. (A Stock Company)**

104 South Michigan Avenue, Suite 600, Chicago, IL 60603
(646) 452-2353

**Policy Number:  US UUA 2619952.11**

| ENDORSEMENTS - Applicable to the whole policy |
|---|

| | |
|---|---|
| **Endorsement 1** | **E60.1 Cox Amendments Endorsement** |
| **Endorsement 2** | **E62.1 Professional Services Endorsement (Occurrence)** |
| **Endorsement 3** | **E68.1 Cox Claims Reporting Endorsement** |
| **Endorsement 4** | **E69.1 Technology Activities with Breach of Contract Endorsement** |
| **Endorsement 5** | **E70.1 Additional Insured Endorsement** |
| **Endorsement 6** | **E2386.1 Social Media Extension MM** |
| **Endorsement 7** | **E2404.1 Subpoena Defense Costs Coverage Endorsement** |
| **Endorsement 8** | **E2405.1 Broad Form Errors and Omissions (BI/PD) Endorsement MM/MAC** |
| **Endorsement 9** | **E2409.1 Reporter's Shield Enhancement Endorsement** |
| **Endorsement 10** | **E2416.1 Amended Definition of "Acquired Entity" Endorsement** |
| **Endorsement 11** | **E2421.2 Spousal, Civil Union & Domestic Partner Extension End MM/MAC** |
| **Endorsement 12** | **E2430.1 Remove Settlement Clause Endorsement** |
| **Endorsement 13** | **E2444.1 Specific Exclusion Endorsement** |
| **Endorsement 14** | **E2484.1 Premium Payment Warranty** |
| **Endorsement 15** | **E2531.1 First Amendment Enhancement Endorsement MM** |
| **Endorsement 16** | **E2816.2 Georgia Amendatory Endorsement MM/MAC** |

IN WITNESS WHEREOF this Declarations has been signed at New York, New York



| | DECLARATION |
|---|---|

# HISCOX

## HISCOX INSURANCE COMPANY INC. (A Stock Company)

104 South Michigan Avenue, Suite 600, Chicago, IL 60603
(646) 452-2353

**Policy Number:  US UUA 2619952.11**

| Endorsement 1 | E60.1 Cox Amendments Endorsement |
|---|---|

In consideration of the premium charged and on the understanding that this endorsement leaves all other terms, conditions and exclusions unchanged, it is agreed that:

1.  Under What Has To Go Wrong (Section II), Media, personal injury and negligent content liability, paragraph l. is deleted in its entirety and replaced with the following:

l. negligent supervision of an employee, but only when asserted in conjunction with and based on the same factual allegations as a **claim** under (a) - (m); and/or

2.  Also under What Has To Go Wrong (Section II), Media, personal injury and negligent content liability, paragraph k. is deleted and replaced with the following:

k. disclosure of a trade secret, but only where the disclosure alleged was to the public within **covered media**;

3.  With respect to What We Will Not Pay (Section VI), Exclusions, paragraphs c. and n., no conduct of any of **you** will be imputed to any other of **you** to determine the applicability of exclusion c. or n.

4. YOUR OBLIGATIONS TO US (Section VII), Your Representations, of the policy is amended as necessary to include the following:

The unintentional failure by **you** to provide accurate and complete representations as of the inception of the policy will not prejudice the coverages afforded by this policy.

5.  Under Definitions (SectionVIII), "Advertising" is deleted and replaced with the following:

"Advertising" means advertising, marketing, publicity, or promotion of the **insured's**, **existing subsidiary's**, or **acquired entity's** own goods and services and of the goods and services of their clients.

6.  Under General Matters (Section IX), Alternate dispute resolution is deleted in its entirety and replaced with the following:

**We** and **you** agree that any dispute arising out of or relating to this policy, including but not limited to its construction, application and validity, or any breach thereof, shall be submitted to non-binding mediation prior to the commencement of litigation by either party. **We** and **you** shall mutually agree on the choice of a mediator, as well as a location for mediation. Each party shall bear its own fees and costs in connection with any mediation but the fees and expenses of the mediator shall be shared equally by the parties.

7.  Under General Matters (Section IX), the Severability clause is deleted in its entirety.



## DECLARATION

**HISCOX INSURANCE COMPANY INC. (A Stock Company)**

104 South Michigan Avenue, Suite 600, Chicago, IL 60603
(646) 452-2353

**Policy Number:  US UUA 2619952.11**

8. Under General Matters (Section IX), the following is added:

Choice of Law
This policy, including its construction, application and validity, is governed by the laws of the State of Georgia without reference to that state's choice of law principles.

The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

**Effective Date:    12/01/2011**



| | **DECLARATION** |
|---|---|

**HISCOX INSURANCE COMPANY INC. (A Stock Company)**

104 South Michigan Avenue, Suite 600, Chicago, IL 60603
(646) 452-2353

---

**Policy Number:  US UUA 2619952.11**

---

| Endorsement 2 | **E62.1 Professional Services Endorsement (Occurrence)** |
|---|---|

In consideration of the premium charged and on the understanding that this endorsement leaves all other terms, conditions and exclusions unchanged, it is agreed that:

1. WHAT HAS TO GO WRONG (Section II) of the policy is amended to include:

**Professional Services**

The performance during the **policy period** of **professional services** for a **client** by **you** or anyone on **your** behalf, including **your** subcontractors and outsourcers, results in a **claim** against **you** that arises from any actual or alleged breach of duty, negligent act, negligent error, or negligent omission, regardless of when such **claim** is made and where such **claim** is brought.

2. For the purposes of the coverage provided by Section 1 of this endorsement only, WHAT WE WILL NOT PAY (Section VI), paragraph (o), of the policy is amended to read:

(o) any breach of any written, oral, express or implied contract or warranty; provided, however, that this exclusion will not apply to any covered liability **assumed under agreement**; to any covered portion(s) of a **claim** under WHAT HAS TO GO WRONG (Section II) Media, Personal Injury & Negligent Media Content Liability (b), (c), (g), (h) or (i) of the policy; or to any legal obligation **you** would otherwise owe in the absence of such contract or warranty;

3. For the purposes of the coverage provided by Section 1 of this endorsement only, WHAT WE WILL NOT PAY (Section VI), Exclusions, of the policy is amended by adding the following:

**We** will not make any payment, including **defense costs** and **damages**, toward any portion(s) of any **claim**:

AA. for, alleging, or arising from:
(i) any breach of an express warranty, guarantee, or contract, including but not limited to any agreements to refund, repurchase, or indemnify any person or entity;

(ii) any breach of any exclusivity, non-competition, non-solicitation, or other similar commercial terms in **your** contract with a **client**;

BB. for, alleging, or arising from any defect in any software, hardware, firmware, or associated network cabling that is solely caused by a third party, including but not limited to any third party software supplier, manufacturer or originator;



# DECLARATION

**HISCOX INSURANCE COMPANY INC. (A Stock Company)**

104 South Michigan Avenue, Suite 600, Chicago, IL 60603
(646) 452-2353

**Policy Number:  US UUA 2619952.11**

CC. for, alleging, or arising from **your** commercial decision to cease providing a particular product or service but only if **you** are contractually obligated to continue providing such product or service;

DD. for, alleging, or arising from any racketeering or conspiracy law, including but not limited to any actual or alleged violations of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. Section 1961 et seq., any similar state statute, or any amendments thereto or any rules or regulations promulgated under any of them;

EE. for, alleging, or arising from any chargeback, liability or fee incurred by **you** or **your client** as a result of a merchant service provider, including any credit card company or bank, wholly or partially reversing or preventing a payment transaction;

FF. made against **you** by any person or entity falling within the definition of **you**; however, this exclusion will not apply to any **claim** based on a liability to an independent third party directly arising out of the performance of your defined **professional services** but which is brought against **you** via an **existing subsidiary**, parent or sister company;

GG. for, or arising from any armed struggle, civil unrest or conflict or any nationalization, confiscation, requisition, expropriation, appropriation, seizure or destruction of property by or under the order of any government or public or local authority;

HH. for, alleging, or arising from any act or threatened act of terrorism, including but not limited to the use of force or violence, of any person(s) or group(s) of persons whether acting alone or on behalf of or in connection with any organization(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear;

II. directly or indirectly arising out of any activities occurring prior to the applicable **retroactive date** (if any);

JJ. for, alleging, or arising from any electrical or mechanical breakdown, electrical disturbance, wear and tear or gradual deterioration;

KK. for, alleging, or arising from any wrongful taking or intentional disclosure of proprietary information, including but not limited to trade secrets or other confidential business information;

LL. for, alleging, or arising from any violation of the responsibilities, obligations or duties imposed by Employee Retirement Income Security Act of 1974, or amendments thereto or similar provisions of any federal, state or local statutory law or common law;



| **DECLARATION** |
| :--- |

# HISCOX

**HISCOX INSURANCE COMPANY INC. (A Stock Company)**

104 South Michigan Avenue, Suite 600, Chicago, IL 60603
(646) 452-2353

**Policy Number:  US UUA 2619952.11**

---

MM. for, alleging, or arising from any failure or inability to pay any bond, debt, financial guarantee or failure to pay or collect funds;

NN. for, alleging, or arising from any financial or investment advice given or predictions of financial performance;

OO. for, alleging, or arising from any legal, audit or accountancy advice or services;

PP. for, alleging, or arising from any real estate services or advice;

QQ. for, alleging, or arising from any pharmaceutical or medical advice or treatment; or

RR. for, alleging, or arising from **your** manufacture, sale, supply, installation or maintenance of any product.

4. For the purposes of the coverage provided by Section 1 of this endorsement only, DEFINITIONS (Section VIII) of the policy is amended to include the following terms:

"Client" means any person or entity with whom **you** have contracted to provide **your** services or deliverables that expressly fall within **your professional services**.

"Professional services" means commercial printing for others for a fee; advertising and marketing services for others for a fee; design, creation, hosting and management of web sites or communication devices for others; application development for others

5. For the purposes of the coverage provided by Section 1 of this endorsement only, DEFINITIONS (Section VIII), Damages, of the policy is amended by adding the following:

"Damages" also does not include:

6. the return or restitution of all or any portion of fees, commissions, profits, or charges for goods provided or services rendered by **you**, or anyone performing **professional services** on **your** behalf;

7. the costs of recall, repair or correction of any **professional services**.

| | |
|---|---|
| **HISCOX** | **DECLARATION** |

**HISCOX INSURANCE COMPANY INC. (A Stock Company)**

104 South Michigan Avenue, Suite 600, Chicago, IL 60603
(646) 452-2353

**Policy Number:  US UUA 2619952.11**

6. For the purposes of the coverage provided by Section 1 of this endorsement only, DEFINITIONS (Section VIII), You/Your of the policy is deleted and replaced by the following:

"You and Your" means:

1. the **insured**, any **existing subsidiary** or any **acquired entity**;

2. any person who was, is or becomes a director, officer, trustee, partner in, or employee of the **insured**, any **existing subsidiary** or any **acquired entity** but only in respect to **claims** arising out of the course and scope of their duties as such and in the event of their death, incapacity or bankruptcy, any **claim** against their estates, heirs, legal representatives or assigns shall be considered a **claim** against them;

3. any person or entity that takes legal control of the insured, existing subsidiary or acquired entity upon the insolvency or bankruptcy of the **insured**, **existing subsidiary** or **acquired entity**;

7. For the purposes of the coverage provided by Section 1 of this endorsement only, GENERAL MATTERS (Section IX), Date of Performance of Media Activities, of the policy is deleted in its entirety.

The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

**Effective Date:**      **12/01/2011**

**DECLARATION**

# HISCOX

**HISCOX INSURANCE COMPANY INC. (A Stock Company)**

104 South Michigan Avenue, Suite 600, Chicago, IL 60603
(646) 452-2353

---

**Policy Number:  US UUA 2619952.11**

---

| Endorsement 3 | **E68.1 Cox Claims Reporting Endorsement** |
|---|---|

In consideration of the premium charged and on the understanding that this endorsement leaves all other terms, conditions and exclusions unchanged, it is agreed that:

1.  WHAT YOU MUST NOTIFY AND WHEN (Section III) of the policy is hereby deleted in its entirety and replaced with the following:

**You** must notify **us** of **claims** against **you** as soon as practicable after such **claim** is first made and the Risk Manager, Chief Financial Officer, General Counsel's office, or Chief Technology Officer first knows or should have known of such **claim**.  Proper notification must be sent in accordance with the instructions set forth below.

Please provide notification of any claim(s), subpoenas **or first amendment restrictions** to:

Hiscox, 520 Madison Ave,  32nd Floor, New York, NY 10022
Email:  tmtclaims@hiscox.com
Fax: 212.922.9652
Telephone: 1.877.544.7269

2.  Notwithstanding the foregoing, it is not necessary to report a **claim** where no lawsuit has been filed or a subpoena or a **first amendment restriction** until the cost of resolving such **claim**, subpoena or **first amendment restriction** inclusive of all **defense costs** has reached $50,000, and then you must notify us of such **claim,** subpoena or **first amendment restriction** as soon as practicable thereafter.

The titles and headings of this endorsement are solely for ease of reference and do not form any part of the terms and conditions of coverage.

**Effective Date:    12/01/2011**

| | DECLARATION |
|---|---|

**HISCOX**

## HISCOX INSURANCE COMPANY INC. (A Stock Company)

104 South Michigan Avenue, Suite 600, Chicago, IL 60603
(646) 452-2353

---

## Policy Number:  US UUA 2619952.11

---

| Endorsement 4 | **E69.1 Technology Activities with Breach of Contract Endorsement** |
|---|---|

In consideration of the premium charged and on the understanding that this endorsement leaves all other terms, conditions and exclusions unchanged, it is agreed that:

1. WHAT HAS TO GO WRONG (Section II) of the policy is amended to include

**Technology liability protection**

The performance of **technology activities** on or after the **retroactive date** by **you** or anyone on **your** behalf, including **your** subcontractors and outsourcers, results in a **claim** first made against **you** during the **policy period**, regardless of where such **claim** is brought, provided that **you** report the **claim** to **us** during the **policy period** or any applicable extended reporting period, for any actual or alleged:

a. unintentional breach of a written contract brought by a **client**;

b. negligence or breach of any duty to use reasonable care, including but not limited to negligent transmission of a computer virus, worm, logic bomb or Trojan horse or negligence in connection with a denial of service attack, or negligent misrepresentation;

c. intellectual property infringement (but not any patent infringement or trade secret misappropriation), including but not limited to copyright infringement, trademark infringement, trademark dilution, trade dress infringement, publicity rights violations, cybersquatting violations, moral rights violations, any act of passing-off, or any misappropriation of formats, characters, trade names, character names, titles, plots, musical compositions, voices, slogans, graphic material or artwork;

d. unfair competition, deceptive business practices or false designation of origin but only when asserted in conjunction with and based on the same allegations as a **claim** falling under the immediately preceding subparagraph (c) above;

e. breach of any duty of confidentiality, invasion of privacy or violation of any other legal protections for personal information, including but not limited to false light, intrusion upon a person's seclusion, public disclosure of a person's private information, misappropriation of a person's picture, name, voice or identity for commercial gain, unauthorized interception or recording of images or sound in violation of an anti-wiretapping statute; or

f. defamation, including but not limited to libel, slander, trade libel, product disparagement, or injurious falsehood.

2. For the purposes of the coverage provided by Section 1 of this endorsement only, WHAT YOU MUST NOTIFY AND WHEN (Section III) of the policy is hereby deleted in its entirety and replaced with the following:

**A. Claims**

**You** must notify **us** of **claims** against **you** as soon as practicable and in any event within the **policy period**.  Proper notification of **claims** must be sent in accordance with the notification details set forth on the Declarations.



# DECLARATION

**HISCOX INSURANCE COMPANY INC. (A Stock Company)**

104 South Michigan Avenue, Suite 600, Chicago, IL 60603
(646) 452-2353

**Policy Number:  US UUA 2619952.11**

**B. Potential claims**

**You** may notify **us** of **potential claims** under this policy. If **you** do, such notification must be provided as soon as practicable and within the **policy period** or any applicable extended reporting period, and must to the fullest extent possible identify the particulars of the **potential claim**, including identifying the potential claimant(s), the likely basis for liability, the likely demand for relief, and any additional information about the **potential claim** that we reasonably request. If such a **potential claim** notification is made to **us** then we will treat any **claim** arising from the same particulars as that notification as if it had first been made against **you** on the date **you** properly notified **us** of it as a **potential claim**, even if that **claim** is first made against **you** after the **policy period** has expired. Proper notification of **potential claims** must be sent in accordance with the instructions set forth under the Declarations.

**C. Automatic extended reporting period**

If **we** renew this policy, then **we** agree to accept **your** proper notification of **claims** and **potential claims** under this policy for up to 30 days after the **policy period** has expired, provided **you** first become aware of the **claim** or **potential claim** during the last 30 days of the **policy period**.

If **we** cancel this policy or do not offer renewal terms for this policy, then **we** agree to accept **your** proper notification of **claims** and **potential claims** under this policy up to 30 days after the **policy period** has expired, provided **you** first become aware of the **claim** or **potential claim** during the last 30 days of the **policy period** or during the 30 days immediately following the **policy period**, and such **claim** or **potential claim** directly arises from circumstances or events first occurring after the **retroactive date** but before the end of the **policy period**.

The automatic extended reporting periods described in this section do not apply unless **we** are notified of such **claim** or **potential claim** as soon as practicable but no later than 30 days from the date **you** first learned of the **claim** or **potential claim**, and they do not apply to any policy that **we** have cancelled or refused to renew due to **your** non-payment of premium or failure to comply with the terms of this policy.

It is agreed that the applicable extended reporting period(s) set forth in this section shall be superceded by any conflicting applicable law that requires **we** provide to **you** a longer extended reporting period.

3. For the purposes of the coverage provided by Section 1 of this endorsement only, WHAT WE WILL NOT PAY (Section VI), paragraph (m) of the policy is deleted and replaced with the following:

(m) any damage to, destruction or loss of use of any tangible property; however, this exclusion will not apply to any covered **claim** for trespass or to any damage to electronically stored data, or destruction or loss of use of electronically stored data;

# HISCOX

## DECLARATION

**HISCOX INSURANCE COMPANY INC. (A Stock Company)**

104 South Michigan Avenue, Suite 600, Chicago, IL 60603
(646) 452-2353

---

**Policy Number: US UUA 2619952.11**

---

4. For the purposes of the coverage provided by Section 1 of this endorsement only WHAT WE WILL NOT PAY (Section VI), paragraph (o) of the policy is deleted and replaced with the following:

(o) any written, oral, express or implied contract or warranty; however, this exclusion will not apply to any:

(i) covered liability **assumed under agreement**;

(ii) covered portion(s) of a **claim** under WHAT HAS TO GO WRONG (Section II), Media, personal injury & negligent media content (b), (c), (g), (h) or (i) of the policy;

(iii) legal obligation **you** would owe in the absence of such contract or warranty; or

(iv) **technology claim**.

5. For the purposes of the coverage provided by Section 1 of this endorsement only, WHAT WE WILL NOT PAY (Section VI), Exclusions, of the policy is amended by adding the following:

**We** will not make any payment, including **defense costs** and **damages**, toward any portion(s):

AA. of any **technology claim** alleging or arising from:

(i) any contractual liability where at the time such contract was entered into **you** were aware or reasonably ought to have been aware that there were not sufficient technical, logistical, or financial resources to perform the contract as promised, including **your** promise to meet a certain performance standard under a service level agreement;

(ii) any breach of a warranty or guarantee; however, this exclusion will not apply to the following:

a. **your** warranty or guarantee that **you** will use reasonable care and skill in the performance of a contract;

b. **your** warranty or guarantee that any software, hardware, firmware, or related services falling within **your technology activities** will not infringe another's intellectual property rights;

c. any implied warranty or similar statutory term requiring any software, hardware, or firmware falling within **your technology activities** to meet a certain standard of quality, safety or fitness, even if **you** have expressly warranted that such software, hardware, or firmware will meet the legally required standard to which **you** are subject;

d. **your** warranty or guarantee that any software, hardware, firmware, or related services falling within **your technology activities** will substantially conform to any material, written specifications and performance standards forming part of the contract between **you** and **your client**; or

(iii) any breach of any exclusivity, non-competition, non-solicitation, or other similar commercial terms in **your** contract with a **client**;

| | DECLARATION |
|---|---|

**HISCOX**

**HISCOX INSURANCE COMPANY INC. (A Stock Company)**

104 South Michigan Avenue, Suite 600, Chicago, IL 60603
(646) 452-2353

**Policy Number: US UUA 2619952.11**

BB. of any **technology claim** resulting in an award for consequential, special or indirect damages, or loss of claimant's profits. However, this exclusion will not apply to:

(i) breach of a warranty made by **you** that any software, hardware, firmware, or related services falling within **your technology activities** will not infringe another's intellectual property rights;

(ii) breach of an express contractual provision that is solely triggered by **your** disclosure of **your client's** confidential information;

(iii) a court's award of consequential, special or indirect damages resulting from **your** contractual disclaimer of such damages being deemed unenforceable by the same court issuing the award;

(iv) any contract between **you** and a governmental entity that has insisted, in writing, that it retain the right to recover consequential damages as a precondition to the execution of the contract;

CC. of any **technology claim** for, alleging, or arising from any defect in any software, hardware, firmware, or associated network cabling that is solely caused by a third party, including but not limited to any third party software supplier, manufacturer or originator; provided, however, that this exclusion will not apply to: (1) covered **defense costs** incurred by **you** to defend such portions of a **claim** but only until (if ever) there is a finding in any legal proceeding (including any arbitration) or any admission that the defect at issue is solely caused by a third party, at which time **you** shall reimburse us for all **defense costs** that **we** have paid toward that **claim**, or (2) any amount **you** satisfy **us** that **you** are legally able to recover under a written contract;

DD. of any **technology claim** for, alleging, or arising from any costs or expenses involved in the repair, upgrade, correction, recall or replacement of any software, hardware, firmware, or associated network cabling, or any costs or expenses relating to **your** legal obligation to comply with an injunction; however, this exclusion will not apply to any portion of a judgment requiring **you** to pay direct damages to **your client** for breach of contract;

EE. of any **technology claim** for, alleging, or arising from **your** commercial decision to cease providing a particular product or service but only if **you** are contractually obligated to continue providing such product or service;

FF. of any **technology claim** for, alleging, or arising from any self-replicating, malicious code that was not specifically targeted to **your** system; however, this exclusion will not apply to any covered portion of any **technology claim** for negligent transmission of a computer virus, worm, logic bomb, or Trojan horse;

GG. of any **technology claim** for, alleging, or arising from any commercial dispute with **your** business partner or business associate, including but not limited to any reseller, distributor, original equipment manufacturer, third-party sales agent, systems integrator, or joint venturer, but only to the extent such a **claim** is based upon:

# DECLARATION

**HISCOX INSURANCE COMPANY INC. (A Stock Company)**

104 South Michigan Avenue, Suite 600, Chicago, IL 60603
(646) 452-2353

**Policy Number:  US UUA 2619952.11**

(i) a commission or royalty, or any other term upon which such partner or associate is to be compensated in connection with doing business with **you**, or any compensation or remuneration promised or owed by **you** pursuant to those terms; or

(ii) **your** decision to cease doing business with such a partner or associate;

HH. of any **technology claim** for, alleging, or arising from any chargeback, liability or fee incurred as a result of a merchant service provider, including any credit card company or bank, wholly or partially reversing or preventing a payment transaction;

II. of any **technology claim** for, alleging, or arising from any failure of or interruption in service provided by an internet service, telecommunications, or other utility provider; however, this exclusion will not apply to any internet service interruption where **you** are the sole provider of that service as part of **your technology activities**;

JJ. of any **technology claim** made against **you** by any person or entity falling within the definition of **you**; however, this exclusion will not apply to any **claim** based on liability to an independent third party directly arising out of the performance of **your technology activities** but which is brought against **you** via an **existing subsidiary**, parent or sister company;

KK. of any **technology claim** for, alleging, or arising from any armed struggle, civil unrest or conflict or any nationalization, confiscation, requisition, expropriation, appropriation, seizure or destruction of property by or under the order of any government or public or local authority;

LL. of any **technology claim** for, alleging, or arising from any act or threatened act of terrorism, including but not limited to the use of force or violence, of any person(s) or group(s) of persons whether acting alone or on behalf of or in connection with any organization(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear;

MM. of any **technology claim** directly or indirectly arising out of any activities occurring prior to the applicable **retroactive date** (if any);

NN. of any **claim** under WHAT HAS TO GO WRONG (Section II) Media, personal injury & negligent media content liability of the policy, even if such **claim** arises in whole or in part from **your technology activities**; or

OO. of any **technology claim** for, alleging, or arising from telecommunications services and internet service provider services.

6. For the purposes of the coverage provided by Section 1 of this endorsement only, all references to **"media activities"** in YOUR OBLIGATIONS TO US (Section VII) of the policy are hereby deleted and replaced with the phrase **"media activities or technology activities"**.

7. For the purposes of the coverage provided by Section 1 of this endorsement only, under YOUR OBLIGATIONS TO US (Section VII), Satisfying Your Retention of the policy, the following sentence is added to the second paragraph:

All **technology claims** that are related will be considered as having been made on the date of **your** first proper notification to **us**.


# DECLARATION

**HISCOX**

**HISCOX INSURANCE COMPANY INC. (A Stock Company)**

104 South Michigan Avenue, Suite 600, Chicago, IL 60603
(646) 452-2353

---

**Policy Number:  US UUA 2619952.11**

---

8. For the purposes of the coverage provided by Section 1 of this endorsement only, DEFINITIONS (Section VIII) of the policy is hereby amended to add the following:

"Client" means any person or entity with whom **you** have contracted to provide services or deliverables that expressly fall within **your technology activities**.

"Potential claim" means any matter reasonably likely to lead to a **technology claim**.

"Retroactive date" means 12/1/2010 for analysis, design, programming or integration of information systems; data processing; information technology consulting; licensing of computer software; marketing, selling, distributing, installing, maintaining, support and training in the use of electronic or computer related hardware and software, for others; web-based automobile dealership inventory tracking and valuation solutions, sales management, systems integration, data storage services for others; 7/18/2006 for $3,000,000 Single Aggregate Limit, inclusive of defense costs and damages for web-based automobile dealership inventory tracking and valuation solutions, sales management, systems integration, data storage services for others; 12/1/2011 for consulting, design, configuration, equipment acquisition, installation, training, activation, management and support of telemedicine systems

However, in respect of any **claim** or **potential claim** arising out of activities performed by an **acquired entity**, "retroactive date" means the date **you** first acquired such entity, unless otherwise agreed by **us** in writing

"Technology activities" means analysis, design, programming or integration of information systems; data processing; information technology consulting; licensing of computer software; marketing, selling, distributing, installing, maintaining, support and training in the use of electronic or computer related hardware and software, for others; web-based automobile dealership inventory tracking and valuation solutions, sales management, systems integration, data storage services for others; consulting, design, configuration, equipment acquisition, installation, training, activation, management and support of telemedicine systems

"Technology claim" means a **claim** arising in whole or in part from the performance of **technology activities**.

9. For the purposes of the coverage provided by Section 1 of this endorsement only, DEFINITIONS (Section VIII), Damages, of the policy is amended by adding the following:

"Damages" also does not include:

6. the costs of recall, repair or correction of any **technology activities**.

10. For the purposes of the coverage provided by Section 1 of this endorsement only, DEFINITIONS (Section VIII), You/Your of the policy is deleted and replaced by the following

"You and Your" means

1. The **insured**, any **existing subsidiary** or any **acquired entity**;

# DECLARATION

**HISCOX INSURANCE COMPANY INC. (A Stock Company)**

104 South Michigan Avenue, Suite 600, Chicago, IL 60603
(646) 452-2353

## Policy Number:  US UUA 2619952.11

2. any person who was, is or becomes a director, officer, trustee, partner in, or employee of the **insured**, any **existing subsidiary** or any **acquired entity** but only in respect to **claims** arising out of the course and scope of their duties as such and in the event of their death, incapacity or bankruptcy, any **claim** against their estates, heirs, legal representatives or assigns shall be considered a **claim** against them;

3. any person or entity that takes legal control of the **insured**, **existing subsidiary** or **acquired entity** upon the insolvency or bankruptcy of the **insured**, **existing subsidiary** or **acquired entity**;

11. For the purposes of the coverage provided by Section 1 of this endorsement only, GENERAL MATTERS (Section IX), Date of Performance of Media Activities, of the policy is deleted in its entirety.

The title of this endorsement is solely for ease of reference and forms no part of the terms and conditions of coverage.

**Effective Date:**   **12/01/2011**

# HISCOX

## DECLARATION

### HISCOX INSURANCE COMPANY INC. (A Stock Company)

104 South Michigan Avenue, Suite 600, Chicago, IL 60603
(646) 452-2353

**Policy Number:  US UUA 2619952.11**

| | |
|---|---|
| **Endorsement 5** | **E70.1 Additional Insured Endorsement** |

In consideration of the premium charged and on the understanding that this endorsement leaves all other terms, conditions and exclusions unchanged, it is agreed that the person(s) and/or entity(ies) listed below shall be considered **additional insured (s)** under DEFINITIONS (Section VIII), Additional insured, paragraph 3, of the policy:

DEFINITIONS (Section VIII), Additional insured, paragraph 3, is hereby added as follows:

"Additional insured" also means Wells Fargo Bank, National Association, but only with respect to a **claim** where Wells Fargo Bank, National Association is vicariously liable for a negligent act, error or omission of the **insured, existing subsidiary or acquired entity** in the performance of **technology activities** by the **insured, existing subsidiary or acquired entity**; provided, however, in all events Wells Fargo Bank, National Association shall not mean or be considered an **additional insured** with respect to any actual or alleged liability, award or settlement payment arising out of, in whole or part, its own acts, errors or omissions.

The title of this endorsement is solely for ease of reference and forms no part of the terms and conditions of coverage.

**Effective Date:    12/01/2011**

| **DECLARATION** |

# HISCOX

## HISCOX INSURANCE COMPANY INC. (A Stock Company)

104 South Michigan Avenue, Suite 600, Chicago, IL 60603
(646) 452-2353

---

**Policy Number:  US UUA 2619952.11**

---

**Endorsement 6**

**E2386.1 Social Media Extension MM**

In consideration of the premium charged and on the understanding that this endorsement leaves all other terms, conditions and exclusions unchanged, it is agreed that with respect to DEFINITIONS (Section VIII), Advertising is deleted in its entirety and replaced with the following:

"Advertising" means advertising, publicity, or promotion in or of **covered media** regardless of the nature or form of such "advertising"  including "advertising"  via any social media  platforms (including but not limited to Facebook, Twitter, LinkedIn or MySpace).

All other terms and conditions remain unchanged.

MED E2386 CW (08/11)

**Effective Date:**    **12/01/2011**

| HISCOX | DECLARATION |
|--------|-------------|

**HISCOX INSURANCE COMPANY INC. (A Stock Company)**

104 South Michigan Avenue, Suite 600, Chicago, IL 60603
(646) 452-2353

**Policy Number:  US UUA 2619952.11**

| Endorsement 7 | E2404.1 Subpoena Defense Costs Coverage Endorsement |
|---------------|-----------------------------------------------------|

In consideration of the premium charged and on the understanding that this endorsement leaves all other terms, conditions and exclusions unchanged, it is agreed that:

1. WHAT WE WILL PAY (Section IV) of the policy is amended to include the following:

**Payments toward subpoena defense costs**

**We** will pay the reasonable and necessary attorney's fees and legal costs **you** incur in proceedings to quash or challenge the scope of a subpoena ordering **you** to disclose or produce any information or material gathered, acquired, collected, created or compiled by **you**, provided such information or material was gathered, acquired, collected, created or compiled for the purpose of the creation, production or dissemination of **media content** in or for **covered media**, and provided that such subpoena was served on **you** during the **policy period**.

2. For purpose of applying the terms and conditions of WHAT YOU MUST NOTIFY AND WHEN (Section III), HOW MUCH WE WILL PAY (Section V), YOUR OBLIGATIONS TO US (Section VII) and GENERAL MATTERS (Section IX) of the policy to the coverage afforded by this endorsement, wherever the word **claim** appears in such sections, it shall be construed to include a subpoena that falls within the scope of coverage afforded by this endorsement.

3. The coverage afforded by this endorsement is part of and not in addition to the **policy limit.**

4. If a sub-limit is indicated below, the sub-limit is the most **we** will pay under this policy in connection with any one subpoena.  All sub-limits under this endorsement are included within the **policy limit** and are not in addition to the **policy limit**.

Sub-limit: $1,500,000

5. The Retention listed on the Declarations is amended as follows:

**Retention**:
a. $500,000 Each and every **claim** inclusive of **defense costs** and **damages**
b. $100,000     Each and every subpoena

The title of this endorsement is solely for ease of reference and forms no part of the terms and conditions of coverage.

**Effective Date:**    **12/01/2011**

## DECLARATION

# HISCOX

### HISCOX INSURANCE COMPANY INC. (A Stock Company)

104 South Michigan Avenue, Suite 600, Chicago, IL 60603
(646) 452-2353

**Policy Number:  US UUA 2619952.11**

| | |
|---|---|
| **Endorsement 8** | **E2405.1 Broad Form Errors and Omissions (BI/PD) Endorsement MM/MAC** |

In consideration of the premium charged and on the understanding that this endorsement leaves all other terms, conditions and exclusions unchanged, it is agreed that:

1. WHAT WE WILL NOT PAY (Section VI), paragraph (I), of the policy is deleted in its entirety and replaced with the following:

any bodily injury, including but not limited to death and emotional injury; however, this exclusion will not apply to any portion of a covered **claim** seeking (i) **damages** for emotional anguish or distress; or (ii) bodily injury arising out of the **media content** of **your covered media or advertising**;

2. WHAT WE WILL NOT PAY (Section VI), paragraph (m), of the policy is deleted in it entirety and replaced with the following:

any damage to, or destruction or loss of use of any tangible property; however, this exclusion will not apply to (i) any covered **claim** for trespass, or (ii) property damage arising out of the **media content** of **your covered media or advertising**.

The title of this endorsement is solely for ease of reference and forms no part of the terms and conditions of coverage.

**Effective Date:    12/01/2011**

| **DECLARATION** |
| --- |

# HISCOX

## HISCOX INSURANCE COMPANY INC. (A Stock Company)

104 South Michigan Avenue, Suite 600, Chicago, IL 60603
(646) 452-2353

## Policy Number:  US UUA 2619952.11

| Endorsement 9 | **E2409.1 Reporter's Shield Enhancement Endorsement** |
| --- | --- |

In consideration of the premium charged and on the understanding that this endorsement leaves all other terms, conditions and exclusions unchanged, it is agreed that:

1. The following Endorsement Schedule applies to the coverage as provided by this Endorsement:

Item 1. **Reporters Shield Sublimit**:      $1,000,000 Single Aggregate Limit
Item 2. **Reporters Shield Coinsurance**:   20%
Item 3. **Reporters Shield Retention**:      $100,000 each fine or penalty

2.  WHAT WE WILL PAY (Section IV) is amended to include the following:

**Payments towards protecting your source**

Solely where permissible by law, **we** will pay in excess of the **Reporters Shield Retention** and subject to the **Reporters Shield Coinsurance** any court ordered fines and/or court ordered penalties that are imposed against **you** during the **policy period** for **your** in good faith failing to comply with an order to disclose or produce any information or material gathered, acquired, collected, created or compiled by **you**, provided such information or material was gathered, acquired, collected, created or compiled for the purpose of the creation, production or dissemination of **media content**.

All sub-limits under this endorsement are included within the **policy limit** and are not in addition to the **policy limit**.

The title of this endorsement is solely for ease of reference and forms no part of the terms and conditions of coverage.

All other terms and conditions remain unchanged.

MED E2409 CW (02/10)

**Effective Date:**    12/01/2011

Case 8:20-cv-00221-JSM-SPF Document 20-2 Filed 02/14/20 Page 137 of 163 PageID 563
Case 8:20-cv-00221-JVM-SPF Document 1-1 Filed 08/20/20 Page 24 of 47 PageID 202

# DECLARATION

**HISCOX**

## HISCOX INSURANCE COMPANY INC. (A Stock Company)

104 South Michigan Avenue, Suite 600, Chicago, IL 60603
(646) 452-2353

## Policy Number:  US UUA 2619952.11

| Endorsement 10 | **E2416.1 Amended Definition of "Acquired Entity" Endorsement** |
|---|---|

In consideration of the premium charged and on the understanding that this endorsement leaves all other terms, conditions and exclusions unchanged, it is agreed that:

1. DEFINITIONS (Section VIII), **Acquired entity**, of the policy, is deleted and replaced with the following:

**Acquired entity**

"Acquired entity" means:

1. any entity that the **insured** or **existing subsidiary** directly or indirectly acquires or creates during the **policy period**, but only to the extent that the entity produces the same type of **covered media** as the **insured** or **existing subsidiary** and only if the annual revenue or the total book value of the consideration provided in return for acquiring control of the entity is less than or equal to 150,000,000 at the time of acquisition or creation; it being agreed and understood that at renewal of this policy, **we** shall be entitled to impose such additional premium in connection with these **acquired entity (ies)** which **we** may require;

2. any entity that the **insured** or **existing subsidiary** directly or indirectly acquires or creates during the **policy period** which has an annual revenue of more than 150,000,000, but only if **you** have provided **us** with written notification of the acquisition or creation within 90 days of such, and only if **we** have provided our written consent to insure that entity under this policy, such consent never to be unreasonably withheld, and **you** have agreed to pay such additional premium as **we** may require.

For purposes of this definition, "acquires" means taking ownership of over 50% of the outstanding voting stock or interest, or assets of any business entity.

The title of this endorsement is solely for ease of reference and forms no part of the terms and conditions of coverage.

**Effective Date:**    **12/01/2011**

# DECLARATION

# HISCOX

## HISCOX INSURANCE COMPANY INC. (A Stock Company)

104 South Michigan Avenue, Suite 600, Chicago, IL 60603
(646) 452-2353

**Policy Number:  US UUA 2619952.11**

| Endorsement 11 | E2421.2 Spousal, Civil Union & Domestic Partner Extension End MM/MAC |
|---|---|

In consideration of the premium charged and on the understanding that this endorsement leaves all other terms, conditions and exclusions unchanged, it is agreed that:

If **you** fall into the class of persons identified in DEFINITIONS (Section VIII), **You/Your**, paragraph 2, of the policy, and a **claim** insured under this policy against **you** includes a **claim** against **your** lawful spouse, lawful civil union partner or domestic partner solely by reason of (i) such person's status as **your** spouse, civil union partner or domestic partner, or (ii) such spouse's, civil union partner's or domestic partner's ownership interest in property which the claimant seeks as recovery for **claims** against **you** arising out of the **insured's media activities**, any sum such spouse, civil union partner or domestic partner becomes legally obligated to pay as **damages** on account of the **claim** shall be treated under the policy as if the sum were **damages you** are required to pay on account of the **claim** against **you**. All limitations, conditions provisions and other terms of the policy applicable to **damages you** become obligated to pay shall also be applicable to such sums **your** spouse, civil union partner or domestic partner becomes obligated to pay. In no event shall the coverage afforded by this endorsement apply to any **claim** arising out of the **media activities** of **your** spouse, civil union partner or domestic partner.

The title of this endorsement is solely for ease of reference and forms no part of the terms and conditions of coverage.

MED E2421 CW (02/10)

**Effective Date:    12/01/2011**



# DECLARATION

## HISCOX INSURANCE COMPANY INC. (A Stock Company)

104 South Michigan Avenue, Suite 600, Chicago, IL 60603
(646) 452-2353

## Policy Number:  US UUA 2619952.11

| | |
|---|---|
| **Endorsement 12** | **E2430.1 Remove Settlement Clause Endorsement** |

In consideration of the premium charged and on the understanding that this endorsement leaves all other terms, conditions and exclusions unchanged, it is agreed that GENERAL MATTERS (Section IX), Settlement of Claims, of the policy is deleted in its entirety.

The title of this endorsement is solely for ease of reference and forms no part of the terms and conditions of coverage.

**Effective Date:**    12/01/2011



**DECLARATION**

# HISCOX

**HISCOX INSURANCE COMPANY INC. (A Stock Company)**

104 South Michigan Avenue, Suite 600, Chicago, IL 60603
(646) 452-2353

---

**Policy Number: US UUA 2619952.11**

---

| | |
|---|---|
| **Endorsement 13** | **E2444.1 Specific Exclusion Endorsement** |

In consideration of the premium charged and on the understanding that this endorsement leaves all other terms, conditions and exclusions unchanged, it is agreed that the following is added to WHAT WE WILL NOT PAY (Section VI) of the policy:

**We** will not make any payment, including **defense costs** and **damages**, toward any portion(s) of any **claim** for, alleging, or arising from:

auction services, however this exclusion does not apply to any covered media or professional services related to auction services.

The title of this endorsement is solely for ease of reference and forms no part of the terms and conditions of coverage.

**Effective Date:     12/01/2011**


**DECLARATION**

# HISCOX

**HISCOX INSURANCE COMPANY INC. (A Stock Company)**

104 South Michigan Avenue, Suite 600, Chicago, IL 60603
(646) 452-2353

**Policy Number:  US UUA 2619952.11**

| | |
|---|---|
| **Endorsement 14** | **E2484.1 Premium Payment Warranty** |
| | Premium payment warranty:  30 days |
| **Effective Date:**    12/01/2011 | |



| | DECLARATION |
|---|---|

# HISCOX

**HISCOX INSURANCE COMPANY INC. (A Stock Company)**

104 South Michigan Avenue, Suite 600, Chicago, IL 60603
(646) 452-2353

**Policy Number:  US UUA 2619952.11**

| Endorsement 15 | **E2531.1 First Amendment Enhancement Endorsement MM** |
|---|---|

In consideration of the premium charged and on the understanding that this endorsement leaves all other terms, conditions and exclusions unchanged, it is agreed that:

1. The following Endorsement Schedule applies to this endorsement:

Item 1. **First Amendment Restriction Sublimit**  $1,000,000
Item 2. **First Amendment Restriction co-insurance paid by you**: 20%
Item 3. **Retention**  $500,000
Item 4. **First Amendment Restriction Retention** $100,000

2.  WHAT WE WILL PAY (Section IV) is amended to include the following:

**Payments towards a first amendment restriction**

**We** will pay all reasonable and necessary attorneys' fees and legal costs incurred by **you** to avoid or respond to a **first amendment restriction,** arising out of **your media activities**, that occurs during the **policy period.**

3. For purposes of the coverage afforded by Section 2 of this endorsement only, WHAT WE WILL NOT PAY (Section VI), is amended by deleting exclusions (e) and (m) in their entirety and replacing them with the following:

e. any enforcement of any state or federal regulation, including but not limited to any regulation promulgated by the Federal Trade Commission, Federal Communications Commission, Federal Election Commission or the Securities and Exchange Commission; however, this exclusion shall not apply to coverage afforded by section 2. of the First Amendment Enhancement Endorsement;

m. any damage to, or destruction or loss of use of any tangible property; however, this exclusion will not apply to:

i) any covered **claim** for trespass; or

ii) coverage afforded by section 2. of the First Amendment Enhancement Endorsement.

4.  For purposes of the coverage afforded by Section 2 of this endorsement only, WHAT WE WILL NOT PAY (Section VI) is amended by adding the following:

s.  any proceeding, ruling or order to suspend or revoke a license by the Federal Communications Commission;

t. any actual or alleged violation of the Federal Trade Commission Act or any analagous state law; or

u. any **claim**.

MED E2531 CW (02/10)

Case 8:20-cv-00221-JSM-SPF Document 20-3 Filed 02/11/20 Page 143 of 163 PageID 569
Case 8:20-cv-00221-JSM-SPF Document 21 Filed 02/02/20 Page 33 of 78 PageID 106



| | DECLARATION |
|---|---|

**HISCOX INSURANCE COMPANY INC. (A Stock Company)**

104 South Michigan Avenue, Suite 600, Chicago, IL 60603
(646) 452-2353

**Policy Number: US UUA 2619952.11**

5. For purposes of the coverage afforded by Section 2 of this endorsement only, DEFINITIONS (Section VIII) is amended to include the following:

**First Amendment Restriction**

"First amendment restriction" means any infringement or threatened infringement by the government of **your** rights and privileges under (a) the speech and press clauses of the First Amendment to the United States Constitution, (b) any analogous State constitutional provision, or (c) any statute, regulation or rule pertaining to the public's right of access to government-held information, including:

  A. any governmental action restricting **your** access to proceedings, meetings or information;
  B. any Federal Communications Commission investigation or enforcement of an alleged obscene, profane or indecent broadcast;
  C. any prior restraint or other limitation on the dissemination of **media content** caused by governmental action; and
  D. any search and/or seizure of **your** property resulting from or in respect of **media content** or the gathering or production of such **media content**.

6. For purposes of the coverage afforded by Section 2 of this endorsement only, DEFINITIONS (Section VIII) of the policy is amended by deleting the definition of **You/Your** and replacing it with the following:

"You" and "Your" means:

1. the **insured,** any **existing subsidiary** or any **acquired entity**.

2. any person who was, is or becomes a director, officer, trustee, partner in, or employee of the **insured**, any **existing subsidiary** or any **acquired entity** but only in respect to **claims** arising out of the course and scope of their duties as such and in the event of their death, incapacity or bankruptcy, any **claim** against their estates, heirs, legal representatives or assigns shall be considered a **claim** against them; and

3. any person or entity that takes legal control of the **insured**, **existing subsidiary** or **acquired entity** upon the insolvency or bankruptcy of the **insured**, **existing subsidiary** or **acquired entity.**

7. For the purpose of applying the terms and conditions of WHAT YOU MUST NOTIFY AND WHEN (Section III), HOW MUCH WE WILL PAY (Section V), WHAT WE WILL NOT PAY (Section VI),YOUR OBLIGATIONS TO US (Section VII) and GENERAL MATTERS (Section IX) of the policy to the coverage afforded by this endorsement, wherever the word **claim** appears in such sections, it shall be construed to also reference a **first amendment restriction** that falls within the scope of coverage afforded by this endorsement.

8. The coverage afforded by this endorsement is part of and not in addition to the **policy limit.**

MED E2531 CW (02/10)

| HISCOX | **DECLARATION** |
|---|---|

**HISCOX INSURANCE COMPANY INC. (A Stock Company)**

104 South Michigan Avenue, Suite 600, Chicago, IL 60603
(646) 452-2353

**Policy Number:  US UUA 2619952.11**

9. If a sub-limit is indicated below, the sub-limit is the most **we** will pay under this policy in connection with a **first amendment restriction**. The sub-limit is also the maximum **we** will pay in connection with all **first amendment restrictions.** All sub-limits under this endorsement are included within the **policy limit** and are not in addition to the **policy limit**.

Sub-limit: $1,000,000

10. The Retention listed on the Declarations is amended as follows:

**Retention**:
a. $500,000 Each and every **claim** inclusive of **defense costs** and **damages**
b. $100,000      Each and every **first amendment restriction**

11. The coverage afforded by this endorsement is subject to the following co-insurance percentage:

Co-insurance borne by **you**:  20%

The titles and headings of this endorsement are solely for ease of reference and do not form any part of the terms and conditions of coverage.

MED E2531 CW (02/10)

**Effective Date:    12/01/2011**

| | DECLARATION |
|---|---|

# HISCOX

## HISCOX INSURANCE COMPANY INC. (A Stock Company)

104 South Michigan Avenue, Suite 600, Chicago, IL 60603
(646) 452-2353

## Policy Number:  US UUA 2619952.11

| Endorsement 16 | **E2816.2 Georgia Amendatory Endorsement MM/MAC** |
|---|---|

In consideration for the payment of premium and in reliance on the statements made and information provided to **us**:

1.  YOUR OBLIGATIONS TO US (Section VII), Your Representations, of the policy is deleted in its entirety and replaced with the following:

**You** agree that all representations (whether oral or written) including but not limited to any misrepresentation, omission, concealment of fact, or incorrect statement made by **your** board member(s), executive officer(s), in-house counsel, or risk manager(s) in connection with the application for this policy and all materials submitted by them or on **your** behalf in connection with the application for this policy are true, accurate, and not misleading, and were relied upon by **us** and for **our** decision to issue this policy. Such representation or submitted material may prevent recovery under this policy if:

a.  the representation or submitted material is fraudulent or is material either to the acceptance of the risk or to the hazard assumed by **us**; or

b.   if the true facts had been known to **us** pursuant to a requirement under this policy or other requirement, **we,** in good faith, would not have issued this policy, would have not issued it at the same premium rate, would have not issued it in as large an amount, or would not have provided coverage with respect to the hazard resulting in the **claim**.

In reaching this determination, only facts and knowledge possessed by **your** board member(s), executive officer(s), in-house counsel, or risk manager(s) or any other person whose signature appears on the application, shall be imputed to **you**.

2. DEFINITIONS (Section VIII), Damages of the policy and any endorsement attached thereto is modified to the extent necessary to provide the following:

The Definition of Damages shall specifically include (subject to the policy's other terms, conditions and exclusions) punitive and exemplary damages.

3.   GENERAL MATTERS (Section IX), Other insurance, of the policy is deleted in its entirety and replaced with the following:

This policy is specifically excess of and will not contribute with:

1.  any valid and collectible Multimedia Liability insurance policy;  Marketing, Advertising and Communications Liability insurance policy; Video, Film and Television Producers Liability insurance policy; or similar insurance; or

2.  any valid and collectible insurance under where there is a duty to defend;

whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is specifically in excess of this policy.

If other valid and collectible insurance, other than the valid and collectible insurance described above, permits contribution by equal shares, **we** will follow this method also.

MED E2816 (09/10)



| DECLARATION |
|---|

# HISCOX

## HISCOX INSURANCE COMPANY INC. (A Stock Company)

104 South Michigan Avenue, Suite 600, Chicago, IL 60603
(646) 452-2353

---

**Policy Number:  US UUA 2619952.11**

---

If other valid and collectible insurance, other than the valid and collectible insurance described above, does not permit contribution by equal shares, **we** will contribute by limits.

This policy is specifically excess of and will not contribute with any indemnification that may be available to **you** from any entity other than the **insured.**

4.   GENERAL MATTERS (Section IX), Cancellation, of the policy is deleted in its entirety and replaced with the following:

The **insured** may cancel this policy at any time by mailing to **us** written notice stating when such cancellation shall be effective. Any unearned premium will be calculated in accordance with the customary short rate table and procedure.

**We** will only cancel this policy if the premium is not paid by the due date, or **you** intentionally make a material misrepresentation to **us** in regard to any **claim** or notice given to **us** under this policy.

If this policy has been in effect for less than sixty (60) days, **we** will send written notice of cancellation to the **insured** at the last known address by first class mail at least ten (10) days prior to the effective date of cancellation.

If this policy has been in effect for sixty (60) days or more, **we** will send written notice of cancellation to the **insured** at the last known address by first class mail at least thirty (30) days prior to the effective date of cancellation; except at least ten (10) days for non-payment of premium when due.

Proof of mailing shall be sufficient proof of notice.

In the event of cancellation for misrepresentation, **we** will return a pro-rata amount of premium.

In the event **we** cancel this policy, the unearned premium will be tendered to either the **insured** or the broker of record on or before the effective date of cancellation.  Failure to return the unearned premium may entitle the **insured** to eighteen per cent (18%) annual interest until the refund has been made and a penalty fee equal to twenty-five percent (25%) of the unearned premium amount; combined penalty and interest not to exceed fifty percent (50%) of the amount of refund due.  Failure to return any unearned premium will not invalidate a notice of cancellation.

However, If the premium is financed by a premium finance company and this policy is cancelled, then any unearned premium will be tendered to the premium finance company within ten (10) working days after the effective date of cancellation and such action by **us** shall be deemed to satisfy **our** obligation as to the returned of unearned premium.

5. GENERAL MATTERS (Section IX), Alternative dispute resolution is modified to the extent necessary to provide the following:

There can be no arbitration between **us** and the **insured**.  Per O.C.G.A.  9-9-2, arbitration agreements may only exist between the **Insureds** and any claimants against the **Insureds.**

MED E2816 (09/10)

| DECLARATION |
| --- |

# HISCOX

## HISCOX INSURANCE COMPANY INC. (A Stock Company)

104 South Michigan Avenue, Suite 600, Chicago, IL 60603
(646) 452-2353

**Policy Number:  US UUA 2619952.11**

6.    GENERAL MATTERS (Section IX) of the policy is amended to include the following at the end thereof:

Nonrenewal

**We** are not required to renew this policy upon its expiration.  If **we** choose not to renew this policy, **we** will send written notice to the **insured** by first class mail at least forty-five (45) days prior to the expiration date of this policy.  Proof of mailing will be sufficient proof of notice.

If the notice of nonrenewal is not provided within the time required, the **insured** may elect to extend this policy for thirty (30) days beyond the expiration date of this policy. The earned premium for this extension will be calculated pro rata based on the expiring policy's rates and must be tendered or paid to **us** on or before the expiration date of this policy.

Conditional Renewal

If **we** issue a renewal policy conditioned on an increase of premium of more than fifteen percent (15%) or a decrease in coverage, **we** will send to the **insured** written notice of such changed terms by first class mail at least forty-five (45) days prior to the expiration date of this policy.  Proof of mailing is sufficient proof of notice.

If the notice of changed terms is not provided within the time required, the **insured** may elect to extend this policy for thirty (30) days beyond the expiration date of this policy. The earned premium for this extension will be calculated pro rata based on the expiring policy's rates and must be tendered or paid to **us** on or before the expiration date of this policy.

This provision does not apply if the increase in premium is due to a change in risk of exposure of the **insured**.

7.   If this policy or any endorsement attached thereto is issued on a Claims-Made basis, it is hereby understood and agreed that the policy (as amended by any endorsement attached thereto) is modified to the extent necessary to provide the following:

In the event of cancellation or nonrenewal, **we** will provide, at no additional premium, a period of thirty (30) days, beginning on the effective date of cancellation or nonrenewal during which the **insured** shall be permitted to report to **us claims** first made against **you** during such thirty (30) day period that are for or based upon acts committed or allegedly committed after the applicable **retroactive date** and prior to the effective date of cancellation or nonrenewal and otherwise covered by this policy.  Such extension of coverage shall be referred to as the "Automatic Extended Reporting Period."

8.   If this policy or any endorsement attached thereto is issued with a terrorism exclusion, it is hereby understood and agreed that the policy (as amended by any endorsement attached thereto) is modified to the extent necessary to provide the following:

MED E2816 (09/10)

# DECLARATION

## HISCOX

### HISCOX INSURANCE COMPANY INC. (A Stock Company)

104 South Michigan Avenue, Suite 600, Chicago, IL 60603
(646) 452-2353

---

**Policy Number:  US UUA 2619952.11**

---

Notwithstanding any provision to the contrary within this insurance or any endorsement thereto it is agreed that this insurance excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss;

1) war, invasion, acts or foreign enemies, hostilities or warlike operation (whether war be declared or not), civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power; or

2) any **Act of Terrorism.**

For the purpose of this endorsement, an **Act of Terrorism** means any violent act or an act that is dangerous to human life, property or infrastructure, results in damage within the United States and its territories, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission, and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

This  exclusion shall apply provided one or more of the following exist(s):

A.  Total industry wide insured losses exceeds twenty-five million dollars ($25,000,000) for related incidents that occur within a 72-hour period;
B.  Fifty(50) or more persons sustain death or serious physical injury as a result of related incidents that occur within a 72-hour period;
C.  The act involves the use, release or escape of nuclear materials, or that directly or indirectly results in nuclear reaction or radiation or radioactive contamination;
D.  The act is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials;
E.  Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism  was to release such materials.

For purposes of (B) above, serious physical injury means:
1.  physical injury that involves a substantial risk of death; or
2.  protracted and obvious physical disfigurement; or
3.  protracted loss of or impairment of the function of a bodily member or organ.

All other terms and conditions remain unchanged.

MED E2816 (09/10)

**Effective Date:    12/01/2011**



# ECONOMIC AND TRADE SANCTIONS POLICYHOLDER NOTICE

Hiscox is committed to complying with the U.S. Department of Treasury Office of Foreign Assets Control (OFAC) requirements. OFAC administers and enforces economic sanctions policy based on Presidential declarations of national emergency.  OFAC has identified and listed numerous foreign agents, front organizations, terrorists, and narcotics traffickers as Specially Designated Nationals (SDN's) and Blocked Persons.  OFAC has also identified Sanctioned Countries.  A list of Specially Designated Nationals, Blocked Persons and Sanctioned Countries may be found on the United States Treasury's web site http://www.treas.gov/offices/enforcement/ofac/.

Economic sanctions prohibit all United States citizens (including corporations and other entities) and permanent resident aliens from engaging in transactions with Specially Designated Nationals, Blocked Persons and Sanctioned Countries.  Hiscox may not accept premium from or issue a policy to insure property of or make a claim payment to a Specially Designated National or Blocked Person.  Hiscox may not engage in business transactions with a Sanctioned Country.

A Specially Designated National or Blocked Person is any person who is determined as such by the Secretary of Treasury.

A Sanctioned Country is any country that is the subject of trade or economic embargoes imposed by the laws or regulations of the United States.

In accordance with laws and regulations of the United States concerning economic and trade embargoes, this policy may be rendered void from its inception with respect to any term or condition of this policy that violates any laws or regulations of the United States concerning economic and trade embargoes including, but not limited to the following:

(1) Any insured under this Policy, or any person or entity claiming the benefits of such insured, who is or becomes a Specially Designated National or Blocked Person or who is otherwise subject to US economic trade sanctions;

(2) Any claim or suit that is brought in a Sanctioned Country or by a Sanctioned Country government, where any action in connection with such claim or suit is prohibited by US economic or trade sanctions;

(3) Any claim or suit that is brought by any Specially Designated National or Blocked Person or any person or entity who is otherwise subject to US economic or trade sanctions;

(4) Property that is located in a Sanctioned Country or that is owned by, rented to or in the care, custody or control of a Sanctioned Country government, where any activities related to such property are prohibited by US economic or trade sanctions; or

(5) Property that is owned by, rented to or in the care, custody or control of a Specially Designated National or Blocked Person, or any person or entity who is otherwise subject to US economic or trade sanctions.

Please read your Policy carefully and discuss with your broker/agent or insurance professional.  You may also visit the US Treasury's website at http://www.treas.gov/offices/enforcement/ofac/.



**NOTICE TO GEORGIA INSUREDS**
O.C.G.A. §33-24-7 – Representations in Applications

---

**GEORGIA POLICYHOLDER NOTICE – ADDENDUM TO THE APPLICATION**

The following is added to the Application and supersedes any language to the contrary, whether contained in the Application, policy or any endorsement thereto:

> **SHOULD INSURER ISSUE A POLICY, THE APPLICANT AGREES THAT SUCH POLICY IS ISSUED IN RELIANCE UPON THE TRUTH OF THE STATEMENTS AND REPRESENTATIONS IN THIS APPLICATION OR INCORPORATED BY REFERENCE HEREIN. ANY MISREPRESENTATION, OMISSION, CONCEALMENT OR INCORRECT STATEMENT OF A MATERIAL FACT, IN THIS APPLICATION, INCORPORATED BY REFERENCE OR OTHERWISE, SHALL BE GROUNDS FOR CANCELLATION OF THE POLICY AND/OR DENIAL OF COVERAGE.**

INT N001 GA (09/09)



**Hiscox Insurance Company Inc.**

## US TMT Multimedia Liability (Admitted)
Policy form

Defense costs are within the policy limit

©2006 Hiscox Inc. All rights reserved.



# US TMT Multimedia Liability (Admitted)
Policy form

| | |
|---|---|
| **About this policy** | **Please note that all sums payable under this policy, including but not limited to all defense cost payments, are included within and are not in addition to the policy limit. It is also important that you understand the full extent of your and our rights and duties under this policy so we urge you to read the entire policy carefully. All words and phrases that appear in bold type (except headings) have special meaning and are defined under DEFINITIONS (Section VIII) of this policy.** |

**I. Our promise to you**

**We** will indemnify **you** for **defense costs** and **damages** incurred as a result of a **claim** that falls within WHAT HAS TO GO WRONG (Section II) under this policy, WHAT WE WILL PAY (Section IV) under this policy, and HOW MUCH WE WILL PAY (Section V) under this policy.

**We** will not make any payment in connection with any **claim** unless **we** are notified in accordance with WHAT YOU MUST NOTIFY AND WHEN (Section III) under this policy, the premium and applicable **retention** are paid, and **you** are in compliance with YOUR OBLIGATIONS TO US (Section VII) under this policy. Also, **we** will not make any payment that is excluded by WHAT WE WILL NOT PAY (Section VI) under this policy.

**II. What has to go wrong**

Media, personal injury and negligent media content liability

The performance of **media activities** by **you** or anyone on **your** behalf during the **policy period** results in a **claim** against **you** that arises from **covered media** or **advertising**, regardless of when such **claim** is made or where such **claim** is brought, and including but not limited to any **claim** for any actual or alleged:

a. copyright infringement, trademark infringement, trademark dilution, trade dress infringement, publicity rights violations, cyber squatting violations, moral rights violations, any act of passing-off, or any misappropriation of content, formats, characters, trade names, character names, titles, plots, musical compositions, voices, slogans, graphic material or artwork;

b. breach of a license **you** have acquired to use a third party's trademark and/or copyrighted material, but only to the extent **your** use inadvertently exceeds limitations expressly set forth in the license regarding the territory, duration, or media in which the material may be used and only if such breach is asserted in conjunction with and based on the same factual allegations as a **claim** under (a) above;

c. plagiarism, piracy, or breach of an implied-in-fact or implied-in-law contract based on **your** use of a third party's creative idea;

d. defamation, including but not limited to libel, slander, trade libel, product disparagement, and injurious falsehood;

e. infliction of emotional distress or outrage;

f. breach of any duty of confidentiality, invasion of privacy or violation of any other legal protections for personal information, including but not limited to false light, intrusion upon a person's seclusion, public disclosure of a person's private information, misappropriation of a person's picture, name, voice or identity for commercial gain, or unauthorized interception or recording of sound or data in violation of a civil anti-wiretap statute;

g. promissory estoppel or breach of contract brought by **your** newsgathering source, but only to the extent such **claim(s)** directly stem from **your** promise to protect the anonymity of that source;

h. failure to give credit or attribution of authorship in accordance with any agreement to which **you** are a bound signatory;

i. unfair competition, deceptive business practices, or false designation of origin, but only when asserted in conjunction with and based on the same factual allegations as a **claim** under (a), (b), (c), (d) or (e) above;

j. trespass, false arrest, wrongful entry, unlawful detention, false imprisonment, wrongful eviction, eavesdropping, or malicious prosecution;

k. disclosure of a trade secret, but only where the disclosure alleged was to the public in a newsworthy publication included within **covered media**;



# US TMT Multimedia Liability (Admitted)
## Policy form

l.   negligent supervision of an employee, but only when asserted in conjunction with and based on the same factual allegations as a **claim** under (a), (b), (c), (d), or (e) above; and/or

m.   any form of negligence (including any negligent act, negligent error, negligent omission, negligent misrepresentation, negligent misstatement, including negligent transmission of a computer virus) but only where arising from **your media content** disseminated in **covered media** or **advertising**.

| | |
|---|---|
| **III.  What you must notify and when** | **You** must notify **us** of **claims** against **you** as soon as practicable.  Proper notification must be sent in accordance with the instructions set forth under the Declarations. |

## IV.   What we will pay

Payments toward defense costs

**We** will pay covered **defense costs** as incurred by **you**.

Payments toward claim resolution

**We** will pay covered **damages** as incurred by **you**.

Payments toward your own declaratory relief actions

**We** will pay reasonable attorney's fees incurred by **you** to prosecute **your** own declaratory relief action if:

a.   a claimant has advised **you**, in writing, that **you** are committing copyright or trademark infringement;

b.   after that claimant has asserted such a written **claim**, and after **you** have filed a declaratory relief action directly in response to that **claim**, the claimant files a counterclaim against **you** alleging copyright or trademark infringement; and

c.   the counterclaim is covered under this policy and pending against **you** while **you** are prosecuting **your** declaratory relief action.

Payments on your behalf

**We** will always advance covered **defense costs**, **damages** and payments toward **your** own declaratory relief actions, as described above, in excess of the applicable **retention**, rather than require **you** to pay those sums in the first instance.

## V.   How much we will pay

Our maximum payment

The **policy limit** is the maximum **we** will pay under this policy for any single **claim** (inclusive of **defense costs** and **damages)** and the maximum **we** will pay for the total aggregate of all **claims** (inclusive of **defense costs** and **damages**) and all other payments expressly covered under this policy.

Upon payment of the **policy limit**, **our** obligations under this policy shall be completely fulfilled and **we** shall have no further liability of any kind under this policy. At any time, **we** can pay to **you** the remainder of the **policy limit**, after which **we** will have no further liability of any kind under this policy.

## VI.   What we will not pay

Exclusions

**We** will not make any payment, including **defense costs** and **damages**, toward any portion(s) of any **claim** for, alleging, or arising from:

a.   any infringement or use of a patent;

b.   any misappropriation, use, or disclosure of a trade secret; provided, however, that this exclusion will not apply to any covered portion(s) of any **claim** under WHAT HAS TO GO WRONG (Section II) (k);

c.   any fraudulent or dishonest conduct or willful violation of law, whether committed by **you** or by another whose actions **you** have ratified or condoned; provided, however, that this



# US TMT Multimedia Liability (Admitted)
Policy form

exclusion will not apply:

(i)      until such conduct or violation has been established by final decision in a judicial, administrative or alternative dispute resolution proceeding, or by **your** own admission in such a proceeding or otherwise (or by the admission in such a proceeding or otherwise of the person whose actions **you** have ratified or condoned), at which time **you** shall reimburse **us** for all payments made by **us** in connection with any **claim** arising from such conduct or violation of the law and **our** obligations under this policy with respect to such **claim** shall cease; or

(ii)      at all if such conduct or violation occurred in connection with **your media activities** for **covered media**, the conduct or violation was approved in advance by **your** legal counsel on the basis of a good faith belief that it would be protected from liability by the First Amendment to the U.S. Constitution, and the **claim** based on the conduct or violation falls under WHAT HAS TO GO WRONG (Section II) (d), (e), (f), (g), (j) or (k);

d.      any unfair competition; deceptive trade practices; restraint of trade or violation of any antitrust or consumer fraud statute, legislation or regulation; however, this exclusion will not apply to any covered portion of any **claim** for unfair competition, deceptive trade practices, or false designation of origin under WHAT HAS TO GO WRONG (Section II) (i);

e.      any enforcement of any state or federal regulation, including but not limited to any regulation promulgated by the Federal Trade Commission, Federal Communications Commission, Federal Election Commission or the Securities and Exchange Commission;

f.      any liability or breach of any duty or obligation owed by **you** due to any statement, representation (express or implied), or omission in respect of **your** financial reports or filings, or directly or indirectly arising from any fiduciary duty owed by **you** or financial advice given by **you**;

g.      any liability or breach of any duty or obligation owed by **you** as an employer, including but not limited to any allegation of discrimination, harassment, wrongful termination, or arising from any duty or obligation owed by **you** in connection with the administration of any health, pension, or other form of employee benefit plan;

h.      any disputes with any of **your** present or former directors, officers, trustees, partners in **you**, joint venturers, employees, agents, or independent contractors concerning ownership of or the exercise of rights relating to **media content**, material, or services supplied to **you** by any of them;

i.      any disputes with any of **your** present or former directors, officers, trustees, partners in **you**, joint venturers, employees, agents, or independent contractors concerning **your** disclosure of their personally identifiable information;

j.      **your** provision of any sweepstakes, gambling activities or lotteries or from any over redemption or under redemption of coupons, discounts, awards or prizes from advertisements, promotions, contests or other games of chance; provided however, that this exclusion does not apply to the extent that a **claim** falls under paragraphs (a), (b), (c), (d) or (f) of What Has to Go Wrong (Section II) of the policy;

k.      any pollution, contamination, or toxic exposure;

l.      any bodily injury, including but not limited to death and emotional injury; however, this exclusion will not apply to any portion of a covered **claim** seeking **damages** for emotional anguish or distress;

m.      any damage to, or destruction or loss of use of any tangible property; however, this exclusion will not apply to any covered **claim** for trespass;

n.      any intentionally false, fraudulent, deceptive, or misleading **advertising** with respect to **your** own goods or services; and this exclusion shall apply separately from and not be subject to any of the limitations set forth in paragraph (c) above;

o.      any breach of any written, oral, express or implied contract or warranty; provided, however, that this exclusion will not apply to any covered liability **assumed under agreement**; to any covered portion(s) of a **claim** under WHAT HAS TO GO WRONG (Section II) (b), (c), (g), (h) or (i); or to any legal obligation **you** would otherwise owe in the absence of such contract or warranty;

Case 8:20-cv-00892-JSM-SPF Document 21 Filed 06/26/20 Page 43 of 47 PageID 120



## US TMT Multimedia Liability (Admitted)
Policy form

p. any unauthorized use of or access to **your** computer network or computer code; however, this exclusion will not apply to:

(i) any covered portion(s) of a negligence **claim** brought against **you** that is based on **your** negligent transmission of any malicious code but only where arising from **your media content** disseminated in **covered media** or **advertising**;

(ii) any computer virus, worm, logic bomb, or Trojan horse that was solely and specifically targeted at **your** computer network;

(iii) any unauthorized access to or posting of any online content to **your** web site that results in a covered **claim** for defamation, intellectual property infringement, breach of privacy, outrage, infliction of emotional distress, or negligent publication;

q. any violation of:

(i) the CAN-SPAM Act of 2003 or any subsequent amendments to that Act;

(ii) the Telephone Consumer Protection Act (TCPA) of 1991 or any subsequent amendments to that Act; or

(ii) any other law, regulation or statute relating to unsolicited communication, distribution, sending or transmitting of any communication via telephone or any other electronic or telecommunications device; or

r. any **claim** that has been or properly could have been the subject of notice to any insurance carrier prior to the **policy period**.

## VII. Your obligations to us

**Your representations**

**You** agree that all representations (whether oral or written) made by **your** board member(s), executive officer(s), in-house counsel, or risk manager(s) in connection with the application for this policy and all materials submitted by them or on **your** behalf in connection with the application for this policy are true, accurate, and not misleading, and were relied upon by **us** and were material to **our** decision to issue this policy. If **we** determine that such representations or submitted materials were untrue, inaccurate, or misleading, in any material respect, then **we** are entitled to rescind this policy and treat it as if it had never existed.

In reaching this determination, only facts and knowledge possessed by **your** board member(s), executive officer(s), in-house counsel, or risk manager(s) or any other person whose signature appears on the application, shall be imputed to **you**.

**Notifying us of changes to your business**

**You** must promptly tell **us** if **you** materially change **your** business, acquire or merge with another business or if any party acquires **your** business. **We** will only provide coverage under this policy for such a change if **we** have given **our** written approval and **you** have agreed to all additional coverage terms and/or additional premium **we** may request to cover the change in risk. However, **you** have no obligation to notify **us** under this section of any entity that falls within subsection (1) of the definition of **acquired entity** under DEFINITIONS (Section VIII) of this policy.

**Providing us with information and assistance**

**You** shall provide **us** with full, timely and accurate information about any **claim** or declaratory relief action that **you** contend falls within the coverage afforded by this policy.

**You** shall:

1. give **us**, or anyone appointed by **us**, at **your** expense, such assistance, cooperation and information as **we** reasonably require under this policy, to avoid, minimize, or resolve any **claim**; and

2. notify **us** as soon as practicable of all settlement offers made by a claimant in connection with any **claim**; and

3. give **us** all assistance and cooperation **we** reasonably require to pursue at **our** expense any subrogated right of recovery **we** may have in connection with any **claim** or declaratory relief action.



# US TMT Multimedia Liability (Admitted)
Policy form

If **you** or anyone on **your** behalf tries to deceive **us** by deliberately giving **us** false information in connection with such a **claim,** then **we** will not make any payment arising out of or relating to that **claim**.

| | |
|---|---|
| Satisfying your retention | **We** will not make any payment under this policy unless **you** first pay the applicable **retention**. The **retention** shall apply separately to each **claim** unless it is reasonably established that a series of **claims** against **you** directly arise from: |

1. the same original cause, a single source or a repeated or continuing problem in **your media activities**; or

2. a single or continuing investigation or a common set of facts or state of affairs in relation to a defamatory statement;

then all such **claims** that **we** agree are related will be treated as a single **claim** and **you** need only pay a single **retention** and they shall be subject to a single **policy limit**.

Any combination of **defense costs** and **damages** with respect to a **claim** may satisfy the **retention**. The **policy limit** is excess of the **retention.**

| | |
|---|---|
| Subrogation | In the event of any payment under this policy, **we** shall be subrogated to all of **your** rights of recovery against any person or entity for such payments and **you** shall fully cooperate with **us** in asserting such rights of recovery, including executing all papers required and by permitting **us** to prosecute an action in **your** name at **our** expense if so requested, and **you** shall do nothing to prejudice such rights. **We** shall have no subrogation rights against **you**. |

Any recovered amounts shall first be applied on a pro-rata basis to **you** and to **us** for sums **you** or **we** incurred to pursue the subrogation action. The remainder of any recovered amounts shall be distributed on a pro-rata basis both to **you** for payments made under the **retention** and to **us** for **our** payments made in excess of the **retention.**

## VIII.  Definitions

All phrases and words that appear in bold type in this policy (excluding headings), either in singular or plural form, have the meaning that is given to them below:

| | |
|---|---|
| Acquired entity | "Acquired entity" means: |

1. any entity that the **insured** or **existing subsidiary** directly or indirectly acquires or creates during the **policy period**, but only to the extent that the entity produces the same type of **covered media** as the **insured** or **existing subsidiary** and only if the annual revenue or the total book value of the consideration provided in return for acquiring control of the entity is less than 10% of the **insured's** annual revenue at the time of acquisition or creation, and, at the time of acquisition or creation, no **claim** exists against such entity that has resulted or is reasonably likely to result in a payment in excess of 50% of the **retention** (including **defense costs**); it being agreed and understood that at renewal of this policy, **we** shall be entitled to impose such additional premium in connection with these **acquired entity(ies)** which **we** may require;

2. any entity that the **insured** or **existing subsidiary** directly or indirectly acquires or creates during the **policy period** which has an annual revenue of more than 10% of the **insured's** annual revenue, but only if **you** have provided **us** with written notification of the acquisition or creation within 90 days of such, and only if **we** have provided **our** written consent to insure that entity under this **policy**, such consent never to be unreasonably withheld, and **you** have agreed to pay such additional premium as **we** may require.

For purposes of this definition, "acquires" means taking ownership of over 50% of the outstanding voting stock or interest, or assets of any business entity.

| | |
|---|---|
| Additional insured | "Additional insured" means: |

1. any third party but only with respect to the **covered media** furnished by **you** to such "additional insured" and arising out of **your media activities**, and only upon the **insured's** written consent following the **insured's** review of a **claim**; or

Case 8:20-cv-00222-JSM-SPF Document 20-1 Filed 09/10/20 Page 157 of 163 PageID 583
Case 8:20-cv-00222-JSM-SPF Document 21 Filed 08/20/20 Page 4 of 47 PageID 122



# US TMT Multimedia Liability (Admitted)
## Policy form

2. any third party, including but not limited to freelancers, correspondents, stringers, photographers, volunteers and "leased employees," commissioned or engaged to provide **media content** by the performance of **media activities** for or on behalf of the **insured**, **existing subsidiary**, or **acquired entity** for **covered media**; but only with respect to **claims** arising out of such **media content** or **media activities** and only upon the **insured's** written consent following the **insured's** review of a **claim**.

| | |
|---|---|
| Advertising | "Advertising" means advertising, publicity, or promotion in or of **covered media**. |
| Assumed under agreement | "Assumed under agreement" means any obligation assumed by the **insured**, **existing subsidiary**, and/or **acquired entity** to hold harmless or indemnify a party against losses directly resulting from the **media content** of **covered media** supplied by the **insured**, **existing subsidiary**, and/or **acquired entity**, but only if such obligation was assumed by the **insured**, **existing subsidiary**, and/or **acquired entity** orally or in writing prior to any such loss being suffered. |
| Claim | "Claim" means any written assertion of liability or any written demand for financial compensation or injunctive relief or any request to toll or waive any applicable statute of limitations; however, "claim" does not mean any criminal proceeding of any kind. |
| Covered media | "Covered media" means the specific media described as "covered media" in the Declarations. |
| Damages | "Damages" means any monetary amount **you** become legally obligated to pay as a result of any judgment, settlement, arbitration award or liability **assumed under agreement**, including punitive and exemplary damages if insurable under applicable law, pre-judgment interest and post-judgment interest or any judgment or award ordering payment of attorney's fees or costs, in connection with a covered **claim** insured under this policy, but not including any: |

1. civil, regulatory or criminal fines, sanctions, taxes, or penalties, including those imposed by any federal, state, or local governmental body or by ASCAP, SESAC, BMI or other similar licensing organizations;

2. the costs of complying with any injunction or other equitable order or equitable judgment;

3. the costs of recalling, correcting, producing, reproducing, or reprinting any **media content** or the costs of any services incurred in connection therewith or any overhead costs, loss of revenue, salaries, wages or any future cost of doing business;

4. past or future royalties or license fees or any payment owed to a licensor under a license; however, this provision will not apply to any covered portion(s) of any trademark and/or copyright **claim** that results in a damage award that is measured by the amount a claimant would have received had **you** paid to license the claimant's infringed work; or

5. disgorgement of profits or restitution of sums to which **you** were not entitled.

In determining the insurability of punitive damages in connection with a claim, this policy shall apply to the fullest extent permitted by the law of any jurisdiction applicable to the **claim**, and it is understood and agreed that **we** will not affirmatively assert that punitive damages are uninsurable if **we** may refrain from doing so under such applicable law.

| | |
|---|---|
| Defense costs | "Defense costs" means: |

1. all reasonable and necessary attorneys' fees and legal costs incurred in responding to a demand for a retraction or correction in connection with a **claim** insured under this policy;

2. all reasonable and necessary attorneys' fees and legal costs incurred investigating, settling, defending and/or appealing a **claim** insured under this policy; and

3. any premiums on attachment or appeal bonds as a result of a **claim** insured under this policy; however, **we** are under no obligation to apply for or furnish such bond.

"Defense costs" does not include any overhead expenses, general business expenses, salaries, or wages incurred by **you** except with prior written consent from **us**.

| | |
|---|---|
| Existing subsidiary | "Existing subsidiary" means any entity in which the **insured** directly or indirectly owns more than 50% of the assets or outstanding voting shares as of the first day of the **policy period** and if the |



## US TMT Multimedia Liability (Admitted)
Policy form

revenue is included on **your** application for this policy.

| | |
|---|---|
| Insured | "Insured" means the entity identified as "the insured" on the Declarations. |
| Media activities | "Media activities" means: |

1. the gathering, acquisition, investigation, collection, researching, creation and compilation of **media content**;

2. any broadcast, transmission, dissemination, telecast, cablecast, syndication, serialization, podcast, streaming, or production of **media content**;

3. any publication, republication, or dissemination of **media content** including any special editions or supplements to such **media content**;

4. any digital, online, or electronic dissemination of **media content**;

5. the release, distribution, licensing, sale, lease, or exhibition of **media content**;

regardless of the mode or method of communication of such **media content**.

Media content
"**Media content**" means the substance of any communication of any kind whatsoever within **covered media** or **advertising**, regardless of the nature or form of such "media content" or the medium by which such "media content" is communicated, including but not limited to language, data, facts, fiction, music, photographs, images, advertisements, artistic expression, or visual or graphical materials.

| | |
|---|---|
| Policy limit | "Policy limit" means the amount stated as the "policy limit" on the Declarations. |
| Policy period | "Policy period" means the period of time stated as the "policy period" on the Declarations, unless this policy is cancelled, in which case the "policy period" ends on the effective date of cancellation. |
| Retention | "Retention" means the amount stated as the "retention" on the Declarations. |
| We/Us/Our | "We," "Us," and "Our," means the insurance company that provides this insurance. |
| You/Your | "You" and "Your" means: |

1. the **insured,** any **existing subsidiary** or any **acquired entity**;

2. any person who was, is or becomes a director, officer, trustee, partner in, or employee of the **insured**, any **existing subsidiary** or any **acquired entity** but only in respect to **claims** arising out of the course and scope of their duties as such and in the event of their death, incapacity or bankruptcy, any **claim** against their estates, heirs, legal representatives or assigns shall be considered a **claim** against them;

3. any person or entity that takes legal control of the **insured**, **existing subsidiary** or **acquired entity** upon the insolvency or bankruptcy of the **insured**, **existing subsidiary** or **acquired entity**; and

4. any **additional insured**.

## IX.   General matters

Defense arrangements
This is a duty to pay policy, not a duty to defend policy.  Therefore, **you** have the duty to defend **claims** on **your** own behalf under this policy.  This means that, if a **claim** is made against **you**, **you** have the responsibility to retain counsel to defend **you**.  **You** have a choice of requesting that **we** consent to **your** retention of qualified counsel, **our** consent not to be unreasonably withheld, or **you** may retain counsel from the Hiscox Media Panel Counsel List.  **You** may settle a **claim** on **your** own behalf and within the applicable **retention** without **our** prior consent.

**We** shall at all times have the right and opportunity to effectively associate with **you** and **your** counsel in the investigation, defense and settlement of any **claim** under this policy.  While **we** do not have the duty to defend **you**, **we** have the right and option to assume the defense of a **claim** against **you** if **you** fail to comply with any of YOUR OBLIGATIONS TO US (Section VII) under this policy.

**We** will not make any payment in excess of the applicable **retention**, unless such **defense costs**



## US TMT Multimedia Liability (Admitted)
Policy form

or **damages** payments are incurred with **our** prior consent.

**You** may not admit any liability for, make any settlement offer with respect to, or settle any **claim** in excess of the applicable **retention** without **our** prior consent.

**We** will not make any payments of any kind on account of any portion(s) of **claims** or declaratory relief actions not covered under this policy, nor will such payments by **you** apply to satisfy any applicable **retention**. **We** and **you** agree to use best efforts to determine a fair allocation of payments (including **defense costs** and **damages**) between portion(s) of **claims** that are covered under this policy and portion(s) that are not covered under this policy. If a fair allocation cannot be agreed upon, **we** and **you** shall submit the issue to an alternative dispute resolution proceeding in accordance with the Alternative Dispute Resolution provision set forth in GENERAL MATTERS (Section IX) of this policy. During the alternative dispute resolution proceeding, **we** shall be obligated to pay only that portion of any **defense costs** or **damages** that **we** in good faith believe is properly allocated to **us**.

Settlement of claims

If a situation arises where **we** have a good faith belief that a claimant's monetary offer to settle a covered **claim** is reasonable when **you** do not, then **we** will neither compel **you** to accept the settlement offer nor will **we** cease providing coverage for such a **claim** merely because **you** did not accept the offer. However, if **we** recommend that **you** do accept such an offer and **you** elect not to, then **our** maximum payment toward that particular **claim** following the rejection or expiration of that offer will be the outstanding covered **defense costs** incurred up to the date the settlement offer was rejected or expired, plus the amount of the unaccepted settlement offer, minus **your** remaining **retention** on the day the settlement offer is rejected or expires. If this amount is in excess of the **retention**, then at **your** request and subject to **our** discretion **we** will pay this amount to **you** in a lump payment in return for **you** fully releasing **us** from all liability with respect to the unsettled **claim**.

In exchange for this release, **we** will not seek reimbursement for any portion of **our claim** payment to **you**, even if the **claim** is later resolved for less than the amount **we** paid to **you**.

Date of performance of media activities

For purposes of this policy, relevant **media activities** shall all be deemed to have been performed on the date of first dissemination of **your media content** that is the subject of any **claim**. Where a **claim** is made but there has not yet been dissemination of **your media content**, then the relevant **media activities** shall all be deemed to have been performed on the date of the first act in preparation for dissemination of **your media content**, such as the first act of gathering, acquiring or otherwise preparing **your media content** for dissemination.

For purposes of determining the date of performance of relevant **media activities**, where a **claim** or multiple **claims** arise from a series of the same, or substantially the same factually or logically related events, such as multiple broadcasts of the same television advertisement or multiple acts in the course of preparation of the same **media content**, they will all be deemed to have been performed on the date of the very first dissemination or act in preparation of such **media content** and, if such date falls within the **policy period**, they will be treated as related **claims** subject to a single **retention** and a single **policy limit**.

**We** shall have no obligation under this policy to pay any portion of any **claim** or related **claims** that is attributable to relevant **media activities** in or for **your covered media** that were performed or are deemed by operation of this provision to have been performed prior to or after the **policy period**. In no event shall a series of **media activities** giving rise to a **claim** or related **claims** trigger any obligations by **us** under more than one policy issued by **us**.

Confidential sources

**Your** rights under this policy shall not be prejudiced by **your** refusal to reveal the identity of a confidential source, the accidental or unintentional identification of a confidential source, or **your** refusal to produce reporter's notes or any other documents or information **you** obtain in the course of **your media activities** with respect to which **you** have asserted a reporter's privilege or its equivalent under the First Amendment, statute or common law.

Retractions and corrections

**You** shall maintain sole discretion as respects the retraction or correction of **media content** in **your covered media**.

Other insurance

Any payment due under this policy is specifically excess of and will not contribute with any other valid insurance, regardless if the insurance is collectible or not, unless such other insurance is specifically stated to be in excess of this policy. This policy is not subject to the terms set forth in



# US TMT Multimedia Liability (Admitted)
## Policy form

any other insurance policy.

**Cancellation**

The **insured** may cancel this policy at any time by mailing to **us** written notice stating when such cancellation shall be effective. Any unearned premium will be calculated in accordance with the customary short rate table and procedure.

**We** will only cancel this policy if the premium is not paid by the due date, or **you** intentionally make a material misrepresentation to **us** in regard to any **claim** or notice given to **us** under this policy, in which case **we** will provide to the **insured** notice of cancellation in accordance with applicable law. In the event of cancellation for misrepresentation, **we** will return a pro-rata amount of premium unless a **claim** has been made or is pending under this policy before such cancellation takes effect.

**We** are not required to renew this policy upon its expiration.

**Severability**

If a board member, executive officer, in-house counsel, or risk manager of the **insured**, an **existing subsidiary** or an **acquired entity** breaches a condition of or obligation under the policy, their breach shall be attributable to themselves and to all of **you**. If a condition of or obligation under the policy is breached by a person or entity who is not a board member, executive officer, in-house counsel, or risk manager, their breach shall be attributable only to themselves and to any persons among **you** who have condoned, ratified or remained passive after learning of such breach, but not to any of the others of **you**.

**Alternative dispute resolution**

**We** and **you** agree that any dispute arising out of or relating to this policy, including but not limited to its construction, application and validity, or any breach thereof, shall be resolved through either non-binding mediation or binding arbitration in accordance with the commercial arbitration rules of the American Arbitration Association ("AAA") in effect at the time of the dispute, as amended by this policy. Either **you** or **we** may elect the type of Alternative Dispute Resolution ("ADR") to resolve a dispute under this policy. However, **you** have the right to reject **our** choice of ADR process at any time prior to its commencement, in which case **your** preferred choice of either non-binding mediation or binding arbitration shall control. If the first ADR process commenced for a particular dispute is an unsuccessful non-binding mediation, then **you** and **we** agree that such dispute shall only be resolved through binding arbitration in accordance with this provision and that such arbitration proceeding shall not be commenced until a 60-day cooling off period following the last date of the failed mediation has first elapsed.

Each party shall bear its own fees and costs in connection with any arbitration, but the costs incurred through AAA, including the fees and expenses of the arbitrator, shall be shared equally by the parties unless the arbitration award provides otherwise. No award of punitive damages shall be made in any arbitration. All arbitration proceedings shall be held only in a city where either **you** or **we** have a place of business in the United States, at the election of the party commencing arbitration. The decision of the arbitrator or arbitrators is final and binding and any award may be confirmed and enforced in any court of competent jurisdiction.

**Bankruptcy or insolvency**

**Your** bankruptcy or insolvency shall not relieve **us** of any of **our** obligations under this policy.

**Currency**

All references to dollar amounts in this policy are references to and payable in the currency of the United States of America.

# EXHIBIT D

**From:** Morris, Dorcas (CEI-Atlanta) [mailto:Dorcas.Morris@coxinc.com]
**Sent:** Thursday, May 05, 2016 08:27
**To:** TMT Claims
**Cc:** Stryszko, Don (CEI-Atlanta); Greenhill, Becky (CEI-Atlanta); Lovell, Lance (CMG-Atlanta); Doniger, Eden (CEI-Atlanta); kelly.thoerig@marsh.com; Azriel, Rachel (CEI-Atlanta); Stepowany, Jessica (CEI-Atlanta); Vines, Sharron (CEI-Atlanta)
**Subject:** Notification of Complaint - Bollea a/k/a Hulk Hogan v. Cox Radio, Inc.

RE:  Terry Gene Bollea a/k/a Hulk Hogan v. Cox Radio, Inc., et al., Sixth Judicial Circuit, Pinellas County, Florida

TMT Claims:

On behalf of Cox Radio, Inc., attached is a Complaint in the above-referenced lawsuit which includes claims of invasion of privacy.  To our knowledge, the lawsuit has not yet been served.  Defense of Cox Radio, Inc. will be provided by:

Tom Clyde
Kilpatrick Townsend
Suite 2800
1100 Peachtree Street, NE
Atlanta, GA 3309-4528
Tel: 404-815-6038
tclyde@kilpatricktownsend.com

Please acknowledge receipt of this notification by way of a return email.  If you have any questions, please call me at 678-645-0838.  Thank you,

Dorcas M. Morris

Dorcas M. Morris

REDACTED

**Hiscox Motion to Dismiss or Transfer Exhibit D**

REDACTED

Sr. Paralegal, Cox Enterprises, Inc.
678-645-0838

REDACTED